**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

               **Plaintiff(s),**       **CASE NUMBER: 10-20123**
                                      **HONORABLE VICTORIA A. ROBERTS**

**v.**

**D-1 DAVID BRIAN STONE,**
**D-2 DAVID BRIAN STONE, JR.,**
**D-3 JOSHUA MATTHEW STONE,**
**D-4 TINA MAE STONE,**
**D-5 JOSHUA JOHN CLOUGH,**
**D-6 MICHAEL DAVID MEEKS,**
**D-7 THOMAS WILLIAM PIATEK,**
**D-8 KRISTOPHER T. SICKLES,**
**D-9 JACOB J. WARD,**

               **Defendant(s).**
_____/

**ORDER GRANTING DEFENDANTS'**
**MOTIONS FOR REVOCATION OF DETENTION ORDERS**

**I.    OVERVIEW**

       Defendants are charged with conspiracy to overthrow, or to levy war against, the United States Government, and related offenses.

       The Government accuses Defendants of belonging to an alleged anti-government extremist organization, the Hutaree.  The Government says Hutaree planned and trained for specific unlawful acts against local, State, and Federal law enforcement officers in order to levy war against the United States.

       After investigating the Hutaree for approximately two years, the Government made the decision to arrest the Defendants at the end of March 2010, because it felt the

Hutaree's unlawful action was "imminent," and would occur in April 2010.

The discrete issue before the Court today, is whether conditions of bond can be set which will reasonably assure both the Defendants' appearance in Court as required, as well as the safety of the community. The Defendants' guilt or innocence need not be decided at this juncture. Indeed, "the statute neither requires nor permits a pretrial determination of guilt." *See United States v. Johnson*, 2007 WL 1712541 at *1 (E.D. Mich. June 13, 2007) (citing *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991)). Nonetheless, the weight of the evidence the Government has against Defendants is an important consideration. In fact, the seriousness of the charged offenses, the weight of the evidence, and whether the Defendants are a danger to the community, are inextricably intertwined; the Court's own Pretrial Services Agency, which makes bond recommendations, concluded that but for the seriousness of the offenses charged, the Defendants are all people it would normally recommend for release on bond.

The Government relies on the seriousness of the charges as well, to argue that Defendants must be held without bond, because they present a danger to the community. While the Government argues that the Defendants are also a flight risk, its reasons are not persuasive. Importantly, the Court's Pretrial Services Agency concludes that the Defendants do not present such a risk. Dangerousness then, is the Court's major concern in assessing whether Defendants should be released on bond.

While the Government contends that the crimes charged against Defendants go well beyond speech, there is no doubt that controversial, offensive and hate-filled speech is implicated. In their defense, the Defendants disagree that this case

2

implicates anything other than speech, and, that whatever they said, did not amount to a conspiracy to commit illegal acts.  The Defendants argue that the language they used does not "instruct, solicit, or persuade others to commit crimes of violence."  *See United States v. Rahman*, 189 F.3d 88, 117 (2nd Cir. 1999).  They disagree that any of them had an intention to commit seditious conspiracy to overthrow, or levy way against, the United States Government.

The United States is correct that it need not wait until people are killed before it arrests conspirators.  But, the Defendants are also correct: their right to engage in hate-filled, venomous speech, is a right that deserves First Amendment protection.  Because speech is so much a part of the Government's case, Defendants urge the Court to look carefully at the evidence in making its bond decision.  Defendants believe that because the weight of the evidence is insubstantial, the Court should have serious reservations about denying them bail.  Due to the complexity of the case, and the number of Defendants, Defendants say they could be in jail for a long time, awaiting trial.

When a person crosses the threshold between protected speech and illegal advocacy and related activity, is not always clear.  That lack of clarity, and the fact that so much of the Government's proffer was based on words spoken by Defendants, caused the Court to look closely not only at the protection afforded by the First Amendment, but also at the clear principle that crime masquerading as speech deserves no First Amendment protection.  Defendants have not challenged the constitutionality of the Seditious Conspiracy statute, 18 U.S.C. §2384, but they ask the Court to weigh the evidence against them in the context of the standard articulated in *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and consider whether evidence has been

3

presented by the Government, which demonstrates that Defendants engaged in "imminent lawless action . . . likely to . . . produce such action." *Brandenburg*, 395 U.S. at 447.

The Court need not decide now, whether Defendants will be able to raise a First Amendment defense. However, the Defendants do raise principled arguments concerning the First Amendment protection afforded, even to speech we hate.

For the reasons stated, the Court finds: (1) Defendants met their burden to produce evidence in favor of release; and (2) the Government failed to persuade the Court that Defendants must be held until trial. The Court **GRANTS** Defendants' motions and sets bond conditions it believes will reasonably assure their appearance in Court as well as the safety of the community.

## II.    PROCEDURAL HISTORY

### A.    Charges Against the Defendants

All Defendants are charged with: (1) Seditious Conspiracy, in violation of 18 U.S.C. §2384 (Count One); (2) Attempt to Use Weapons of Mass Destruction, in violation of 18 U.S.C. §2332a(a)(2) (Count Two); and (3) Carrying, Using, and Possessing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §924(c)(1) (Count Four). Only David Brian Stone and David Brian Stone, Jr. are charged additionally with Teaching/Demonstrating Use of Explosive Materials, in violation of 18 U.S.C. §842(p)(2) (Count Three). All Defendants, with the exception of Tina Mae Stone and Thomas William Piatek, are charged with a second count of Carrying, Using, and Possessing a Firearm During and in Relation to a Crime of

4

Violence, in violation of 18 U.S.C. §924(c)(1) (Count Five).

These are all serious charges, two of which trigger a presumption that no condition, or combination of conditions, will reasonably assure Defendants' appearance in Court as required, and the safety of the community.

### B.     Detention Hearings

With the exception of Piatek, all Defendants had a detention hearing before Magistrate Judge Donald A. Scheer in the Eastern District of Michigan on March 31, 2010, April 1, 2010, and April 2, 2010. On April 2, 2010, the Magistrate Judge ordered them detained.

Piatek's detention hearing was before Magistrate Judge Paul R. Cherry in the Northern District of Indiana on March 31, 2010. Piatek was ordered detained as well.

All Defendants filed motions to revoke their detention orders. A bond review hearing was held on April 27, 2010 and April 28, 2010.

### III.    STANDARD OF REVIEW

"This Court reviews a defendant's appeal of an order of detention *de novo*." *United States v. Montgomery*, 2010 WL 1052339 at *1 (E.D. Mich. March 19, 2010) (citing *United States v. Leon*, 766 F.2d 77 (2nd Cir. 1985); *United States v. Koubriti*, 2001 WL 1525270 (E.D. Mich. Oct. 16, 2001); *United States v. Runnderstand*, 2008 WL 927774 (E.D. Mich. April 4, 2008)).

In reviewing the appeal, the Court "may 'start from scratch' and hold a new hearing or review the transcripts of the proceedings before the magistrate." *United States v. Hammond*, 204 F.Supp.2d 1157, 1162 (E.D. Wis. 2002) (citing *United States*

*v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991)); *see also United States v. Vasquez*, 241

F.Supp.2d 34, 35 (D. Me. 2003) (court considered both the transcript of the hearing

before the Magistrate Judge and additional evidence produced at a hearing).

For its *de novo* review, this Court considered the exhibits, testimony, and proffers

introduced at the detention hearings; and, the additional exhibits, testimony, and

proffers introduced at the bond review hearing.

## IV.   APPLICABLE LAW AND ANALYSIS

Upon the appearance before a judicial officer of a person charged with an
offense, the judicial officer shall issue an order that, pending trial, the
person be –

.    .    .

(2)    released on a condition or combination of conditions .
. .; [or]

.    .    .

(4)    detained[.]

18 U.S.C. §3142(a).

Detention pending trial is authorized by 18 U.S.C. §3142(e)(1) when there is "no

condition or combination of conditions [that] will reasonably assure the appearance of

the person as required and the safety of any other person and the community[.]"  "The

law requires reasonable assurance but does not demand absolute certainty[.]"  *United*

*States v. Alston*, 420 F.2d 176, 178 (D.C. Cir. 1969); *see also United States v. Orta*, 760

F.2d 887, 891-92 (8th Cir. 1985):

the district court erred in interpreting the "reasonably assure" standard set
forth in the statute as a requirement that release conditions "guarantee"
community safety and the defendant's appearance.  Such an
interpretation contradicts both the framework and the intent of the pretrial
release and detention provision of the 1984 Act.  Congress envisioned the

6

pretrial detention of only a fraction of accused individuals awaiting trial. The district court's interpretation, however, virtually mandates the detention of almost every pretrial defendant: no other safeguard can "guarantee" the avoidance of the statutory concerns.

Two of the charges against the Defendants – Attempt to Use Weapons of Mass Destruction; and, Carrying, Using, and Possessing a Firearm During and in Relation to a Crime of Violence – create a presumption that no condition, or combination of conditions, will reasonably assure Defendants' appearance in Court as required, and the safety of the community. *See* 18 U.S.C. §3142(e)(3).

However:

the government may not merely come before the trial court, present its indictment, and thereby send the defendant off to jail, foreclosing any further discussion. Rather the defendant . . . must be afforded the opportunity for a hearing at which he may come forward with evidence to meet his burden of production, leaving on the government the ultimate burden of persuasion.

*United States v. Hurtado*, 779 F.2d 1467, 1478 (11th Cir. 1985). The presumption does not *de facto* result in an irrebuttable presumption. *See United States v. Hazime*, 762 F.2d 34, 35 (6th Cir. 1985) (18 U.S.C. §3142(e) creates a rebuttable presumption). Nor does the statutory presumption of detention shift the burden of proof from the Government, which must still establish that the Defendants should be detained. *See United States v. Matir*, 782 F.2d 1141, 1146 (2nd Cir. 1986); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985).

The Government must persuade the Court: (1) by a preponderance of the evidence that no conditions of release can reasonably assure Defendants' appearance in Court as required; and, (2) by clear and convincing evidence, that no conditions of release can reasonably assure the safety of the community. *See United States v.*

7

*Cashin*, 739 F.Supp. 1107, 1110 (E.D. Mich. 1990).

Even if the Defendants rebut the presumption in favor of detention, the

presumption still remains as one factor to be considered in determining whether the

Defendants should be released or detained.  *United States v. Dillon*, 938 F.2d 1412,

1416 (1st Cir. 1991).  Additional factors for the Court to consider include:

(1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2)     the weight of the evidence against the person;

(3)     the history and characteristics of the person, including -

(A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. §3142(g).

The Court reviews these factors while keeping in mind Defendants' presumption

of innocence.  *See* 18 U.S.C. §3142(j) ("Nothing in this section shall be construed as

modifying or limiting the presumption of innocence").

### A.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED

#### 1.     Seditious Conspiracy, 18 U.S.C. §2384

18 U.S.C. §2384 says:

If two or more persons . . . conspire to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, . . . they shall each be fined . . . or imprisoned not more than twenty years, or both.

Seditious conspiracy is a crime of violence.

The Indictment alleges that the Defendants conspired to levy war against the United States by: (1) acquiring firearms, magazines, ammunition, explosives and other components for destructive devices, uniforms, communication equipment, supply and ammunition vehicles, and medical and other supplies; (2) engaging in military-style training with firearms in anticipation of the planned for military operations, including firearms and explosives training, weapons proficiency drills, patrolling and reconnaissance exercises, close quarter battle drills, "man-down" drills, and instruction and demonstrations regarding the manufacturing and use of destructive devices and weapons of mass destruction; (3) preparing defensive fighting positions, ambush kill zones, and storage bunkers; (4) planning to kill a local law enforcement officer and attack law enforcement vehicles with improvised explosive devices ("IEDs") with explosively formed projectiles during the funeral procession; (5) planning to engage in a covert reconnaissance exercise in April 2010, during which anyone they encountered who did not acquiesce to Hutaree demands would be killed; (6) planning to train for the April 2010 exercise in February and March; and (7) traveling to Kentucky to attend a summit of militia groups in order to facilitate better communication, cooperation, and coordination between the various militias (Defendants never reached Kentucky; they turned around due to bad weather).

9

### 2.      Attempt to Use Weapons of Mass Destruction, 18 U.S.C. §2332a(a)(2)

18 U.S.C. §2332a(a)(2) says:

A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction[] against any person or property within the United States, and

(A)      the mail or any facility of interstate or foreign commerce is used in furtherance of the offense;

(B)      such property is used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce;

(C)      any perpetrator travels in or causes another to travel in interstate or foreign commerce in furtherance of the offense; or

(D)      the offense, or the results of the offense, affect interstate or foreign commerce, or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce[]

.      .      .

shall be imprisoned for any term of years or for life[.]

A "weapon of mass destruction" includes any explosive bomb, grenade, mine, or other similar device.  *See* 18 U.S.C. §2332a(c)(2)(A) and 18 U.S.C. §921.

Attempt to Use Weapons of Mass Destruction is a crime involving explosives.

The Indictment alleges that the Defendants knowingly attempted to use explosive devices against local, State, and Federal law enforcement officers and vehicles; and, email, the Internet, and telephones, were used in furtherance of this offense.

### 3.      Teaching/Demonstrating Use of Explosive Materials, 18 U.S.C. §842(p)(2)

18 U.S.C. §842(p)(2) says:

It shall be unlawful for any person –

(A)     to teach or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute by any means information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, with the intent that the teaching, demonstration, or information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence; or

(B)     to teach or demonstrate to any person the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute to any person, by any means, information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, knowing that such person intends to use the teaching, demonstration, or information for, or in furtherance of, an activity that constitutes a Federal crime of violence.

Teaching/Demonstrating Use of Explosive Materials is a crime involving explosives.

The Indictment alleges that David Stone and David Stone, Jr.: (1) taught and demonstrated how to make or use weapons of mass destruction with the intent that the teaching or demonstration be used to further the Seditious Conspiracy crime; and, (2) distributed information pertaining to the manufacture or use of weapons of mass destruction with the intent that the information be used to further the Seditious Conspiracy crime.

### 4.      Carrying, Using, and Possessing a Firearm During and in Relation to a Crime of Violence, 18 U.S.C. §924(c)(1)

18 U.S.C. §924(c)(1) says:

any person who, during and in relation to any crime of violence . . . for which the person . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . . be sentenced to a term of not less than 5 years[.]

11

Carrying, Using, and Possessing a Firearm During and in Relation to a Crime of Violence is a crime involving a firearm.

The Indictment alleges that on at least one occasion, Defendants: (1) knowingly carried and used firearms during and in relation to the Seditious Conspiracy and Attempted Use of Weapons of Mass Destruction crimes; and (2) knowingly possessed firearms in furtherance of such crimes.

This factor, the nature and circumstances of the offenses charged, weighs in favor of detention.

**B.      (1) THE WEIGHT OF THE EVIDENCE AGAINST THE DEFENDANTS; AND (2) THE NATURE AND SERIOUSNESS OF THE DANGER TO THE COMMUNITY THAT WOULD BE POSED BY THE DEFENDANTS' RELEASE**

Under most circumstances, courts are cautioned to give the least amount of consideration to the weight of the evidence against a defendant in deciding whether conditions of bond can be set that will reasonably assure his appearance in Court and the safety of the community.  *See Johnson*, 2007 WL 1712541 at *1.  While this is most true when the evidence is strong and the possibility great, that the weight of the evidence might overshadow other considerations, when the weight of the evidence is weak, release on bond should be more favored.

Because of the serious nature of the charges against the Defendants, the Court's Pretrial Services Agency assumes that the presumption in favor of detention cannot be overcome, and that no conditions can be set to assure the safety of the community. Similarly, the primary argument the Government launches against the Defendants' release on bond, is the seriousness of the charges.

12

For these reasons, the Court finds that the weight of the evidence against the Defendants, and the potential danger to the community based on the seriousness of the charges, are the most important factors for it to consider, and they must be considered together.

### 1.    Overthrow, or Levy War Against, the United States Government

A major question is whether the Defendants even discussed or planned crimes against the United States.

The evidence the Government proffered included:

1.    Defendants have a video on the Hutaree website in which they burn a *United Nations* flag – not the *United States* flag – and raise the Hutaree flag.

2.    A speech David Stone made – at the request of the Government's undercover agent – to Hutaree members in a van on February 6, 2010:

So, do I think all cops out here would . . . fight right alongside some Chinese trooper?  Heck yeah.

.    .    .

People in this nation as well as some around this world are waiting for those individuals like you . . . to actually make the decision to go to war against the evil greedy New World Order.  [According to David Stone, the New World Order is a terrorist organization].

We are free and should not be afraid or ashamed to admit we are the American militia.  We outnumber them.  As long [as] we let them terrorize any American through fear and intimidation, then they are winning this battle and we should step up to the fight that they have started and finish it. . . .  As we sit here, the New World Order, continues to put all constitutional loving people in this nation on their national criminal watch lists, just one more step toward, toward total control.  But keep this in mind, they may have their lists, but we also . . . we are also making lists of these terrorists that are destroying our nation. . . .  We are everywhere and need to understand this for it is called America, land of the free. This is our home.  We own it.  Not them.

13

We cannot allow this any more if we are serious about taking our nation back from the elitist New World Order.  They are few in number.  We are many.  Every day we watch ever so close for those evil blue helmets to appear on our streets.  But as long as their Interpol law enforcement mercenaries called the brotherhood working for the New World Order and doing such a great job then we don't have a need to watch for these new foreign armies to come to our shores.  They are already here.  We need to actually stop and see who the enemy has hired to do the job of destroying what is left of our nation and our freedoms.  This is our nation. . . .  It's our cross to bear and we need to ask the simple question, how much longer are you going to put up with a foreign army controlling your streets and highways?  The HUTAREE is not an ally with everyone across this nation but make no mistake about it, we will fight alongside anyone who calls the New World Order, the enemy and sees them as terrorists as we do.

In closing I want to say that we need to quit playing this game with these elitist terrorists and actually get serious because this war will come whether we are ready or not. . . . [W]e have rattled and warned the New World Order.  Now it's time to strike and take our nation back so that we may be free again from tyranny.

This so-called speech  - never delivered outside the van - speaks of reclaiming

America, not overthrowing the United States Government.

### 2.    The Government's Belief that Defendants would Engage in Unlawful Activity in April 2010

In a January 9, 2010 audio recording that the Government introduced at the

detention hearing, David Stone and Joshua Matthew Stone make the following

statements:

**DAVID STONE**:    In April, we're gonna get dropped on the ground and do a real op.  April's gonna consist of two training[s].  It'll be the second Saturday of April, and the forth[sic] Saturday of April.

.    .    .

**JOSHUA STONE**:  Welcome to your first real training.

.    .    .

14

**JOSHUA STONE**:   And as far as this training in April, don't be afraid to pull the trigger on anybody, if we have to.

.     .     .

**JOSHUA STONE**:   Now if we do wind up plugging somebody, welcome to ah ah, the first training of really shooting someone.

There is no mention in the proffered recording of violence against the United States or against law enforcement officers; there is no plan of action announced. Indeed, when Joshua Stone was asked who the targets would be in April 2010, his response was "I don't know."  The recording suggests that the Hutaree planned to engage in training, in April; David Stone specifically said two *training* sessions will occur on the second and fourth Saturdays in April.

In addition, while David Stone is heard to say, "We're gonna practice it, and practice it and practice it and practice it.  It has to go off flawless," there may have been one training session between January 9, 2010 and the date of their arrest, March 2010; no proffer was offered that Defendants purchased weapons, in addition to their legal arsenal; or, that they put a plan in place to "overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them."

Recordings of meetings between various Defendants after January 9th shed no light on a plan to commit Seditious Conspiracy.  *See* audio recordings dated February 6, 2010 and February 20, 2010.

Special Agent Leslie Larsen was as vague in her testimony, as were these audio recordings.  She testified at the bond review hearing that the Defendants "may have been planning something."

15

### 3.   Violence Against Members of the Judicial Branch of Government, Including Local Law Enforcement Officers

Some Defendants do have a discussion about killing members of the Judicial

Branch of the United States Government (other than local law enforcement officers).

*See* February 20, 2010 recording:

| | |
|---|---|
| **DAVID STONE**: | Everybody wants to go after the federal agents, but you realize, the big head is way up here. Start down here, start, whack! |
| **JOSHUA STONE**: | What happened? |
| **DAVID STONE**: | You take a step out that ladder, what happens? The big head to come bump, bump . . . |
| **JOSHUA STONE**: | It's like a totem pole.  (Sound effects). |
| **DAVID STONE**: | you take out his minions because he's got all these minions protecting him. |
| | .    .    . |
| **MICHAEL MEEKS**: | There[sic], there[sic] just as easy to get to as anybody else though.  That's my point.  If you can start right at the top.  They're easy. |
| **KRISTOPHER SICKLES**: | Take the judge out, take the judge. |
| **DAVID STONE**: | If you can get to them. |
| | .    .    . |
| **MICHAEL MEEKS**: | I'm lookin' at enough people right here to take out virtually anybody.  And I mean virtually anybody.  You just got to be motivated enough to go do it. |

Some Defendants also discuss killing local law enforcement officers.  *See*

February 6, 2010 recording:

| | |
|---|---|
| **DAVID STONE**: | We're gonna . . . we're gonna pop [a Hudson |

16

police cop] – guaranteed!

.      .      .

| DAVID STONE: | We're gonna pop every one of [the Hudson police cops]. There we go. "Hey, you think we got him?" "Yeah!" "Why?" "There[sic] all dead." |

| DAVID STONE: | You kill enough cops, you can't get enough people to take the job. Why? I'm not gonna become a cop and go die. |

| JOSHUA STONE: | Yeah. |

| DAVID STONE: | Become a cop and last, last two weeks on the street, nah, that's ok. I'll stay working at Burger King. |

*See also* February 20, 2010 recording:

| DAVID STONE: | I think we gotta just start huntin[sic] 'em here pretty soon. Just group it up and we'll just go find 'em. They're easy to find, they're sittin[sic] along side the road and they got these red and blue lights on top of their car. They're not hard to find! |

| MICHAEL MEEKS: | Sure it's like, it's like a K-Mart super special, or whatever. |

.      .      .

| KRISTOPHER SICKLES: | think how scared they would all be if people were just randomly killing cops like on a mass basis, you know what I mean? |

| DAVID STONE: | Well like I say, if we steal a really nice car, we just go flyin[sic] down the road to, to find them and the other two cars are followin[sic] along, la la la. We obeyin[sic] the speed limit of course, wearin[sic] their seat belt, lookin[sic] like they're nice people, and you do nothing more than just try to pick one off. And he's |

good, he will come out of nowheres[sic] to find you, bam!  He's gonna be like (siren sound effect), it's like hehe, okay, I'll pull over, no problem.  (Sound Effect) And the other two vehicles just roll up and just go, boom, boom, boom, boom, boom!

.    .    .

**DAVID STONE**:   You leave him layin' dead on the pavement. And you take off go finding the other one.

.    .    .

**KRISTOPHER SICKLES**:   You know what we do [David Stone].  There's a local uh, place called Sawmill Creek and they have like, it's like a big banquet hall and like every year they have this big police meeting and they're all unarmed and there's like probably hundreds of them there.  We just walk in-

**DAVID STONE**:   No, no, no, no that's just where we just sit back, we go.  700 hundred!  Kabunk!  Kabunk! As they're sittin[sic] there, lalala, I'm a cop, lala (Sound effect).

.    .    .

**DAVID STONE**:   Or, or better yet, we shoot one, from a distance, high powered rifle, you sit back you take him out – you go, Kapop!  You just shoot one.  And then you just kinda sit back, they'll pack out huntin[sic] for ya.  Try to find out who you are, but they have this thing, that everybody has, and it's called a funeral.  Now for that funeral, you'll have cops from every state of the country come where?  To his funeral.

.    .    .

**DAVID STONE**:   Why not just take care of the situation? Kabunk!  Kabunk!  (Sound effect).

18

.     .     .

**DAVID STONE**:        I, I'm thinkin' IEDs and you just blow the whole convoy up.  Boom!

.     .     .

**KRISTOPHER SICKLES**:  Sneak in their house, poison their milk.

.     .     .

**DAVID STONE**:        No, no, you set their house on fire and you have another team sitting back watching the local fire department try and come down the road and it's just pop!  Pop!  Pop!  Pop!  Pop! As trucks go baba, "we're over heating", Rrrr (Sound effect).  "Hey, we're not gonna make it to this fire."

.     .     .

**DAVID STONE**:        I mean there's a hundred and one scenarios you could use.

.     .     .

**DAVID STONE**:        I know where four county cops live right now. We can go burn their house down (Sound effect).

(Laughter)

.     .     .

**JOSHUA STONE**:       I know where at least one Hillsdale undercover cop lives.

.     .     .

**KRISTOPHER SICKLES**:  Hell yeah, I know where half the Huron cops live.

**DAVID STONE**:        All the cops are dead in their houses.  Who's gonna come out and fight us?

19

**KRISTOPHER SICKLES**:   Slash their tires first, you know what I mean.

.      .      .

**DAVID STONE**:      everybody has a beef against the guys in
uniforms.

.      .      .

**KRISTOPHER SICKLES**:   I remember I asked [David Stone] one time, I'm
like, I'm like, I'm like, "would you ever be a
cop?"  He said, "No, cause then I have to kill
myself."

(Laughter).

Discussions about killing local law enforcement officers – and even discussions

about killing members of the Judicial Branch of Government – do not translate to

conspiring to overthrow, or levy way against, the United States Government.

Notably, on the February 20, 2010 recording, the Defendants laugh, make

sounds, and appear to talk over one another.  There is also a discussion of strippers.

### 4.    Mere Presence

The Government introduced three audio recordings into evidence.

Present for the audio recording dated January 9, 2010 were David Stone, David

Stone, Jr., Joshua Stone, Joshua John Clough, Michael David Meeks, Kristopher T.

Sickles, and Jacob J. Ward.   Tina Stone and Piatek were not there.  David Stone and

Joshua Stone were the only speakers in that recording.

Present for the audio recording dated February 6, 2010 were David Stone,

Joshua Stone, Clough, Meeks, and Piatek.  David Stone Jr., Tina Stone, Sickles, and

Ward were not.  David Stone, Joshua Stone, and Piatek are the only speakers in that

recording.

Present for the audio recording dated February 20, 2010 were David Stone, Joshua Stone, Clough, Meeks, Sickles, and Ward.  They all spoke in that recording. Absent were David Stone, Jr., Tina Stone and Piatek.

The Government proffers no evidence that the non-speaking Defendants supported, adopted, or even heard the positions advocated by the speakers.  Assuming the tape recordings evidence the commission of a crime, mere presence at the scene of a crime, or merely knowing that a crime is being committed or is about to be committed, is not sufficient to find the Defendants committed that crime.  In order to find the Defendants guilty, the Government must prove beyond a reasonable doubt, that in addition to being present or knowing about the crimes, the Defendants knowingly and deliberately associated themselves with the crimes in some way as a participant – someone who wanted the crime to be committed – not as a mere spectator.  No proffer was made concerning the non-speaking Defendants.

### 5.	Similarly-Situated Non-Indicted Hutaree Members

The Government proffered that there are approximately 25 Hutaree members who were not indicted.  Some of these individuals are similarly situated with the Defendants; they were involved in the military-style training that the Government says precipitated the Defendants' arrest.  The fact that the similarly situated Hutaree members were not indicted is an indication that the offenses charged against these Defendants may not be as serious as the Government contends.

### 6.	Respect for Lawful Authority

The Government argues that the Defendants pose a danger to the community

because they lack respect for lawful authority.  However, when the Defendants were arrested, they all surrendered peacefully, including Joshua Stone, who had six firearms at his disposal, and who allegedly said the Hutaree would go to war if the Government did not release his co-Defendants within two hours.

There was no resistance, no weapons drawn, no threats made to the arresting agents, and at least one Defendant gave a statement to the agents.

While Meeks and Sickles had in the past allegedly expressed a desire to die "suicide-by-cop," neither attempted to do so when they were arrested.

### 7.    Assaultive Behavior

The Government proffered that: (1) Meeks suggested blowing up a bridge across the Raisin River when "the enemy comes"; (2) Meeks said, "We gotta . . . start over man.  We gotta get rid of the judicial system . . . everybody.  They need to die"; (3) Meeks discussed "capping" a member of law enforcement and taking his or her weapons; (4) in response to a claim that former Senator Edward Kennedy had a CCW permit, Meeks said, "They think they're different.  Wait till they find out they bleed exactly the same"; (5) Sickles expressed a desire to detonate an IED outside the Huron, Ohio Police Department; (6) Sickles left another militia group because "They weren't doing enough"; (7) Tina Stone was ready and willing to use a rifle to intervene in a traffic stop involving another Hutaree member; (8) all Defendants who traveled to the Kentucky summit to meet with other militias had guns; (9) Clough stated during a "live-fire" training and a discussion regarding killing police officers, that "This would not be a pretty day for any officers coming down here"; (10) Clough referred to a list of elected officials, federal judges, and other leaders as a "hit list" for the Hutaree; (11) Clough

22

discussed killing a law enforcement officer during a traffic stop by shooting him in the back with a rifle; (12) Ward referred to the Prosecutor's Office in his home county and local law enforcement as his "enemies"; and (13) Ward told an FBI employee that she would "hear about [her former employer] in the news and maybe even read about it."

However, none of the Defendants has ever engaged in assaultive behavior toward law enforcement, including during the two years that Special Agent Larsen said the Hutaree was under investigation.

### 8.   Legality of Weapons

There is no evidence that the Defendants could not legally possess weapons.  All of the Defendants' weapons and ammunition were legal, with the exception of some weapons found in David Stone's house.  The Government proffers that David Stone had 3-4 firearms that were not the legal length (according to the Government, at least one of these firearms may belong to David Stone, Jr.).  Even assuming this proffer is accurate, there is no evidence that David Stone, or David Stone, Jr., used weapons to commit an assaultive crime.

In addition, the Government proffers that Joshua Stone engaged in illegal efforts to convert a semi-automatic weapon into an automatic weapon.  There is no evidence that any automatic weapons were found.

Law enforcement seized all of the Defendants' ammunition, firearms, and other dangerous weapons.

### 9.   "Live-Fire" Training

The Government proffered that the Defendants engaged in "live-fire" training.

However, according to Defendants, "live-fire" training means they fired at a backstop (i.e., a dirt mound) on a private range in the woods twice a year.  The Defendants also proffered that they used unloaded weapons when they trained in the woods.

The Government offered no contrary evidence.

### 10.   Militia Associates

While some of the Defendants have a history of ties to at least one other militia organization, the Court believes it can impose a condition of release to alleviate the Government's concern that David Stone and Joshua Stone have militia associates in Michigan, Ohio, Kentucky, Texas, Oklahoma, and Indiana; that Tina Stone can re-group with other militias; and, that Clough, Ward, and Sickles are members of another militia group (which the Government concedes is not illegal).

In sum, these two factors -- the weight of the evidence and the seriousness of the danger to the community -- weigh in favor of release.

While the Court has not analyzed the evidence pertaining to the other charges against Defendants, those charges all relate to the Seditious Conspiracy charge.  It is noteworthy, however, that there is no evidence that the agents found explosive devices, despite the Government's proffer that Defendants had an urgency to have explosive devices made for the April 2010 operation.

### C.   HISTORY AND CHARACTERISTICS OF THE DEFENDANTS

All Defendants have family ties and ties to their respective communities, none of the Defendants was on probation or parole when they were arrested, and none of the Defendants has the financial resources to flee.

The Court now discusses each Defendant individually.

24

### 1. David Stone

David Stone is 45-years-old, and is married to co-Defendant Tina Stone. He is the father of four adult children.

David Stone worked at Performance Engineering in Adrian, Michigan from July 2007 until July 2008. In 2008, he worked for a few months at Iott Farms in Petersburg, Michigan. He currently works as a Forklift Driver for Demlow Products in Clayton, Michigan.

He does not have any physical or mental health problems. He does not drink alcohol or use illegal drugs. The results of his drug test were negative.

David Stone has no criminal history.

### 2. David Stone, Jr.

David Stone, Jr. is 19-years-old, and is engaged to Brittany Bryant (the Government vaguely alluded to its belief that Ms. Bryant participated in Hutaree training sessions). David Stone, Jr. has a 6-month-old son with Ms. Bryant.

David Stone, Jr. has seasonal employment on the Vandervener farm.

People describe David Stone, Jr. as a "respectful man," "successful," "kindhearted," "responsible," "everything anyone could ask for," a "great father," "very considerate," a "great asset to the community," a person who "desire[s] to work and do things right," a person who "learn[s] from mistakes," and is "100% trustworthy, honest, sensitive, compassionate, and caring."

David Stone, Jr. does not have any physical or mental health problems. He does not drink alcohol or use illegal drugs.

He has no criminal history.

### 3.    Joshua Stone

Joshua Stone is 21-years-old, and is married to Shannon Stone (Shannon had some involvement in the Hutaree).  Shannon indicated that Joshua Stone helped her graduate from high school, and she wants to help Joshua Stone get his GED.  Shannon also wants to help Joshua Stone get out of the "militia mess."

Joshua Stone has seasonal employment.

Joshua Stone does not have any physical or mental heath problems.  He does not drink alcohol or use illegal drugs.

He has no criminal history.

### 4.    Tina Stone

Tina Stone is 44-years-old, and is married to co-Defendant David Stone.  She is the mother of three adult children from prior marriages, and she is a Grandmother.

She is a graduate of Columbia Central High School in Brooklyn, Michigan.

For a time, Tina Stone owned a construction company called Inspirational Designs (2002 until 2007).  From 2007 until 2008, she worked for Stratford Plastic Components as a Press Operator.  From 2008 until January 2010, she worked for Moore Industries as a Press Operator.  She has also worked in nursing homes, and as a substitute teacher's aide with Head Start.  Tina Stone is currently unemployed.

Tina Stone does not have any physical or mental health problems.  She does not drink alcohol or use illegal drugs.

Tina Stone's criminal history consists of: (1) a contempt of court conviction from

1987, in which she was sentenced to 15 days in jail; and (2) a 2006 conviction for obstructing a police officer. She was sentenced to six months, non-reporting probation. This obstruction charge stemmed from her efforts to stop her 17-year-old daughter from leaving the house with a 15-year-old boy.

### 5. Joshua Clough

Clough is a 28-year-old single man who lives with his parents.

Clough was a self-employed videographer for nine years before he became a security guard at a shopping mall in Adrian, Michigan (he may no longer have this job due to his arrest on these charges).

Clough does not have any physical or mental health problems. He does not drink alcohol or use illegal drugs.

Clough has no criminal history.

### 6. Michael Meeks

Meeks is a 40-year-old single man. He does not have children.

Meeks attended Washtenaw Community College, earning a paramedic certification.

Meeks was in the United States Marines from 1988-1992, including combat service in Desert Storm. Before he was discharged from active duty, he earned a Rifle Expert Badge, a Certificate of Appreciation, a Sea Service Deployment Ribbon with one star, a National Defense Service Medal, a Combat Action Ribbon, a Southwest Asia Service Medal, a Good Conduct Medal, a Meritorious Mast, and a Kuwait Liberation Medal.

Meeks works as a truck driver for Interactive Metals in Adrian, Michigan (his driving is confined to a two-hour radius around the City of Adrian).  Meeks' employer, Matthew Anderson, describes Meeks as "a valuable part of our business team," and "dedicated, hard-working and very loyal as an employee."  According to Mr. Anderson, "It would be a great disappointment for us to lose [Meeks]."

At the bond review hearing, the Government stated that David Stone allegedly asked Meeks to obtain metal pieces for IEDs.  However, no evidence was presented that Meeks actually obtained metal from his employer.

Meeks' mother, Sylvia Meeks, testified at the bond review hearing and indicated that Meeks uses her address for mail, instead of listing his address with the United States Postal Service, because it is more convenient for Meeks to get his mail when he visits his parents.

Although Meeks has not lived at the address listed on his driver's license for over five years, Meeks says he provided the agents his current address when he was arrested on these charges.

Meeks proffered a newspaper article that says he helped search for two missing citizens with the Bridgewater Township Officers.

Meeks does not have any physical or mental problems.  He does not use drugs, but his mother believes he drinks alcohol to excess.

Meeks has a misdemeanor conviction from 1997 for drunk driving.

### 7.   Thomas Piatek

Piatek is a 47-year-old single man.  He has a 25-year-old daughter and two granddaughters, whom he helps support.

28

Piatek has worked as a truck driver for Meyer Industrial Container in Chicago, Illinois for 17 years.

Piatek is the primary caregiver for his special needs brother, participates in the Fourth of July parade, and is an associate member of the Fraternal Order of Police.

People describe Piatek as "a down-to-earth person," someone who would "help anybody," someone who does not engage in "aggressive" behavior or "any kind of violence," someone who "goes to work every day," and someone who would "probably be the first one to render aid [if there was somebody hurt]."

Piatek does not have any physical or mental health problems.  He does not use drugs or drink alcohol.  His urinalysis results were negative.

In 1990, Piatek was charged with Aggravated Assault and Driving on a Median. Piatek successfully completed one year of supervision, and the case was dismissed.

### 8.    Kristopher Sickles

Sickles is a 27-year-old married man with two minor children.

Sickles worked as a salesperson at GNC for two years, and The Exchange music store for two years before he became unemployed in July 2009.  If released, Sickles would stay home and take care of his children, while his wife works outside the home.

Sickles does not have any physical or mental health problems, but he was prescribed medication for ADHD as a child.  Sickles has a history of marijuana, cocaine, and LSD use.  He used marijuana every other day for over ten years; he last used the drug during the week of March 22, 2010.  Sickles has not used LSD in over ten years. His last cocaine use was one year ago.

Sickles was charged in 2004 with Felony Disseminating Matter Harmful to

Juveniles.  The offense was reduced to a misdemeanor, and he paid fines and costs. Sickles had 17 police reports filed against him at the Huron Police Department.

The Government proffered that Sickles made the statement that he killed his cat "to kind of see if I could do it . . . I felt like it was like a coming of age thing . . . kill something . . . that . . . I had a feeling for."  However, Special Agent Larsen testified that Sickles killed his cat approximately 10 years ago.

The Government argues that Sickles is the self-proclaimed leader of the Ohio Militia.  Sickles proffered at the bond review hearing, however, that the Ohio Militia has two members – one of whom is Sickles.

Sickles proffered a newspaper article in which the Police Chief of Huron, Ohio said that he did not believe Sickles was a danger to the community.

### 9.    Jacob Ward

Ward is a 33-year-old single man.  He does not have children.

Ward received his GED in 1997.

Ward does not have any physical problems.  There is a question regarding his mental health, although he has never been diagnosed with a mental illness.  Ward's mother describes Ward as delusional and resilient, but respectful of authority.

Ward worked steadily from November 2002 until September 2008 at Jim's Pizza Box in Huron, Ohio.  From December 2008 until June 2009, he worked at the Sandusky Mall in Sandusky, Ohio.  Ward has a potential job as a delivery driver for Domino's Pizza.

Ward does not drink alcohol or use illegal drugs.

In 1996, Ward was charged with Contributing to the Unruliness of a Child; this

charge was dismissed.  In 1997, Ward was convicted of assault and battery.  In 2008, Ward was charged with Expired Operator's License.

In sum, this factor, the history and characteristics of the Defendants, weighs in favor of their release.

### D.   COURT'S FINDINGS

The Court reviewed all exhibits, testimony, and proffers, and finds that each Defendant produced sufficient evidence to rebut the presumption in favor of detention. The Government fails to persuade the Court, by a preponderance of the evidence, that there are no conditions that will reasonably assure the Defendants' appearance in Court as required.  The Government also fails to persuade the Court by clear and convincing evidence, that there are no conditions that will reasonably assure the safety of the community, if Defendants are released.

Importantly, there have been other defendants in this district, charged with serious crimes, who were released on bond.  For example:

In 1987, 13 defendants were charged in Fort Smith, Arkansas with seditious conspiracy, murder, robbery, and conspiracy to set up a separate Aryan nation by overthrowing the United States by terrorism.  Co-defendant Robert Miles, then the former Grand Dragon of the Ku Klux Klan ("KKK") and a white supremacist leader, was released on bond after spending several weeks in prison following his arraignment in May 1987.  When he was the Grand Dragon of the KKK, Mr. Miles was convicted and served time for conspiring to bomb school buses in an attempt to stop the integration of public schools in Michigan.  *See* Mattias Gardell, *Gods of the Blood: The Pagan Revival and White Separatism*, p. 350, n. 35.  Mr. Miles remained on bond until his trial in March

31

1988.  Mr. Miles was supervised in this district; he did not have any bond violations.

In *United States v. Nagi, et al.*, docket number 06-20465, co-defendant Aref Nagi was charged with: (1) Conducting or Participating in the Affairs of an Enterprise Through a Pattern of Racketeering Activity; (2) Conspiracy to Participate in the Affairs of an Interstate Enterprise Through a Pattern of Racketeering Activity; (3) Assault with a Dangerous Weapon in Aid of Racketeering; (4) Conspiracy to Assault with a Dangerous Weapon in Aid of Racketeering; (5) Conspiracy to Transport Stolen Property in Interstate Commerce; (6) Conspiracy to Alter, Remove, and Obliterate Vehicle Identification Numbers; (7) Conspiracy to Possess with Intent to Distribute, and Distribution of, Controlled Substances; and (8) Use of a Firearm During and in Relation to a Crime of Violence.  After Mr. Nagi was denied bond three times, he appealed his detention to the Sixth Circuit.  The Sixth Circuit found that Mr. Nagi's pretrial detention was excessive, and compared him to some of his co-defendants charged with conspiracy to commit murder - who were released:

> The charges against Nagi are serious, but they do not include the even more serious conspiracy to commit murder charges that some of Nagi's co-defendants face, some of whom remain free on bond, and none of whom have (sic) spent anywhere close to three-plus years in detention. Last, we must consider the strength of the evidence underlying the detention, *i.e.*, the evidence of risk of flight and dangerousness.  Nagi has surrendered his passport, and the risks of flight and injury to other persons and the community can be ameliorated by house arrest and an electronic tether. On balance, we conclude that the relevant factors weigh in favor of release.

*United States v. Nagi*, No. 09-1995 at p.4, (6th Cir. Dec. 14, 2009) (citation omitted).

In *United States v. O'Reilly, et al.*, docket number 05-80025, co-defendant Archie Broom was charged with Premeditated Murder with a Firearm During and in Relation to

a Violent Crime.  With no objection from the Government, Mr. Broom was released on

bond after his initial appearance on a Criminal Complaint on December 27, 2004.  He

remained on bond until October 6, 2005, when he consented to detention.  Another, co-

defendant, Khayyam Wilson, was charged with the same crime.  There was no

objection from the Government when he was released on bond on November 21, 2006.

On January 14, 2008, the Court removed the location monitoring condition of his bond.

Mr. Wilson remains free on bond.

## V.      CONCLUSION AND CONDITIONS OF RELEASE

The Court **GRANTS** Defendants' motions, and imposes a combination of

conditions that the Court believes will reasonably assure their appearance in Court as

required, and the safety of the community.

The following conditions of release apply to all Defendants:

(1)      home detention with electronic monitoring and curfew as directed;

(2)      surrender CCW permits;

(3)      surrender licenses to carry or purchase guns;

(4)      cannot apply for a license to carry or purchase guns;

(5)      cannot drink alcohol;

(6)      cannot use illegal drugs;

(7)      subject to drug testing and/or treatment;

(8)      seek or maintain employment;

(9)      report to Pretrial Services on a weekly basis;

(10)     provide phone records to Pretrial Services as directed;

33

(11)   provide a list of names, addresses, and phone numbers for all Hutaree members;

(12)   provide a list of names, addresses, and phone numbers for members of any other militia groups they associated with;

(13)   submit to random visits from Pretrial Services;

(14)   cannot possess, borrow, or be near firearms, ammunition, explosives or other dangerous weapons;

(15)   cannot have contact with any co-Defendant, without counsel present;

(16)   cannot have contact with witnesses, without counsel present;

(17)   cannot associate with, have contact with, or communicate with any convicted felons;

(18)   cannot associate with, or have unsolicited contact or communication with law enforcement officers or other government employees, without counsel present;

(19)   cannot allow law enforcement officers inside Defendants' place of residence, except for official police business;

(20)   surrender passports;

(21)   cannot apply for a passport;

(22)   cannot use a police scanner;

(23)   cannot associate with, contact, or communicate with any militia or paramilitary group and/or person associated with any militia or paramilitary group, without counsel present; and

(24)   cannot participate in militia or paramilitary activities.

In addition to the above-listed conditions:

(1)   David Stone cannot use a computer or the Internet.  David Stone cannot associate with, contact, or communicate with Mark Koernke.  David Stone's father, Ray Stone, is appointed his third-party custodian.  Ray Stone must surrender all firearms and other dangerous weapons.  David Stone's travel is restricted to the Eastern District of Michigan;

34

(2)      David Stone, Jr. must live with his mother, Donna Popejoy.  Donna Popejoy is appointed his third-party custodian.  Donna Popejoy, and her husband, Harry Popejoy, must surrender all firearms and other dangerous weapons.  David Stone, Jr.'s travel is restricted to the Eastern District of Michigan;

(3)      Joshua Stone will live with his wife, Shannon Stone. Shannon must establish residency, and provide proof of residency to Pretrial Services, before Joshua Stone is released.  Joshua Stone's travel is restricted to the Eastern District of Michigan;

(4)      Tina Stone cannot use a computer or the Internet.  Tina Stone must live with her parents, Timothy Michael Kelley and Henrietta Kelley, who are appointed third-party custodians.  Tina Stone's travel is restricted to the State of Michigan;

(5)      Clough must get mental health assessment and counseling.  Clough must shut down the Hutaree website, and cannot establish any subsequent website while this matter is pending, or until further order of the Court.  After he shuts down the website, Clough cannot use a computer or the Internet. Clough's parents, William Clough and Charlotte Clough, are appointed his third-party custodians.  Charlotte Clough and William Clough must surrender all dangerous weapons.  Clough must live with his parents.  Clough's travel is restricted to the Eastern District of Michigan;

(6)      Meeks must get alcohol assessment and treatment.  Meeks must live with his parents, Eugene Meeks and Sylvia Meeks, who are appointed third-party custodians.  Meeks' travel is restricted to the Eastern District of Michigan;

(7)      Piatek's brother, Stanley Piatek, is appointed his third-party custodian.  Piatek's travel is restricted to the Eastern District of Michigan, the Northern District of Indiana, the Northern District of Illinois (for employment purposes only), and points in between;

(8)      Sickles' wife, Kelly Sickles, is appointed his third-party custodian.  Sickles' travel is restricted to the Eastern District of Michigan, the Northern District of Ohio, and points in between;

(9)      Ward must get mental health assessment and counseling.  Ward's mother, Nadine Bober (a Correctional Officer), is appointed his third-party custodian.  Ward's travel is restricted to the Eastern District of Michigan, the Northern District of Ohio, and points in between.

(10)    All Third Party Custodians must sign an Agreement to Assume Custody of

their respective Defendant.

**IT IS ORDERED**.

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  May 3, 2010

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
May 3, 2010.

s/Linda Vertriest
Deputy Clerk