UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                            Case No. 10-20123

v.                            Honorable Victoria A. Roberts

DAVID STONE, JR., et al.,

      Respondent.

_____/

**DAVID STONE, JR.'S**
***FRANKS* MOTION TO SUPPRESS EVIDENCE**

1.     The affiant in this case was Federal Bureau of Investigation (FBI) Task Force Agent Sandra L. Larsen.

2.     On March 23, 2010, the affiant obtained arrest warrants for the nine defendants currently charged in the First Superseding Indictment.

3.     On that same day, the affiant obtained a search warrant for a property in Onsted, Michigan, which the Agent believed to be the residence of David Stone, Jr.  The affiant eventually learned that Stone, Jr. did not reside at the address.

4.     On March 27, 2010, the affiant obtained a second search warrant for Stone, Jr.'s residence in Adrian, Michigan, utilizing the prior affidavit along with additional averments in a second affidavit.

5.     The affiant makes several material misrepresentations and omissions in the two affidavits that substantially undermine the very basis for the search warrants: an alleged seditious conspiracy against the United States government and Stone, Jr.'s claimed role as one of the conspirators.

6.     The audio recordings (and accompanying transcripts) surreptitiously obtained by the confidential informant and two undercover agents provide a "substantial preliminary showing" that the affidavit contains intentionally or recklessly false material statements and material omissions.  *Franks v. Delaware*, 438 U.S. 154, 155-156, 171 (1978).

7.     If even a few of these false statements are excised, or material omissions inserted, the affidavit is devoid of probable cause to search Stone, Jr.'s residence.  Therefore, the Due Process Clause of the Fifth and Fourteenth Amendment, and the Warrant Clause of the Fourth Amendment, require that Stone, Jr.'s request for an evidentiary hearing be granted. *Franks*, 438 U.S. at 155-156, 171.

8.     The Government does not concur in this motion.

WHEREFORE, Stone, Jr. respectfully requests that this Court:

a)     hold a *Franks* hearing; and

b)     enter an order suppressing all evidence seized as the result of the unconstitutional searches and seizures in March of 2010, and any fruits thereof.

Respectfully submitted,

Legal Aid & Defender Association
**FEDERAL DEFENDER OFFICE**

s/ Richard M. Helfrick
E-mail: Richard_Helfrick@fd.org

s/ Todd A. Shanker
E-mail: Todd_Shanker@fd.org
Counsel for David Stone, Jr.
613 Abbott St., 5th Floor
Detroit, MI 48226
Dated: February 1, 2011                    (313) 967-5542

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

           Case No. 10-20123
v.          Honorable Victoria A. Roberts

DAVID STONE, JR., et al.,

    Respondent.

_____/

**BRIEF IN SUPPORT OF**
**STONE JR.'S *FRANKS* MOTION**

## <u>TABLE OF AUTHORITIES</u>

**<u>Supreme Court</u>**

*Franks v. Delaware*, 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 18, 19

*United States v. Leon*, 468 U.S. 897 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 18

**<u>Circuit Courts</u>**

*United States v. Fowler*, 535 F.3d 408 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Helton*, 314 F.3d 812 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Hill*, 142 F.3d 305 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**<u>District Courts</u>**

*United States v. Delgado*, 121 F.Supp.2d 631 (E.D. Mich. 2000). . . . . . . . . . . . . . . . . . . . . . . . 2

**<u>Constitutional Authority</u>**

U.S. Const. Amend. IV, V, XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

i

FACTS

The warrant affidavits submitted under oath by Agent Sandra L. Larsen cover a period of approximately 20 months, beginning with the alleged formation of the seditious conspiracy in August of 2008 and concluding on the day of the defendant's arrest on March 27, 2010.  David Stone, Jr. is mentioned in the affidavit as present on a total of eight dates over that 20 month-period.[1]  During that time-frame, there is no evidence whatsoever that Stone, Jr. ever uttered any anti-government or anti-law enforcement statements.  He was not present when the supposedly seditious rhetoric took place, and did not participate in even one of these discussions.  In addition, there is no evidence within the four corners of the affidavit, and none has been provided in the discovery process, that indicates Stone, Jr. was ever seen possessing or carrying a machine gun or short-barreled gun.

The FBI first obtained and executed a warrant at a home in Onsted, Michigan where Stone, Jr. did not reside. Following this mistake, four days later the affiant obtained and executed a second warrant at an apartment in Adrian, Michigan, which Stone, Jr. shared with his fiancee Brittany Bryant and his infant son, Elijah, who was 6-months-old at the time of the FBI raid on the property.

---

[1]        The dates, according to the affiant, were June 13, 2009; July 25, 2009; August 22, 2009; December 12, 2009; January 9, 2010; February 20, 2010; and March 27, 2010.

1

LAW AND ARGUMENT

**On Its Face, The Warrant Affidavit Failed to Establish Probable Cause to Search David Stone, Jr.'s Apartment In Adrian.  The Affidavit Also Contained Several Material Misrepresentations and Omissions That Were Made With A Deliberate Or Reckless Disregard For The Truth, Eliminating Any Applicability Of The "Good Faith" Exception. A *Franks* Hearing Is Warranted Because Even A Partially Corrected Affidavit Will Underscore The Lack Of Probable Cause.**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The Warrant Clause of the Fourth Amendment manifests this protection by providing, "that no warrants shall issue, but upon probable cause." U.S. Const. Amend. IV.  Therefore, in order to be valid, a search warrant must be supported by probable cause. U.S. Const. Amend. IV; *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003). When probable cause to search a location is established through a search warrant affidavit, that affidavit "must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165 (1978).  An affiant's sworn averments are subject to impeachment and excision if they are premised upon false information provided by a government informant or agent.  *Franks*, 438 U.S. at 171; *United States v. Delgado*, 121 F.Supp.2d 631, 640-641 (E.D. Mich. 2000).  The warrant affidavit at issue here failed to set forth particular facts establishing probable cause.  On its face, the affidavit lacked a nexus to Stone, Jr.'s Adrian residence. In addition, the affidavit is rife with material misrepresentations that were either deliberate or reckless.

In *Franks*, the United States Supreme Court held that a defendant must satisfy a two-

2

prong test to obtain an evidentiary hearing to challenge the substance of a warrant affidavit:  first, a defendant must make a "substantial preliminary showing" that specified portions of the affiant's statements were deliberately false or showed a "reckless disregard for the truth." *Franks*, 438 U.S. at 171. The second prong of the *Franks* standard requires a court to find that the exclusion of the inaccurate statement(s), or the inclusion of the omitted material, would leave the affidavit with insufficient content to establish probable cause.  *United States v. Hill*, 142 F.3d 305, 310 (6th Cir. 1998)(citations omitted).  Here, Defendant's offer of proof - the government's own secret recordings - provides the required "substantial preliminary showing" necessary to obtain a hearing pursuant to *Franks*.

In addition, the Sixth Circuit in *United States v. Fowler*, 535 F.3d 408 (6th Cir. 2008) explained how the *Franks* standard is applied where omissions of material fact are at issue, rather than affirmative misstatements.  The Court stated:

> In the case of alleged material omissions - by analogy to the standard for *included* false statements - the defendant is entitled to a hearing if and only if: (1) the defendant makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit, and (2) a finding of probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it.

*Fowler*, 535 F.3d at 415 (emphasis in original). In this case the affidavit omitted material facts that, if added to the affidavit, would decisively nullify probable cause, and therefore vitiate the validity of the search warrant.

In sum, if even a small portion of the false statements and/or material omissions are corrected, the affidavit will reveal an inescapable paucity of probable cause to search Stone, Jr.'s residence. Furthermore, the good faith exception does not apply because the material

3

misstatements and omissions establish a deliberate or reckless disregard for the truth.  *United States v. Leon*, 468 U.S. 897, 914-915, 926 (1984)(good faith exception does not apply where the officers were "dishonest or reckless in preparing their affidavit" or the affidavit contains information the affiant knew or should have known was false).

> A.    Paragraphs 3, 15, 32, 47, 48, 49, 51, 52, 54, 55, 56, 57, 58, 62, 66 re: General Statements About All Members of the Hutaree Militia & The Alleged Plot Against Police Officers

Paragraph three, entitled "Brief Overview of the Michigan Militia, David Stone [Sr.] and Hutaree," claims to set forth facts regarding the beliefs, plans and actions engaged in by Hutaree members. This paragraph broadly states that "[t]his group believes that any individuals with differing opinions or 'non-believers' are enemies. Non-believers include law enforcement, government employees, or participants in the New World Order."  Multiple Residence Affidavit ¶3.  This assertion by the affiant is not only generalized, in that it is made regarding all members of the Hutaree (both indicted and unindicted) it lacks any evidentiary basis regarding David Stone, Jr.  There exists no evidence that Stone, Jr. made any statements or performed any other actions indicating his assent in these beliefs.  No recordings made by the undercover agents or the confidential informant provide any indication that Stone, Jr. himself shared any beliefs espoused by any other member of the Hutaree.[2]

Furthermore paragraph three also purports to set forth the Hutaree's "plan" to kill a local police officer and attack the funeral convoy. Multiple Residence Affidavit ¶3.  Again, this

---

[2]    September 27, 2008, August 13, 2009, and September 13, 2009 are the only dates in the affidavit where Stone, Sr. is alleged to have "defined" the "enemy" in a fashion remotely similar to the claim in these general allegations.  Stone, Jr. is not alleged to have been present on any of these dates.

statement is entirely unsupported by any evidence as to Stone, Jr.  While there are some recordings which indicate that some members may have discussed hypothetical attacks on law enforcement while using considerable hyperbole, there is no evidence that indicates Stone, Jr. was ever a part of these conversations.  Moreover, there is direct evidence from the undercover and informant recordings which indicates that Stone, Jr. was not only a non-participant in these conversations, he was not even present.

Significantly, over a 20-month period,  the affidavit only recounts three occasions where even a hint of the alleged plot against police officers was arguably mentioned.[3]  The first time was in a meeting between two Hutaree members and the UC "Steve" on August 13, 2009.  ¶32. Seven of the nine defendants, including David Stone, Jr., were not present, let alone participating in this conversation.  *Id*.  The second time was on the aborted road-trip to the Militia Summit meeting in Kentucky on February 6, 2010.  ¶54.  Four of the nine defendants, including David Stone, Jr., were not present, much less involved in these statements.  *Id*.  The third time was during a training on February 20, 2010.  ¶57.  Three of the nine defendants, including David Stone, Jr., were once again neither present nor involved in the rhetoric- and hyperbole-laden conversations.  In sum, David Stone, Jr. is not present for – a participant in – any of the conversations alleged in the affidavit as specifically establishing or furthering a plot against police officers.  Moreover, there is not a single passage among the hundreds of hours of clandestine audio recordings by the CI and two UCs where Stone, Jr. ever says anything remotely hostile regarding police or government.  Given these facts, the broad-sweep of criminality

---

[3]        The affidavit also claims there was anti-police talk on December 20, 2008.  ¶15. However, six of the nine defendants charged in this case - including David Stone Jr. – were not present.

described in the ¶3 is either deliberately or recklessly false, and a wanton violation of the defendant's First Amendment right to associate with his own family and anyone else.

Finally, paragraph three states that "the Hutaree" were ordering IEDs (improvised explosive devices) and providing their supplier (the UC) with diagrams and materials to manufacture such devices. Multiple Residence Affidavit ¶3.  Once again the affiant's averment here is entirely overbroad and unfounded. The four-corners of the Warrant Affidavit and the extensive clandestine government recordings upon which the affidavit is premised fail to provide any evidence that David Stone, Jr. even had knowledge of the alleged IED orders, let alone that he participated in these orders or provided any schematics or materials for the construction of such explosives.  While there are some claims within the affidavit that allege that a few defendants participated in discussions about the undercover agent's efforts to build an IED, there is absolutely no evidence that Stone, Jr. was present during any of these conversations; no evidence that he engaged in any of these activities; and no evidence that he assented to any plan regarding such activities. See ¶47, 48, 49, 51, 52, 54, 55, 56, 58, 62, 66.  The affiant's blatant misrepresentations and absurdly broad sweep of all indicted and unindicted Hutaree members into a category of extreme criminality was deliberately or recklessly untruthful.

> B.     Paragraph 22, 6/5/09 re: "Upcoming War With The United
>        States Government"

In paragraph 22, the affiant describes the confidential informant's (CI) meeting with David Stone, Sr. on June 5, 2009.  Stone, Sr. is alleged to have stated that the "upcoming training" on June 13, 2009, was "intended to get the Hutaree members ready for the upcoming war with the United States government." Warrant Aff. ¶22.

This is a materially false representation.[4]  Neither the recording nor the transcript from this date indicate that Stone, Sr. ever made a statement describing the next training as preparation for an "upcoming war with the United States government."

Similarly, the affiant claims Stone, Sr. showed the CI a building he believed would be used by "the government" as a "FEMA [Federal Emergency Management Agency] Detention Center" after the war started.  ¶22, *Id*.  This, too, is a false statement intended to create the impression of a seditious conspiracy.  In fact, Stone, Sr. told the CI that the Delphi Plant was owned by "the state" for a "detention center."  1D22, 6/5/09, p. 84.  FEMA is not mentioned on the recording.

      C.      Paragraph 24, 6/13/09 re: A "Government Ambush" And
              The Alleged Detonation of  "Shrapnel-Filled" and
              "Galvanized Pipe" Bombs

This paragraph is rife with both material misrepresentations and omissions.  First, there is a crucial omission that goes to the heart of the allegations in this affidavit. At the beginning of the training day, the trainees discussed what army they would potentially be facing in the event of war.  At approximately 10:57 a.m., David Stone, Sr. definitively stated the following to the members of the Hutaree: "Europe will be the army that we're gonna fight."  1D24, 6/13/09, p. 14.  Stone, Sr. also tells the group that "the Germans" have agreed to "fly sorties against the general population."  1D26-1, 6/13/09, p. 94.

The affidavit compounds this material omission with the false statement that "David Stone [Sr.] said he plans to lead the government down a path in the woods that will have booby

---

      [4]      The two apparently did meet on June 5th, though the transcript of the audio recording lists the date as 6/6/09.  See 1D22, Transcript, 6/6/09; 1D22, Audio Recording, 6/5/09.

traps, so he can set up an ambush." ¶24. This is utterly false. Neither the recordings nor the transcripts of the June 13, 2009 training day contain such a claim. Stone, Sr. did, however, clearly state that it would be the European army that the Hutaree would one day "fight." 1D24, 6/13/09; 1D26-1, -2, 6/13/09.

In this same paragraph, the affiant untruthfully claims that a "shrapnel-filled" bomb was detonated near the "second team" during training. ¶24. The affiant describes the explosive used as an "IED fragmentation type of antipersonnel 'land mine' composed of two explosive charges," with the first charge "propel(ling) the device into the air where the second and larger charge detonates," thereby "increasing the fragmentary range and the lethality of the device." *Id.* This too is an utterly false statement. Compounding this considerable exaggeration, the affiant next falsely states that "a pipe bomb IED of the size and dimension constructed by David Stone could easily kill or seriously injure a human being" with the "fragmentation effect" created by the "galvanized pipe."

The evidence fails to support the claim that "shrapnel-filled" or "galvanized pipe" explosives were ever used or detonated during this training.[5] Though Stone, Sr. used several different names for the devices, when asked about the charge he specifically stated: "Charge's honestly just a cardboard tube you can see it right there. Same thing. That's just the rocket ignitor... [and] black powder." 1D24, 6/13/09, Tr. 73. The Case Agent, Leslie Larsen, confirmed Stone, Sr.'s description when she testified at the Bond Review Hearing, and confirmed further that this was the only device with which Stone, Jr. assisted when directed by his father. R. 157,

---

[5]     In fact, over the 20-month period, the recordings indicate that the undercover agent was the only person to detonate IEDs like those described – and when he did, Stone, Jr. was not present.

5/11/10, p. 32. As several of those present at this "trip-wire"-avoidance training pointed-out, the effect was similar to that of an M80 or "cherry bomb," not a shrapnel-filled device or a galvanized pipe bomb.  The  supposed "bouncing betty" was nothing more than a bird-bomb. The government itself has already conceded in open-court that this was not a real "bouncing betty," but rather, a "non-fragmentary" simulation.  See R. 85, Detention Hearing, 3/31/2010, p. 18.   If a real, "shrapnel-filled" bouncing betty had been used, members would have likely been seriously injured or killed during the training.  These were "simulators," not lethal IEDs.

The affiant's overtly misleading attempt to make the Hutaree appear more dangerous by swearing under oath that the group was detonating lethal fragmentary IEDs near trainees was a material misrepresentation intended to powerfully enhance the appearance of probable cause. The utter falsity of these representations has already been uncovered in open court by the Case Agent and the government, and as a result, must be excised.

        D.      Paragraph 30, 7/25/09 re: the Hutaree Picnic and the
                    "Upcoming War" with the "United States Government"

This is yet another paragraph loaded with materially false statements and omissions intended to enhance the appearance of a seditious conspiracy.   First, the affiant states that "Stone [Sr.] spoke about how the United States Government would start war on the people" and would do so "in Oklahoma City," and that ongoing "FEMA [Federal Emergency Management Agency] exercises were really practice for the upcoming war."  ¶30.  These statements are intentionally or recklessly false.

Stone, Sr. stated that they were on the "brink of war" in Oklahoma City because the area was "overflowing" with "**foreign** troops... **foreign** aircraft, **foreign** military equipment..." and

9

"**foreign** militaries;" and the "Germans and Singapore... are gonna fly sorties against American people."  1D30, 7/26/09, p. 8, 15 (emphasis added).

Stone, Sr. emphasized that "the cops" will *not* take part in a war against the American people, thereby instantly diminishing the potential "One World Army" by "650,000" people.  *Id*. at p. 15.  Another Hutaree member explained that the "police know we're no threat to them."  *Id*. at p. 39.  And neither Stone, Sr. nor anyone else ever said anything about "FEMA exercises."

On top of these false statements and material omissions, the affiant ominously noted that David Stone, Jr. was present at this event.  However, the affiant omitted the fact that Stone, Jr.'s "role" was to grill the hamburgers and hot dogs for the families who were attending the picnic, and that as always, he said nothing which indicated any hostility toward any human being, let alone an intent or agreement to go to "war" against police officers or the United States government.  *Id*. at p. 43-44, 53.  In sum, ¶30 continues a pattern of directed deception (or, at a minimum, coincidental recklessness) by the affiant, where each event is falsely described in such a way as to make the Hutaree appear to be engaged in a seditious conspiracy against the United States government.  To the contrary, the concern at this event was not the U.S. government – it was "foreign troops."

        E.        <u>Paragraph 33 and 34 - 8/22/09 re: "Trusted members of the Hutaree"</u>

In this section, the affiant again notes the presence of David Stone, Jr. at a training on August 22, 2009.  However, the affiant fails to include the fact that Stone, Jr. is not present for the conversation between the UC and Stone, Sr. regarding the UC's plans to "detonate a device" constructed by the UC.  It is significant that Stone, Sr. specifically told the UC that only "the

trusted members of the Hutaree" would be present for the UC's detonation performance, scheduled for August 27, 2009.  On that date, David Stone, Jr. was **not** one of the "trusted members" present for the explosives show put on by the undercover agent.  See ¶34.

> F.    Paragraph 44 & 62 - 12/13/09 and 3/13/10  re: "Go Bags"
>        and The Birth of David Stone, Jr.'s Son Elijah

In these paragraphs the truth is riven with material misrepresentations and crucial omissions, just as it is in so many other sections of the affidavit. In paragraph 44, the affiant attempts to justify a search warrant for various residences other than Stone, Sr.'s property based on the following claim: "Over the time of this conspiracy, the members of the Hutaree have been repeatedly urged to keep their... firearm(s), tactical gear and ammunition... close at hand in the event they are notified to immediately mobilize."  According to the affiant, these items are often kept in what is known to militia members as a "go bag."  ¶44.

However, the affidavit itself does not reference Stone, Sr. urging members to have "go bags" or weaponry "close at hand" at any training session.  Similarly, counsel's review thus far of the discovery provided by the government has not uncovered a single instance where Stone Sr. urged "members of the Hutaree" to have their "go bags" ready at a moment's notice.

More importantly, the affiant knew that David Stone, Jr., in particular, did not have a "go bag" at his home.  Paragraph 62, which recounts Joshua Stone's wedding on 3/13/2010, contains the fact that David Stone, Jr. told the UC agent that "he kept his weapons" at Senior's residence. ¶62.  What is never revealed anywhere in the affidavit is the fact that David Stone, Jr.'s infant son Elijah was born in September of 2009.  Stone, Jr. specifically told the UC that he was no longer keeping his guns and militia "stuff" at home for the safety of his child, and then explained

11

further that he and his fiancee Brittany (Elijah's mother) were "trying to get out on our own [and] we definitely don't want to have anything [at the new apartment]."  1D87, 3/13/10, p. 140.[6]

The affiant intentionally or recklessly omitted all information about the birth of Stone, Jr.'s son, his fiancee, his move out of Stone, Sr.'s residence, his desire for independence with his young family, and his certainty that he did not want any weapons or Militia "stuff" in his new residence.  Why would the affiant omit this information?  Because it would have significantly weakened the affidavit's portrayal of Stone, Jr. as a criminal conspirator committed to overthrowing the United States government and killing police officers.  As noted throughout this Brief, this portrayal of Stone, Jr. was foul fiction, whether it was crafted intentionally or with a reckless disregard for the truth.  Though the affiant and the investigative team knew full well that Stone, Jr. was spending less and less time with the Militia, and more and more time caring for his baby and working lengthy hours at a brake-parts factory in order to support his young family and pay the rent, the affiant conveniently chose to devise the affidavit as if Stone, Jr's child, fiancee, and job did not exist.  This was a material omission that significantly undermined any claim that probable cause existed to search Stone, Jr.'s residence.

G.   Paragraph 57 - 2/20/10 re: "Those Present Conducted Detailed Discussions About Assassinating Law Enforcement Officers"

The next material misrepresentation in the affidavit occurs in paragraph fifty-seven, referring to activities that took place on February 20th, 2010. In this instance the affiant claimed Stone, Jr. was "present," and that each of those "present" were engaged in "detailed discussions

---

[6]      In anticipation of the birth of the baby, Stone Jr. and Brittany moved in with her father, Kevin Bryant, in September 2009, and lived in his home all the way up until they moved into their own apartment in March 2010.

about assassinating law enforcement officers." ¶57.  Putting aside the fact that these allegedly "detailed discussions" involved inane, cartoon-like hyperbole, this averment embodies once again the sort of methodical and material misrepresentations and omissions that pervade throughout the affidavit. When viewed in conjunction with the information provided by the undercover agent's recording, the averment is blatantly false with regard to Stone, Jr. and made with either deliberate or reckless disregard for the truth.

This paragraph is especially troubling in that it both affirmatively misrepresents the truth and recklessly omits facts that entirely change the character of the affidavit. After indicating which members of the Hutaree were present at the meeting, the affidavit states: "those present conducted detailed discussions about assassinating law enforcement officers." Multiple Residence Affidavit ¶57. What the affidavit failed to reveal – and what the recordings of the undercover agent from that date firmly establish – is that Stone, Jr. was not actually present for any of these conversations. That the affidavit omitted this fact is incredibly telling, as the affiant was unmistakably attempting to connect Stone, Jr. to conversations in which he took no part. The inclusion of this fact ultimately demonstrates, in conjunction with other materially false claims, that the two warrant affidavits decisively fail to provide probable cause to believe that Stone Jr.'s Adrian residence was connected to any illegal activity or criminality.

The undercover recording for this date evidences the fact that Stone, Jr. was not present during these conversations, as he did not arrive until around 11:45 a.m. that day, *after* the first set of barbed statements had already taken place.[7]  Furthermore, Stone, Jr. left the training when the

---

[7]     The transcript mistakenly refers to Stone, Jr. on page 6, 37, and 42 as briefly speaking just after the arrival of the undercover.  If there were any doubt about this mistake, the recording and transcript decisively resolve it in favor of Stone, Jr.  **At 10:28-29 a.m., Senior**

rest of the group took a lunch break (around 12:45 PM) *before* any further discussions of a similar character were continued.  1D84, 2/20/2010, p. 144-193.  In the short time that Stone, Jr. was present, he did speak directly with the UC about his newborn son, his lack of sleep, and his demanding hours at the Bishop Circle Assembly Plant.

As with every piece of evidence reviewed thus far, Stone, Jr. did not utter an unkind word about law enforcement or government or anyone else.  In sum, the affiant's sworn claim that Stone, Jr. participated in "detailed discussions about assassinating law enforcement officers" was crafted with either an intent to mislead the magistrate judge or blind eyes for the truth.   There is no evidence whatsoever on any of the 20-months-worth of recordings which indicate that Stone, Jr. participated in any discussion hostile to law enforcement or the United States government.

        H.     Paragraph 62 - 3/13/10 re: Joshua Stone's Wedding & Stone Sr.'s Comment to Those Assembled That "Everyone [I]s Watching What [The Hutaree] W[ill] Do"

This paragraph too contains several material omissions regarding Joshua Stone's wedding just two weeks before the arrests in this case.  While the affiant recounts Stone, Sr.'s alleged discussions regarding IEDs that were being constructed by the undercover agent, she chose to omit the material fact that (1) Stone, Jr. was not present for these conversations; (2) despite the undercover's insistent prodding, Stone, Sr. repeatedly stated that there was "no target" for any of the undercover agent's as-yet-unmade IEDs; and (3) contrary to the affidavit's claimed means to accomplish the objective of the conspiracy (i.e. kill a "local" officer and then attack the funeral), Stone, Sr. stated that the group would instead be "mobile," because conflict could break out

---

**receives a phone call from Mike Meeks and recites the list of those present for training: "Steve-O [the undercover agent]. Kris. Jake. Uh, Jared. Eric. Az. Josh. Uh, And I think I'm here."** 1D71, 2/20/2010, p. 71.  David Stone, Jr. was not present at this time.

anywhere "from Pennsylvania, Ohio, Kentucky, Tennessee, Indiana, Illinois, [and] Minnesota [to] Wisconsin." 1D87, 3/13/10, p. 144-146.

In addition, it is true that Stone, Sr. addressed the group as a whole before the wedding ceremony, and said that "everyone [i]s watching what [the Hutaree] w[ill] do." ¶62.  But the affiant omitted what Stone, Sr. said next – words that change the entire character of the averment. Stone, Sr. emphasized to the entire group:

> "We're not radicals, we're not skinheads – **we're not doing anything illegal**.  **We're going to keep it that way.**"

1D87, 3/13/2010, p. 44 (emphasis added).  These material omissions yet again undermine the object, means, and existence of a conspiracy among the nine defendants, and once again distance David Stone, Jr. from even the mere discussion of IEDs.

## I.    Paragraph 67 - The Hutaree "Inner Circle"

In paragraph 67, the affiant describes two theories for determining which individuals possessed a criminal intent to join the seditious conspiracy, and who, as a result, were considered a part of the Hutaree "Inner Circle" such that probable cause existed against them.  The affiant states that the culpable members in the alleged conspiracy to kill police officers were (1) those "who attempted to travel to Kentucky" on February 6th, 2010; and/or (2) those who were present at both the January 9th and February 20th, 2010 training.  Stone, Jr. was not present for the Kentucky road-trip. And although he briefly attended the February 20, 2010 training, he was not present and did not participate in the anti-law enforcement discussions that constitute the foundation of the government's evidence of a supposed plot against law enforcement.

Furthermore, as previously mentioned, Stone, Jr. was **not** one of the "trusted members"

15

chosen by Stone, Sr. to attend the undercover agent's explosives show on August 27, 2009.  See ¶34.  Similarly, as noted *supra*, even though the law enforcement investigative team knew that Stone, Jr. was spending less and less time with the Militia, and more and more time at work and caring for his newborn son, the affiant conveniently chose to construct the affidavit as if Stone, Jr.'s child, fiancee, and job did not even exist.

Yet further, the affiant also omitted the fact that Stone, Jr. was not a groomsman at the wedding of Stone, Sr. or Joshua Stone.[8]  These material omissions provide further evidence of the affiant's misleading attempt to create the impression that Stone, Jr. was a member of the Hutaree "inner circle" despite the fact that he did not attend or participate in the events described as litmus tests for criminal intent in this seditious conspiracy case.  ¶67, 57, 54.

J.   Single Residence Affidavit, Paragraph 8, 3/27/10 re: Stone, Sr. And Stone, Jr. Travel to "Hutaree Event" Together

The shorter affidavit submitted in this case on March 27, 2010, claims to provide facts sufficient to search Stone Jr.'s Adrian residence only when read in conjunction with the longer multiple residence affidavit. However, the shorter affidavit, in its brevity, continues a pattern of dissembling when it omits yet another crucial fact.  Paragraph eight indicates that through surveillance, an individual matching David Stone, Sr.'s description was observed leaving Stone, Sr.'s residence and traveling to Stone Jr.'s Adrian apartment on March 27, 2010. Single Residence Affidavit, ¶8.  The affiant states that she was aware that members of the Hutaree were supposed to be attending a "Hutaree event" later that day.  *Id.*  The averment continues by noting that the individual matching Stone, Sr.'s description arrived at Stone, Jr.'s residence, and that the

---

[8]   Notably, the best man at both weddings was the undercover agent "Steve Clark."

two men drove away in the direction of the mysterious "Hutaree event." *Id*.  What the affiant

fails to reveal is that the planned "Hutaree event" was actually believed by both Stone, Sr. and

Stone, Jr. to be a memorial service for a member of the Hutaree and a family friend.  In reality,

the event was an Agent-conceived stratagem - a fake funeral for the confidential informant who

had – along with the UC – become not just a "member" of the Hutaree, but a friend.  When these

facts are added to the paragraph it entirely changes the quality of the shorter affidavit.

     With these facts omitted, the logical inference drawn is that Stone, Jr. was participating in

an unknown Hutaree activity, possibly resurrecting his dormant participation with the group, or

maybe even furthering or initiating the execution of the alleged conspiracy against police

officers. In reality, Stone, Jr. was simply going with his father to pay last respects to a man who

was considered a family friend and who they believed had passed away suddenly and

unexpectedly. The true facts regarding this "Hutaree event" were omitted with the intent to

mislead the issuing Magistrate, or at a minimum, with reckless disregard for the truth.  This

material misrepresentation was intended to disingenuously cast Stone, Jr. as an active Hutaree

member on the very day of the arrests and arouse a tangible suspicion of criminal activity in

order to justify a second search warrant.  After all, the agents had so little concern regarding

Stone, Jr.'s whereabouts, and had such minuscule knowledge of his movements that they initially

obtained a search warrant for a residence where he no longer lived.  Simply put, the affiant

omitted every significant aspect of the truth surrounding this "Hutaree event" in order to

effectuate a search of Stone, Jr.'s apartment.  The truth is that a father and son drove to a friend's

funeral service together; unbeknownst to them, the "friend," the "death," and the funeral were all

part of a hoax choreographed by law enforcement.

The Defendant Has Made A "Substantial Preliminary" Showing Under *Franks*

The abundant material misstatements and misrepresentations of the truth undoubtedly misled the issuing magistrate with regard to David Stone, Jr.'s residence. The extensive dissembling in the affidavit falsely connected Stone, Jr. to criminal beliefs and homicidal intent in a seditious conspiracy. And the affiant did so either intentionally or with a reckless disregard for the truth. Stone, Jr. has never held or assented to anti-government or anti-law enforcement beliefs, much less agreed to join a conspiracy to overthrow the United States government and kill police officers. If even a small portion of these false statements are removed from the affidavit, there is no probable cause to search Stone Jr.'s residence for several reasons. A minimally corrected affidavit: 1) fails to establish that Stone, Jr. concurred in the opinions of any other member of the Hutaree, or that he agreed with the Hutaree's so-called "plan;" 2) fails to connect Stone, Jr. or his residence with a conspiracy to use WMDs; and 3) fails to connect Stone Jr. or his residence to any discussion or statements manifesting an intent to harm law enforcement.

The clandestine recordings generated by the government itself convincingly provide a "substantial preliminary showing" that the warrant affidavit contains sworn statements made with a deliberate or reckless disregard for the truth; and that even a minimally corrected affidavit would result in a marked lack of probable cause to support the search of Stone, Jr.'s Adrian, Michigan apartment. *Franks*, 438 U.S. at 155-56.

Furthermore, the affiant's warped depiction of the truth regarding Stone, Jr. mandates that the good faith exception to the Exclusionary Rule is not applicable in this case. *Leon*, 468 U.S. at 914-915, 923, 926 (good faith exception does not apply where the officers were "dishonest or reckless in preparing their affidavit" or the affidavit contains information the affiant knew or

18

should have known was false);  *Franks*, 438 U.S. at 165, 170.

In summary, the affidavit forcefully attached vile words, hateful beliefs, and criminal intentions to David Stone, Jr. – words he never uttered, beliefs he never held, and intentions he never had.  At the same time, the affidavit eviscerated entirely the life that Stone, Jr. did have  – and the life he aspired to –  with his fiancee and son.  Whether this fictional characterization of Stone, Jr. was deliberate or reckless, a *Franks* hearing should be granted.

<u>CONCLUSION</u>

Utilizing the audio recordings (and accompanying transcripts), Defendant has made a "substantial showing" that the affidavit contains deliberate and/or reckless false statements and material omissions.  Even a minimally corrected affidavit lacks probable cause, because there is no evidentiary nexus between any alleged criminal activity or conspiracy, and Stone, Jr.'s residence. For all of the above-mentioned reasons Defendant respectfully requests that this Honorable Court order a *Franks* hearing and suppress all evidence seized in violation of the Fourth Amendment, as well any fruits of the poisonous tree.

Respectfully submitted,

Legal Aid & Defender Association
**FEDERAL DEFENDER OFFICE**

<u>s/ Richard M. Helfrick</u>
E-mail: Richard_Helfrick@fd.org

<u>s/ Todd A. Shanker</u>
E-mail: Todd_Shanker@fd.org
Counsel for David Stone, Jr.
613 Abbott St., 5th Floor
Detroit, MI 48226
Dated: February 1, 2011        (313) 967-5542

19

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                          Case No. 10-20123
v.                            Honorable Victoria A. Roberts

DAVID STONE, JR., et al.,

      Respondent.

_____/

## CERTIFICATE OF SERVICE

      I hereby certify that on February 1, 2011, I electronically filed the attached Objections with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

                Sheldon N. Light
                Joseph Falvey
                Jonathan Tukel
                Christopher Graveline
                Assistant U.S. Attorneys

                Respectfully submitted,

                Legal Aid & Defender Association
                **Federal Defender Office**

                s/ Todd A. Shanker
                613 Abbott St., 5th Floor
                Detroit, MI 48226
                Phone:  (313) 967-5542