UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

       Plaintiff,

                                    CASE NO. 2:10-CR-20123

   v.                             JUDGE VICTORIA A. ROBERTS
                                      MAGISTRATE JUDGE PAUL J. KOMIVES

DAVID BRIAN STONE, et al.,

       Defendants.

_____/


### REPORT AND RECOMMENDATION ON:
### (1) DEFENDANT DAVID STONE JR.'S *FRANKS* MOTION TO SUPPRESS (docket #278) AND RELATED JOINDERS (docket #279-84, 287, 339, 341); (2) DEFENDANT PIATEK'S MOTION TO QUASH SEARCH WARRANT (docket #285) AND RELATED JOINDERS (docket #288, 291, 296, 340); and (3) DEFENDANT JOSHUA STONE'S MOTION TO SUPPRESS (docket #337) AND RELATED JOINDERS (docket #338, 343, 346, 357)

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      A.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
          1.    *The Case in General and the Instant Motions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
          2.    *The Search Warrant Affidavit* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      C.    *Probable Cause* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      C.    *The* *Franks* *Issue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
          1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      D.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

\*      \*      \*      \*      \*


I.     RECOMMENDATION: The Court should deny defendant David Stone, Jr.'s *Franks* Motion

to Suppress Evidence, defendant Piatek's Motion to Quash Search Warrant, and defendant Joshua

Stone's Motion to Suppress Search of 6021 Tomer Road. The Court should also deny the related

joinders/concurrences of the remaining defendants.[1]

II.    REPORT:

A.    *Background*

    1.    *The Case in General and the Instant Motions*

On March 29, 2010, the Grand Jury returned a multi-count indictment against nine defendants: David Brian Stone, David Brian Stone, Jr., Joshua Matthew Stone, Tina Mae Stone, Joshua John Clough, Michael David Meeks, Thomas William Piatek, Kristopher T. Sickles, and Jacob J. Ward. The Grand Jury returned a First Superseding Indictment on June 2, 2010, and a Second Superceding Indictment on February 10, 2011. In general, the Second Superceding Indictment alleges that defendants are members of the "HUTAREE," characterized as an anti-government organization. Count One of the Indictment charges all nine defendants with seditious conspiracy in violation of 18 U.S.C. § 2384. Count Two charges all nine defendants with conspiracy to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(2). Count Three charges defendants David Brian Stone and David Brian Stone, Jr., with teaching or demonstrating the use of explosive materials in violation of 18 U.S.C. § 842(p)(2). Counts Four and Five charge all nine defendants with carrying, using, or possessing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1). Counts Six and Seven charge two additional § 924(c) counts against all defendants except for defendants Tina Mae Stone and Piatek. Counts Eight and Nine charge defendant David Brian Stone with possession of a machine gun in violation of 18 U.S.C. §§ 922(o), 924(a)(2). Count Ten charges the same against defendant Joshua Stone, and Counts Twelve

---

[1]Although the Court referred these matters to me for hearing and determination pursuant to 28 U.S.C. § 636(b)(1)(A), that section prohibits a magistrate judge from hearing and determining a motion "to suppress evidence in a criminal case." *Id.* Thus, I respectfully submit this Report and Recommendation pursuant to § 636(b)(1)(B) in lieu of a determination of the matters.

and Thirteen charges the same against defendant Clough. Finally, Counts Thirteen through Fifteen charge defendants David Brian Stone, David Brian Stone, Jr., and Joshua Stone, respectively, with possession of an unregistered firearm in violation of 26 U.S.C. §§ 5841, 5861(d), 5871. The Second Superceding Indictment also alleges a claim for criminal forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(G), 924(d); 26 U.S.C. § 5782; and 49 U.S.C. § 80303.

The crux of the case is the seditious conspiracy charge alleged in Count One. In this count, the government charges that defendants "knowingly conspired, confederated, and agreed with each other and with other persons known and unknown to the Grand Jury, to oppose by force the authority of the Government of the United States, and to prevent, hinder, and delay by force the execution of United States law, including federal laws regarding the sale, purchase, receipt, possession, and use of firearms and destructive devices." 2d Superceding Indictment, Count One, ¶ 2 [hereinafter "Indictment"]. The Indictment then alleges the means and methods used by defendants to further the objects of the conspiracy. Specifically, the Indictment alleges that "[t]he HUTAREE's general plan was to commit some violent act to draw the attention of law enforcement or government officials, in order to prompt a response by law enforcement," such as by killing a law enforcement officer. *Id.*, ¶ 3. The Indictment further alleges that once such a law enforcement response had been provoked, "HUTAREE members would retreat to one of several 'rally points' where the HUTAREE would conduct operations against the government and be prepared to defend in depth with trip-wired and command detonated anti-personnel IEDs [(improvised explosive devices)], ambushes, and prepared fighting positions." *Id.*, ¶ 4. Such a confrontation, the Hutaree believed, "would be a catalyst for a more widespread uprising against the United States Government." *Id.* The Indictment alleges that the "conspirators planned and trained for armed

conflict against local, state, and federal law enforcement" through numerous means, including acquiring weapons, engaging in military-style training, planning the execution of a law enforcement officer, obtaining information about and materials for the construction of IEDs, engaging in reconnaissance exercises and planning for the killing of anyone who happened upon their exercises, and attempting to initiate a Hutaree protocol to engage law enforcement in an armed conflict following the arrest of several Hutaree members. *Id.*, ¶ 5. The weapons of mass destruction, explosive device, and § 924(c)(1) charges alleged in Counts Two through Seven are derivative of the seditious conspiracy count alleged in Count One. The remaining firearms charges alleged in Counts Eight through Fifteen arise from the Government's seizure of various weapons during the execution of multiple search warrants in this case.

The matter is currently before the Court on three motions to suppress filed by defendants. On February 1, 2011, defendant David Stone, Jr., filed a motion to suppress or for a hearing pursuant to *Franks v. Delaware*. In this motion, defendant alleges that the affidavit in support of two search warrants contained deliberately or recklessly false material statements or omissions. Defendant also argues that the warrant fails to establish probable cause on its face. This motion has been joined by all defendants.[2] The Government filed a response to the motion June 23, 2011, and defendant David Stone, Jr., filed a reply on July 7, 2011. In the second motion, filed on February 4, 2011, defendant Piatek seeks to quash the warrant on the ground that the affidavit in support of the warrant failed to demonstrate probable cause to believe that evidence of a crime would be found at his residence. This motion is joined by defendants Clough, Tina Stone, David Stone, Jr., and Joshua Stone. The

---

[2]Defendant Piatek's joinder offers additional argument in support of the motion. The remaining defendants' joinders simply concur in the relief sought.

government filed a response to this motion on June 23, 2011, and defendant Piatek filed a reply on June 29, 2011. In the final motion, filed on May 26, 2011, defendant Joshua Stone seeks to suppress the search of his residence, on the ground that the affidavit submitted to obtain the warrant failed to demonstrate probable cause to believe that he had committed any of the offenses set forth in the affidavit and thus that evidence of the crimes could have been found in his residence. The government filed a response to this motion on June 23, 2011. For the reasons that follow, the Court should deny each of the motions.[3]

2.    *The Search Warrant Affidavit*

Between March 23 and April 11, 2010, eleven search warrants were issued by Magistrate Judges Morgan and Scheer. Eight of the warrant applications were accompanied by the identical affidavit of Detective Sergeant Sandra L. Larsen, of the Michigan State Police. *See* Def. David Stone, Jr.'s, Mot. to Suppress, Ex. 1 [hereinafter "Aff."]. The affidavit details the government's investigation of the Hutaree group, mostly through the observations of a confidential source (identified in the affidavit as "CHS-1") who joined the group in August 2008, and of an undercover agent of the Federal Bureau of Investigation (FBI) (identified in the affidavit as "UCE-1") who

---

[3]With respect to the various joinders in these three motions by other defendants, there is a question as to whether some of them are proper. "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (internal quotation omitted. Presumably, with respect to defendant David Stone, Jr.'s, motion, the other defendants join because the same affidavit was used to support the searches of their property, and thus contains the same deliberate falsehoods or omissions. It is less clear in what respects the other defendants join in defendants Piatek's and Joshua Stone's motions, as those motions are more particularly directed at the probable cause for a search of their individual properties. In any event, because the motions should be denied, the Court need not separately address the joinders by the other defendants.

joined the group on February 2, 2009. The confidential informant met with members of the group on several occasions. At the first meeting, defendant David Stone, Sr. (Stone), described himself as the leader and identified defendant Joshua Stone as second in command. *See* Aff., ¶ 6. He explained his beliefs regarding the government and militia training. In September 2008, the confidential source participated in a Hutaree training exercise, at which Stone stated that the Hutaree was preparing for war, and that all "non-believers" were considered enemies. These included government employees and law enforcement personnel. During this session, a Hutaree member later identified as Walter "Jason" Priest shot a live round for an AR-15 rifle. Further investigation revealed that Priest had a prior conviction involving the detonation of two pipe bombs. Stone and Joshua Stone spoke about having explosives, but none were seen by the confidential source. Defendant Clough videotaped this training session and others, and produced videos which were posted to the Hutaree's website. *See id.*, ¶¶ 8-9. Clough and other Hutaree members posted various videos, pictures, and messages to the Hutaree website, YouTube, or other websites consistent with the group's anti-government views, explaining weapons and training, and directing people to be prepared for a coming conflict. *See id.*, ¶¶ 12, 13, 21, 23, 29, 43, 46, 50, 59, 61.

The confidential informant attended another training exercise on October 18, 2008. At this training session, Stone discussed the supplies that would be needed for the Hutaree to get organized. He discussed equipping several trailers with medical supplies, food, ammunition, and radio equipment. *See id.*, ¶ 10. About a month later, a video was posted on the Hutaree website in which defendant Clough described perimeter defense security systems, including a trip-wire system subsequently used by the Hutaree to detonate explosives during training. *See id.*, ¶ 12. On December 8, 2008, Walter Lewis Priest, the father of Jason Priest and a federally licensed firearms

dealer, was audited by the Bureau of Alcohol, Tobacco, and Firearm (ATF).  In response to the ATF audit, Stone sent an e-mail to Hutaree members indicating that it "looks like the ATF enforcers are looking for a reason to start a firefight, and WE WILL answer the call."  At a meeting the following day, Stone told Hutaree members to "stand down" for now.  *See id*., ¶¶ 13-14.  The confidential source met several members of the Hutaree at the Stone residence on December 20, 2008.  At that time, the informant observed a number of rifles scattered over the residence, including a short barreled shotgun and an AR-15.  The meeting included live-fire training and a discussion of killing law enforcement officers.  *See id*., ¶ 15.  Jason Priest was arrested by officers of the Adrian Police Department on January 22, 2009, in relation to a domestic disturbance call.  At the time of his arrest, the police seized an AR-15 rifle, a shotgun, a handgun, homemade silencers, bomb making materials, and partially constructed pipe bombs.  *See id*., ¶ 16.

On February 2, 2009, the FBI was able to insert an undercover special agent into the Hutaree.  The agent was a certified Special Agent Bomb Technician and former member of the military's Combined Explosives Exploitation Cell.  At the initial meeting, Stone asked the agent to join the Hutaree and informed him that they were preparing for "something big" in the spring or summer of 2009.  *See id*., ¶¶ 17-18.  On March 24, 2009, both the confidential source and the undercover agent met with Hutaree members at the Stone residence.  Visible were AR-15 rifles, tactical gear, assault vests, and an ammunition re-loading station.  Stone claimed to have approximately 20,000 rounds of re-loaded ammunition.  Three days later, the confidential source attended an overnight training session, at which members were directed by Stone to practice approaching residences while dressed in camouflage and armed.  The confidential source observed numerous assault rifles and rifle parts through Stone's trailer.  *See id*., ¶¶ 19-20.  On June 5, 2009, the confidential source met Stone at the

Stone residence and observed him making "flares" to function as simulated explosives during training exercises. The confidential source was present when Stone purchased the black powder to make these flares from a sporting goods store. Stone claimed that he was going to mix this powder with another powder that he already possessed. During the shopping trip, Stone pointed out to the confidential source the building he believed the government would use as a detention center and "spotting towers" located on his property. *See id.*, ¶ 22.

On June 13, 2009, both the confidential source and the undercover agent participated in a live-fire Hutaree training session. Stone and defendant David Stone, Jr., demonstrated IED explosions, and Stone instructed the members on how to construct IEDs. The training focused on patrolling in formation while avoiding hidden trip wires. Members were split into two groups. The group in which the confidential source was patrolling hit a trip wire, setting off two explosions in rapid succession. Stone gathered the members and explained how the devices functioned, describing the device that had been tripped as a "bouncing betty," a type of fragmentation antipersonnel mine. Stone and David Stone, Jr., attempted to demonstrate another device, which failed to detonate. After, Stone returned to his trailer and upon exiting threw what appeared to be an assembled pipe bomb to the undercover agent. After confirming that the pipe was not filled with an explosive agent, the undercover agent examined it. Stone explained to the agent and then to the other members how the pipe bombs would be used. Stone also took the undercover agent to a room inside the residence, in which the agent observed a large roll of fuse, a pile of electric matches, a box full of electrical wire, and cardboard tubes. The undercover agent opined, based on his experience, that Stone was in possession of all the materials needed to readily assembly IEDs. *See id.*, ¶ 24. On June 26, 2009, the undercover agent met Stone and Joshua Stone at the Stone residence. The agent observed

stockpiles of food, ammunition, partially constructed IEDs, wiring, electric matches, and AR-15 style weapons. The agent also observed what appeared to be two pipe bombs. Stone explained these devices and detonated one of them. *See id.*, ¶ 25.

In July 2009, the undercover agent learned that defendant Ward is an active Hutaree member. At that time, Ward possessed an assault rifle and .45 caliber semi-automatic handgun. *See id.*, ¶ 27. In early July, Ward contacted an FBI employee who was a former acquaintance. Ward asked the employee if he was under investigation as a member of the Hutaree. *See id.*, ¶ 28. On July 25, 2009, Stone hosted a picnic for Hutaree members at his home. Stone spoke about the upcoming "war" that would be started by the government against American citizens. Stone believed the war would start in Oklahoma City, and wanted two nine-man squads to be fully trained. *See id.*, ¶ 30.

On August 13, 2009, Stone met with the undercover agent and explained that all local, state, and federal law enforcement are the "enemy." Stone indicated that he wanted to kill a police officer and then attack the gathered officers and family at the funeral for that officer. The undercover agent disclosed to Stone that he had access to explosives, and demonstrated a device for Stone. Stone spoke of using street signs cut into disks as part of the explosive devices, as well as ball bearings or shrapnel. *See id.*, ¶ 32. On August 22, 2009, both the undercover agent and confidential source attended a Hutaree training session at the Stone residence. The training consisted of patrol and trip wire detection. During this session, the undercover agent spoke with Stone about the explosive device that the agent had constructed at Stone's request. The agent observed smokeless powder, partially constructed pipe bombs, ammunition and cartridge casings, hobby fuse, and electric matches. *See id.*, ¶ 33. Five days later, the undercover agent met with Stone, defendant Joshua Stone, and defendant Clough at Stone's residence to demonstrate the explosive device. Stone

discussed how these devices needed to be constructed to be directed at convoys. *See id*., ¶ 34. On September 13, 2009, the confidential source meet stone at his new residence, the home of his fiancé, defendant Tina Stone. Stone indicated that the targets of the upcoming war included anyone not on "our" side. *See id*., ¶ 36. On October 6, the undercover agent met with Stone, Joshua Stone, and another Hutaree member. Stone said that the Hutaree possessed two .50 caliber rifles, and spoke of using IED's and tank pits against government troops and armor. *See id*., ¶ 37. On November 7, 2009, the confidential informant and undercover agent attended a Hutaree training session near Stone's new residence. Stone demonstrated holes dug on the property to store supplies or to serve as fighting positions. *See id*., ¶ 39.

On December 12, 2009, the undercover agent and confidential source attended the wedding of Stone and Tina Stone. Numerous AR-15 style weapons were present at the wedding. Defendant Meeks brought a document that defendant Clough described as a "hit list" for when the war with the government starts. The list named many government officials, judges, and corporate, union, and media leaders. *See id*., ¶ 43. The following day, both the undercover agent and confidential source received a series of phone calls placing Hutaree members on "high alert" and telling them to "go hot" to rescue a fellow militia member in another state. Joshua Stone later contacted the undercover agent and confidential source to inform them that the situation had been resolved and ordering them to "stand down." Over the course of the conspiracy, members of the Hutaree were repeatedly urged to keep their equipment close at hand in case they had to immediately mobilize. *See id*., ¶ 44.

On January 9, 2010, after Stone had moved back into his old residence, the undercover agent and confidential source attended a training session at Stone's residence. The training consisted of formation patrols and cover and concealment. Stone indicated that the next months of training were

to gear up for "live" training in April. That training would consist of "mobility" training involving the insertion of teams into a "hostile" area, with the goal to remain undetected. If the members were detected, they were to handle it as a hostile situation, and to "put the person on the ground." Joshua Stone repeated his father's instructions to his patrol group. Later, Joshua Stone showed the undercover agent a short barrel rifle and two AR-15 rifles. *See id*., ¶ 45. On January 14, Stone and Tina Stone met the undercover agent at the agent's purported place of business. Stone indicated that he wanted the agent to build several IEDs and explosively formed projectiles (EFP). *See id*., ¶ 46. On January 17, the undercover agent and confidential source received telephone calls from Tina Stone and Joshua Stone instructing them that they were on "red alert" due to Stone being stopped by a Sheriff's deputy. Joshua Stone later called the undercover agent to inform him that they were on "code orange," or standby. During this call Stone told the undercover agent that he wanted "special things" for an upcoming trip to meet other militia groups in Kentucky. *See id*., ¶ 48. On January 20, the undercover agent received an e-mail from Stone which included a schematic of an EFP. *See id*., ¶ 49. On January 25, Stone informed the undercover agent that he wanted anti-personnel devices for the upcoming trip to Kentucky. *See id.*, ¶ 52. On January 28, Stone, Tina Stone, and Joshua Stone met the undercover agent at his business. Stone ordered four pipe bombs to take to the militia summit. *See id*., ¶ 52.

On February 6, 2010, the undercover agent drove to the summit with Stone, Joshua Stone, Piatek, Meeks, and Clough. The members present were armed with rifles and pistols. At Stone's direction, the undercover agent carried extra ammunition from Stone's residence to the vehicle. Stone told the undercover agent that he would task other Hutaree members to acquire materials for the EFP. Because of a winter storm, the militia summit was canceled. *See id*., ¶ 54. On February

20, the undercover agent attended a live-fire training session at Stone's residence. Joshua Stone told the undercover agent that his girlfriend accidentally threw out three wine bottles he had planned on giving the undercover agent for use in constructing IEDs, but that he would get the other materials needed for production of the IEDs. The undercover agent observed various rifles at the scene. Hutaree members conducted detailed discussions about assassinating law enforcement officers. *See id.*, ¶ 57. On March 13, the undercover agent attended Joshua Stone's wedding. The agent spoke with Stone about the EFPs and IEDs that Stone wanted constructed. Although Joshua Stone had failed to provide any of the necessary parts, Stone gave the agent a document which included step-by-step instructions for building an EFP. *See id.*, ¶ 62. On March 18, the undercover agent met with Stone, Joshua Stone, Tina Stone, and other Hutaree members at Stone's residence to pick up some component parts for the EFPs Stone had ordered. Stone indicated that he understood that the device could go through a vehicle and kill any occupants, and stated that they needed to test the device on a police vehicle. Stone also indicated that he wanted the agent to construct "beer can mortars." Joshua Stone also requested that the agent make him a silencer. *See id.*, ¶ 66.

Based on these averments, the affiant sought search warrants for a number of properties, including properties identified as being owned by or the residences of defendants Stone, Clough, David Stone Jr., Meeks, Sickles, Ward, and Piatek. *See id.*, ¶¶ 5, 74.[4] The affidavit sought warrants to search for and seize electronically stored evidence and physical evidence including, *inter alia* firearms and firearm components, explosive material, ammunition, records, military equipment such

---

[4]Because defendant David Stone, Jr., had moved, a second warrant was secured to search his new residence. That affidavit incorporated Larsen's initial affidavit.

as night vision goggles and body armor, and uniforms of the Hutaree.  *See id.*, ¶¶ 75-79.[5]

C.      *Probable Cause*

Defendants first contend that the affidavit in support of the search warrants fails to establish

probable cause for the search.  The Court should reject this argument.

1.      *Legal Standard*

The Fourth Amendment provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. CONST. amend. IV.  The Fourth Amendment requires that every warrant for a search be based

upon probable cause, and that probable cause be determined by a neutral and detached magistrate.

*See Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972).  As the Supreme Court has explained,

"probable cause is a fluid concept–turning on the assessment of probabilities in particular factual

contexts–not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois v. Gates*, 462

U.S. 213, 232 (1981).  In determining whether probable cause for a search exists, a court applies a

"totality of the circumstances" test.  *See id.* at 230.  The inquiry under this test is necessarily fact-

driven, and the court must evaluate the officers' actions in accordance with the "practical

considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

*Brinegar v. United States*, 338 U.S. 160, 175 (1949).  A finding of "probable cause requires only a

probability or substantial chance of criminal activity, not an actual showing of such activity."  *Gates*,

---

[5]The government also obtained warrants to search defendant Piatek's vehicle and to place a tracking device on the vehicle, as well as authorization for a pen register on defendant Piatek's phone. The affidavits in support of these warrants were largely based on the same allegations set forth in Larsen's affidavit, and defendant Piatek challenges these searches on the same bases as he challenges the search of his home.

462 U.S. at 243-44 n.13; *see also*, *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009) (quoting *Gates*, 462 U.S. at 236) (probable cause for a search warrant exists when "'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"). A "fair probability" does not require "any particular mathematical degree of probability." *United States v. Terry*, 522 F.3d 645, 648 (6th Cir. 2008) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). The "totality of the circumstances" test requires a court to consider all factors together, even if they would be innocent when viewed in isolation. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002).[6]

"[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 263 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)); *see also*, *Terry*, 522 F.3d 645, 647 (6th Cir. 2008). Because "'[a] grudging or negative attitude by reviewing courts toward warrants,' is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant," *id*. (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)), a magistrate's determination of probable cause will withstand a Fourth Amendment challenge "so long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." *Id*. (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)) (alteration in original); *see also*, *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009) ("When reviewing a magistrate judge's probable cause determination, a reviewing court should give great deference to a magistrate judge's probable cause determination and reverse that

---

[6]*Arvizu* involved an application of the totality of the circumstances test to the reasonable suspicion needed to justify an investigatory stop. Although "reasonable suspicion" is a lesser quantum of evidence than probable cause, the manner in which the totality of the circumstances test is applied is the same, and thus *Arvizu* provides guidance on applying that test in the probable cause context. *See United States v. Yusuf*, 461 F.3d 374, 390 n.15 (3d Cir. 2006).

decision only if it was arbitrarily made."). In conducting this review, "the reviewing court may only look within the four corners of the affidavit." *Frechette*, 583 F.3d at 379 (internal quotation omitted).

"When reviewing an application, courts must bear in mind that search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found." *Mays v. City of Dayton*, 134 F.3d 809, 814 (6th Cir. 1998) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978)). In making the probable cause determination, "[t]he issuing judge or magistrate may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 644 (6th Cir. 2003) (internal quotation omitted).

2. *Analysis*

After applying these standards, the Court should conclude that the warrant affidavit established probable cause to believe that a search of the various residences and vehicles would uncover evidence of a crime or contraband. The affidavit sets forth numerous, detailed allegations regarding the Hutaree's beliefs and activities, based on the observations of both a confidential source and an undercover agent. These allegations establish not only the Hutaree's beliefs and goals, but also their possession of numerous weapons including short-barreled rifles, assault weapons, ammunition, and bomb making components. With respect specifically to the three moving defendants–David Stone, Jr., Joshua Stone, and Piatek–the affidavit provides probable cause to believe that they were members of the organization and participated in its activities. For example, as to defendant David Stone, Jr., the affidavit avers that he was present at several Hutaree training

sessions at which he was armed with weapons and dressed in a Hutaree uniform, *see* Affidavit, ¶¶ 24, 30 n.21, 33, 45, 57, and at one of which he assisted in demonstrating explosive devices, *see id.*, ¶ 24. With respect to defendant Piatek, the affidavit avers that he too participated in numerous training sessions at which he was armed and dressed in a Hutaree uniform, *see id.*, ¶¶ 30 n.21, 33, 39. The affidavit also avers that he was present for the trip to the militia summit in Kentucky. *See id.*, ¶ 54. Finally, with respect to defendant Joshua Stone, the affidavit avers that he was identified as the second in command of the organization, *see id.*, ¶ 6; that he was present at numerous Hutaree training sessions at which he was armed, spoke about explosives, and gave commands, *see id.*, ¶¶ 8, 15, 24 n.17, 30 n.21, 33, 39, 45, 57; that he spoke with, or was present at discussions with, the undercover agent regarding the preparation of explosive devices, *see id.*, ¶¶ 32, 34, 37, 52, 55, 57, 66; and that he communicated with Hutaree members regarding "alerts," *see id.*, ¶¶ 44, 48.

These averments gave the issuing magistrate judges a "substantial basis" for concluding that the defendants were members of the Hutaree, shared its goals, and possessed evidence of a crime or contraband, notably Hutaree uniforms and weapons. Further, there was a substantial basis for the magistrate judges to conclude that this evidence would be found in the defendants' residences. The affiant, a veteran law enforcement officer, averred that she was "aware through this investigation, other investigations with which she has been involved and through discussions with other experienced investigators that it is common for members of anti-government militia groups engaged in criminal activity to stockpile [weapons and equipment] within their residences, garages, property, businesses, storage units, sheds, and automobiles in order that they may have ready access to these items." *Id.*, ¶ 72. As noted above, it is well-established that "[a] judicial officer may rely on an experienced officer's conclusions based on the nature of the evidence and type of offense." *United*

*States v. Stotts*, 176 F.3d 880, 885 (6th Cir. 1999); *see also*, *Rodriguez-Suazo*, 346 F.3d at 644. Thus, the issuing magistrate judges were entitled to rely on the affiant's experience in determining that Hutaree members were likely to have weapons and other evidence of their activities in their residences. *Cf. United States v. Hall*, 142 F.3d 988, 995 (7th Cir. 1998) (probable cause to search defendant's home established based on officer's averment that, in his experience, pornographers tend to maintain their collections at home). This is particular so here, where the affiant's conclusions were buttressed by defendant Stone's instructions to Hutaree members that they should "keep their equipment close at hand in the event they [were] notified to immediately mobilize." Affidavit, ¶ 44.

Directly on point is the Sixth Circuit's decision in *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001). In that case, the defendant was investigated for his involvement in an anti-government militia, which conducted training exercises in preparation for a war with the government. Similar to the alleged conspiracy at issue here, the group plotted to attack certain targets and then "hold on" while other militias in other parts of the country rose up against the government. The defendant's involvement included attending meetings, participating in training exercises, recruiting members, and purchasing weapons. *See id*. at 497-98. Based primarily on information provided by an undercover agent of the Bureau of Alcohol, Tobacco, and Firearms (ATF) and a confidential source, the government secured a warrant for the search of the defendant's home. The affidavit in support of the warrant detailed the militia group's activities and goals, and the defendant's role in those activities. *See id*. at 501-03. On appeal, the Sixth Circuit rejected a similar claim to that made by defendants here, namely, that affidavit failed to establish probable cause because "there was no evidence that any criminal conduct was associated with [the

defendant's] home." *Id*. at 503. The court explained that "there was ample evidence in the affidavit to allow the magistrate judge to draw a reasonable inference, based on the durable nature of firearms and the ongoing nature of the alleged conspiracy, that evidence of the crime would be found at Graham's home." *Id*. Specifically, the court of appeals pointed to the averments of the affidavit detailing the group's goals and possession of weapons stockpiles, defendant's own role as a member of the group, and the observation of defendant possessing a weapon. *See id*. at 503-04. The court also pointed to the affiant's averment that, based on his training and experience, those who unlawfully possess firearms maintain them in their homes, and that militia members tend to possess firearms. The court explained that "[t]his information, when considered with the other facts alleged in the affidavit, was more than sufficient to create a fair probability in the mind of the magistrate judge that a search of Graham's property would uncover the evidence of criminal conduct." *Id*. at 504.

So too, here. As in *Graham*, here the search is supported by an affidavit detailing the Hutaree's alleged antigovernment views and preparation for war, the group's stockpiling of weapons, the possession of weapons by the group's members including the defendants, and the defendants role in the organization. The affidavit also avers that, based on the affiant's experience and conversations with other law enforcement officers, members of such groups often maintain their firearms in their residences, an averment supported by defendant Stone's alleged urging of Hutaree members to always be equipped to fight on short notice. As in *Graham*, "[t]his information . . . was more than sufficient to create a fair probability in the mind of the magistrate judge[s] that [] search[es] of [defendants'] propert[ies] would uncover the evidence of criminal conduct." *Id*. at 504. Accordingly, the Court should conclude that the affidavit on its face establishes probable cause for

the searches conducted pursuant to the warrants issued on the basis of the affidavit, and that defendants are therefore not entitled to suppression on this basis.

C.     *The Franks Issue*

Defendants also argue that, even if the affidavit establishes probable cause on its face, the affidavit contains material misstatements or omissions entitling them to a hearing.  The Court should reject this argument.

1.     *Legal Standard*

Defendants seek a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  In *Franks*, the Court held that where a defendant shows by a preponderance of the evidence that "a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the . . . false statement is necessary to the finding of probable cause, . . . the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."  *Franks*, 438 U.S. at 155-56.  Thus, to establish a claim under *Franks* a defendant must establish three elements: "(1) a factual statement made in an affidavit supporting a warrant is false; (2) the affiant made the false statement 'knowingly and intentionally or with reckless disregard for the truth'; and (3) without the false statements, the remainder of the affidavit is insufficient to establish probable cause."  *Delta Eng'g v. United States*, 41 F.3d 259, 262 (6th Cir. 1994).  Importantly, to satisfy the second element it is not sufficient that the affiant make a negligent misstatement; to establish a *Franks* violation petitioner must show that the misstatement or omission was either deliberate or reckless.  *See Atkin*, 107 F.3d at 1217; *United States v. Reivich*, 793 F.3d 957, 960 (8th Cir. 1986).  *See generally*, *Franks*, 438 U.S. at 171.  Where the first two elements are shown, the third element of the *Franks*

test requires the reviewing court to view the affidavit as if the false statements were not included. If the affidavit, so read, nevertheless establishes probable cause for a search, the petitioner's *Franks* claim fails. *See United States v. Keszthelyi*, 308 F.3d 557, 566-67 (6th Cir. 2002); *United States v. Graham*, 275 F.3d 490, 506-07 (6th Cir. 2001). *See generally*, *Franks*, 438 U.S. at 171-72. To be entitled to a *Franks* hearing to establish these elements, a defendant bears the initial burden of demonstrating, through an offer of proof, the element of his *Franks* claim. As the Court explained:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

*Franks*, 438 U.S. at 171-72.

Although material omissions, as opposed to misstatements, "are not immune from inquiry under *Franks*," *Atkin*, 107 F.3d at 1217, "'because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to the defendant's benefit,'" *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) (quoting *Atkin*, 107 F.3d at 1217), the court has "'recognized that an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information.'" *Id*. (quoting *Atkin*, 107 F.3d at 1217). Thus, "a *Franks* hearing is only merited in cases of omissions

in 'rare instances.'" *Id.* (quoting *Mays*, 134 F.3d at 815); *see also*, *Hale v. Kart*, 396 F.3d 721, 727 (6th Cir. 2005).

      2.     *Analysis*

Defendants point to a number of statements in the affidavit which they contend are false. The bulk of these statements do not involve false statements at all, and thus provide no basis for a hearing under *Franks*. Defendant David Stone, Jr., first contends that the general allegations in paragraphs 3, 15, 32, 47-49, 51-52, 54-58, 62, and 66 about the beliefs of the Hutaree, the alleged plot to kill law enforcement officers, and the group's alleged attempts to acquire IEDs are materially false *as to him* because they are not based on any statements made by him, are generalized, and "lack any evidentiary basis" regarding him. Defendant Joshua Stone makes a similar argument. However, defendants do not point to any statements within these paragraphs that they contend are actually false; they do not, for example, contend that the affiant inaccurately attributed to them statements made by someone else. Although defendants attempt to make this argument under *Franks*, their argument with respect to these averments is not that they are false, but that they do not suffice to establish probable cause. In other words, their attack on these portions of the affidavit are "aimed mainly at the agents' perception of the events" and not on "the veracity of the affidavit's statements." *United States v. Cruz*, 552 F. Supp. 2d 187, 191 (D.P.R. 2007). The same holds true for defendant David Stone, Jr.'s, argument with respect to paragraph 57, averring that several Hutaree members engaged in detailed discussions about assassinating law enforcement officers.

Defendant David Stone, Jr., also contends that the government's averment in paragraph 22 that defendant David Stone, Sr. indicated on June 5, 2009, that the upcoming training was intended to get members ready for the upcoming ware with the United States government was false, because

the recording from this date does not reveal Stone, Sr., making such a statement, and that the averment that Stone, Sr., told the confidential source that he believed a former Delphi plant was to be used as a FEMA detention center was false because he actually told the confidential source that the plant was owned by the state for a detention center. He similarly contends that the statements in paragraph 30 averring that, at the July 25, 2009, picnic Stone, Sr., discussed an upcoming war that the United States would start on its own people were false because Stone, Sr., actually spoke about foreign troops, and that statements attributed to Stone, Sr., in paragraph 24 about ambushing government agents were false because he actually spoke of fighting "Europe" and "the Germans." Even if these statements were deliberately or recklessly false, however, they were not material to the probable cause determination. Even without these three averments, the affidavit contains numerous other averments detailing Stone, Sr.'s, or other Hutaree members' beliefs that the Hutaree was preparing for a war against the United States government or armed resistance to federal law enforcement officers. *See* Affidavit, ¶¶ 3, 8, 13-14, 20, 32, 37, 43. Further, the fact that Stone, Sr., may have referred to state or foreign agents at these times does not weaken the probable cause determination, in light of the averments that the Hutaree believed that federal, state, and local law enforcement officers were working in conjunction with the New World Order and United Nations peacekeepers. *See* Affidavit, ¶¶ 3, 8 n.4, 22-23, 54.

Defendant David Stone, Jr., next contends that the averments of paragraph 24 stating that he and his father detonated IEDs, and in particular a "bouncing betty" mine, were false because the government has conceded that a real "bouncing betty" was not used, but only a non-fragmentary simulation, and because the explosions at this training session were similar to an M80 or cherry bomb, not a pipe bomb. Again, however, even assuming that this averment was intentionally or

recklessly false,[7] its excision from the affidavit would not call into question the existence of probable cause to believe that members of the Hutaree possessed explosives or explosive device components. The affidavit is replete with other averments that Hutaree members claimed to possess such material and sought to acquire completed explosive devices. *See* Affidavit, ¶¶ 25, 32-34, 46, 48-49, 52, 57, 62, 66. Notably, defendant does not challenge the averment in paragraph 24 reflecting that undercover agent's belief that Stone, Sr., possessed all of the materials necessary to readily assemble an IED, *see id.*, ¶ 24, nor the averment that Stone, Sr., detonated a pipe bomb in the undercover agent's presence, *see id.*, ¶ 25.

Defendant Stone, Jr., next contests the truth of averments in paragraphs 33 and 34 regarding "trusted members" of the Hutaree. This allegation, however, fails to point to any false statement or material omission. Paragraph 33 alleges that Stone, Jr., was present at the training session. It does not, however, aver that he or any other member was involved in the conversation between Stone, Sr., and the undercover agent regarding the explosive device the agent had constructed. Rather, the averment states only that the undercover agent was able to speak with Stone, Sr., regarding the device, that they made plans to detonate the device at a later time, and that Stone, Sr., assured the agent that "he would only invite trusted members of the HUTAREE who would not contact law enforcement." *Id.*, ¶ 33. The following paragraph states that only Stone, Sr., Joshua Stone, Clough, and an unidentified Hutaree member were present for the demonstration; it accurately reflects that Stone, Jr., was not present. *See id.*, ¶ 34. Thus, defendant Stone, Jr., has failed to show that these

---

[7] Notably, two paragraphs earlier the affiant avers that the confidential source observed Stone, Sr., making black powder devices that would function as "cherry bombs," that Stone, Sr., intended to use at the next training session (*i.e.*, the training session that is the subject of paragraph 24) as "poppers," small explosive charges lacking fragmentary material used in training to make noise and simulate larger explosions. In light of this averment, it is questionable whether the reviewing magistrate judge would have read paragraph 24 as averring the use of real fragmentary IEDs rather than simulated ones.

averments contained any materially false statements or omissions. Relatedly, defendant Stone, Jr., contends that the affidavit's description of him as being in the Hutaree "inner circle" was false. This averment, however, merely stated the "affiant's opinion" that various members, including Stone, Jr., "constitute the 'inner-circle' of the HUTAREE." *Id.*, ¶ 67. This conclusion is set forth merely as an opinion "and cannot legitimately be characterized as false or misleading." *United States v. Powell*, No. 10-20169, 2010 WL 3476080, at *9 (E.D. Mich. Sept. 2, 2010) (Edmunds, J.).

Defendant Stone, Jr., next challenges an omission from paragraph 62, which avers that at Joshua Stone's wedding Stone, Sr., addressed the group and said that "everyone was watching the HUTAREE to see what they would do." Affidavit, ¶ 62. Defendant contends that the affidavit deliberately omitted Stone, Sr.'s, next words, which were: "We're not radicals, we're not skinheads – we're not doing anything illegal. We're going to keep it that way." Contrary to defendant's argument, however, this statement does not "change the entire character of the averment," at least in any way relevant to the probable cause determination. The mere statement that everyone was watching the Hutaree was irrelevant to the probable cause determination, and Stone, Sr.'s, characterization of his own activities as lawful does not in any way establish that the activities were in fact lawful, or weaken the strength of the numerous averments in the affidavit that establish probable cause.

Defendant Stone, Jr., also challenges an omission from the second affidavit secured to search his apartment. This affidavit avers that Stone, Sr., drove to Stone, Jr.'s apartment and picked him up to attend a Hutaree event later that day. Defendant contends that omitted from this averment is the fact that the Hutaree event was a supposed memorial service for a Hutaree member that was conceived by the undercover agent. This event was a fake funeral planned by the agent for the

confidential informant. Defendant contends that "[w]ith these facts omitted, the logical inference drawn is that Stone, Jr. was participating in an unknown Hutaree activitiy, possibly resurrecting his dormant participation with the group, or maybe even furthering or initiating the execution of the alleged conspiracy against police officers," when in reality he was "simply going with his father to pay last respects to a man who was considered a family friend." Defendant, however, reads too much into this second affidavit. Nothing in the affidavit purports to establish probable cause for a search of defendant Stone, Jr.'s, home by itself, the affiant does not suggest the "logical inference" drawn by defendant Stone, Jr., and a reading of the affidavit does not lead to that inference. The whole point of the second affidavit, rather, is to establish probable cause to believe that the apartment identified in the affidavit belonged to Stone, Jr., despite the initial search warrant application listing his address as another residence. The second affidavit does not recount any facts relating to the Hutaree and its activities; it merely provides information regarding the government's attempts to establish Stone, Jr.'s, residence. *See* Def. Stone, Jr.'s Br., Ex. 2, ¶¶ 3-8. The inclusion of the event to which the Stones were traveling was solely to establish that Stone, Jr., was seen exiting from the apartment where the government suspected he was residing. It served no other purpose, and the nature of the event (or any inferences about the nature of the event) had no bearing on the probable cause determination.

Finally, and most significantly, defendant Stone, Jr., contends that the affidavit omitted information that he had abandoned, or was in the process of abandoning, his ties with the Hutaree. The affidavit sets forth that at the March 13, 2010, wedding of Joshua Stone, defendant David Stone, Jr., told the undercover agent that he kept his weapons at Stone, Sr.'s residence. *See id.*, ¶ 62. Defendant contends, however, that this paragraph omitted that he told the undercover agent that he

no longer kept his guns or militia "stuff" at home out of concern for the safety of his infant son, and that he and his fiancé were "trying to get out on our own [and] we definitely don't want to have anything" at their new apartment. Defendant contends that this information was omitted "[b]ecause it would have significantly weakened the affidavit's portrayal of Stone, Jr. as a criminal conspirator committed to overthrowing the United States government and killing police officers." Def.'s Br., at 12. Perhaps this is so, but it is also irrelevant. As noted above, the question is not whether the affidavit establishes that defendant Stone, Jr., is guilty of the offenses charged, or even whether there was probable cause to believe that he is guilty; the only question is whether the affidavit establishes probable cause to believe that evidence of a crime or contraband would be found in defendant Stone, Jr.'s, home. And the affidavit included Stone, Jr.'s, statement that he did not keep his weapons at home. It excluded only Stone, Jr.'s, statement regarding the reason he did so. Although Stone, Jr.'s additional statements may have weakened the probable cause to believe that he had weapons or weapons related material in his home–although this is doubtful in light of the fact that the affidavit included Stone, Jr.'s statement that he did not keep weapons in his home–they do not weaken the probable cause established in the affidavit to believe that Stone, Jr.'s, apartment may have contained the other evidence sought in the warrant, such as uniforms, manuals, membership information, and electronically stored information. Thus, this is not one of the "'rare instances'" in which omission of this information warrants a *Franks* hearing. *Graham*, 275 F.3d at 506 (quoting *Mays*, 134 F.3d at 815) (omission from affidavit of statements by defendant that his militia activities were "all mind warfare" and that "I don't want to see innocent people die, and I'm sticking up for my freedom, my rights," did not warrant *Franks* hearing because "[t]he allegedly exculpatory statements do not 'outweigh' the inculpatory ones," and even assuming the omissions were made in reckless disregard

for the truth "the affidavit along with the omitted portions of testimony would still amply establish probable cause to believe that evidence of criminal activity or contraband was contained in Graham's home.").

In short, as explained above a number of the statements identified by defendants were not false, and even assuming that the other statements or omissions were deliberately or recklessly false, excising those statement and including those omissions does not render the affidavit devoid of probable cause to believe that the defendants' residences (and, in the case of defendant Piatek, his vehicle) would contain contraband or evidence of a crime. Accordingly, the Court should conclude that defendants have failed to meet their burden of establishing their entitlement to a *Franks* hearing.

D.      *Conclusion*

In view of the foregoing, the Court should conclude that the affidavit in support of the search warrants provided probable cause, and that defendants have failed to show the need for a *Franks* hearing. Accordingly, the Court should deny defendant Stone, Jr.'s *Franks* Motion to Suppress Evidence, defendant Piatek's Motion to Quash Search Warrant, and defendant Joshua Stone's Motion to Suppress Search of 6021 Tomer Road. The Court should also deny all related concurrences filed by the other defendants.

III.      <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which

raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives _____
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: August 3, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 3, 2011.

s/Susan Jefferson _____
Deputy Clerk