United States District Court
Eastern District of Michigan


United States of America,                    Criminal No. 10-20123

                 Plaintiff,                  Honorable Victoria A. Roberts

vs.

D-l    David Brian Stone,
D-2    David Brian Stone, Jr.,
D-3    Joshua Matthew Stone,
D-4    Tina Mae Stone,
D-6    Michael David Meeks,
D-7    Thomas William Piatek, and
D-8    Kristopher T. Sickles,

                 Defendants.
_____/


Response in Opposition to Defendants'
Rule 29 Motions for Judgment of Acquittal

The United States, in response to the several motions for judgment of

acquittal brought by defendants in this case, says that those motions are

without merit and should be denied, for the reasons stated in the brief in

1

support of this response.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

*s/ Sheldon N. Light*
SHELDON N. LIGHT (P28798)
CHRISTOPHER GRAVELINE (P69515)
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9732
sheldon.light@usdoj.gov
christopher.graveline2@usdoj.gov

Dated: March 25, 2012

United States District Court
Eastern District of Michigan

United States of America,                    Criminal No. 10-20123

                Plaintiff,                   Honorable Victoria A. Roberts

vs.

D-l    David Brian Stone,
D-2    David Brian Stone, Jr.,
D-3    Joshua Matthew Stone,
D-4    Tina Mae Stone,
D-6    Michael David Meeks,
D-7    Thomas William Piatek, and
D-8    Kristopher T. Sickles,

                Defendants.
_____/

Brief in Support of
Response in Opposition to Defendants'
<u>Rule 29 Motions for Judgment of Acquittal</u>

The defendants have moved for judgments of acquittal pursuant to

Fed.R.Crim.P. 29. In essence, they each claim that the government has failed

to produce sufficient evidence of the two conspiracies charged in this case

(Counts 1 and 2), or that if it has, the evidence is insufficient to establish

their individual participation in the conspiracy.

The government submits that, viewed in the light most favorable to the

government, there is sufficient evidence of each of the charged conspiracies.

Further, under the applicable standards for determining participation in a

1

conspiracy, there is sufficient evidence as to each defendant's role and participation in each conspiracy.

There is sufficient evidence, as well, of each additional count: Count 3 (teaching or demonstrating the use of explosives); Counts 4 through 7 (carrying and possessing firearms in connection with a crime of violence); and Counts 8-10, 13, and 15 (possession of illegal machineguns and short-barreled rifles).

## Standard of Review

In reviewing for sufficiency of evidence, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court does not weigh the credibility of witnesses; rather, "all of the evidence is to be considered in the light most favorable to the prosecution." Id. In applying this standard, the court must "give[] full play to the responsibility of the trier of fact fairly to . . . draw reasonable inferences from basic facts to ultimate facts" by crediting all reasonable inferences that support the jury's verdict. Id.

It is not necessary that each element of the crimes charged be supported by direct evidence. *United States v. Townsend*, 796 F.2d 158, 161

(6th Cir. 1986).  Rather, as the Supreme Court held in *Holland v. United States*, 348 U.S. 121, 140 (1954):

> Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence.  In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference.  In both, the jury must use its experience with people and events in weighing the probabilities.  If the jury is convinced beyond a reasonable doubt, we can require no more.

Thus, "[C]ircumstantial evidence alone can sustain a guilty verdict and . . . to do so, circumstantial evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984).

The existence of a criminal conspiracy, and a defendant's participation in the conspiracy, need not be proven by direct evidence; rather, the common purpose and plan "may be inferred from a development and a collocation of circumstances." *Poliafico v. United States*, 237 F.2d 97, 104 (6th Cir. 1956), cert. denied, 352 U.S. 1025 (1957); *Glasser v. United States*, 315 U.S. 60, 80 (1942).  Thus "[t]he nature of the agreement comprising a conspiracy may be inferred from circumstantial evidence." *E.g., United States v. Spears*, 49 F.3d 1136, 1142 (6th Cir. 1995).  And proof of knowledge and intent on the part of the conspirators can likewise be based on circumstantial evidence. *United*

3

*States v. Butler*, 618 F.2d 411, 414 (6th Cir. 1980.  A formal or explicit agreement is not required for the formation of a conspiracy; the agreement may be inferred from acts done in furtherance of the objects of the conspiracy. *Poliafico v. United States*, 237 F.2d at 104.

Once the existence of the conspiracy is independently proven, only slight evidence is necessary to link a particular defendant to that conspiracy. *E.g., United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998); *United States v. Poulos*, 895 F.2d 1113, 1117 (6th Cir. 1990); *United States v. Mayes*, 512 F.2d 637, 647 (6th Cir. 1975); *Poliafico v. United States*, 237 F.2d 94, 104 (6th Cir. 1956).  "Although mere presence alone is insufficient to support a guilty verdict, presence is a material and probative factor which the jury may consider in reaching its decision." *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991).  Even if a defendant joins after the inception of the conspiracy, and plays only a minimal role, she may be found guilty of conspiracy.  *United States v. Clark*, 732 F.2d 1536, 1539-40 (11th Cir. 1984). To be criminally liable it is only necessary that a defendant know the object of the conspiracy, associate herself with it, and knowingly contribute her efforts in its furtherance.  *United States v. Hodges*, 935 F.2d at 772; *United States v. Mayes*, 512 F.2d at 647. If one is working with others for accomplishment of a common purpose or objective, she may be convicted as a co-conspirator.

4

*United States v. Klein*, 560 F.2d 1236, 1243 (5th Cir. 1977), *cert. denied*, 434 U.S. 1073 (1978).

Participation in a criminal conspiracy need not be proven by direct evidence; the common purpose and plan "may be inferred from a development and a [collection] of circumstances." *Poliafico v. United States*, 237 F.2d at 104; *see also United States v. Hodges*, 935 F.2d at 773. The absence of direct proof of the agreement generally results from the secret nature of the conspiracy itself. "Secrecy and concealment are essential features of [a] successful conspiracy. The more completely they are achieved, the more successful the crime." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). Because the nature of a conspiracy entails secrecy, "the agreement and members' participation in it must often be established by way of inference from the surrounding circumstances." *United States v. Ivey*, 915 F.2d 380, 384 (8th Cir. 1990).

A formal or explicit agreement is not essential to the formation of a conspiracy. *Iannelli v. United States*, 420 U.S. 770, 777 n. 10 (1975), *overruled on other grounds by Brown v. Ohio*, 432 U.S. 161 (1977); *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990). "[A] tacit or material understanding among the parties is sufficient to show a conspiracy." *Id*. at 161. *See also, United States v. Arboleda*, 929 F.2d 858, 870 (1st Cir. 1991);

5

*United States v. Hoelscher*, 914 F.2d 1527, 1534 (8th Cir. 1990); *United States v. Hughes*, 891 F.2d 597, 601 (6th Cir. 1989). The agreement may be inferred from acts done in pursuit of the criminal purpose. *Direct Sales Co. v. United States*, 319 U.S. 703, 714 (1943); *United States v. Hitow*, 889 F.2d 1573, 1577 (6th Cir. 1989).

Each member of the conspiracy does not have to be an active participant in every phase of the conspiracy. If the member is a party to the general agreement, he may be convicted as a co-conspirator. *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990); *United States v. Sophie*, 900 F.2d 1064, 1080 (7th Cir. 1990); *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986). A party to a conspiracy need not know the number of his confederates. *United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir. 1944). A defendant may be convicted of conspiracy charges even though he does not know the identity of all his co-conspirators. *Id.*; *United States v. Sullivan*, 903 F.2d 1093, 1098 (7th Cir. 1990); *United States v. Daily*, 921 F.2d 994, 1008 (10th Cir. 1990); *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990); *United States v. Goble*, 512 F.2d 458, 464-5 (6th Cir. 1975). Nor must he have detailed knowledge of the entire scope of the operation, the role played by each member, or the division of the spoils. *Poliafico v. United States*, 237 F.2d at 104. There is no requirement that a co-conspirator receive

6

any reward, financial or otherwise, from the venture.  *Id*. at 106-7.  Thus, knowing participation in the criminal conspiracy for friendship or family ties, rather than financial gain, is not a defense to a conspiracy charge.

<u>The Conspiracies Charged</u>

Count One charges a conspiracy to oppose by force the authority of the government of the United States, in violation of 18 U.S.C. §2384.[1] The indictment relates the nature of this conspiracy in a number of allegations: The vehicle of this conspiracy was the "Hutaree," which advocated and prepared for violence against local, state, and federal law enforcement. (General Allegations, ¶6). The "Hutaree" agreed to oppose by force what it called "the Brotherhood," consisting of federal, state, and local law enforcement agencies. (General Allegations, ¶8). In preparation for its planned use of force against the authority of the government, the "Hutaree" met regularly over a period of more than two years for military-style training

---

1.      18 U.S.C. §2384 provides in pertinent part:

If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take or possess any property of the United States contrary to the authority thereof [they shall be guilty of a crime.]

18 U.S.C. § 2384.

(General Allegations ¶11, Count One, ¶5(b)), they were instructed in the manufacture and use of destructive devices and weapons of mass destruction (Id.), and they assembled a vast arsenal that included machineguns, short-barreled rifles, numerous other firearms, many thousands of rounds of ammunition, and explosives and other items that could readily be assembled to build destructive devices including IEDs. (General Allegations ¶12, Count One, ¶ 5(a)). One object of this preparation, and of the conspiracy, was to use violence to provoke a response by the government, leading to an armed conflict in which the "Hutaree" would conduct military operations against the government. (Count One, ¶4). One plan for accomplishing this was to kill a member of local law enforcement and then to attack those attending the funeral with homemade mortars, IEDs, and EFPs. (Count One, ¶5(c)). Conspirators took affirmative steps towards implementing this plan. For example, they obtained diagrams for building IEDs and EFPs  and provided materials to an undercover agent to build them with. (Count One, ¶5(d)). In January and February, 2010, they made and shared with each other plans to conduct a reconnaissance exercise in April, 2010, in which anyone who came upon the exercise could be killed. (Count One, ¶¶5(e & g)). Also, in February, 2010, in connection with a planned "summit" with other militia groups, defendant Stone, Sr. solicited the undercover agent to provide four

anti-personnel IEDs to take with the group to the summit. (Count One, ¶5(h)). On March 27, 2010, the FBI arrested Stone Sr. and several other conspirators.

Count Two charges defendants with conspiracy "to use, without lawful authority, one or more weapons of mass destruction, specifically explosive bombs, explosive mines, and other similar explosive devices, against persons and property within the United States, that is, local, state, and federal law enforcement officers and vehicles owned and used by local, state, and federal law enforcement agencies," in violation of 18 U.S.C. § 2332a(a)(2).[2] Count Two incorporates by reference the general allegations and the allegation of Count One, which provide a factual outline of the defendants' conspiracy to use weapons of mass destruction.

<u>Summary of the Evidence</u>

On September 27, 2008, Daniel Murray, the CHS, attended Hutaree

---

2.     18 U.S.C. § 2332a provides in pertinent part:

A person who, without lawful authority, . . . conspires to use, a weapon of mass destruction . . . (2) against any person or property within the United States, and (A) the mail or any facility of interstate or foreign commerce is used in furtherance of the offense; (B) such property is used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce; (C) any perpetrator travels in or causes another to travel in interstate or foreign commerce in furtherance of the offense; or (D) the offense, or the results of the offense, affect interstate or foreign commerce, or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce . . . [shall be guilty of a crime.]

9

training in Manchester, Michigan.  This training was attended by David Stone Sr., Joshua Stone, Joshua Clough, Kristopher Sickles, and many others.  Daniel Murray reported that he learned at this session that the mission of the Hutaree to wake up the world that the government was bad and that the true patriots were among the Hutaree and would lead. (Tr. 2/21/12 at 65-66). The enemy was the New World Order and law enforcement, and anyone who was "against the Biblical basis." Id. at 67. Joshua Stone said during the training that he had explosives, that he could get explosives, and that he knew how to use them. David Stone spoke of using explosives to blow up a deer and damage property. Trip wires with "poppers" were used during this training; David Stone said that if they had used the real explosives that he could get, they would all have been blown up. Id. at 68.

On October 18, 2008, Daniel Murray attended a meeting at the Manchester location that had been intended to be a training session. Also present were David Stone, Joshua Stone, David Stone Jr., Michael Meeks, and others. Id. at 74. This meeting was recorded. Among other things, David Stone spoke to the group of the plans for rally points, medics, radios, trailers, supplies, and ammunition. (Gov't exhibit 1A).  In discussing ammunition with the group, David Stone said "We want to kill," going on to say "Because if all we do is injure them, these guys are gonna come back . . . ." (Gov't exhibit 1D).

10

David Stone also told the group that he had a guy who could build mortars for them. (Gov't exhibit 1E).

On December 8, 2008, Daniel Murray and others received an email from David Stone titled "FLASH,,FLASH,,ATF ENFORCERS." (Gov't exhibit 88). In that email and a subsequent conversation between Daniel Murray and David Stone, David Stone indicated that ATF agents had conducted a raid on their firearms dealer, Walter Priest. Stone said that ATF agents had taken all records of them & others in group. He said that this was an intimidation tactic by ATF and to stand ready; if ATF pushed further, there would be a war. Stone indicated other militias like SMVM were running scared. He thought that others militias were cooperating with the government and said this was not useful for militias because there was a coming war. (Tr. 2/22/12 at 14-16).

On December 20, 2008 Daniel Murray attended a meeting at the Stone residence on Tomer Road. Also present were David Stone, Joshua Stone, Joshua Clough, and others. Daniel Murray observed numerous firearms around the residence, all loaded, including a short-barreled assault rifle that David Stone identified as "my little cop killer." (Id. at 17-19; Gov't exhibit 3A). There was further discussion about the ATF raid on the Hutaree's arms dealer and David Stone's response to what he stated was "a prelude to an

11

attack." David Stone also discussed the difference in attitude between the Hutaree and other militia groups like the SMVM. (Gov't exhibit 3A). In further discussion Stone said "You call only tell someone so long. Listen, if you're gonna talk the talk you better be able to walk the walk." (Gov't exhibit 3B).

On January 17, 2009 Daniel Murray attended Hutaree training in Manchester with attended by David Stone, Joshua Stone, David Stone Jr., the Lineweavers, and others. Joshua Stone was assigned as commander of second fire team and performs in that role, in live fire exercises and maneuvers. (2/22/12 Tr. at 28-29; Gov't exhibit 4A, B, C).

On February 28, 2009 Daniel Murray attended Hutaree training in Manchester, that was also attended by  David Stone, Joshua Stone, David Stone Jr., Michael Meeks, Thomas Piatek, Joshua Clough, and others. (Tr. 2/23/12 at 13-14). David Stone spoke of his attitude towards law enforcement, saying "they're gonna pull over the wrong person someday." (Gov't exhibit 10A). The group conducted drills in the woods, live fire exercises. (Gov't exhibit 10B, C, D).

On March 27-28, 2009, Daniel Murray attended Hutaree overnight training at the Tomer Road location. This was also attended by  David Stone, Joshua Stone, David Stone Jr., Michael Meeks, Joshua Clough, and others.

(Tr. 2/23/12 at 22). Daniel Murray was in David Stone, Sr.'s team. Michael Meeks and Josh Clough were also in this group. Id. at 23. The purpose of training was to "go on scout around an area within that countryside." The group went on a circular route out and around areas beyond the Tomer property, approaching close to buildings on other properties. They walked approximately 3 miles that night. They had sporadic radio contact with the other team. During the exercise, David Stone, Sr. talked about the difference between true believers and nonbelievers.  True believers were people supportive of their movement.  The nonbelievers were everyone else.  David Stone, Sr. said that they were entitled as a Hutaree group to take whatever nonbelievers had and they were entitled to their property as well. During training session, they approached a wooded area and heard dogs and an animal sound, and saw flashlights moving around. David Stone, Sr. said that if they came upon people they were to kill them.  After Stone calmed down, the group decided to go around the woods.  They returned to the trailer around 2 or 3 am. Id. at 24-27.

Daniel Murray and David Stone had a lengthy meeting on June 6, 2009, at the Tomer Road property and in a drive around the Adrian area.. (Tr. 2/23/12 at 27 et seq.; Gov't exhibit 16).  David Stone spoke of the usefulness of black powder bombs over firearms for killing. (Gov't exhibit 16B). He spoke of

13

the resources he had to reload thousands of rounds of ammunition for his AR-15s. (Gov't exhibit 16F). During the drive, Stone said that "we're going to be in detention centers" and showed Murray a location in Adrian that he said was the planned location for a FEMA detention center. (Gov't exhibit s 16E, G). Stone spoke in further detail about how he makes pipe bombs with black powder, using shotgun primers and mixing powders to make it work. (Gov't exhibit 16H). He showed Murray how he was building the bombs for the upcoming training on June 13, saying "these babies go off. Holy crap do they go off." (Gov't exhibit 16J).

Both Daniel Murray and the UCE, Steven Haug, attended the Hutaree training on June 13, 2009. The training was attended by David Stone, Joshua Stone, David Stone Jr., Thomas Piatek, Michael Meeks, Joshua Clough, and others. (Tr. 2/23/12 at 30; 3/9/12 at 14-15; gov't exhibits 17, 18). Before the training began, David Stone said "We do IEDs" and "We detonated an IED last time." (Gov't exhibit 17A). The teams practiced patrols with detection of trip wires and ambushes, with David Stone Jr. conducting the ambushes. The UCE observed the use of improvised triggers for the detonation of explosives attached to trip wires, and wires used for the detonation of command-detonated explosives. (Tr. 3/9/12 at 20, 25-26). David Stone Sr. and David Stone Jr. demonstrate the detonation of numerous bombs, using command

14

detonation wires they had set up the night before. (Tr. 2/23/12 at 33; 3/9/12 at 28-32; gov't exhibits 17E, 18I). All participants in the training present for this demonstration of the placement, wiring, and detonation of these explosives. At one point, David Stone Jr. explained to the group the wiring of the explosives, and David Stone Sr. commented that he could easily make more of these devices. (Gov't exhibit 18I).

Later, during the lunch break back at the trailer, David Stone Sr. showed the UCE the makings of a pipe bomb, and explained how to make and fuse a pipe bomb. (Gov't exhibit s 18K, L). David Stone subsequently had extended discussions with Joshua Stone, Joshua Clough, and Thomas Piatek about the procedures for making pipe bombs. (Gov't exhibit s 18K, L, M). In Exhibit 18M, David Stone and Thomas Piatek have a lengthy discussion of the procedures for assembling and fusing a pipe bomb. (Tr. at 13-15). Also after the training, Michael Meeks stated his attitudes towards government and law enforcement, saying "That's why you whack the cops who are trying to arrest ya" and "We gotta get rid of the judicial system . . . They need to die . . . Slowly and painfully." (Gov't exhibit 17F). The group went out for additional drills after lunch. All of the participants in the training carried and possessed firearms during the training. (Tr. 3/9/12 at 40-42).

On June 26, 2009 the UCE met with David Stone at the Tomer Road

15

property, where he demonstrated another explosive device that he had

constructed. During the conversations leading up to the demonstration, Stone

identified Michael Meeks as his "heavy gunner." (Tr. 3/9/12 at 45, 48; gov't

exhibits 20D, G). David Stone conducted an extended discussion of how he

constructed explosives such as the device he was going to demonstrate, and

then he detonated it. (Gov't exhibit 20G). This discussion demonstrated the

sophistication of Stone's understanding of explosives. (Tr. 3/9 at 49-50).

The UCE met David Stone on August 13, 2009, first at Arby's and then

at Tomer Road. (Tr. 3/12/12 at 50-53). The UCE brought and demonstrated an

explosive device for Stone, a few hundred feet down Sword Road from the

trailer. (Gov't exhibit 24E). In later conversation, the UCE and David Stone

were joined by Joshua Stone, Shannon Witt, and Pete Palmer. Stone talked

about the principles of flour bombs and their purpose to kill people. (Gov't

exhibit 24L). Later in the conversation with the UCE and the others, Stone

spoke of the Brotherhood, consisting of all of law enforcement, including

federal law enforcement. He said "the Brotherhood is our problem. Once we

take these guys down, the rest of it will come." (Gov't exhibit 24N). He then

went on to plan an attack on the Brotherhood by killing an officer and then

attacking the funeral. Id., Tr. at 103-104). He later the UCE that he wants

shaped charges to take out convoys. (Gov't exhibit 24P).

16

Daniel Murray and the UCE went to Hutaree training at Tomer Road on August 22, 2009, which was attended by David Stone, Joshua Stone, David Stone Jr., Michael Meeks, Thomas Piatek, Joshua Clough, Kristopher Sickles, Tina Stone, the Lineweavers, and others. (Tr. 3/12/12 at 68-9). David Stone addressed the entire group at the beginning, telling them this would be the last training here, they would be moving. He spoke of the need to get mobile, and to get motivated. He discussed the swine flu shot and plans to go to a rally point if "they" back "us" in with vaccinations. Pointing to the camper on the property, he said "that big thing sitting back there is going to be our radio camp & command medical trailer." (Gov't exhibit 25A). This discussion was followed by exercises and instruction in trip wire detection and patrol tactics. (Tr. 3/12/12 at 69, 70-73). A group photograph was taken. All of the participants in the exercises possessed and carried firearms. (Id. at 73-74; gov't exhibit 96).

The UCE met with David Stone, Joshua Stone, Joshua Clough, and Shannon Witt at Tomer Road on August 27. (Tr. 3/12/12 at 78-79). The UCE brought and demonstrated a shaped charge for the group, using it to blow a hole in a heavy steel plate. (Gov't exhibit 27A, 35A). Stone and the others were impressed and excited about the device and its capacities. Later, riding in a car with this group, Stone said "that would definitely take out a convoy."

(Tr. 3/13/12 at 11-12; gov't exhibit 27M). After the group returned to Tomer Road from Bird Lake Road, Michael Meeks joined them and was shown the steel plate that was penetrated by the explosive device. He recognized the kind of device involved – a shaped charge – and participated in later discussions with the group regarding these explosives and their usefulness to take out convoys. (Gov't exhibit 27O, P). In this discussion, David Stone again referred to Jeff, his guy who could build and aim mortars effectively, and discussed the capacity to "stop them in their tracks going down the road and then . . . drop things in on top of their heads."  (Gov't exhibit 27P, Tr. at 237-38). Meeks and Stone further discussed the usefulness of a shape charge as an anti-tank mine. (Gov't exhibit 27Q, Tr. at 247-48).

On September 13, 2009 Daniel Murray met with David Stone at the Bird Lake Road residence. (Tr.. 2/23/12 at 38-39). Stone talked about base camp, radios, and a camper – the camper at the old place. He said that Oz had bought solar panels and a radio with upper & lower side bands, and was doing great leaps in being a radio man. (Gov't exhibit 34A). He said "we don't need a medic right now," because Mikey (Meeks) is the best medic we have now, he actually did it in Iraq; Robert is his backup. Stone said "we got Tom (Piatek) showing up from Indiana," he's the heavy gun from the other team he is gung ho, and Mikey shows up every training, he's my heavy gun. Murray

18

asked, "What is the goal in all this?" and Stone told him: "Here's our goal . . . At what point are we going to go to war? What time, when do you finally say we do. This forced vaccine is a major one." (Gov't exhibit 34C). Later, Stone said "healthcare – those are fighting words. We're going to go on a pack hunt: killing cops & their families." (Gov't exhibit 34D). He went on to say cops are the best street gang – "And it's called the brotherhood." Murray asked Stone, "How many people in our group would actually pull the trigger?" Stone told him: "About 20. Probably 15 that really want to." (Gov't exhibit 34E).

On October 6, 2009 the UCE met with David Stone, Joshua Stone, and Shannon Witt, and the visited the warehouse that the UCE was obtaining. (Tr. 3/13/12 at 15-16). David Stone spoke of how they were going to kill the enemy with trip wires and explosives, saying they would cripple vehicles with explosives, and then use .50 caliber rifles to snipe at the people trying to recover the vehicles. (Gov't exhibit 36G). The UCE asked, have we got .50 caliber rifles; Stone replied that we have two of them. The only .50 caliber rifles later seized by the FBI were two owned by Thomas Piatek. The group stayed in the car and did not enter the warehouse, as it was not yet ready.

On November 7, 2009, the UCE and Daniel Murray participated in Hutaree training at a new location, on Church Road in North Adams, Michigan, after meeting at the Bird Lake Road residence and convoying to

the training location. Participants included David Stone, Tina Stone, Joshua Stone, David Stone Jr., Joshua Clough, Michael Meeks, Thomas Piatek, Kristopher Sickles, and others.  (Tr. 3/13/12 at 20-21). Before departing Bird Lake Road, David Stone spoke to the group of the need to consolidate and organize their guns and supplies. (Gov't exhibit 39B). At the North Adams location, the group broke into two fire teams and conducted patrols and stalk and ambush exercises. They examined a large hole that was being dug to hold a cache of supplies, and a trailer and structure on the property. Later they conducted another drill. (Tr. 3/13/12 at 24-27).

Daniel Murray and the UCE attended the December 12, 2009 wedding at Bird Lake Road. David Stone, Joshua Stone, David Stone Jr., Michael Meeks, Joshua Clough, and others were present. (Tr. 2/24/12 at 22-25; 3/13/12 at 28-29). Before the ceremony, David Stone spoke in detail to Hutaree members and described the coming April Op, a "real world op" in which a fire team would be dropped in an unfamiliar location and would have to conduct reconnaissance over a two day period with support from the Hutaree base camp, and then be extracted. (Gov't exhibits 43A, 45A). This operation would require a van for insertion and extraction of the fire team; Michael Meeks said he had located a van and it was "a done deal." (Gov't exhibit 45A, Tr. at 37).

20

Daniel Murray and the UCE attended Hutaree training at Tomer Road on January 9, 2010, which was attended by David Stone, Joshua Stone, David Stone Jr., Michael Meeks, Joshua Clough, Kristopher Sickles, and others. Tina Stone was in the trailer for the discussions there, but did not go out for the training that day. (Tr. 3/13/12 at 39-40). Joshua Stone privately showed the UCE his "trade secrets" consisting of AR-15s he was converting to fully automatic, as well as a short barreled firearms. He told the UCE that only he and Mikey know about this, along with David Stone Sr., and said that both his father and his brother, David Jr., also had short-barreled AR-15s. (Tr. 3/13/12 at 44-49; gov't exhibit 48B).

Later, with Joshua Stone, Tina Stone, Joshua Clough, and others present, David Stone explained his plans for attending a militia summit in Kentucky on February 6. (Gov't exhibit 48D). With Joshua Stone, Michael Meeks, David Stone Jr. and others present, David Stone also detailed the recent "Sons of Liberty" red alert and reaffirmed their commitment to "answer the call" if ATF comes to the door. (Tr. 3/13/12 at 50-51; gov't exhibit 48E). All of this occurred in the trailer, before the training session began.

In the subsequent training the two fire teams were led by David Stone and Joshua Stone. Each of them gave detailed instructions to their teams about the coming April Op, including the necessity to kill anyone who comes

21

across the fire team conducting the "real world" reconnaissance exercise. (Tr. 3/13/54-55; gov't exhibits 48I, 46B, 46C). Later, with David Stone Jr., Joshua Stone, Kristopher Sickles, Michael Meeks, and others present, David Stone said: "If can get us into a war, we'd be the first ones to pull triggers." (Tr. 3/13/12 at 56-57; gov't exhibit 48N). Also, in another conversation, Joshua Stone told Kristopher Sickles "I can get some 3 inch titanium salutes . . . . It's like a hand grenade in cardboard . . . if you took and put ball bearings or nails or something, and just taped around it, and there you go." (Tr. 2/24/12 at 28; gov't exhibit 46E).

On January 14, 2010 the UCE met with David Stone and Tina Stone at the undercover warehouse in Ann Arbor. (Tr. 3/13/12 at 60-61)He showed them his work room for making explosives for the Hutaree, with explosive supplies including dynamite, cast boosters, and electric blasting caps. (Tr. 3/14/12 at 9-11; gov't exhibits 49A, 75A). David Stone discussed his planning for the April "real world op" (Gov't exhibit 49B) and his plans for Kentucky trip in February. (Gov't exhibits 49C, E). Tina Stone was an active and informed participant in the discussion. (Gov't exhibit 49E). Stone said "We ain't that far off. we're doin pretty good as a group. . . ." (Gov't exhibit 49J). Stones spoke again of using IEDs & shape charges to take out convoys, talked about using coffee cans & concave copper to make the explosives; he agreed to

22

dig in his computer and find a diagram to send to the UCE. (Gov't exhibits 49K, 75A). The UCE showed David and Tina Stone wine bottle for a shaped charge, the steel plate w/ the hole from the prior demonstration, blasting caps, cast boosters, & explosives. (Tr. 3/14/12 at 9-11; gov't exhibit 75A). The UCE asked, "how many do you want?" David Stone replied: "As many as you can make." (Gov't exhibit49K).

In an email exchange between January 17 and 20, 2010: David Stone Sr. provided the UCE with information and schematic for an EFP warhead. (Gov't exhibit 90) In a subsequent email David Stone advised the UCE that he wanted him to bring anti-personnel explosives on the coming trip to Kentucky. (Gov't exhibit 94).

On January 28, 2010 the UCE met with David Stone, Joshua Stone, Tina Stone, and Shannon Witt at the undercover warehouse. (Tr. 3/14/12 at 18-20). David Stone told the UCE he wanted pipe bomb to bring on the February trip, and they and Joshua Stone discussed the construction and fusing of pipe bombs, and the plans for coming trip. (Gov't exhibit 76A).

Early on the morning of February 6, 2010 the UCE met David Stone, Thomas Piatek, Joshua Stone, Joshua Clough, and Michael Meeks at the Tomer Road trailer for the trip to Kentucky. (Tr. 3/14/12 at 21 et seq.) Before they left, there were conversations with David and Tina Stone about EFPs,

23

and about obtaining wine bottles, coffee cans, and street signs to use for making EFPs. (Tr. 3/14/12 at 25-27; gov't exhibits 58B, C). David Stone gave the UCE a printed diagram for constructing and EFP. (Gov't exhibit 287C). Tina Stone confirmed that she was prepared for a "red dog" alert if the travelers ran into trouble, and was prepared to clear out the guns and the gear in the front room of the trailer if that happened. (Gov't exhibit 58D).

The group then departed for the Kentucky militia summit. All of them were armed with rifles, handguns, ammunition, extra magazines, and gear loaded in the van. All brought "blowout bags." Later, on the road, the group discussed the state of the country and the status of militias. (Gov't exhibit 54C, Tr. at 38-39). The group also discussed what it takes to get to "the feds;" David Stone said you have to start at lower levels of law enforcement. (Gov't exhibit 54D, Tr. at 50-51). He said: "My philosophy is let's just go to war, whenever it's all done and over with then we'll see what's left . . . ." (Gov't exhibit 54D, Tr. at 48). Due to the weather, the group turned back without making it to Kentucky. The group discussed stealing road signs to use in making IEDs. (Gov't exhibit 54E).

On the way back the group discussed David Stone's idea of taking over a zone, by first taking out the "gang" of law enforcement he called the Brotherhood. (Gov't exhibit 54F, Tr. at 214-16).  Stone said: "But until people

24

realize that and stand up and one voice and say no, we mean no. It's not going to happen. like in my speech Mikey." (Id. at 217). Then, encouraged by the UCE and by Joshua Stone, David Stone delivered his speech, including Hutaree's intention to oppose "law enforcement mercenaries called the brotherhood" and the "new world order," and concluding "welcome to the new revolution." (Id. at 217-19). Viewing the video recording of this it is clear that all of the occupants of the vehicle, particularly defendant Piatek, paid close attention to the speech. None expressed any reservations about its message.

Later, in or near Morenci, Michigan, the group passed a car stopped on the road with a flat; a police car was there. Joshua and David Stone agreed that the officer – a Hudson, Michigan officer – was a "prick," and David Stone said "we're going to pop him one of these days." Later, he said "We're going to pop every one of them." (Gov't exhibit 54J, Tr. at 254-55). Others in the vehicle were listening; none disagreed with this statement.

The UCE attended Hutaree training at Tomer Road on February 20, 2010. Present were David Stone, Joshua Stone, David Stone Jr., Joshua Clough, and Kristopher Sickles.  Michael Meeks came later in the day. (Tr. 3/14/12 at 39-40). David Stone gathered the group before going out to train, and they talked about the need for a medic and the man who had crashed an airplane into an IRS building. (Gov't exhibit 59C). Later, David Stone told the

25

group about what he thought would trigger the war, saying "No, I'd go today but are you ready to go. Are you ready to go? Are you ready to go?" – pointing to individual members of the group. (Tr. 3/14/12 at 43-44, gov't exhibit 59 D, Tr. at 89). The discussion then turned to the ways to kill a police officer when pulled over in a traffic stop.

Later on February 20, there was an extended conversation between David Stone Sr., Michael Meeks, Kristopher Sickles, Joshua Stone, Joshua Clough, and the UCE about killing cops. (Tr. 3/15/12 at 18-20; gov't exhibit 59H). The discussion begins with a reference by Meeks and Joshua Stone to copicide, to which David Stone suggests that it would be preferable to "shoot[] them at a distance" to increase the number coming after you. (Gov't exhibit 59H, Tr. at 217). Later, after more talk about killing police, Stone Sr. expands on the idea: shoot one from a distance, and sit back and wait for the funeral, attracting "cops from every state in the country." Then, still with the group sharing in the discussion, Stone states: "I'm thinking IEDs, you just blow the whole convoy up. Ka-boom." (Gov't exhibit 59H, Tr. at 222-24).

On March 13, 2010 the UCE attended the wedding of Joshua Stone and Shannon Witt. He spoke with David Stone, Joshua Stone, and Michael Meeks about obtaining road signs for EFPs. (#/14/12 Tr. at 52-53; gov't exhibit 63A). David Stone gave the UCE printed instructions for making a funnel shaped

charge. (Gov't exhibits 63C, 288). Later, David Stone told the UCE that he wanted one EFP right away and as many as he can make by early fall. (Tr. 3/14/12 at 54-55, gov't exhibit 63G).

On March 18, 2010 the UCE met with David and Tina Stone, first a the Arby's and then at Tomer Road. (Tr. 3/14/12 at 57-58). At Arby's they had a detailed discussion about assembling materials for EFPs, including wine bottles, coffee cans, and road signs. (Gov't exhibits 65A, B, C). At Tomer Road, the UCE is given a road sign and cans to use to make EFPs. (Gov't exhibits 65E, 667, 668, 663). Joshua Stone and Shannon Stone were also present when these material were provided to the UCE. David and Joshua Stone had a subsequent discussion with the UCE about the ways of getting road signs for EFPs, and about converting firearms to fully automatic. (Gov't exhibit 65F, H). Speaking of fully automatic machines guns, David Stone told the UCE: "Every time we get in the field, Steve, we've got that ability. . . . We, we already got some that's already got them." Joshua Stone agreed: "Every training. . . . Every training." (Gov't exhibit 65F, Tr. at 53-54).

On March 27, 2010 the FBI arrested of David Stone, David Stone Jr., Tina Stone, Joshua Clough, and Michael Meeks at the Ann Arbor warehouse. Kristopher Sickles and Thomas Piatek were later arrested in Ohio and Indiana. Joshua Stone not arrested the night of March 27; he fled with others

to rally point North Adams, Michigan property, where he obtained firearms

and ammunition. He and the group finally surrendered on March 29, 2010.

Subsequent searches of defendants' residences recovered large numbers

of firearms, including illegal machineguns and short-barreled rifles.

Approximately 150,000 rounds of ammunition. Large quantities of black

powder, smokeless powder, and other components of explosive devices were

recovered from the Tomer Road residence. Various manuals for military

activity and manuals and instructions for building explosive devices were

found in various residences. Anti-government literature of various kinds was

also found at numerous locations. The GMC Jimmy that David Stone and

others rode in to the ruse memorial service was searched, and it contained,

among other items, a machine gun (Gov't exhibit 301), a short-barreled rifle

(Gov't exhibit 303), ammunition for both weapons, and four more stolen street

signs.

<u>Analysis</u>

From this summary it is readily apparent that there were continuing

conspiracies, as alleged in the indictment, to oppose by force the authority of

the United States and to use weapons of mass destruction. David Stone Sr.

and Joshua Stone were at the center of this conspiracy. They had identified

an enemy, consisting of the Brotherhood (federal, state, and local law

28

enforcement) along with associated elements of government, including the federal government (and including specific federal agencies, such as FBI, ATF, and FEMA) as well as the New World Order. They intended to oppose this enemy by force, whenever the "war" started, by whatever trigger, and they discussed and planned for ways in which the Hutaree could provide the trigger by provoking a response from law enforcement. The triggers they discussed mostly involved killing a law enforcement officer, and they discussed specifically, on several occasions, killing one officer and then attacking others – either the funeral procession or the families of the officers – to trigger war. They conducted numerous training sessions, both offensive and defensive in nature, over a two year period, that included patrols, offensive and defensive maneuvers, offensive and defensive ambush tactics, road crossing exercises, leaping maneuvers, reconnaissance, and offensive and defensive exercises with trip wires and IEDs. These training sessions were intended to enable the Hutaree to survive and prevail in the "war" they expected would be triggered. In connection with this, they planned to use IEDs, and later shaped charges and EFPs. They were clearly experienced from the outset in making and using IEDs with black powder and other explosives they had on hand – they discussed it at the first training attended by the CHS, and they demonstrated it thoroughly with the help of David

29

Stone Jr. at the June 13, 2009 training. When they and the group were presented with the opportunity to go to the next level, with shaped charges and with EFPs, they readily jumped at the chance. They, with the help of other members of the group, then actively pursued and facilitated making additional IEDs, shaped charges, and EFPs, by obtaining and providing information to the UCE and by obtaining materials to use in making the devices. The expressed purpose for seeking these EFPs was to use them against "the enemy," against convoys, and against a law enforcement funeral. The evidence at trial showed that the materials the Hutaree obtained and that had available to them would have produce massively destructive devices that could have caused great damage to property and persons in the United States.

David Stone Jr. was an intimate and trusted member of the group and the Stone family, and having grown up with them since childhood can be presumed to know much about their practices with firearms and explosives. That presumption is validated by the evidence: he was an active and frequent participant in the training sessions, even though not often a vocal participant. He was familiar with explosives, and how to wire, avoid, and detonate them, as shown by his role in the June 13, 2009 IED demonstrations, and his statements to others during that training. Even after he moved out of the

trailer on Tomer Road, he continued to come back for training. He was party to discussions of the April, 2010 "real word op" training that was planned. If he had not had conflicting plans, he would likely have been a part of the core group of Hutaree members who were selected for the February 6, 2010 trip to Kentucky.

Tina Stone did not join the group until August, 2009, when she was still Tina Kelley and became David Stone's girlfriend. She soon became and active, engaged, and vocal member. She trained with the group, and participated actively in discussions of her and Shannon Witt's coming role as support and security for the base camp. She was party to the discussion on January 9, 2010 regarding the upcoming Kentucky trip. She was an active and engaged participant in discussions with David Stone and the UCE at the warehouse and at Tomer Road about the EFPs and explosives the Hutaree were seeking, and played an active, unhesitant, and continuing role in obtaining materials to use in building EFPs – wine bottles, street signs, and cans. She provided active support to the core group that departed for Kentucky on February 6, preparing to maintain security at Tomer Road and to clean out the weapons and supplies if anything happened to the group.

Michael Meeks too was an active and trusted participant, joining in almost all the training sessions conducted by the Hutaree. He was a key

member of David Stone's fire team, Team Kovar: Meeks was his "heavy gunner," and Stone frequently expressed his faith in "Mikey." He frequently spoke of his anti-government and anti-law enforcement sentiments, in strong and violent terms. While he was not part of the group that observed the detonation of the EFP on August 27, 2009, he was invited and showed up later that day. When he saw the results of the demonstration (the steel plate) he immediately recognized what the UCE had brought to the group and joined in discussing it further. He was party to the discussions of the April "real world op," both at the wedding in December and at the January 9, 2010 training, and was tasked with locating and obtaining a van for use in the op. He was involved in getting the street signs the group wanted to steal for use in EFPs. And he was and active party to the conversation on February 20, 2010, about killing police officers, including the discussion of killing one and then attacked the funeral procession with IEDs/EFPs.

Thomas Piatek was also a dedicated member of the Hutaree, coming farther that any other regular member, from northwestern Indiana. Despite the distance he came to many of the training sessions, including the IED demonstrations on June 13, 2009. He was highly trusted by David Stone, who gave him the assignment of "heavy gunner" on Joshua Stone's fire team, Team Teok. According to the testimony of two witnesses, Jamie Glassman

and Nancy Blade, Piatek expressed his hatred for law enforcement and for the government, said he viewed the Hutaree as "family," d said in March, 2010, that "something big" was coming. As a trusted member of the core group, he was part of the contingent that traveled to Kentucky on February 6, 2010, and was an active participant in discussions on that trip. The video of the speech the David Stone gave during the trip shows Piatek as a rapt and approving listener, and his comments after the speech reflect his agreement. Finally, Piatek had the largest arsenal of any of the Hutaree, including over 40 firearms of various calibers, multiple magazines for many of those firearms, and over 100,000 rounds of ammunition. His firearms included two .50 caliber sniper rifles, which were referenced by David Stone in a talk about using .50 caliber rifles to snipe at government officials. Also seized from Piatek's residence were military manuals, explosives manuals, and anti-government literature.

Kristopher Sickles also came to numerous Hutaree training sessions, and also came a considerable distance – from Sandusky, Ohio. He came to the training on January 9, 2010, where both David and Joshua Stone discussed the April "real world op" and the plans to put anyone who resisted the reconnaissance team "on the ground." In chat session with Joshua Clough ("Az") on February 19, 2010, Sickles shows that he knows exactly what that

33

talk was about, saying to Az that "I'd watch what was said in front of that Dan guy," because Dan seemed to show some hesitation and asked a lot of questions when Joshua Stone spoke of the April Op. (Government exhibit 82G). Later that day, Sickles said in further chat with Az that "I trust all the inner hutaree members," and that "josh said we were going somewhere for I think it was aprils training. And he wasnt sure where yet. But were treating it like a real op and if we come across someone and there not willing to work with us . . . . ." Az responded: "that's always been the case." (Gov't exhibit 82H). Sickles returned to Tomer Road the next day, February 20, for training, and was an active participant, later that day, in the discussion of killing cops – including killing a single cop and then attacking the funeral with IEDs/EFPs.

<u>Remaining Counts</u>

The evidence clearly is sufficient to support the allegation that David Stone Sr. and Jr. at least demonstrated (and arguably also taught) the use of explosives, in Count Three.

The evidence clearly is sufficient to show that each of the defendants charged in Counts Four through Seven carried and possessed at least one firearm during the training on the day charged. Thus if the predicate crime of violence is proved, there is sufficient evidence that those firearms were

carried during and in the course of the crime, and possessed in furtherance thereof.

The evidence clearly is sufficient to show that each of the firearms charged in Counts 8-10, 13, and 15 was either an illegal machine gun or an illegal, unregistered short-barreled rifle, and was knowingly possessed by the defendant charged.

<u>Conclusion</u>

For these reasons, the defendants' motions for judgment of acquittal should be denied.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

*s/ Sheldon N. Light*
SHELDON N. LIGHT (P28798)
CHRISTOPHER GRAVELINE (P69515)
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9732
sheldon.light@usdoj.gov
christopher.graveline2@usdoj.gov

Dated: March 25, 2012

## Certificate of Service

I hereby certify that on March 25, 2012, I electronically filed the foregoing document  with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Richard Helfrick, Esq.
Michael Rataj, Esq.
Randall Roberts, Esq.
Mark Satawa, Esq.
Henry Scharg, Esq.
Christopher Seikaly, Esq.
Todd A. Shanker, Esq.
William Swor, Esq.
James Thomas, Esq.
Arthur Weiss, Esq.

s/ Sheldon N. Light
SHELDON N. LIGHT (P28798)
Assistant U.S. Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226-2311
313.226.9732
sheldon.light@usdoj.gov

36