UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                             Case No. 10-CR-20123

           Plaintiff,         Hon. Victoria Roberts

   vs.

DAVID BRIAN STONE, DAVID BRIAN
STONE, JR., JOSHUA MATTHEW
STONE, TINA MAE STONE, MICHAEL
DAVID MEEKS, THOMAS WILLIAM
PIATEK, and KRISTOPHER T. SICKLES,

         Defendants.
_____/

VOLUME 32
TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE VICTORIA A. ROBERTS
UNITED STATES DISTRICT COURT JUDGE
Detroit, Michigan
Monday, March 26, 2012

APPEARANCES:

| | |
|---|---|
| For Government: | Sheldon Light, Esq. |
| | Christopher Graveline, |
| | U.S. Attorney's Office |
| For Defendant D. Stone: | William W. Swor, Esq. |
| For Defendant Stone Jr: | Richard M. Helfrick, Esq. |
| | Todd Shanker, Esq. |
| For Defendant J. Stone: | James C. Thomas, Esq. |
| For Defendant T. Stone: | Michael A. Rataj, Esq. |
| For Defendant Meeks: | Mark Satawa, Esq. |
| For Defendant Sickles: | Henry M. Scharg, Esq. |
| For Defendant Piatek: | Arthur J. Weiss, Esq. |

               *    *    *

OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
(313) 961-6230  www.transcriptorders.com

# I  N  D  E  X

**PROCEEDINGS:**                                                    **PAGE**

**RULE 29 and RULE 801(d)(2)(E) MOTIONS**
    Oral Argument by Mr. Light                              5
    Oral Argument by Mr. Shanker                           58
    Oral Argument by Mr. Thomas                            78
    Oral Argument by Mr. Rataj                             96
    Oral Argument by Mr. Light                            118
    Oral Argument by Mr. Satawa                           120
    Oral Argument by Mr. Scharg                           137
    Oral Argument by Mr. Weiss                            146
    Oral Argument by Mr. Swor                             159
    Oral Argument by Mr. Light                            178
    Oral Argument by Mr. Rataj                            207
    Oral Argument by Mr. Swor                             208

## E X H I B I T S

**EXHIBIT NO.**     **IDENTIFICATION**                                    **PAGE**

(NONE.)

```
 1                              Detroit, Michigan
 2                              Monday, March 26, 2012
 3                              9:02 a.m.
 4                          –      –      –
 5              (Jury not present.)
 6              LAW CLERK SCOTT:  United States District Court
 7    for the Eastern District of Michigan is now in session, the
 8    Honorable Victoria A. Roberts, presiding.
 9                   You may be seated.
10                   The Court calls Case No. 10-20123.  United
11    States of America versus David Brian Stone, Jr. et al.
12                   Counsel, please place your appearances on the
13    record.
14                   MR. LIGHT:  Good morning, Your Honor.  Sheldon
15    Light and Christopher Graveline for the United States.
16                   MR. SWOR:  Good morning, Your Honor.  William
17    Swor, on behalf of David Brian Stone.
18                   MR. SCHARG:  Good morning, Your Honor.  Henry
19    Scharg, on behalf of Kristopher Sickles.
20                   MR. RATAJ:  Good morning, Your Honor.  Mike
21    Rataj, on behalf of Tina Stone.
22                   MR. SATAWA:  Good morning, Your Honor.  May it
23    please this Honorable Court, Mark Satawa, on behalf of
24    Michael Meeks.
25                   MR. THOMAS:  Good morning, Your Honor.  James
```

```
1    Thomas, on behalf of Joshua Stone.
2                 MR. WEISS:  Arthur Weiss, on behalf of Thomas
3    Piatek.
4                 MR. HELFRICK:  Richard Helfrick and Todd
5    Shanker, on behalf of David Brian Stone, Sr.
6                 THE COURT:  Good morning everyone.
7                 The Court has before it a number of motions.  At
8    the heart of all of the motions and at the heart of the
9    801(d)(2) determination the Court has to make is whether
10   sufficient proof has been presented that conspiracies exist.
11                So, I guess that's where the Court wants to
12   start this morning, and I'll start with argument from the
13   Government.  I know the burdens are different for the
14   801(d)(2)(E) and with respect to whether sufficient evidence
15   has been presented for the Government to withstand the Rule 29
16   motions, but -- I understand that, but that's where I want to
17   start.
18                MR. LIGHT:  Understood.
19                I won't repeat the argument or at least I won't
20   try to recapitulate the argument that's contained in the
21   response that the Government filed yesterday to the various
22   Motions for Judgment of Acquittal, but I will say to the Court
23   that that response contains a fairly concise summary of the
24   evidence as we see it that goes to support the existence of
25   the conspiracies charged, as well as the roles and
```

1   participation of each of the conspirators.  And I'm referring

2   specifically to the portion of the response that we filed

3   starting on page nine called Summary of the Evidence.

4               Over the weekend I attempted to go through the

5   transcripts, my notes and the transcripts of the recordings,

6   and present a fairly concise view of what the evidence is in

7   this case as presented by the Government and as viewed in the

8   light most favorable to the Government, which I believe is the

9   standard to be applied on these determinations.  And I'm not

10  going to repeat what's in the brief.

11              I will apologize for the typographical errors.

12  In reviewing it this morning, I found a number of various

13  typographical errors.  I hope they are not too misleading to

14  the Court, but they are a product of my limited touch typing

15  skills over the weekend.

16              In looking at whether or not there's evidence of

17  the conspiracies charged, the place to start is to look at the

18  indictment and consider what the conspiracies are that have

19  been charged.

20              Count 1 charges a conspiracy to oppose by force

21  the authority of the Government of the United States.  And it

22  goes on both in the general allegations of the indictment and

23  in the allegations of manner and means in Count 1 specifically

24  to lay out aspects of that conspiracy to oppose by force the

25  authority of the United States.

1            From reading some of the motions that have been

2    filed by the Defendants, it appears that the Defendants want

3    to limit the allegations and limit the scope of the conspiracy

4    to just one of the paragraphs of the charge that relate

5    specifically to that aspect of the conspiracy that involved a

6    plan to kill a member of law enforcement and then to ambush

7    the convoy of other law enforcement officers who would come

8    and attend the funeral of the particular law enforcement

9    officer killed by the conspiracy.

10            THE COURT:  Mr. Light, you said the Defendants

11   want to limit the conspiracy to that?  Is that what you said?

12            MR. LIGHT:  That's what I said; for example, in

13   the briefing on the motion, the Rule 29 motion by Defendant

14   David Brian Stone, Jr., in which that briefing focuses on

15   whether or not the Government has proved a conspiracy to kill

16   a specific law enforcement officer and then to attack the

17   funeral of that law enforcement officer.  And their briefing

18   is focused on whether or not that specific conspiracy has been

19   proved and whether or not David Brian Stone, Jr.'s

20   participation in that specific conspiracy has been proved.

21            THE COURT:  Well, just one moment.

22            *(Brief pause.)*

23            THE COURT:  All right.

24            MR. LIGHT:  The conspiracy that is charged in

25   Count 1 is broader and more general than that.

1          One of the focuses also of David Stone, Jr.'s

2   arguments, as well as the other Defendants' arguments, is that

3   the Government hasn't proved a specific plan to commit a

4   specific attack, at a specific place, at a specific time, on a

5   specific law enforcement officer.

6          And I will readily concede that we have not

7   proved such a specific plan, but I will submit to the Court

8   that that's not required for the conspiracy that's charged.

9          The conspiracy that's charged is a conspiracy

10  that involves the overall intent and purpose of the Hutaree to

11  oppose law enforcement, to oppose the Brotherhood, as they

12  understand it.  And the Brotherhood, as they understand it, is

13  composed of all law enforcement, including federal, state and

14  local law enforcement.  And throughout the record there is

15  also specific reference to specific elements of federal law

16  enforcement as an aspect of the law enforcement forces that

17  the Hutaree oppose and intend to oppose by force.

18          THE COURT:  Mr. Light, in your opinion, the

19  Government does have to prove -- in Count 1 I'm talking

20  about -- the conspiracy as charged and the plan as described

21  here?

22          MR. LIGHT:  Yes.

23          THE COURT:  Okay.

24          MR. LIGHT:  Yes.

25          THE COURT:  And so part of that plan is that

1    they believed -- well, let me back up.

2              The Government charges that the Defendants

3    intended to kill someone from law enforcement in some manner,

4    and a number of manners are outlined in Paragraph 3 of Count 1

5    under Means and Methods.

6              And then the second part of this conspiracy, as

7    outlined, is that once the killing has occurred, they would

8    expect that a funeral would be planned, and then the second

9    thing that the Defendants would do would be to attack the

10   funeral procession.  That's the second thing.

11             Then they would retreat to a rally point

12   expecting, again, that the government would follow -- the

13   government, lower case -- and that they would defend

14   themselves there, and that all of this would spark an uprising

15   against the United States Government.

16             Magistrate Komives addressed this in one of the

17   early motions that was filed and did say -- I think it was in

18   the Motion to Dismiss and in the Request for a Bill of

19   Particulars on Count 1.  In denying the Request for a Bill of

20   Particulars with respect to the charge of opposing the

21   Government by force -- and this Court accepted that

22   recommendation -- was that the Government did sufficiently

23   allege that the point of this conspiracy, the point of the

24   agreement was to spark this widespread uprising against the

25   United States.

1                    MR. LIGHT:  That's right.

2                    THE COURT:  And he said that that was an

3       essential part of this conspiracy.

4                    So, as I review all of this, it seems to me that

5       the killing of local law enforcement, that's not essential to

6       a charge of seditious conspiracy.  If it were, a lot of people

7       would be charged with seditious conspiracy who have killed

8       local law enforcement people.  So, it's not essential.

9                    The attacking the funeral procession is not

10      essential to a charge of seditious conspiracy.  And at any

11      point that you think I'm wrong, you can tell me.

12                   The rallying and conducting operations against

13      the government, lower case, is not essential.

14                   Essential to this is the sparking of the

15      widespread uprising against the United States Government.

16      Otherwise, maybe there's some other criminal activity ongoing,

17      but it's not seditious conspiracy.

18                   MR. LIGHT:  Well, I believe that what's

19      essential would include attacking a funeral procession that

20      would include -- and I believe this is mentioned in one of the

21      discussions about this process -- that would include law

22      enforcement officers from all around the country and would

23      include federal, as well as state and local law enforcement

24      officers.  That would support opposing by force the authority

25      of the United States.

1              But more importantly would be triggering a

2    response by law enforcement.  Not necessarily a widespread

3    uprising, not necessarily a widespread revolt, although that

4    is something that is discussed repeatedly in the recordings

5    that we've heard in the course of the trial, but what is

6    essential is triggering a response from law enforcement

7    including federal law enforcement; that is, the authority of

8    the United States.

9              So, what we see here in various manifestations

10   throughout the recordings is an intent and a plan in various

11   ways to trigger responses from law enforcement, including

12   federal law enforcement.

13             I would point, for example, to discussions -- I

14   can't specify right now, but I reviewed regarding the process

15   of first attacking local law enforcement, so-called cannon

16   fodder of the Brotherhood or of law enforcement, and the

17   process then of causing a response by the feds., causing a

18   response by the higher authorities, causing a response

19   reaching up into the New World Order, as it's discussed, and

20   the Blue Helmets, as they are discussed, both of which would

21   have an aspect of federal authority in them.

22             So, it's really not the widespread uprising,

23   although that's discussed in many of the recordings, but it's

24   triggering the response from federal authorities and then

25   opposing those authorities.

1          So, I would not agree that there had to be a

2   widespread uprising or a plan for a widespread uprising to

3   constitute the conspiracy charged.

4          The conspiracy charged is not a conspiracy to

5   foment a rebellion and cause a widespread uprising, although

6   there is evidence of that intent in this case.  The conspiracy

7   charged is to oppose by force the authority of the United

8   States by triggering a response by various authorities of the

9   United States through the methods that are alleged in the

10  indictment.

11         THE COURT:  So, your point then is that this

12  part of the indictment, that Hutaree believed and intended

13  that such an engagement would be a catalyst for a more

14  widespread uprising against the United States Government, that

15  that is superfluous to the indictment?

16         MR. LIGHT:  No, I wouldn't say that it's

17  superfluous, because as I said, there's evidence that that was

18  part of the intent.  But I would say that it's -- it's part of

19  the allegations, but it's not essential to the elements of the

20  offense.

21         THE COURT:  So, you could have left that

22  sentence off, you're saying, and we could still be here today

23  trying this case as it was tried?

24         MR. LIGHT:  Yes, we could.

25         THE COURT:  As it is being tried?

1          MR. LIGHT:  Yes, we could.

2          THE COURT:  Okay.

3          MR. LIGHT:  But by alleging that and proving

4     it -- and I believe there is evidence to support that intent

5     and that part of the plan -- it supports what is essential in

6     this case, and that is a plan to oppose by force the authority

7     of the United States.

8          Now, the indictment includes then various ways

9     in which the group prepared for what we've been discussing so

10    far.  And those specific allegations, to follow the Court's

11    questioning, are not essential to the elements of the offense,

12    but they do fill in the ways in which the Hutaree -- the means

13    and methods by which the Hutaree developed and evolved the

14    conspiracy and the plan that's charged in Count 1.

15          So that if we look at Paragraph 5 of Count 1,

16    it's a listing of various ways in which these objectives of

17    the conspiracy were prepared for and were planned for and were

18    developed.  That includes obtaining and assembling all of the

19    materials that were necessary for the conflict with

20    authorities, including federal authorities, that were

21    necessary for opposing by force federal authorities.

22          5 A is obtaining firearms, including illegal

23    firearms, magazines, ammunition, machine gun, short-barreled

24    rifles, explosives and components for destructive devices, et

25    cetera, all of which has been the subject of extensive proof

1    in this case; is the materials that were obtained and

2    possessed and acquired at the Tomer Road location, at

3    Mr. Meeks' location, and at especially Mr. Piatek's location.

4                    THE COURT:  Excuse me.

5                    MR. SATAWA:  Your Honor, may I place an

6    objection on the record at this point?

7                    Before we go too much further in what I'm sure

8    is going to be a very long and trying day of argument, is I'm

9    looking at 5 A, and it says "conspirators."  And it says

10   conspirators acquired firearms, including at least five

11   machine guns and three other unregistered short-barreled

12   rifles.

13                   Mr. Light was speaking of the conspirators and

14   then in connection with 5 A just said certain things were

15   found in the home of Mr. Meeks.

16                   Mr. Meeks was not found with a machine gun.

17   Mr. Meeks was not found with a short-barreled rifle.

18                   And as we go forward, I would ask the Court to

19   please instruct or require the Government to say exactly who

20   of these individuals, since they all have the right to an

21   individual determination by this Court on their own particular

22   Rule 29 motions, that he is speaking of.  Because Mr. Meeks

23   did not have a machine gun.  He did not have an unregistered

24   short-barreled rifle.  And any suggestion to the contrary is

25   just one more fallacy by the Government.

```
 1                   MR. LIGHT:  I'd appreciate the opportunity to
 2      conduct my own argument.  Mr. --
 3                   MR. SATAWA:  And I would -- and I have a right
 4      to object.
 5                   THE COURT:  Excuse me, counsel.  Please.
 6                   You are right, it is going to be a long day.
 7      So, I don't want to get started this early with people
 8      speaking over others so that I can't focus on anything that's
 9      being said.
10                   So, let me just end right there.
11                   You can take your seat, Mr. Satawa.
12                   MR. SATAWA:  Yes, Your Honor.
13                   THE COURT:  Mr. Light, I think it's fair.  I
14      think it's a fair point.
15                   Part of the reason the Court asked the
16      Government to submit a trial brief in the first place was
17      because of the volume of evidence that was coming in and
18      because of the considerations that the Court had to give to
19      each of these Defendants as individuals and the determination
20      that the Court has to make about their specific intent.
21                   And so I think it is a fair point at this
22      juncture.  Until and unless it is established that all of the
23      Defendants were part of the conspiracies charged, then, you
24      know, the acts of everybody cannot be attributed to them.  So,
25      for purposes of this argument, I think it's a fair point.
```

1      MR. LIGHT:  Well, I understand the point, Your

2  Honor, and it is a point that Mr. Satawa is going to be

3  completely free to raise in his portion of his argument.

4      I was speaking generally in terms of what has

5  been alleged in the indictment and what has been proved to

6  support that.

7      I was not saying specifically that Mr. Meeks

8  possessed a machine gun.  But I was saying that the members of

9  the conspiracy, specific members of the conspiracy had machine

10  guns, and that has been proved in this case.  And specific

11  members of the conspiracy had short-barreled rifles, and that

12  has been proved in this case.

13      THE COURT:  I understand that.

14      MR. LIGHT:  Specific members had magazines and

15  ammunition, including Mr. Meeks.

16      THE COURT:  Mr. Light, however, it is the

17  Government's burden to prove the specific intents of each of

18  these Defendants to engage in the conspiracies charged and to

19  do certain things.

20      And so all I'm saying is that it is a fair point

21  for you not to lump all of them together as we're trying to

22  establish whether they joined the conspiracies charged.

23      MR. LIGHT:  Well, I believe the evidence in this

24  case points to specifically who possessed which firearm.  And

25  we'll be here a very long time if we are going to go over

| | |
|---|---|
| 1 | specifically, you know, what each person did at each moment of |
| 2 | all of the evidence that has come into this case over the past |
| 3 | seven weeks. |
| 4 | But to move on, through Paragraph 5, |
| 5 | military-style training was another element of the preparation |
| 6 | for conflict with the authority of the United States.  And I |
| 7 | think I can say that every one of these Defendants was |
| 8 | involved in this military-style training.  And every one of |
| 9 | these Defendants at one time, and usually at many times, |
| 10 | carried firearms in the course of that training.  And I think |
| 11 | I can say, that as to many of them, they were involved in the |
| 12 | training, for example, on June 13th that involved |
| 13 | manufacturing and using destructive devices and explosives. |
| 14 | That does not include certain people.  Tina |
| 15 | Stone wasn't there on June 13th, but others were.  And that |
| 16 | was part of the process of preparing for conflict with the |
| 17 | authority of the United States and opposing the authority of |
| 18 | the United States once the plan was carried out. |
| 19 | Another element of the plan in Paragraph 5 D |
| 20 | involves David Brian Stone specifically, obtaining information |
| 21 | about improvised explosive devices and explosively formed |
| 22 | penetrators for the purpose of obtaining those to use in the |
| 23 | plan that's alleged in Count 1. |
| 24 | Joshua Stone was involved in that as well. |
| 25 | Tina Stone too was involved in that, as the |

1    proofs in this case have demonstrated.  She was intimately

2    involved in January and February in the meetings and

3    discussions at the undercover warehouse about obtaining the

4    elements of IEDs and EFPs to use in furtherance of the plan.

5              Mr. Meeks was involved in terms of being

6    assigned and tasked with obtaining street signs to use in

7    constructing IEDs and EFPs.

8              THE COURT:  Can we go back to the second

9    conspiracy charge?  I would like to focus first on the

10   seditious conspiracy.

11             And your focus -- or, you have the Court's focus

12   now on planning the funeral which would have triggered the

13   response, that would include a response from federal law

14   enforcement.

15             So, let's talk about that agreement, that

16   conspiracy, and how and when you believe that agreement was

17   first put in place.

18             MR. LIGHT:  One moment, please, Your Honor.

19             *(Brief pause.)*

20             MR. LIGHT:  Your Honor, what I would say to that

21   is this.  From the beginning of the time frame of the

22   conspiracy as alleged in Count 1, there are repeated

23   discussions with various members of the conspiracy and with

24   the confidential human source and the undercover agent about

25   the need to oppose the Government and about the need to

```
 1    oppose, if necessary, by force the Government in conjunction

 2    with the upcoming war or conflict with the Government.

 3                    And this evolves to the point where on August

 4    13th, in a meeting with the undercover agent and with Joshua

 5    Stone and with Shannon Witt and with Pete Palmer, Mr. Stone

 6    first talks about bombs, flour bombs, incendiary bombs

 7    involving flour or coal dust and the purpose of those bombs

 8    being to kill people.

 9                    He then goes on to speak of the Brotherhood,

10    which is not a new concept.  It is a concept that has been

11    expressed in prior conversations and prior dealings.  And he

12    says, "The Brotherhood is our problem.  Once we take these

13    guys down, the rest of it will come."

14                    He then goes on to plan and to describe with

15    Joshua Stone and the others present his plan to attack the

16    Brotherhood by killing an officer and then attacking the

17    funeral, and goes on to describe or to tell the undercover

18    agent that he wants shaped charges to take out convoys.

19                    This is at the stage of the conspiracy where it

20    has moved towards more sophisticated explosives like shaped

21    charges and eventually explosively formed penetrators.

22                    So, this is the point in the conspiracy where it

23    evolves to the plan that is described.

24                    And I would say, as a matter of general

25    principle, a conspiracy doesn't have to be a fully formed
```

1    thing at the beginning.  A conspiracy can be an evolving and

2    changing matter as it relates to participants in the

3    conspiracy, as it relates to objectives of the conspiracy, as

4    it relates to the methods and means of the conspiracy.

5                    This is the point in the conspiracy where it

6    coalesces in the discussion between David Stone, Sr., Joshua

7    Stone, and the others who are present, of the plan to attack

8    the Brotherhood by killing an officer --

9                    MR. HELFRICK:  I'm sorry to interrupt.  But

10   Mr. Light didn't say August 13th of what year.

11                   MR. LIGHT:  August 13th of 2009.

12                   Thank you, sir.

13                   THE COURT:  So, of the Defendants that are here

14   on trial, you believe that an agreement was struck on August

15   13th between Joshua and David Stone to commit seditious

16   conspiracy?

17                   MR. LIGHT:  But that's not all.

18                   THE COURT:  Well, with respect to the Defendants

19   here.

20                   MR. LIGHT:  That's the --

21                   THE COURT:  Okay.  Then what else?

22                   MR. LIGHT:  That's not all.

23                   As time goes on, there is an evolution to the

24   point where on February 20th --

25                   THE COURT:  No, no, no, I understand.  And I do

1    want you to go on.

2              MR. LIGHT:  Mm-hmm.

3              THE COURT:  But in terms of a first formation

4    involving any of the Defendants that are here, you are saying

5    that August 13th was the date that involved Defendants here to

6    kill law enforcement and attack a funeral procession that

7    involved federal officers?

8              MR. LIGHT:  That specific aspect of the

9    conspiracy, yes, Your Honor.

10             But it's a broader conspiracy that's alleged in

11   this indictment.  It's not just focused --

12             THE COURT:  That's why I asked you in the very

13   beginning if we are talking about what the plan that you have

14   alleged in this indictment or are you talking about something

15   else?

16             MR. LIGHT:  I'm talking about an overall plan to

17   oppose by force the authority of the United States.

18             THE COURT:  So, how else -- maybe you need to

19   give me your broad outline first of how else you believe these

20   Defendants were going to oppose the United States Government

21   by force other than the funeral -- attacking the funeral

22   procession at which they believed federal and law enforcement

23   would be present.

24             MR. LIGHT:  Well, for example, there are

25   discussions on a number of occasions of the idea of killing a

```
 1   police officer, taking his or her identification, going to his

 2   or her home, killing his family or her family, on the

 3   proposition that that would cause a similar response by law

 4   enforcement, a similar response by the Brotherhood, which

 5   would result in the same actions by the Hutaree; that is,

 6   retreating to a rally point and opposing law enforcement --

 7   and opposing by the law enforcement, including federal

 8   authorities, who would respond to an attack like that.

 9              THE COURT:  All right.  So that I'm clear,

10   looking at this indictment then that sets forth various ways

11   that the Defendants would commit the killing of law

12   enforcement, you are saying that the evidence in this case

13   supports -- are you saying that the evidence in this case

14   supports everything that you've outlined in the means and

15   methods in Paragraph 3?

16              MR. LIGHT:  Well, the scenario I've just

17   described, which is supported by the evidence, is a scenario

18   that's encompassed by the allegations in Paragraph 3.

19              The allegation is that there was a general plan

20   to commit a violent act to draw the attention of law

21   enforcement or government officials and to prompt a response

22   by law enforcement.  That's the general plan; prompt a

23   response by law enforcement.

24              And then there are various ways in which that

25   can be accomplished:  Kill a cop after a traffic stop, that's
```

1    going to prompt a response by law enforcement.  Kill a member

2    of law enforcement and his or her family at home.  That's the

3    one I just discussed.  That's a way to prompt a response by

4    law enforcement.  Ambush a member of law enforcement in a

5    rural community, that's another way of attacking law

6    enforcement and prompting a response.  And then finally,

7    another alternative, killing a member of law enforcement and

8    attacking the funeral procession.

9              These are alternative methods that are alleged

10   in Paragraph 3.  It's not just the funeral procession that

11   would be one way of triggering or prompting the response by

12   law enforcement that would lead to the conflict that the

13   Hutaree were seeking.

14             So, maybe I wasn't clear in my earlier response

15   to the Court.

16             THE COURT:  So, Mr. Light, with respect to these

17   other attacks on law enforcement, you are not saying that

18   there was an agreement that the other ways of attacking

19   someone in local law enforcement was going to result in a

20   funeral procession to which all federal -- to which federal

21   law enforcement responded?

22             I guess what I'm focused on is how you draw

23   in -- how they were going to draw in the United States

24   Government.

25             I see the funeral procession.

```
 1                    MR. LIGHT:  Mm-hmm.

 2                    THE COURT:  I see that.

 3                    I'm not seeing how you are alleging they did

 4    this or there was any agreement or any discussion that

 5    involved these other ways of killing law enforcement that was

 6    going to draw in the United States law enforcement.

 7                    MR. LIGHT:  Well, I think if you look at the

 8    evidence as a whole, their understanding was that once you

 9    attack local law enforcement in one of the manners described,

10    that's going to elevate it to federal law enforcement.  And

11    there's repeated discussion, for example, of the ATF and the

12    ATF's interest in matters of the kind that I'm describing

13    here.

14                    So, the funeral is one clear way, but there are

15    other ways as well that I think the proofs in this case

16    support.

17                    Now, I was talking about Paragraph 5 D which

18    relates to the importance of IEDs and --

19                    THE COURT:  But I'm not done with the first

20    count yet.

21                    MR. LIGHT:  I wasn't moving to the second count.

22    But Paragraph 5 D relates to the IEDs and EFPs being an

23    element of the seditious conspiracy and part of the means and

24    methods of the seditious conspiracy.

25                    So, I'm sorry if I led the Court to believe that
```

1    I was already talking about Count 2.

2                    THE COURT:  One moment.

3                    *(Brief pause.)*

4                    THE COURT:  So, Mr. Light, still with respect to

5    Paragraph 3 and Paragraph 4 of the means and methods,

6    Paragraph 3, which talks about attacking the funeral

7    procession with weapons of mass destruction, that phrase then

8    is intended to go only with and killing a member of law

9    enforcement that lasts -- and killing a member of law

10   enforcement and not with the other references to killing a

11   member of law enforcement?

12                   MR. LIGHT:  That's the way I read that

13   paragraph, Your Honor.

14                   THE COURT:  All right.  And then -- so, that

15   one -- that method of killing someone in law enforcement has

16   its own way of drawing in federal law enforcement officials.

17                   Then we have to look at Paragraph 4 of means and

18   methods and attach that to these other ways of killing law

19   enforcement in order to get the response from the federal

20   government?

21                   MR. LIGHT:  I think that's right, Your Honor.

22                   And part of it is if you look at -- I know

23   you're going to think I'm taking you back to Count 2, but I

24   really am not, Judge.

25                   The first part of Paragraph 4 is that the

1    Hutaree's general plan was further that -- well, I'm missing a

2    paragraph.  I'm sorry.  Give me a moment, Your Honor.

3                    *(Brief pause.)*

4                    MR. LIGHT:  -- was further that once violation

5    action had been taken, they would retreat to a rally point and

6    conduct operations against the Government that would involve

7    trip wire and command detonated explosives, ambitious and

8    prepared fighting positions.

9                    And I submit that that would involve the

10   authority of the United States that they would be opposing at

11   that point.

12                   THE COURT:  Okay.  So, we talked a little bit

13   about August 13th where there was a specific discussion about

14   killing someone in law enforcement and attacking the funeral

15   procession.

16                   MR. LIGHT:  Correct.

17                   And part of that discussion -- and part of the

18   idea of attacking the funeral procession is to use weapons of

19   mass destruction, to use shaped charges or to use explosively

20   formed penetrators as part of that attack.  And that's

21   specifically mentioned at the end of the discussion on August

22   13th where Dave Stone says that he wants shaped charges for

23   the purpose of taking out convoys.  And convoys can include

24   such things as a funeral procession.

25                   And over the discussions after that relating to

1   shaped charges and EFPs, there are repeated references to the

2   usefulness of shaped charges to take out a convoy.

3           THE COURT:  But where -- let me stay with this

4   agreement to kill and attack a funeral procession that you say

5   was formed on August 13th minimally involving David Stone and

6   Joshua Stone.

7           MR. LIGHT:  Mm-hmm.

8           THE COURT:  Who else became a part of that

9   agreement?

10          MR. LIGHT:  Well, that's the evolution I'm

11  trying to show, is an evolution in terms of the discussion of

12  taking out convoys that then leads to a discussion on February

13  20th, again, about attacking a funeral.  But it's all of a

14  piece.  For example, on August 27th in a meeting with David

15  Stone, Joshua Stone, Joshua Clough and Shannon Witt, there's a

16  demonstration of a shaped charge and its ability to penetrate

17  a heavy steel plate.

18          Riding in a car with the group, David Stone says

19  "That would definitely take out a convoy."

20          THE COURT:  And you said that date was August

21  27th?

22          MR. LIGHT:  Yes.

23          THE COURT:  And are you saying that that August

24  27th discussion is what then brought in Joshua Clough and

25  Shannon Witt?

1          MR. LIGHT: Well, Shannon Witt was at the prior

2    discussion.

3          THE COURT: Okay.

4          MR. LIGHT: This brings Joshua Clough into this

5    evolution of the plan. And later on it brings in Michael

6    Meeks who joins them after the device is exploded, but

7    recognizes immediately it's a shaped charge and participates

8    in later discussions with the group regarding this kind of

9    explosive and its usefulness to take out convoys.

10          THE COURT: And, again -- so, you are saying by

11   the end of the day on August 27th, we now have Clough and

12   Meeks in because of this discussion, a discussion to take out

13   convoys, and that they are now part of this agreement to kill

14   law enforcement and to attack a funeral procession?

15          MR. LIGHT: Yes, I am, especially since later on

16   in the discussion David Stone again talks about his guy who

17   could "build mortars and has the capacity to stop them in

18   their tracks, going down the road, and then drop things in on

19   top of their heads."

20          THE COURT: And what is it about convoys that

21   makes it clear that it involves federal law enforcement?

22          MR. LIGHT: I think as we go on, you will see

23   that it gets tied together later on.

24          THE COURT: So, I guess my question is -- I'm

25   not seeing anything that makes it clear that federal law

1    enforcement is part of convoys at this point.

2              So, are Clough and Meeks in this yet?

3              MR. LIGHT:  I believe they are.  Because they

4    don't have to know every aspect of the conspiracy.

5              THE COURT:  But this conspiracy is against the

6    United States.  That is the aspect of seditious conspiracy.

7              MR. LIGHT:  And this record is replete with

8    opposition -- discussions of opposition to the authority of

9    the United States.

10             THE COURT:  I understand that --

11             MR. LIGHT:  And in the context of that

12   discussion and that opposition to the authority of the United

13   States, I think it can readily be inferred that the convoys

14   they are discussing are convoys that would involve federal law

15   enforcement or federal military authorities.

16             In fact, at the end of this discussion,

17   Mr. Meeks and Mr. Stone further discuss the usefulness of a

18   shaped charge as a kind of anti-tank mine.

19             The Court and the jury are allowed to make

20   reasonable inferences from the overall tenor of the

21   discussions as to what was intended when they are talking

22   about convoys.  And I think it's a reasonable inference that

23   they are not talking about convoys of local police going down

24   the road; they are talking about convoys that can and would

25   include federal authorities.

1           THE COURT:  Okay.  So, in your mind, by August

2  27th, three of these Defendants are in Count 1?

3           MR. LIGHT:  At least.

4           THE COURT:  Okay.  I haven't heard anything with

5  respect to the others yet.

6           MR. LIGHT:  Taking us to January 14th, 2010, the

7  undercover agent met with David Stone and Tina Stone, who is

8  now an active member of the group, at the undercover warehouse

9  in Ann Arbor.  And this is the meeting where he shows them a

10 workroom for making explosives for the Hutaree, that has

11 explosive devices and supplies there, including cast boosters,

12 which are a detonation device for detonating low explosives,

13 and electric blasting caps, as well as dynamite and pipe bomb

14 components and other items.

15          During this discussion Mr. Stone Says:  "We

16 ain't that far off.  We're doing pretty good as a group."

17          And he goes on to speak of using IEDs and shaped

18 charges to take out convoys.  And he talks about using coffee

19 cans and concave copper to make the shaped charges or EFPs.

20 And he agrees to provide information to the undercover agent

21 to build those devices; again, in the context of talking about

22 them to use them to take out convoys.

23          The agent asks him, "How many do you want?"

24          And David Stone said, "As many as you can make."

25          And I will submit that that brings Tina Stone

1    within the group, who is aware of the purpose for which they

2    are going to use these explosives or planning or conspiring to

3    use these explosives.

4              THE COURT:  Again, because David Stone says that

5    these IEDs and shaped charges can be used to take out convoys?

6              MR. LIGHT:  Yes.

7              THE COURT:  And "We ain't that far off"?

8              MR. LIGHT:  And what?

9              THE COURT:  And "We ain't that far off."

10             MR. LIGHT:  Yeah.

11             THE COURT:  And how does it bring in Tina Stone?

12   Because he said that in front of her?

13             MR. LIGHT:  And she's there for the discussion,

14   for the understanding that these elements that are in the

15   warehouse are being made available to the Hutaree to make

16   these explosives.  And she is participating in the discussion.

17   She is an active an engaged participant in the discussion.

18             And this isn't the only time that she comes to

19   the warehouse and shares in the discussion and planning for

20   the use of these explosives.

21             THE COURT:  What does she say?

22             MR. LIGHT:  I guess we are going to have to find

23   the transcript.

24             I have 49 A -- actually 49 J and 49 K.

25             *(Brief pause.)*

```
 1                    MR. LIGHT:  Looking at 49 K on page 88, this is
 2      with Tina Stone present.
 3                    The agent says, "It can go through a quarter
 4      inch of steel.  I don't think that will be much of a problem
 5      going through a door."
 6                    David Stone:  "IEDs."
 7                    The agent:  "What do you got in mind?"
 8                    David Stone:  "Shaped charges.  Just got to take
 9      some -- unintellible."
10                    The agent:  "Yeah?  Anything in particular?"
11                    David Stone:  "Pickups and convoys.  We'll back
12      them out of our region real quick."
13                    The agent:  "Mm-hmm."
14                    David Stone:  "Shut down their supply lines,
15      make 'em go way out and around us."
16                    The agent:  "What kind of shaped charge you
17      talking about?"
18                    David Stone:  "It has to be a copper."
19                    The agent:  "Copper?"
20                    Stone:  "Use a coffee can."
21                    The agent:  "Mm-hmm."
22                    Stone:  "With a copper plate concaved in."
23                    The agent:  "Right."
24                    Stone:  "That and a pile of explosive, whatever
25      you toss (unintelligible) trigger off on it."
```

US v Stone, et al. #10-CR-20123

```
 1               The agent:  "Right."

 2               Stone:  "Makes a penetrator."

 3               The agent:  "Mm-hmm."

 4               Stone:  "The problem is depleted radium armor.

 5    You got to smack it about four times to get through it."

 6               The agent:  "So?"

 7               Stone:  "Drop the plate, bam, bam, bam, as you

 8    are trying to get through it."

 9               The agent:  "So you get four coffee cans?"

10               Stone:  "APCs" -- which are armored personnel

11    carriers.

12               Tina Stone:  "So does that mean I got to start

13    buying coffee in a metal can?"

14               David Stone:  "Well, that is shaped charge

15    from -- you're going to have to bury them in the road.

16    Problem is . . ."

17               The agent:  "What, from the bottom?"

18               Stone:  "Now, they -- they watch the roads real

19    close."

20               The agent:  "Yeah."

21               Stone:  "So you got to disguise them really

22    well."

23               The agent:  "Right."

24               Stone:  "I mean --"

25               The agent:  "They don't watch the roads over
```

US v Stone, et al. #10-CR-20123

1    here that well."

2                    Stone:  "Not at the beginning they won't."

3                    At the beginning.

4                    The agent:  "Right."

5                    Stone:  "But they will.  They will learn."

6                    The agent:  "Well, yeah, sure.  But you know, we

7    change too."

8                    Stone:  "If they change, we'd have to adapt and

9    change also."

10                   Tina Stone:  "Well, if they were cops, all we'd

11   have to do is give them free doughnuts."

12                   Stone:  "Well, you ain't even got to do free

13   doughnuts.  Just put out a sign free doughnuts."

14                   Tina Stone:  "Yeah."

15                   David Stone:  "With an arrow, and they will

16   follow."

17                   The agent:  "Right.  Coffee cans with metal.  I

18   think I can figure that out."

19                   Stone:  "I have that on file."

20                   The agent:  "Yeah?  Are there like specs on it,

21   some kind of drawing or something?"

22                   Stone:  "I'll have to dig in my computer."

23                   The agent:  "Well, shoot that my way.  I'll do a

24   little research and development for you and see what I can

25   work out.  And uhm -- if I figure it out I -- how many you

```
 1    want?"

 2                    David Stone:  "Say what?"

 3                    The agent:  "I said if I figure it out to make

 4    it work, how many do you want?"

 5                    David Stone:  "As many as you can make."

 6                    Tina Stone:  "Like we need to give him some

 7    light bulbs."

 8                    So, she's -- she's there.  She's listening.

 9                    THE COURT:  I understand that she's there.

10                    MR. LIGHT:  She is understanding.

11                    THE COURT:  She is there.

12                    And so much of this case is about people being

13    present and people being in association with other people.

14                    Are you telling me that this exchange here on

15    January 14th is sufficient to prove that Tina Stone had

16    knowledge that there was a plan to attack a convoy of law

17    enforcement people that involved federal officials?

18                    MR. LIGHT:  I'm saying it's sufficient to show

19    that she was aware and agreed to a plan to attack a convoy

20    with the kinds of weapons that are being discussed here.  And

21    that from the entire context of her participation in the

22    Hutaree, it's reasonable to infer that she understood that

23    that would include federal authorities, United States

24    authorities.

25                    THE COURT:  All right.  So, you have talked
```

1    about four of the Defendants.

2                    MR. THOMAS:  Your Honor, at the risk of breaking

3    off this argument prematurely, may I have a five-minute break,

4    please?

5                    THE COURT:  Yes.  We'll take five.

6                    *(Recess held from 10:18 a.m. until 10:29 a.m.)*

7                    THE COURT:  So, Mr. Light, before we leave Tina

8    Stone, just -- and Michael Meeks, are you saying that they

9    agreed to the -- they are now into the conspiracy first

10   discussed on June 13th by -- between David Stone and Joshua

11   Stone and others, or is it something --

12                   MR. HELFRICK:  August 13th.

13                   THE COURT:  August 13th.  Thank you.  August

14   13th.

15                   Or is it something broader?

16                   MR. LIGHT:  I would say, at the very least, it's

17   the broader conspiracy at this point in time.

18                   And, again, I want to go back to paragraph --

19                   THE COURT:  And the broader being just a ...

20                   MR. LIGHT:  A what?

21                   THE COURT:  An attack after some law enforcement

22   person has been killed.  And up to this point, there hasn't

23   been any evidence of a discussion of killing a police officer

24   in a different context, has there been?

25                   MR. LIGHT:  Yes, there has.

1          THE COURT:  All right.

2          MR. LIGHT:  There have been numerous discussions

3  of killing police officers in a variety of contexts, including

4  the discussions about killing officers and then going and

5  killing their families.

6          THE COURT:  That Michael Meeks and Tina Stone

7  have been a part of?

8          MR. LIGHT:  I'm going to have to dig to come up

9  with the specifics on that.  I don't have that on the top of

10  my head.

11         THE COURT:  Okay.  It is important to the Court.

12  I want to know what it is that you're saying they have agreed

13  to.

14         If you are saying that you don't -- are you

15  saying that you don't necessarily have to prove that they were

16  in agreement that someone from law enforcement would be killed

17  to spark this gathering of federal law enforcement?

18         MR. LIGHT:  No, I'm not saying that at all.

19         THE COURT:  So, are you saying that they have to

20  have been part of an agreement to kill law enforcement, local

21  law enforcement?

22         MR. LIGHT:  Yes.

23         THE COURT:  And I need to know where you say

24  Michael Meeks and Tina Stone were part of an agreement to do

25  that.

1          MR. LIGHT:  Well, Tina Stone is part of a -- the

2     agreement to kill a member of law enforcement as a way of

3     triggering the response that I'm talking about is an agreement

4     that is reflected in various ways along the course of the

5     conspiracy.

6          We've been focusing on one of the ways; that is,

7     to attack the funeral procession after that.  And it's in that

8     context that Tina is directly involved in the discussion we

9     just read and in some other discussions about the process for

10    getting the explosives that are necessary to attack that

11    convoy.

12          THE COURT:  And --

13          MR. LIGHT:  And I believe that if you take that,

14    together with her presence for other discussions regarding

15    opposition to law enforcement, that you can infer her being a

16    party to that agreement.

17          THE COURT:  Okay.  So, she's present during this

18    discussion.

19          Are you saying that her comment "I guess I'll

20    have to drink coffee that comes in metal cans now," that that

21    is her way of agreement to be part of the conspiracy?

22          MR. LIGHT:  That's one way in which she agrees

23    to be part of getting the materials that are necessary to

24    build the devices that are to be used in attacking a convoy.

25          I mean, she says one thing, but she's there

1    while the discussion talks about burying those devices in the

2    road and attacking convoys.

3                    THE COURT:  I know that she --

4                    MR. LIGHT:  She doesn't have to say "Yes, sir, I

5    agree that that is what we're going to do" to be part of the

6    agreement to do what they're talking about.

7                    THE COURT:  All right.  Well, but it does get

8    back to people being merely present.

9                    She's there.  She's not saying anything in

10   response.

11                   How do you get past a mere presence argument for

12   someone who is in a discussion, even a discussion about

13   something that may be illegal, without something else that

14   expresses their intent to be part of the conspiracy?

15                   That's why I'm asking you -- first of all, I

16   need to know where you say she was present at a discussion to

17   kill someone in law enforcement, number one.

18                   If you say that that is essential to this, then

19   what did she say in response to that discussion?

20                   If she didn't say anything, then we have her

21   saying "I guess I have to drink more coffee that comes in

22   metal cans."  Her presence, plus that comment.

23                   And I need to know if you are telling me that

24   that is sufficient; her presence at discussions and then that

25   comment, "I guess I have to drink coffee in metal cans," if

1    that is what gets her into this conspiracy.

2              MR. LIGHT:  Well, that certainly gets her in the

3    door of the conspiracy, but it's not the only evidence against

4    her, because she comes back and she comes back and she comes

5    back.

6              And the law says that mere presence -- mere

7    presence is not sufficient to show participation in a

8    conspiracy or in an offense, but presence is a factor that the

9    Court and the jury can consider.

10             And if it's repeated presence and it's repeated

11   presence in the context of discussions like this, then that is

12   certainly a factor that the Court and the jury can consider.

13             And if it's repeated presence combined with

14   action, then that is certainly something that the Court can

15   consider.

16             And later on in the evidence you have Tina not

17   only saying we're going to have to get metal coffee cans, but

18   you have her getting and turning over coffee cans.

19             You have her talking about getting wine

20   bottles --

21             MR. RATAJ:  Your Honor, I've got to place an

22   objection.  There's absolutely no evidence that she gave

23   Jersey Steve anything.  And he testified to that under oath

24   right in that box.

25             THE COURT:  Including coffee cans?  Including

| | |
|---|---|
| 1 | coffee cans, Mr. Rataj? |
| 2 | MR. RATAJ:  Anything.  I asked him if she gave |
| 3 | him anything, and he said no. |
| 4 | THE COURT:  Okay.  Thank you. |
| 5 | Is that true, Mr. Light? |
| 6 | MR. LIGHT:  I don't -- I don't think so, but I |
| 7 | will have to check to confirm if that's true. |
| 8 | THE COURT:  Okay. |
| 9 | MR. LIGHT:  But she certainly was part of the |
| 10 | process and talked about being part of the process of |
| 11 | obtaining those materials. |
| 12 | Whether the undercover got them directly from |
| 13 | her or from someone else, I think the record as a whole |
| 14 | supports the proposition that she was a part of the group that |
| 15 | put them together, that got them for the undercover agent -- |
| 16 | THE COURT:  That gathered what? |
| 17 | MR. LIGHT:  That gathered these materials. |
| 18 | She talks about it.  She talks about obtaining |
| 19 | wine bottles.  She talks about obtaining coffee cans. |
| 20 | On February 6th in the morning there's a |
| 21 | discussion of the coffee cans that she has obtained and the |
| 22 | fact that they are cardboard coffee cans, and that cardboard |
| 23 | coffee cans won't work; they have to be steel coffee cans. |
| 24 | And, lo and behold, later on there are steel coffee cans. |
| 25 | I think there's abundant evidence from which you |

1    can conclude and infer that she was part of the process of

2    getting those coffee cans, getting those materials, with an

3    understanding that they were to be used in the manufacture of

4    explosively formed penetrators for use on convoys.

5              THE COURT:  All right.  Mr. Light, just so that

6    I don't have to keep asking this question, is it your

7    position -- is it the Government's position that in order for

8    any of these Defendants to be considered to be part of a

9    conspiracy, that they had to have been present during a

10   discussion to kill someone in law enforcement?

11             MR. LIGHT:  No, they don't have to be present

12   for a specific discussion of that.

13             There has to be sufficient evidence from which

14   the Court and the jury can infer an awareness that that was

15   one of the objectives of the group they were in.  They don't

16   have to be party to a specific discussion about either killing

17   a member of law enforcement for the purpose of attacking a

18   funeral -- which is one aspect of the broader scheme in

19   Paragraph 3 -- or a specific discussion of killing a law

20   enforcement officer in one of the other means, as long as

21   there's evidence from which the Court and the jury can infer

22   an awareness that that was the plan and that was the objective

23   of the group that they were part of.

24             THE COURT:  And that they became -- and that

25   they bought into that?

 1                    MR. LIGHT:  Yes.

 2                    THE COURT:  Mm-hmm.

 3                    Kill law enforcement officers and attract a

 4     federal presence?

 5                    MR. LIGHT:  Exactly, Your Honor.

 6                    THE COURT:  So, you are going to tell me about

 7     Tina Stone and Michael Meeks and where they -- how we can

 8     infer an awareness that they knew an objective was to kill law

 9     enforcement officers and to attract a federal presence.

10                    MR. LIGHT:  Okay.  I'll go on to some more of

11     the evidence that relates to Mr. Meeks, as well as Mr. Piatek,

12     Joshua Stone and David Stone and Joshua Clough.  And that's

13     the car trip on February 6th, 2010.

14                    As I indicated earlier, at the beginning of that

15     recording, before that group departs from the Tomer Road

16     location bound for Kentucky, there are conversations in the

17     trailer, in the kitchen or living area of the trailer, with

18     David and Tina Stone about explosively formed penetrators,

19     about obtaining wine bottles, about obtaining coffee cans,

20     about obtaining street signs to use to make those explosively

21     formed penetrators.  In fact, during this meeting, Mr. Stone

22     gave the agent a great diagram of an explosively formed

23     penetrator.

24                    And there was discussion with Tina Stone about

25     the procedures to be implemented if something happened to the

1    group while they were on the road or while they were at the

2    militia summit that was to take place in Kentucky.  And she

3    was prepared for what was called a red dog alert and was

4    prepared to clear out the guns and the gear and the ammunition

5    that were in the Go-to-War Room of the trailer if something

6    happened.

7              Then the group that I've described drove towards

8    Kentucky.  We've listened to some of the recording of what was

9    discussed during that attempt to get to Kentucky and the

10   return.  And there was a discussion of what it takes to get to

11   the feds.

12             And if we look at the transcript of Government

13   Exhibit 54 D, this is a discussion that's taking place while

14   Mr. Piatek is present.  Mr. Clough is present.  David Stone is

15   talking.  The undercover agent is talking.  And the other

16   riders are present in the car as well.

17             David Stone Says:  "The secret society still got

18   to have -- to have their henchmen.  A lot of henchman and

19   you're nothin'.

20             One voice:  "They can be silenced real easy."

21             The agent:  "Was that coming from the state or

22   the feds., though, or both?"

23             David Stone:  "Both.  They are in bed together

24   so bad, that they're so intertwined, that you can't separate

25   the two of them."

1             And I would interpose here.  This is the mindset

2    that is expressed repeatedly in the presence of all of the

3    members of the group from time to time; that they are so

4    intertwined, you can't separate them.  That's the view of the

5    Hutaree.

6             "The feds. and the rest of law enforcement are

7    in bed together so bad, that they're so intertwined, you can't

8    separate the two of them."

9             The agent says:  "Yeah."

10            Stone says:  "Can see it down to the county

11   level."

12            The agent:  "Well, they probably all controlled

13   by feds., you think?"

14            David Stone:  "Yep."

15            "So, how do you get to the feds.?"

16            "Well, you can't just go to the feds., because

17   the fed has all these levels protecting them in between."

18            The agent says:  "Right."

19            Stone says:  "Well, you need to start hacking

20   away."

21            The agent says:  "Won't that give them time to

22   get their stuff together, though?  They'll see it coming?"

23            Stone:  "Unfortunately, I think it's going to

24   come real quick and real, real fast."

25            The agent:  "Well, that might play to our

| | |
|---|---|
| 1 | advantage then.  It won't give them time to mobilize |
| 2 | everything they need to." |
| 3 | Stone:  "Yeah." |
| 4 | The agent:  "Get all their moving parts going." |
| 5 | Stone:  "By the time they can really fire off |
| 6 | their big machine to get really moving, there will be major |
| 7 | sections of the territory that's already going to be lost to |
| 8 | them." |
| 9 | I think that's emblematic of the view of Stone, |
| 10 | and the views that he expresses repeatedly to the Hutaree, |
| 11 | that the feds. and the state and the locals are inextricably |
| 12 | intertwined, and that to attack one of them is to attack all |
| 13 | of them. |
| 14 | And that goes to the heart of the general |
| 15 | conspiracy that's alleged in this case in Paragraph 3 of Count |
| 16 | 1 that does include the specification of one way of attacking |
| 17 | local law enforcement and provoking a federal response, but |
| 18 | it's not the only way.  And it's not the only way that's |
| 19 | alleged and it's not the way that David Stone and the Hutaree |
| 20 | understood it.  They understood that by -- and believed that |
| 21 | by attacking any element of law enforcement, they were |
| 22 | attacking the authority of the United States and the federal |
| 23 | government. |
| 24 | Now, later on -- or, actually earlier in that |
| 25 | conversation also was Mr. Meeks, Mr. Piatek, Mr. Joshua Stone, |

1    Mr. Clough and the agent in the van.

2                Mr. Stone says:  "My philosophy is let's just go

3    to war.  Whenever it's all done with, and then we'll see

4    what's left."

5                On the way back, Stone discusses with those

6    parties present his idea of taking over a zone; by first

7    taking out what he calls a gang of law enforcement, he calls

8    the Brotherhood.

9                Then he goes on to say "But until people realize

10   that and stand up in one voice and say no, we mean no, it's

11   not going to happen, like in my speech, Mikey," speaking to

12   Mr. Meeks.

13               And then he gives the speech that we've heard

14   and seen on video that includes the Hutaree's intention to

15   oppose the law enforcement mercenaries called the Brotherhood

16   and to oppose the New World Order, and then concludes with the

17   remark, "Welcome to the new revolution."

18               THE COURT:  So, Mr. Light, if you could tell me

19   then, at what point do you believe the other Defendants were

20   drawn into this seditious conspiracy?

21               MR. LIGHT:  Well, I think Mr. Meeks is in it

22   now.  Mr. Piatek is in it now.

23               THE COURT:  As of February 6th?  I mean --

24               MR. LIGHT:  If not earlier.

25               THE COURT:  Because -- all right.  Because they

1    heard this conversation?

2              MR. LIGHT:  And they were party to it and did

3    not disagree with it and continued to participate and were

4    present later on when the car -- or, the van passed a police

5    car that was stopped with a car on the road with a flat tire,

6    and David Stone talked about how we're going to pop him one of

7    these days, referring to the Hudson, Michigan police officer

8    who was there by the side of the road, and went on to say

9    we're going to pop every one of them, meaning all of the

10   members of the Hudson, Michigan Police Department.

11             THE COURT:  And are you saying that it was

12   incumbent on them to disagree in order not to be considered

13   part of a conspiracy?

14             MR. LIGHT:  I'm saying that if they had shown

15   disagreement, it might be evidence that would -- could be used

16   to show that they weren't party to the intentions expressed by

17   Mr. Stone, certainly.

18             THE COURT:  This is very troubling, Mr. Light.

19   I just think back to so many discussions that I may have been

20   a part of where people are saying things that I don't agree

21   with, but I don't necessarily register that disagreement.  It

22   doesn't mean that I agree with what they're saying.

23             MR. LIGHT:  It doesn't.  But if you are party to

24   that discussion and it's in the context of being a member of

25   that group on repeated occasions and in the context or

1    participating in activities of that group on repeated

2    occasions, and it's in the context of hearing other

3    expressions by other members of that group of a similar nature

4    on repeated occasions, then it can add up to an inference that

5    you are in agreement with what's being said.

6              If it's one time in one place and it's one thing

7    being said, I fully understand.  I hear things said, myself,

8    that I don't agree with and I don't jump up and say ah-hah,

9    you're wrong.  But that's different from being a member of a

10   group, participating in their activities, listening to the

11   same kinds of discussions frequently --

12             And this isn't the only time that David Stone

13   expressed these kinds of attitudes towards police officers.

14   It's not the only time that Michael Meeks expressed these

15   kinds of attitudes towards police officers.  You see that

16   repeatedly in some of the recordings that we've heard in this

17   case.

18             You see Mr. Piatek in this very recording

19   expressing his attitudes and his negative attitudes towards

20   police officers.

21             It's not just that somebody remained silent.

22   It's that somebody remained a party to the conversation and

23   then carried it on further.

24             THE COURT:  Let me ask you a question about

25   Mr. Piatek.

1              Isn't it in that discussion though that he says

2       that "not all cops are bad"?  Did he say something like that?

3              MR. LIGHT:  He does say something later on about

4       "not all cops are bad."

5              But if you look at the entire discussion --

6       that's just one little bit of that discussion that Mr. Weiss

7       picked out of the transcript.  If you look at the entire

8       transcript of the discussion, I think it reflects an attitude

9       that's on par with the attitude that Mr. Stone was expressing.

10      And that's earlier in the conversation before we got to the

11      specific point where Mr. Stone says we're going to pop the

12      Hudson, Michigan police officer.  That's earlier --

13             THE COURT:  All right.  But so what?

14             And I don't mean to say that lightly, because

15      many things that were said by the Defendants are quite

16      offensive.  But so what?

17             Where is -- you know, what I'm hearing is

18      because they didn't disagree and they didn't disagree on a

19      number of occasions, even though they were in the presence of

20      Mr. David Stone, Sr., and they didn't disagree numerous times

21      with things that he said that were quite offensive, maybe even

22      illegal, that that makes them guilty of a conspiracy.

23             MR. LIGHT:  As long as they're not disagreeing,

24      they're going along, they are continuing to participate in the

25      activities, they are contributing their efforts to the overall

| | |
|---|---|
| 1 | activities of the group, I think that's the sufficient to |
| 2 | support an inference, if you view the evidence in a light most |
| 3 | favorable to the Government, that they have agreed. |
| 4 | Our brief cites the standard case law that says |
| 5 | that you don't have to have an express agreement to find |
| 6 | conspiracy.  That you can infer agreement to a conspiracy from |
| 7 | the combination of the information available to the |
| 8 | individual, along with the acts taken by the individual. |
| 9 | I submit that if you look at all of the evidence |
| 10 | together, it's sufficient to support the inference that |
| 11 | Mr. Piatek was in agreement with the objectives of the group, |
| 12 | he was in agreement with the plan of the group, and he |
| 13 | continued on with the group. |
| 14 | THE COURT:  All right.  So, what is the action |
| 15 | that Mr. Piatek took? |
| 16 | MR. LIGHT:  He came back repeatedly to the |
| 17 | training sessions over the period that he was a member of the |
| 18 | conspiracy.  He came back from -- |
| 19 | THE COURT:  But how do we know -- how do we know |
| 20 | that he was training towards opposing the United States? |
| 21 | MR. LIGHT:  Based upon his concurrence as shown |
| 22 | circumstantially with the objectives expressed by David Stone |
| 23 | and others repeatedly during his presence in the conduct of |
| 24 | the conspiracy. |
| 25 | I think if you look at the video -- |

```
 1              THE COURT:  I'm sorry?

 2              MR. LIGHT:  If you look at the video of that

 3    part of the February 6th expedition, of the period of time

 4    when David Stone, Sr. delivers his diatribe, that includes his

 5    diatribe against what he calls "the Mercenaries of the

 6    Brotherhood" and expresses his intention to oppose by force

 7    those authorities, the expression on Mr. Piatek's face speaks

 8    volumes.  It speaks not to him just sitting there and

 9    acquiescing, not to him just sitting there and ignoring, not

10    to him just hearing and not feeling like responding to, but

11    him accepting and agreeing and being a party to the sentiments

12    being expressed there.  That video speaks worlds.

13              Now, finally, I'd like to also direct the

14    Court's attention to what takes place on February 20th.

15              This might not be finally, but I'll try to get

16    there soon, Your Honor.

17              February 20th there's a training session at

18    Tomer Road.  Present for the training session are David Stone,

19    Joshua Stone, David Stone, Jr., Joshua Clough, Kristopher

20    Sickles with Michael Meeks coming on later on in the day.

21              There's discussion about what David Stone

22    believes would trigger the war, saying, "No, I'd go today.

23    But are you ready to go?  Are you ready to go?  Are you ready

24    to go?"

25              Pointing to individual members of the group.
```

1          And that discussion then turned to the ways in

2    which you might kill a police officer if you are pulled over

3    at a traffic stop, with David Stone actually demonstrating how

4    you could use a short-barreled rifle and open the door to do

5    that.

6          Mr. Meeks wasn't yet present, but the others

7    were present for that discussion.

8          And then later on after the training there was

9    an extended conversation about killing police officers.  That

10   discussion begins with a reference by Mr. Meeks and by Joshua

11   Stone to "copicide."  In response to that, Mr. Stone, Sr.

12   suggests that it would be preferable to shoot them at a

13   distance to increase the number coming after you.

14         And then later, after some more talk about

15   killing police, Stone, Sr. expands on the idea for this group.

16   "Shoot one from a distance.  Sit back and wait for the

17   funeral, attracting cops from every state in the country."

18         And then still with the group sharing in the

19   discussion, Stone said "I'm thinking IEDs.  You just blow the

20   whole convoy up, kaboom."  Which is consistent with all of the

21   discussions that have been taking place between Mr. Stone,

22   Sr., Joshua Stone, Tina Stone and the agent and others about

23   obtaining the materials with which to make the IEDs or, more

24   specifically, the EFPs that would be used to blow up a convoy

25   like this.

1          THE COURT:  So, this is the first time you've

2     mentioned Mr. Sickles.

3          MR. LIGHT:  Yes.

4          THE COURT:  And David Stone, Jr., I believe.

5          MR. LIGHT:  Yes.

6          THE COURT:  Is this when you're saying the two

7     of them were drawn into . . .

8          MR. LIGHT:  Into this specific aspect; that is,

9     the funeral procession aspect of the conspiracy.

10          But once again, Your Honor, I don't want to

11     limit the focus to the funeral procession.  There are other

12     discussions and there's a broader conspiracy alleged that

13     involves the other ways in which to attract a response by the

14     Brotherhood, which I would say, under the evidence in this

15     case, automatically involves federal authorities based in part

16     on the kind of idea that I just read from of Mr. Stone, Sr.

17     equating them all together, which is --

18          THE COURT:  And -- I'm sorry.

19          MR. LIGHT:  -- which is -- you know, which is

20     the idea that permeates a lot of these discussions.  Is that

21     they are inextricably intertwined and that taking on one is to

22     take on all and will provoke a response that we can then

23     oppose by force.

24          THE COURT:  And I know you are not saying that

25     all of the Defendants were part of the other discussions

| | |
|---|---|
| 1 | that -- about killing someone from local law enforcement, but |
| 2 | are you saying that they did not necessarily have to be part |
| 3 | of a discussion about killing law enforcement? |
| 4 | MR. LIGHT:  Yes. |
| 5 | THE COURT:  You are saying they did not have to |
| 6 | be -- |
| 7 | MR. LIGHT:  I'm saying they did not have to be |
| 8 | part of a specific discussion for the rest of the evidence, of |
| 9 | the discussions that they were part of, that might not be a |
| 10 | specific discussion about the funeral procession plan, to be |
| 11 | party to that agreement based on their actions and based on |
| 12 | their understanding of the aims of the group. |
| 13 | Just to close the circle as it relates to the |
| 14 | involvement of David and Tina Stone, along with Joshua Stone, |
| 15 | in assembling the materials for the EFPs, there was the |
| 16 | meeting on March 18th, 2010 that started at Arby's and then |
| 17 | moved on to Tomer Road, where, again, there was discussion |
| 18 | about how to assemble the materials for the EFPs, including |
| 19 | wine bottles, coffee cans and road signs and the actual |
| 20 | delivery at Tomer Road to the agent of a road sign and coffee |
| 21 | cans and a bean can to make those EFPs. |
| 22 | I would also, parenthetically, indicate that at |
| 23 | the time of the arrests at the warehouse, about nine days |
| 24 | later, the vehicle that David Stone drove there with others in |
| 25 | it had four or five more road signs in the back of it that |

1    obviously had been brought there with the intent that they be

2    used to make EFPs as well.  So, it's not just the one road

3    sign that was delivered on March 18th.

4                There's a little bit of additional evidence with

5    regard to Mr. Sickles' involvement and participation in the

6    scheme, and that's the specific conversations that he had with

7    Joshua Clough in chat sessions, particularly chat sessions on

8    February 19th the day before the training where there was this

9    specific discussion of killing a police officer, leading to a

10   funeral convoy or procession that could be attacked.  And in

11   those chats Mr. Sickles expresses caution about what to say in

12   front of that Dan guy because Dan seemed to hesitate and to

13   ask a lot of questions when Joshua Stone talked about the Real

14   World op. that was planned for April.

15               Sickles later on said:  "Well, I trust all the

16   inner Hutaree members," and shows his understanding of the

17   meeting of the April op.

18               He says:  "Josh said we were going somewhere

19   for, I think it was April's training, and he wasn't sure where

20   yet, but we are treating it like a real op.  And if we come

21   across someone and they're not willing to work with us ..."

22               And Clough responded:  "That's always been the

23   case."

24               The next day, February 20th, Sickles came back

25   for the training and was an active participant in the

1    discussion that we've already talked about, about killing a

2    single cop and then attacking the funeral with IEDs.

3              I think what I've been discussing so far, I've

4    been relating it to Count 1, the seditious conspiracy count,

5    but it also -- the parts relating to the explosives, the IEDs,

6    the EFPs, all relate to Count 2 as well.

7              And Count 2 was a conspiracy to use explosive

8    devices, variously defined.  In fact, the definitions on these

9    are weapons of mass destruction, destructive devices or bombs

10   or explosives; to use them against persons or property in the

11   United States.

12             And that's a charge that does not hinge on those

13   persons or property being necessarily federal persons or

14   federal property.

15             The charge itself specifies that the intent was

16   to use those explosive devices against law enforcement

17   personnel or their vehicles, but it does not, by its terms --

18   that charge does not by its terms limit itself to the

19   involvement of federal authorities.  That's not an element of

20   the violation, that the proposed targets of the conspiracy to

21   use explosives devices be federal authorities.

22             Under its terms, that charge relates to an

23   intent to use and a conspiracy to use those explosive devices

24   against law enforcement vehicles or law enforcement personnel,

25   which would include the convoys that are repeatedly referred

1    to in the conversations that we've heard about.

2                    And that's the nature of that charge.

3                    THE COURT:  All right.

4                    MR. LIGHT:  Now, I don't see the need to address

5    the rest of the charges in the indictment.  They are either

6    independent -- and I don't believe they are being challenged

7    on Rule 29.  That is, the weapons charges, for the possession

8    of illegal weapons.

9                    I agree that the 924(c) charges involving the

10   possession of weapons during the conspiracies hinge on whether

11   or not the conspiracies are valid charges.

12                   THE COURT:  All right.

13                   MR. LIGHT:  Let me check and see if there's

14   anything else that . . .

15                   I'm getting a shake of the head.  I think I've

16   used my 20 minutes already, Your Honor.

17                   THE COURT:  All right.  Thank you.

18                   MR. LIGHT:  Thank you.

19                   THE COURT:  All right.  Who is the first

20   responder?

21                   MR. SHANKER:  I will be, Your Honor.

22                   Your Honor, to quote my brother counsel, Michael

23   Rataj, what country are we in?

24                   I mean, I am hearing an argument that people who

25   are present for a discussion, that may have offensive

1    components to it, that if they don't affirmatively disagree,

2    that they have been drawn into a conspiracy.

3              It's chilling to me.

4              I mean, think through your life the people that

5    you've talked to and you want to be diplomatic, they are

6    saying something offensive and you don't say anything.

7              And I think what's important here is that all of

8    these Defendants, there were many reasons for them to show up

9    at the training, legal reasons.  To express themselves by

10   training to defend their families, by -- they have a property

11   there that is a nice place for militia training.  They are gun

12   enthusiasts.  And they have Second Amendment right to do that.

13             THE COURT:  Mr. Shanker, let me ask you this.

14   While the conspiracy has to be something unlawful --

15             MR. SHANKER:  Correct.

16             THE COURT:  -- an overt act alleged to further

17   that illegal act can be perfectly legal.  Right?

18             MR. SHANKER:  It could be.  But the problem here

19   is there's no agreement to anything illegal.  And that is the

20   fundamental problem I think.

21             THE COURT:  So, that really is the focus.

22   Because I know that a lot of what the Defendants did

23   technically are legal things.  But that doesn't matter if the

24   Government says that it was to accomplish an illegal purpose.

25             MR. SHANKER:  It doesn't matter as long as they

1    are able to show that there was an agreement to the essential

2    nature of a criminal plan.  And that is what would allow the

3    statements in under 801(d)(2)(E).  They need to show by a

4    preponderance of the evidence that there is a criminal

5    conspiracy here.

6              And what is so disturbing about this case is it

7    has been a trial -- we've heard a monologue from David Stone,

8    Sr. with occasional chirping from other Defendants, some of it

9    offensive, some of it not.

10             Our client, David Stone, Jr. doesn't say

11   anything that would indicate he is joining anything criminal

12   at all.  And, you know, he -- there's no evidence at all to

13   support guilt for David Stone, Jr., but I think --

14             THE COURT:  Do you --

15             MR. SHANKER:  But I think there's a problem with

16   all of the Defendants, though, frankly.

17             THE COURT:  Let me ask you this.  Do you

18   agree -- well, he has said at the beginning of his

19   presentation that the language in the indictment, that Hutaree

20   believed and intended that such an engagement would be a

21   catalyst for a more widespread uprising against the

22   Government, really didn't need to be part of this indictment,

23   and that if it wasn't there, we would be here today in this

24   same position.

25             Do you agree with that?

1              MR. SHANKER:  I would disagree with that,

2    because, first of all, they took the time to put that in the

3    indictment to establish a seditious conspiracy charge.  And,

4    really, that's the whole issue here; I mean, did they agree to

5    oppose by force the authority of the United States Government.

6    And that's the Government acting as the United States,

7    exercising their authority.

8              And so they -- their -- this is their

9    indictment.  They knew when they put that in it was a

10   necessary component.  Everything that's outlined in there is a

11   necessary component.

12             And the reason why we've been focusing on this

13   whole plan with killing a police officer and attacking a

14   funeral and then defending against the authority, the federal

15   government, is that is what the Government has charged.

16   They've made these charges.  They've defended these charges

17   for two years, and we have vigorously opposed the indictment.

18             I understand why we are here right now.  That's

19   not an issue.  But they need to live with their indictment,

20   with the words and the language, that they chose to charge all

21   of these people with seditious conspiracy.  Very serious

22   charges.

23             THE COURT:  So, how Mr. Light has limited it --

24             And you'll have a chance to respond to that,

25   Mr. Light, if I've chosen the wrong word.

1            But he says that the conspiracy that makes it

2    seditious conspiracy is to kill law enforcement, spark this

3    funeral, federal law enforcement would attend, and the

4    procession, the funeral procession would be attacked.

5            MR. SHANKER:  And --

6            THE COURT:  Do you believe that that -- if there

7    was evidence to support it, that that is seditious conspiracy?

8            MR. SHANKER:  I don't think it is.

9            Under Baldwin v. Franks, you still have got to

10   get to the point that the federal government is acting as the

11   federal government and exercising their authority.  At that

12   point there would be no exercise of federal authority --

13           THE COURT:  Well, if they were attacked, if the

14   funeral procession was attacked --

15           MR. SHANKER:  Right.

16           THE COURT:  Then -- by members of the Hutaree,

17   then the federal law enforcement people would respond to that.

18           MR. SHANKER:  I think it's key -- the response

19   is a crucial aspect of that.  That they would be defending at

20   the rally point.  I think that's a key aspect of this that

21   makes it an allegation of seditious conspiracy.

22           I also think that there's a problem, you know,

23   with who would be at the funeral of something like this.

24           THE COURT:  Well, that's -- that Mr. Stone

25   thought that something like this could attract federal law

1    enforcement from all over the country, it doesn't matter if it

2    would never have materialized, does it?

3                    MR. SHANKER:  Well, I'm not sure if that's even

4    the word to use.

5                    I think he says officers from states all over

6    the country, is what I thought he said -- I could be wrong --

7    at least on February 20th.

8                    But the crucial aspect here is that nobody ever

9    agrees.  And the fact that they didn't disagree cannot be

10   enough in this country to say that somebody has joined a

11   seditious conspiracy.  And I think that's a big problem.

12                   And, Your Honor, I would like to address this

13   discussion about convoys, because that was something new.

14                   Mr. Light is saying that when convoys are

15   mentioned, this is in reference to the federal government in

16   some way or another.  However, we have evidence on this

17   record -- it's 1D39, Exhibit E, and it is on August 27th --

18                   THE COURT:  I'm sorry.  Start again.  It is

19   what?

20                   MR. SHANKER:  Recording 1D39.

21                   THE COURT:  Yes.

22                   MR. SHANKER:  It was Exhibit E.  I'm not sure

23   what the number was there, but it is from August 27, 2009 --

24                   THE COURT:  So, it's 39 E, the exhibit number?

25                   MR. SHANKER:  I'm not sure what the number is.

```
 1     That is the recording number, 1D39 --
 2                 MR. SWOR:  It's Exhibit 24.
 3                 MR. SHANKER:  24.
 4                 MR. SWOR:  It is Exhibit 24, on the 27th --
 5                 THE COURT:  Okay.  August 27, '09.
 6                 MR. SHANKER:  In this recording there is
 7     evidence -- there is discussion about how the local sheriffs
 8     have an APC.
 9                 So, you know, just because somebody is talking
10     about convoys and that somebody -- we know who that is; it's
11     David Stone, Sr. -- it doesn't mean that it involves federal
12     authorities.  There's a specific reference to the local
13     sheriff's APC.
14                 So, there are a number of fundamental problems
15     with the Government's case, and that's just another one.
16                 And, Your Honor, I really -- there is no
17     evidence -- I don't know if David Stone, Jr. even came up
18     until they talked about February 20th.
19                 THE COURT:  You mean today?
20                 MR. SHANKER:  Today.
21                 THE COURT:  He did not.
22                 MR. SHANKER:  And once he came up there, it was
23     mentioned that he did leave early that day.
24                 The best that we can say from the record that we
25     have is that he either left before the discussion about
```

|     |                                                                           |
| --- | ------------------------------------------------------------------------- |
| 1   | harming police officers or he left during the discussion.  And            |
| 2   | I don't see in any way how that could show agreement to what               |
| 3   | is going on.                                                               |
| 4   | And I say that not trying to say that just being           |
| 5   | present and participating in that conversation is evidence of             |
| 6   | guilt at all, because we heard that tape played.  People are              |
| 7   | laughing.  People are using conditional language, when, if,               |
| 8   | should, when this happens.  David Stone, Sr. himself uses                  |
| 9   | conditional language and sums the whole thing up by saying                |
| 10  | there's a hundred and one scenarios we could use.  Could use.             |
| 11  | Your Honor, this case, the charges should be                  |
| 12  | dismissed against David Stone, Jr.  And I would say that there            |
| 13  | is no evidence that there is any agreement to any criminal                |
| 14  | act.                                                                       |
| 15  | What we have is something that comes up                       |
| 16  | repeatedly from one person, and that's it.  And what these                |
| 17  | other people are doing is expressing opinions.  And I think               |
| 18  | even what David Stone, Sr. is doing when he brings these items            |
| 19  | up is he trying to advocate.                                              |
| 20  | This isn't a conspiracy.  This really, really               |
| 21  | was and is a First Amendment case.  And I think that the                  |
| 22  | charges should be dismissed, other than the firearms charges              |
| 23  | regarding automatic weapons and short-barreled weapons.                   |
| 24  | THE COURT:  Your client is charged with teaching              |
| 25  | and demonstrating too, isn't he?                                          |

US v Stone, et al. #10-CR-20123

| 1 | MR. SHANKER:  Yes, he is, Your Honor. |

1            MR. SHANKER:  Yes, he is, Your Honor.

2            And that charge relies on one of the two

3    conspiracies, both of which we think the Government has failed

4    miserably to establish even in the light most favorable to the

5    Government.

6            THE COURT:  Well, it doesn't -- does it rely

7    upon the conspiracies?

8            MR. SHANKER:  It relies upon a conspiracy to

9    commit a crime of violence.  It relies on -- it is a predicate

10   to that charge, I do believe, to wit:  The seditious

11   conspiracy and/or the conspiracy to use a weapon of mass

12   destruction.

13           MR. SWOR:  No, no.  Seditious.

14           MR. SHANKER:  Oh, was it just seditious

15   conspiracy?

16           MR. LIGHT:  It is actually both.

17           THE COURT:  I'm sorry.  Mr. Light?

18           MR. LIGHT:  There is a predicate for Count 3.

19           THE COURT:  Okay.

20           MR. LIGHT:  And the predicate is either the

21   seditious conspiracy in Count 1 or the conspiracy to use

22   weapons of mass destruction in Count 2.

23           THE COURT:  So, does that mean that David Stone,

24   Jr. must have been teaching or demonstrating to someone who is

25   going to be held into Count 1 or Count 2?

1              MR. LIGHT:  Yes, Your Honor.

2              THE COURT:  And who was he

3    teaching/demonstrating to?

4              MR. LIGHT:  All of the members who were present

5    on the 13th.  And I can -- the list is in my brief or I could

6    give it to the Court when I stand up again.

7              THE COURT:  Okay.

8              MR. SHANKER:  And, Your Honor, as far as the

9    actual teaching and demonstrating, I think we heard a very

10   concise telling cross-examination by Mr. Helfrick of Agent

11   Haug.

12             David Junior didn't teach anything.  He put

13   metal to a battery at the direction of his dad and he set off

14   cardboard tubes with some form of black powder or flash

15   powder.

16             They are not being charged for those devices.

17   Those devices are not weapons of mass destruction.  And he

18   didn't teach anything to anybody.  That's all he did.

19             THE COURT:  Okay.  May I just ask Mr. --

20             Mr. Light, could you respond to that?  What he's

21   teaching and demonstrating, is that true that they are not

22   weapons of mass destruction?

23             MR. LIGHT:  No, that's not true.

24             The agent testified that they were IEDs and they

25   were identifiable as IEDs.

1          If one looks at the definition of a weapon of

2   mass destruction, a weapon of mass destruction is defined as

3   including any destructive device.  A destructive device is

4   defined as including any explosive bomb.  And based on the

5   testimony of the agent, the explosives that were used on the

6   13th were explosive bombs.

7          We also know from the meeting between Daniel

8   Murray and David Stone the week before on June 6th, 2009 about

9   the way in which those bombs were made.  And the cardboard

10  tubes with which they are made, the ingredients that go into

11  them, the wadding that goes into them, the end caps and the

12  fusing are all discussed at the conclusion of the recording

13  from June 16th, including words from David Stone to the effect

14  of, I think, "Holy shit these things go off."

15             THE COURT:  David Stone, Sr.

16             MR. LIGHT:  Senior.

17             THE COURT:  Mm-hmm.

18             MR. LIGHT:  But there's specific reference.

19  These are the bombs -- or, these are the explosives that are

20  going to be used in our training next week.

21             So, I believe the evidence is clear that those

22  were destructive devices, they were weapons of mass

23  destruction.

24             And under the definition in the statute and, at

25  the very least, David Stone, Sr. and David Stone, Jr.

1    demonstrated how they were placed, how they were wired, how

2    they were set up for detonation and how to detonate them.  Not

3    only did David Stone, Jr. place -- or, make the electrical

4    connections that set off the charges, but he later on

5    discusses with others in the group how they were set out

6    there, what his role was in putting them out there and in fact

7    how they were covered to protect them from getting wet

8    overnight because apparently they had been placed the day

9    before.

10                   THE COURT:  All right.  Thank you.

11                   MR. SHANKER:  Your Honor, these were weapons of

12   mass destruction.  Mr. Light refers to this as a destructive

13   device.  And the weapons of mass destruction statute refers to

14   Section 921 -- that is, 18 USC 921, and that would be Section

15   (a)(4).  And in that section it says:

16                        "The term 'destructive device' shall not

17                        include any device which is neither designed

18                        nor redesigned for use as a weapon."

19                   This was a training about trip wire avoidance.

20   These devices had -- there was no shrapnel in them at all.

21                   We don't -- the Government hasn't even

22   established exactly what they were, but they were definitely

23   not being used as a weapon.  They are stretching one again in

24   front of this Court.

25                   And I also wanted to point out that at this June

1    training there is no conspiracy.  We aren't even to the point

2    that David Stone, Sr. has even articulated the so-called plot

3    charged in the indictment.  It's not until a month later --

4    two months later that he utters this to Steve Haug.

5              So, once again, Your Honor, I respectfully

6    request that the charges be dismissed against David Stone, Jr.

7              And I thank this Court for hearing me today.

8    And if you have any other questions, I can answer them.

9              THE COURT:  I do, Mr. Shanker.  One other one

10   before you sit down.  It just has to do with how you started

11   off and the seditious conspiracy statute and the attack on a

12   funeral procession.

13             You said that if they were merely attacking a

14   funeral procession that included federal law enforcement, that

15   that's not the kind of force that the seditious conspiracy

16   statute contemplates?

17             MR. SHANKER:  Well, according to Baldwin, which

18   I have cited in the Rule 29 motion, there has to be an

19   exercise of authority by the Government.  And that's what I'm

20   referring to there.

21             THE COURT:  Okay.  So, if there was this funeral

22   procession and the members of the Hutaree did attack, and law

23   enforcement then responded, wouldn't that be -- and the

24   Hutaree continued to attack?

25             MR. SHANKER:  I think if you got to that point,

```
 1    that would be the exercise of authority.  If the use of force

 2    was against that exercise of authority, you would be there.

 3                 But the problem is, you know, we are nowhere

 4    near that here as far as what's agreed to.  And that's the

 5    real problem here.

 6                 And the reason why I said that response, it's

 7    important, is because you asked me about the language they

 8    included and whether it was superfluous.  And I don't think it

 9    was.  I think it's essential to the charge.

10                 THE COURT:  Mm-hmm.  Okay.

11                 MR. SHANKER:  Thank you, Judge.

12                 THE COURT:  Thank you.

13                 Who is next?

14                 Anyone else want to speak?

15                 MR. SWOR:  Your Honor, the Defendants would

16    request to take a break, personally.  It sounds like --

17                 THE COURT:  And professionally?

18                 MR. SWOR:  No.  The Defendants.

19                 THE COURT:  Oh.  The Defendants want to take a

20    break?

21                 MR. SWOR:  Yes.

22                 THE COURT:  Okay.  Fine.  We can do that.

23                 (Recess held from 11:32 a.m. until 11:52 a.m.)

24                 THE COURT:  Thank you.

25                 Mr. Thomas, before you present, can I ask
```

US v Stone, et al. #10-CR-20123

1    Mr. Shanker another question?

2               And I have a question for Mr. Light.

3               MR. THOMAS:  Yes.  We were going to clarify

4    something.

5               THE COURT:  What do you intend to clarify?

6               MR. THOMAS:  Well, I wanted to clarify about

7    weapons of mass destruction.

8               THE COURT:  Okay.  That's not what I want to

9    ask.

10              MR. THOMAS:  Okay.

11              THE COURT:  Okay.  Thank you.

12              So, Mr. Shanker, you said that Defendants had

13   good legal reasons for doing what they did.

14              MR. SHANKER:  Yes.

15              THE COURT:  Wouldn't that go to the weight

16   rather than the admissibility of evidence?

17              MR. SHANKER:  Well, I think the problem is, is

18   that there's a burden, a minimal burden that the Government

19   needs to meet to show that there is an agreement to a

20   conspiracy.

21              And I'm just pointing out that when somebody is

22   in the presence of David Stone, Sr. and he makes an offensive

23   comment and they don't disagree -- there's a reason even

24   beyond the fact that they don't have to disagree, there's a

25   reason why -- there's other reasons why they're there.

1          They are not -- I can't recall any of the

2   training being specific to attacking a police officer and

3   attacking a funeral.  They are preparing for the Apocalypse,

4   or some, and some are preparing to defend their families.  And

5   there's all kinds of reasons to joining an organization.

6          THE COURT:  The Government says they are

7   preparing for a war.

8          MR. SHANKER:  The Government says that, but that

9   isn't what they trained for.  And if there was a war, then

10  they trained to act defensively.

11         And one of the exhibits that the Government put

12  in was a color-coded set of conditions for war that was seized

13  from David Stone, Sr.'s house.  And it says when it gets to

14  condition black and war is actually in effect, it says

15  "defensive use of force authorized."

16         And I thought that was a pretty stunning piece

17  of evidence coming from the Government.

18         So, again, that's in a war situation.

19         So, that was my only point with that, Your

20  Honor.

21         THE COURT:  All right.  Thank you.

22         MR. SHANKER:  Thank you, Judge.

23         THE COURT:  Mr. Light, with respect to this

24  Count 3.

25         MR. LIGHT:  Yes.

1          THE COURT:  The Defendants make the point that

2     this was June 13th that this teaching and demonstration

3     allegedly occurred, and the earliest date that you've given

4     the Court -- although the indictment says August of 2008.  The

5     earliest date you've given the Court for involvement of any of

6     these Defendants is August 13, 2009.

7          Does that do anything to your Count 3?

8          MR. LIGHT:  No, it doesn't, Your Honor, for this

9     reason.

10          The August 13th date is a date of focus, if you

11     will, of the agreement on the particular aspect that the Court

12     and I have focused on, which is the killing of a member of law

13     enforcement for the purpose of then attacking the funeral

14     procession for that member of law enforcement.

15          But two things about that.  One is that

16     discussions of other ways of provoking a response from law

17     enforcement, including federal law enforcement, go back before

18     June 13th.

19          THE COURT:  That involve some of the Defendants

20     who were training on June 13th?

21          MR. LIGHT:  Yes, Your Honor.

22          THE COURT:  Who?

23          MR. LIGHT:  I would have to specify that,

24     because I would want to go back and look at the prior

25     conversations and specify who had those conversations.  But

1    most, if not all, of the Defendants were present for the June

2    13th training.

3                 THE COURT:  And were they just conversations or

4    was it something more than conversations that any of these

5    Defendants had before August 13, 2009?

6                 MR. LIGHT:  I think there were conversations

7    from which one could infer a general agreement that part of

8    the mission of the Hutaree is to provoke a response and

9    provoke a conflict, the war that would then ensue in which the

10   Hutaree would go to their rally points and take action.

11                Now, the other point I wanted to make though is

12   even if we just use August 13th as the focal point or

13   consummation of the agreement specifically relating to a law

14   enforcement officer and relating to attacking the funeral of

15   that law enforcement officer, there are prior actions and

16   agreements that are part of that conspiracy that are

17   preparatory for that conspiracy going back into 2008, which

18   are the -- and they are detailed in the indictment.

19                They are the training sessions devoted to being

20   prepared to take defensive and offensive action in the various

21   ways that are described in the indictment.  They're the

22   obtaining and assembling of gear, including firearms,

23   ammunition, medical supplies and other things.  Those are all

24   parts of the conspiracy as well.

25                And while they may have occurred before that

1    point in time when the conspiracy focused on the one aspect --

2    that is, the attacking an individual and then attacking the

3    convoy that would attend his funeral -- that doesn't mean that

4    those other actions prior to that are not part of and parcel

5    of the conspiracy.

6              The conspiracy doesn't have to be complete as of

7    the time that part of the training for the conspiracy takes

8    place.

9              And I would say that the training and

10   demonstration of the use of certain kinds of IEDs or

11   explosives on June 13th can be part of the conspiracy that

12   then is the focus of the discussions on August 13th and then

13   subsequently in February of 2010.

14             THE COURT:  So, anything that predated the

15   training of June 13, 2009 -- let me rephrase.

16             You said that prior to August 13th -- oh, prior

17   to June 13, 2009, Defendants were training, getting weapons,

18   doing a lot of things that were legal in and of themselves.

19             MR. LIGHT:  Correct.

20             THE COURT:  Correct?  And --

21             MR. LIGHT:  Some of which were illegal,

22   involving illegal weapons, of course.

23             THE COURT:  Okay.  But you're saying also that

24   there was or there was not a discussion to draw in the federal

25   government into some conflict prior to June 13, 2009?

1    MR. LIGHT:  I believe there were discussions

2  about drawing the federal government into conflict.  And one

3  specific discussion is the discussion that takes place in

4  December of 2008 reflected in some e-mails and then subsequent

5  telephone calls and a subsequent discussion at the Tomer Road

6  residence about the intent to respond to what the Hutaree saw

7  as a provocative action by ATF when ATF conducted an

8  inspection of Walter Priest's federal firearms license

9  facility, which the Hutaree described as their firearms

10  dealer.

11    And so there we directly have an element of the

12  federal government involved and statements by David Stone to

13  other members of the conspiracy of an intent to oppose by

14  force the ATF if they continue in that kind of provocation.

15    THE COURT:  Okay.

16    MR. LIGHT:  Thank you.

17    MR. SCHARG:  Can I just correct the record for

18  one moment?

19    THE COURT:  Sure.

20    MR. SCHARG:  Mr. Light spoke about participants.

21    The record will reflect that Mr. Sickles was

22  present September 27 of 2008 for that training session and was

23  not seen again and participated in any activity until August

24  22nd of 2009, almost a period of one year.  So, he was not

25  present at any of those events that Mr. Light alluded to.

1           THE COURT:  Okay.  Thank you.

2           MR. THOMAS:  Judge, I don't mean to step on

3    anybody's toes and I won't, but it originally troubled me

4    about otherwise legal acts and whether or not they could be a

5    predicate for a charge of conspiracy.

6           And I know what the law is.  And I certainly --

7    I think I agree with the Court's rationale.  That at some

8    point there has to be an agreement to use whatever these

9    otherwise lawful acts were to perpetuate a crime or to commit

10   a crime.  And so it was towards that end that -- I've always

11   been looking in this case for the agreement.  Not the presence

12   or not -- not maybe -- even not objective, but what was it

13   that went to the very heart of this seditious conspiracy that

14   it is my belief Count 1 and Count 2 require in order for there

15   to be a crime before this jury.

16           And I looked to the indictment.  And you had a

17   question about Count 2.  And, as you know, Count 2

18   incorporates by reference Count 1 and the allegations which

19   are recited in the Count 1.  And it's towards this end that I

20   want to piggyback on Mr. Shanker's argument.

21           That says that they:

22           "Conspired" -- I'm looking on page 11 of

23           the indictment -- "to use, without lawful

24           authority, one or more weapons of mass

25           destruction, specifically explosive bombs,

1                    explosive mines, and other similar explosive

2                    devices, against persons and property within

3                    the United States ..."

4           And then it goes on to be specific:

5                    "... that is, local, state, and federal

6                    law enforcement officers and vehicles owed

7                    and used by local, state, and federal law

8                    enforcement."

9           Now, it's my position that the use of the word

10  "and" requires that it be proven in addition; that it not be

11  exclusive.  It's not either/or.  It is inclusive of federal

12  law enforcement authorities.  And I cite the fact that they

13  incorporated by reference the first count which specifically

14  describes the seditious conspiracy.

15          I also want to address the issue relating to

16  what is --

17          THE COURT:  Mr. Thomas, may I interrupt you?

18          MR. THOMAS:  Yes.

19          THE COURT:  You're saying that unless the crime

20  is against all three of those agencies and all three of their

21  vehicles, this crime can't be charged and proven?

22          MR. THOMAS:  Well, my argument would be yes.

23  And specifically because of the fact that I -- I didn't draft

24  this indictment.  They did.  They took it to the Grand Jury.

25  And if I were going to read it literally, it would require --

1    it would require all three.  It didn't say "either/or."  It

2    said "and."

3              And it requires a seditious conspiracy as it

4    relates to the explosion of those bombs, because the seditious

5    conspiracy count is incorporated by reference.  And it's

6    toward the seditious conspiracy that all of these facts are

7    drawn.

8              So, it is not for them to say, well, if they

9    planned to blow up anything with an explosive device that was

10   within the statute, that they can then be convicted, any

11   person, anyplace, any thing.  It has to be specific, and it's

12   referred to specifically within the indictment.

13             The training that was referred to in June --

14             THE COURT:  Before you leave that, I just have

15   to . . .

16             MR. THOMAS:  I hesitated because I thought you

17   might jump in, but . . .

18             THE COURT:  I just want to see the statute as

19   you go on.

20             Leslie, would you find that.

21             MR. THOMAS:  Do you want me to stop?

22             THE COURT:  Just for a moment, if you would.

23             MR. THOMAS:  All right.

24             *(Brief pause.)*

25             THE COURT:  Mr. Thomas, you are saying

1    regardless of the language of the statute, the Government

2    chose to make this conjunctive rather than disjunctive.  And

3    because they chose to do that, they have to prove that the

4    Defendants intended to use these weapons against all of those

5    law enforcement bodies or the count fails?  Is that what

6    you're saying?

7              MR. THOMAS:  That's correct, Judge.

8              And I would cite the Court to the general

9    allegations that talk about the weapons of mass destruction.

10   And then they talk about it in terms of this organization

11   attempting to oppose by force the United States by actions

12   which include the use of the bomb.

13             THE COURT:  Okay.  We'll come back to that.

14             MR. THOMAS:  All right.

15             Well, corollary to that, we were talking about

16   two instances in this case where there was discussions or

17   there was training.  That was June the 6th of '09 and June the

18   13th of '09.  Those would be exhibits that have been

19   identified as Exhibit 16 and Exhibit 17.

20             Importantly, in the June 6th conversation -- or,

21   the testimony relating to the June 6th -- that would be the

22   June 6th conversation.  David Stone is heard describing what

23   the explosion was, and he referred to it as a cherry bomb.

24             On June the 13th, it was also referred to as an

25   "M-80 something, a cherry bomb."  And that's according to the

1      Government's undercover informant.

2                  These are clearly not what were contemplated by

3      the statute as weapons of mass destruction.  And I refer to

4      the Exhibits, Judge, 16 and 17 for your review.

5                  THE COURT:  Was there additional testimony on

6      what a, quote, cherry bomb is?

7                  MR. THOMAS:  Well, I don't think that there was

8      anything more than that.

9                  If I were to use the Government's analogy on

10     inferences, I could infer that it certainly wasn't a

11     destructive device of any great magnitude, because there was

12     no evidence of it that was determined to have been found as a

13     result of the search of the premises.  But I think that that

14     would be a stretch, as I think that the Government's

15     inferences that they are requesting you to take are a stretch.

16                 THE COURT:  All right.

17                 MR. THOMAS:  But certainly there was no

18     quantification of the explosive potential except for, you

19     know, its comparison to gunfire and that it may have been --

20     at one point it was suggested that it was not as loud as or as

21     loud as the gunfire and then that it was a little more louder

22     than the gunfire.  But there's no specific proof as to what a

23     cherry bomb is, but I think that --

24                 THE COURT:  Are you saying that that's the

25     extent of David Stone, Jr.'s participation in discussion about

1    these alleged weapons of mass destruction?

2              MR. THOMAS:  No, I'm not talking about -- no.

3    I'm just -- no.  David Stone, Jr.'s?

4              THE COURT:  That's what I said.  That's what I

5    intended to say.

6              MR. THOMAS:  Yes.

7              THE COURT:  That's the extent of David Stone,

8    Jr.'s participation?

9              MR. THOMAS:  Yes, that's what I'm saying.

10             THE COURT:  All right.

11             MR. THOMAS:  And I recognize that I'm stepping

12   on Mr. Shanker's toes.

13             THE COURT:  All right.

14             MR. THOMAS:  I think the main thrust of my

15   argument, if the Court will remember, is that towards the end

16   of acknowledging what actually is conspired to here and the

17   fact that there is no specific target, there is no specific

18   date, there is no specific plan, David Stone engaged in a lot

19   of language in this case.  When it really came to the point of

20   deciding what it was he was going to do, very poignantly he

21   was asked by the undercover enforcement officer at the

22   warehouse, you know, now that you've got it, what are you

23   going to do with it, you know.  Do you have any plans?  No.

24   Do you have any specific target?  No.

25             And that, I'm sure Mr. Swor is going to get to.

1    But when I was cross-examining witnesses regarding what
2    appeared to be Mr. Stone's main issue -- that is, the
3    Brotherhood -- there were several different varying
4    definitions of what the Brotherhood was.
5            And what I did is I pulled places in the
6    transcript or in the exhibits that have been presented to this
7    Court, the actual language about the Brotherhood.  And it's my
8    position that if the Brotherhood includes cops or includes
9    anything but federal authority, that Congress was very, very
10   specific in what it was that was necessary for a seditious
11   conspiracy, and cops is not enough.
12           In Haywood v. United States, 268 F2d 795 -- it's
13   a 1920 decision -- this was a seditious conspiracy relating to
14   the execution of the laws of the United States that were
15   related to a strike action that was taking place during a
16   period of great tribulation in the United States.
17           The language there that I latched onto is that:
18               "The Defendants thereby may have
19               violated local laws.  With that, we have
20               nothing to do.  Federal crimes exist only by
21               virtue of federal statutes, and the lawmakers
22               owe the duty to the citizens and subjects of
23               making it unmistakably clear those acts for
24               the commission of which the citizen or the
25               subject may lose his life or liberty.  In

US v Stone, et al. #10-CR-20123

 1                    that case, its prima facia meaning condemns

 2                    force only when a conspiracy exists, to use

 3                    it against some person who has the authority

 4                    to execute and who is engaged in executing a

 5                    law of the United States."

 6                    I didn't think that "Brotherhood" came under

 7       that definition when we heard about it in the case.

 8                    Specifically, on June the 26th, 2009, Mr. David

 9       Stone talks about cops as a Brotherhood and that they -- and

10       in no way does he indicate any federal implication.  He's

11       staying in Michigan.

12                    "If you kill a cop, they pack and buddy from

13       every state of the country.  And they're, 'Ah, yeah, we're a

14       brotherhood.  We've got to find 'em and kill 'em.'"

15                    This is not a federal reaction to the killing of

16       cops on June 26th of 2009.  This is a specific conversation

17       relating to cops against a symbol.  What I will be arguing to

18       a jury, if I have to argue to a jury, a symbol.

19                    There's no such thing as the Brotherhood of

20       Cops.  It's in his imagination.  It's a focal point for him.

21       It's something that has no -- it's not reality based.

22                    THE COURT:  Well, Mr. Thomas, whether he called

23       it the Brotherhood or he never put a name on it at all, his

24       speech makes clear that he does not hold federal officials in

25       high regard or the federal government in high regard.  And I

1    think that's an understatement.

2                    MR. THOMAS:  Well ...

3                    THE COURT:  And the Baldwin v. Franks case talks

4    about how that conspiracy could not be maintained because the

5    force that was exerted was against Chinese citizens rather

6    than against the government in its efforts to protect those

7    citizens.  So, clearly in the Baldwin case I think the court

8    contemplated that if there had been action taken against

9    people in the government who are to protect its citizens, then

10   that would be sufficient to maintain a seditious conspiracy

11   charge.

12                   MR. THOMAS:  In order for there to be a

13   conspiracy, besides the agreement, we go to the very essence

14   of what it is that is agreed.  You have to know.

15                   THE COURT:  Well, that's different.  But I guess

16   I disagree with you that federal law enforcement cannot -- or,

17   federal cops cannot be the government as contemplated by the

18   seditious conspiracy statute.  I believe that they are, that

19   it is.

20                   MR. THOMAS:  Well, I think you're correct on

21   that if it was that he knew that federal action would take

22   place in the event that he was going to provoke some sort of

23   response, number one; and, number two, if it was agreed by

24   Joshua Stone.

25                   And so it's towards that end that I wanted to

1    talk to you about Brotherhood and I wanted to go through the

2    four or five conversations that that's mentioned, because I

3    don't think that it contemplates in many instances knowledge

4    and, secondly, Joshua Stone's agreement that he would oppose

5    the Brotherhood if it consisted of the federal government.

6                   THE COURT:  Okay.

7                   MR. THOMAS:  So, I think that we are on -- I

8    think we are on the same track, and I understand your

9    question.  But we don't necessarily disagree with your

10   analysis that if, in fact, it did include the federal

11   government by way of a reaction in any way, whether it be

12   federal police or federal agents.

13                  THE COURT:  And you are saying that there isn't

14   any evidence that suggests David Stone intended to include

15   federal law enforcement when he discussed the Brotherhood?

16                  MR. THOMAS:  I'm going to go through those

17   piece-by-piece with you.  But I think that David Stone, when

18   really queried as to what was intentioned -- he was a

19   gentleman that would take people to the brink.

20                  We were talking about a December conversation

21   where there was a red alert about a potential ATF action that

22   was taken.  It was only within two hours that he reports

23   "stand down."

24                  And I think what we've seen in this case is a

25   history of Mr. Stone suggesting something and then finding

US v Stone, et al. #10-CR-20123

1     himself a back door and then backing off.

2                    "Alert, alert, alert, somebody is getting a

3     traffic ticket" or a discussion about what he would do in the

4     event that he did get a traffic ticket in a supposed stop that

5     occurred where he actually confronted the officer, and at the

6     time he was driving with a suspended license, and then nothing

7     happened.

8                    When he's at the warehouse talking with the

9     undercover officer, Special Agent Haug, about what it is that

10    he's going to do with these IEDs that are being brought into

11    the equation by the Government, he doesn't have any specific

12    thing that he wants to do.  And when he's queried specifically

13    about using it against the Government, he says no.

14                    On August the 13th of 2009, a conversation takes

15    place between Special Agent Haug, and Joshua Stone is present.

16    They have a general discussion about the militia and that --

17    and they talk about 50 armies in 50 states to hold the

18    country, and it's called the militia.  The years, with people

19    from 17 to 45 are supposed to be in the militia, and if

20    there's a problem, let's go, boys.

21                    Now, Stone is quoted as saying:  "Instead we've

22    replaced it with the Brotherhood."

23                    The undercover enforcement officer says:

24    "Mm-hmm."

25                    "And a few federal officers and a standing

1    Army."

2              My client Joshua Stone chimes in:  "Always

3    overseas fighting."

4              The undercover enforcement officer says:  "Not

5    here anyway."

6              Stone then clarifies.  He says:  "But the

7    Brotherhood is our problem.  Once we take those guys down, the

8    rest of it will come."

9              Now, the undercover enforcement officer says:

10   "That's a big Army across the country though" -- talking about

11   the Brotherhood -- "650,000.  That's what they say their

12   numbers are."

13             Mr. Stone says:  "650,000 strong in the

14   Brotherhood.  And when everybody starts shooting, your numbers

15   are going to fall real fast to 150,000."

16             This is not a specific discussion about the

17   United States Government.  To the extent that there is any

18   discussion regarding military, they are absent and overseas.

19             And Joshua Stone says:  "They are not" -- agrees

20   with -- I'm sorry.  David Stone agrees with the fact that they

21   are not here anyway.

22             Further on, they talk about the gang.  And they

23   are the gang called Brotherhood.  That gang theory comes up in

24   other conversations.

25             On September the 13th, David Stone and -- it

1    looks like Mr. Murray -- in a long paragraph talks about -- on

2    page 58:  "Start doing that, and you're going to have a whole

3    bunch of cops that are going to do this number with their

4    badges.  And my family ain't dyin' for this today."

5                    I'm sorry, Judge, I'm misquoting.  This is David

6    Stone saying this.  I will start again.

7                    "You start doing that, you are going to have a

8    whole bunch of cops who are going to do this number with their

9    badges.  My family ain't dyin' for this today.  And all of a

10   sudden they are no longer fighting."

11                   This is further discussions as it relates to the

12   Brotherhood.

13                   "Well, I heard it put one time that the cops are

14   the best organized street gang in the" --

15                   And then it is interrupted by David Stone:  "And

16   it's called the Brotherhood."

17                   The informant, Mr. Murray says:  "Yeah, but they

18   are the biggest and best organized street gang in the --"

19                   And David Stone says:  "Exactly."

20                   Mr. Murray continues:  "-- country."

21                   David Stone says:  "And that's what we're going

22   to take on first.  You take on the Brotherhood and you start

23   popping those boys, you're going to see the Brotherhood's

24   numbers start to dwindle like any gang."

25                   And then continues on, without any discussion

1    about what would happen next, who would be involved, and

2    certainly nothing relating to either the United States

3    military, the United States Government in any way, that there

4    is a conspiracy that exists to use it against a person who has

5    the authority to use it or to execute it and who is

6    immediately engaged in executing the laws of the United

7    States.

8                    THE COURT:  Mr. Thomas, Mr. Light pointed out

9    there was some discussion in which David Stone said the two,

10   the state and federal law enforcement, couldn't be separated;

11   that they were intertwined.

12                   MR. THOMAS:  All right.  And then the question

13   is if David Stone says that, who was present and where is it

14   that Joshua Stone said, yep, I agree?

15                   THE COURT:  I don't think that was a

16   conversation in which it was pointed out that Joshua Stone was

17   present.

18                   MR. THOMAS:  Well -- and that points out the

19   importance of individual consideration as it relates to this

20   conspiracy.

21                   Where is it that it was said that Joshua Stone

22   agreed?

23                   And we certainly can say that by the actions

24   that occurred in March, he did something.  But was it against

25   the United States?

1        On October the 6th, Joshua says -- this is the

2   only -- this is I think the only time that Joshua ever talks

3   about military.  And it's in the presence of David Stone,

4   Shannon Stone and Special Agent Haug.  And that was that

5   Joshua Stone did not see going against the military.  In fact,

6   he suggests that when this confrontation arises -- not clear

7   whether it is because of the fact that it was some provocation

8   on the part of David Stone, but it could be Satan versus

9   Christianity, it could have been good versus evil.  It could

10  have been any of the other descriptions which were being taken

11  as to how it was that war would exist.  That, quote-unquote,

12  war that --

13        In my cross-examination I tried to bring out the

14  fact that it may have been figurative, it may have been

15  fictional, it may have been a state of mind.  But in any event

16  Joshua Stone says:  "I mean, I don't see all of the military

17  going, you know, totally against us.  They are going to have a

18  hard time killing their own people, especially when they have

19  their foreign commanders giving them orders."

20        Joshua Stone didn't contemplate that he would be

21  fighting against the military.

22        In the February 6th conversation I think what

23  Mr. Light had failed to point out is that on page 50 of that

24  conversation, that the state police are considered to be

25  Interpole; that you're not talking about the federal

1     government.   You're talking about the global government.

2                     The wonders of technology, Judge.

3                     David Stone says the undercover --

4                     The undercover officer, Special Agent Haug:

5     "But what if we hit the feds. first really hard and then maybe

6     disrupt them until then --"

7                     David Stone interrupts and says:  "Well ..."

8                     And then the undercover enforcement officer

9     Special Agent Haug says:  "They have a state -- maybe state

10    will try to break away then.  See anything like that or not?"

11                    David Stone says:  "No.  Because the state

12    police are Interpole.  They are not even -- I mean whenever

13    you're talking to the feds., you are not even really talking

14    about our federal government institutions.  You're talking

15    about the global government."

16                    Haug says:  "Right."

17                    And then Stone says:  "Every state, every cop is

18    a member of Interpole.  A lot of the -- even the little

19    township cops are now too."

20                    Haug says:  "Yeah."

21                    Stone says:  "Countries -- some countries are

22    holdouts, but for the most part --"

23                    And then Haug intercedes and says: "Let's hear

24    it from them."

25                    Even David Stone, when queried about whether or

1   not he's talking about our federal government, says no, it's

2   not our federal government, on February the 6th.

3                Additional language hyperbole.  I mean, Joshua

4   Stone talking on February 6th about bringing dancers as a

5   decoy cannot have been evidence of any formed intent on his

6   part.

7                And, in any event, the little shiny badges that

8   are referred to and the Brotherhood being a gang does not have

9   any implication of federal involvement that is required.

10                And then on February 20th, again, David Stone is

11   talking about the Brotherhood being out of control in that

12   conversation.  He doesn't say they are the military.  He says

13   they look like the military.  He distinguishes them from

14   anything that arguably could be considered as federal

15   government.  And then he goes on to talk further about magical

16   Blue Helmets.

17                And I think that there is a paucity of evidence

18   of any intent to engage in any action against anyone who is

19   engaged in the execution of the laws of the United States.

20   And so as a result, Judge, as it relates to this seditious

21   conspiracy count, I'm asking you to dismiss the charges.

22                THE COURT:  Thank you.

23                Can I just before you go, Mr. Rataj --

24                Mr. Light, could you respond to Mr. Thomas's

25   argument concerning Count 2 and the manner in which the

```
 1      Government chose to charge?

 2                  MR. LIGHT:  Do you mean the conjunctive versus

 3      disjunctive question?

 4                  THE COURT:  I do.

 5                  MR. LIGHT:  Well, there's black letter law on

 6      that, Your Honor, to the effect that when a statute specifies

 7      alternative means in which to commit an offense in the

 8      disjunctive, it's appropriate for the Government to charge

 9      those alternative means in the conjunctive, but when the case

10      goes to the jury or when it's decided on Rule 29, it's based

11      on whether the Government has proved any one of those prongs

12      that are alleged in the conjunctive.

13                  THE COURT:  So, you're saying if the seditious

14      conspiracy charge didn't go to the jury, but Count 2 did, it

15      would go to the jury as using weapons against local ...

16                  MR. LIGHT:  It would go to the jury on the

17      theory of using weapons of mass destruction, destructive

18      devices or explosives, even though those are alleged in the

19      conjunctive in the statute, against federal, state or local

20      law enforcement vehicles or persons because --

21                  And I believe the Sixth Circuit case on this, or

22      one of them, is a case called United States v. Hathaway.  And

23      I don't have the cite at hand.  But basically the proposition

24      is that the Government is allowed to prove in the disjunctive

25      if it alleges violations or alternative violations of the
```

```
 1    statute in the conjunctive.

 2                 As long as the statute itself is in the

 3    disjunctive, alleging it in the conjunctive just satisfies the

 4    proposition that a Grand Jury has passed on that charge and

 5    has said that each one of the means under the statute is a

 6    basis on which the Defendant can be tried.  But once it goes

 7    to trial, any one of them is sufficient to establish a

 8    violation of the statute.

 9                 THE COURT:  All right.  Thank you.

10                 MR. LIGHT:  Thank you.

11                 THE COURT:  Mr. Rataj, did I see you rise?

12                 MR. RATAJ:  Thank you, Your Honor.

13                 I will be relatively brief, Your Honor.

14                 Your Honor, us you know, I have filed a joint or

15    concurrence with David Stone, Jr.'s brief, and I adopt the

16    arguments that are set forth in those papers.

17                 I have also submitted my brief, as you know, and

18    I'm not going to repeat all of the arguments that I've set

19    forth in my papers as well.  But I'm confident the Court has

20    read them.

21                 Your Honor, it's almost unbelievable to speak

22    what I've heard here this morning, because what we've heard

23    now is Mr. Light trying to distance himself from his own

24    indictment by arguing something different; that what we have

25    all prepared to defend against for two years.  And that is,
```

1    that these Defendants have conspired to kill a police officer

2    and then blow up the funeral procession.

3              And as we know, after we've heard testimony from

4    all of these Government witnesses, there's never been a plan,

5    there's never been a target, there's never been any kind of an

6    agreement to do that.  And so the case should fall on its face

7    like it should have two years ago.

8              And the irony in this case, Your Honor, is that

9    the only person that committed any act of violence was the

10   Government's own confidential informant, Mr. Murray, who shot

11   a 9 millimeter at his wife and then stabbed her.

12             THE COURT:  Well, Mr. Rataj, I think the

13   Government's position is that the crime is the agreement and

14   that there doesn't necessarily have to have -- necessarily

15   have to have been a definite plan, a specific time --

16             MR. RATAJ:  Agreement to do what, Your Honor?  I

17   mean, this is the --

18             THE COURT:  They're saying that the agreement is

19   to do what you just outlined:  Kill a member of law

20   enforcement and somehow spark the involvement of federal

21   officials after that killing has occurred, and then there

22   would be an attack on those federal law enforcement people.

23             It might sound very farfetched, but that's how I

24   understand -- and then one of the ways that the federal law

25   enforcement people might respond would be by participating in

```
 1    a funeral.
 2              MR. RATAJ:  Okay, fine.  Where's the evidence to
 3    support that, Your Honor?
 4              There hasn't been any evidence over five, six,
 5    weeks, seven weeks, however long we've been in this trial, to
 6    even support that theory.  Okay?
 7              But let's look at Tina Stone for a minute, Your
 8    Honor -- okay? -- because that's who I am representing here.
 9    And as we all know, we are entitled to have the Court look at
10    each Defendant separately as if there were separate trials.
11              We know, Your Honor, that Tina's first
12    involvement with the Hutaree was on August 22 of 2009.  That
13    was the only training that she ever attended.  And we also
14    know that there were three training sessions after that.
15              November 7, 2009.  She wasn't there.  Special
16    Agent Haug said that she was baby-sitting her granddaughter.
17              The next one -- the next contact would have been
18    the wedding.  And nothing happened at the wedding other than
19    two people got married.
20              The next training would have been I believe it
21    was January 9th of 2010.  Tina Stone was unpacking boxes at
22    the Tomer Road residence because they had just moved back
23    there, her and Mr. Stone, from the Bird Lake location.
24              And then the final training session before
25    everybody was arrested was on February 20th of 2010.  Tina
```

1    Stone wasn't there either because she left to attend Shannon

2    Witt's wedding shower.

3                    We know that on February 6th, Tina Stone did not

4    make the trip.

5                    And we know that on February 20th, when we had

6    these conversations -- which we all know were disjointed,

7    layered, filled with humor and laughter, hyperbole, she wasn't

8    there either.

9                    THE COURT:  What date is that?

10                   MR. RATAJ:  February 20th, which is the date

11   that the Government hangs their hat on.

12                   Curiously, just for the record, Your Honor --

13   this is how disingenuous the Government has been in this case.

14   They allege in their Second Superseding Indictment, when

15   they've had plenty of time to figure out what evidence they

16   had in this case, they claim that my client participated on

17   the January 9, 2010 training.  That is right in the

18   indictment, paragraph 5, in Count 1.

19                   She wasn't there.  They know that.  But they put

20   it in the indictment any ways.

21                   Now --

22                   THE COURT:  Mr. Rataj, what I heard Mr. Light

23   say this morning is that the indictment that he used for when

24   Tina Stone was definitively in the alleged seditious

25   conspiracy agreement was January 14th at the warehouse.  And I

1    believe Mr. Light said that her expression of a willingness to

2    get these coffee cans was action on her part.  It wasn't just

3    speech, but it was action.  And that she had been part of

4    other discussions before then that would signal her

5    endorsement of the agreement.

6                    Do you know of anything prior to January 14th,

7    2010 that she was a part of?

8                    MR. RATAJ:  Nothing, Your Honor.  Absolutely

9    nothing.

10                   But let's address January 14th and let's look at

11   what Mr. Light has argued, but let's put it in its proper

12   context, because he doesn't do that.  All right?

13                   January 14th is the first meeting that Senior

14   and Tina have at the warehouse with Jersey Steve.  And we hear

15   about Tina -- the only statement that Mr. Stone -- Mr. Light

16   can point to is a statement that Tina said I'm going to buy --

17   does that mean I have to buy more coffee cans.  Then she talks

18   about doughnuts.  And then she tells Jersey Steve, you need

19   more light bulbs in this place.  Okay?  That's it.

20                   But let's look at that statement in context,

21   because I had cross-examined Special Agent Haug about that

22   day.  And those comments have to be looked at in connection

23   with what Jersey Steve had asked Mr. Stone about the,

24   quote-unquote, war.  Okay?

25                   You know, when is the war going to start?  Okay.

1    And what does Mr. Stone say, Your Honor?  Mr. Stone says

2    biblically when everything lines up, when the coming of -- we

3    start to see signs of Jesus Christ himself coming down to

4    earth, when we see the antichrist fighting the saints.

5              That's got nothing to do with attacking the

6    United States Government or opposing the United States

7    Government by force, Your Honor.  Nothing.  Absolutely not one

8    thing.

9              And there's not one statement attributed to Tina

10   Stone where she had agreed to use IEDs, EFPs, homemade

11   mortars, pipe bombs, or whatever else you can think of,

12   against the United States Government.  Not one statement in

13   the record.  Over seven weeks, six weeks of trial, not one

14   statement.

15             You know, I mean, there's just absolutely no

16   evidence that Tina Stone or any Defendant, for that matter,

17   had agreed, okay, to kill a police officer and blow up the

18   funeral procession and entice the Government into some kind of

19   a fight.  There's just no evidence of it.  Zero.

20             They pick and choose a statement here and a

21   statement there, and they pile inference upon inference upon

22   inference and upon inference to try to make out a conspiracy.

23             And the case law is very clear on that.  You

24   can't make out a conspiracy by piling on inferences.  And

25   that's all they've done in this case.

```
 1                    There is no case, Judge.

 2                    This whole thing about the convoy, it is a

 3     complete red herring.  We didn't hear nothing about that.

 4     That's not in the indictment.  Nowhere in the indictment.

 5     Nowhere in the proofs from that chair right there.

 6                    THE COURT:  Well, there certainly is -- there

 7     are audio tapes of references to convoys.

 8                    What you're saying is that there wasn't any

 9     testimony that said the convoys included federal law

10     enforcement?

11                    MR. RATAJ:  That's correct.

12                    THE COURT:  And that's your point.

13                    MR. RATAJ:  Yes, that's one of my points.

14                    You know, I mean, if you look at February 6th,

15     okay -- if you look at --

16                    First of all, Special Agent Haug had to admit,

17     okay, that the speech that Mr. Stone read in the car is

18     protected by the First Amendment.  Okay?

19                    And it is.  There's nothing in that speech that

20     they could possibly hang their hat on to establish this

21     conspiracy.  Nothing.

22                    But let's look at what Jersey Steve once again

23     tried to do.  Okay?  Is he wanted Stone to give him that

24     target.  You know, give us a date when we're going to do all

25     this.  Okay.  Well, what if we hit the feds. and we hit 'em
```

```
 1        first and we hit 'em hard?

 2                    And Mr. Thomas just talked about that.  Stone's

 3        response was, no, okay.

 4                    We are not talking about the federal government

 5        here.  We are talking about the global government, whatever

 6        the heck that means, you know.

 7                    I mean, it changed so many -- the target, okay,

 8        of who they were going to be at war with changed so many

 9        times, okay, we don't know what Mr. Stone was talking about,

10        but he certainly wasn't talking about the United States

11        Government during any of his conversations.

12                    And there's certainly no evidence to suggest

13        that Tina Stone agreed and was willing to conspire with these

14        Defendants to oppose by force the Government of the United

15        States of America and use weapons of mass destruction in that

16        process.  No evidence whatsoever.  And the case has got to go

17        down, Your Honor.

18                    I've said enough already, you know.  You know

19        what really irritates me about this case, Judge -- and I'll

20        temper my comments.  But I mean the arrogance of these people.

21        Okay?

22                    You know, prosecutors have an obligation in this

23        country, okay, to do right.  And you don't do whatever it

24        takes to get a conviction because you got a two-year

25        investigation where you've only turned up three guns.
```

1           I mean, you look at Leslie Larsen's February 12,

2      2010 memo, and that says it all, Judge.  Okay?  We're not

3      going to spend two years and all of the money we spent on this

4      investigation and walk away with three guns.

5           And so what do they do?  They come in here and

6      they put on this dog-and-pony show where they pile up guns and

7      ammunition and all of this other military tactical gear, which

8      they all admitted is legal, other than a few guns, to scare

9      the heck out of the jury.  Okay?

10          That's -- they've gone to -- they've done

11     everything they possibly could, okay, to try to save face.

12     And that disgusts me, as an American, as somebody who has

13     served his country.

14          Not like Leslie Larsen, who was a clerk and

15     became an FBI agent and now she's got a badge and a gun.

16     Okay.  So, she's better than everybody else.

17          I mean, did you see how she talked about my

18     client, Judge?  You see how these people talked about my

19     client?  Toothless Tina.  She's a lesbian.  She's a fat ass.

20          My taxpayer dollars are going to pay for that?

21     I don't think so.

22          You are the only person in this entire world

23     that can put a stop to this nonsense.  And I'm begging you to

24     do that.  Because four of these guys out here are political

25     prisoners.  And I said it in my papers.

1           And one of the things that irritated me about

2     this case is to see these guys get chain ganged into this

3     courtroom everyday.  For what?  For exercising their

4     constitutional rights?  For talking smack?  For talking things

5     that, you know, some of us might find, you know, a little bit

6     abrasive and offensive and all these other things?

7           And I put it in my papers, Judge.

8     Constitutional truisms.  I list them.

9           You can talk about killing cops in this country.

10    There's nothing wrong, there's nothing illegal about it.  We

11    might not want to hear about it.

12          I asked Special Agent Haug about Ice T's "Cop

13    Killer."  He was familiar with it.  Ice T was able to write a

14    song about killing cops, and nobody -- and I didn't see the

15    federal government going out and arresting him.

16          This is protected speech.  We might not like it.

17    We might not want to listen to it.  But we have the right to

18    turn it off if we want to.  We don't have to listen to it.  We

19    don't have to agree to it.

20          Do you think I like listening to that idiot Rush

21    Limbaugh on the radio?  If I turn him on, I have the right to

22    turn it off.  Okay.

23          People have a right to say things in this

24    country, Judge.  And that's all these fellas were doing, you

25    know, sitting around a camp fire in their backyard.

1          You know, come on over to my house when I cook

2     barbecue one day.  You know, you'll get an earful too.  Okay?

3     Believe me.  Way worse than what these fellas were saying.  I

4     guarantee you, you know.

5          But I don't think that I should be arrested for

6     seditious conspiracy, okay, because I live in the United

7     States of America.

8          I don't see a Chinese flag behind Your Honor.  I

9     don't see a flag from North Korea behind Your Honor.  I see an

10    American flag, Judge.  An American flag.

11         And these people are nothing more than political

12    prisoners.  That's all they are.  And they are victims, okay,

13    of the arrogance, okay, and these ambitious people that are

14    behind this prosecution, because they are all trying to make a

15    name for themselves.

16         But they fell flat on their face.  And so what

17    do they do for the last seven weeks?  They come in here and

18    they put on a dog-and-pony show.

19         They withheld evidence from us, I mean,

20    throughout this entire trial.  We are getting evidence in the

21    middle of trial, you know.

22         This is the way they play.  Okay?  Because they

23    want to get a conviction no matter what, because careers are

24    on the line.

25         Well, guess what, Judge.  I don't care.  Okay?

US v Stone, et al. #10-CR-20123

```
1    I don't care.  As far as I'm concerned, Leslie Larsen should
2    be fired.  Fired.  She's got no business carrying a badge and
3    a gun.
4              This case needs to be dismissed, Judge, and
5    there's no evidence against my client, okay, as it relates to
6    Counts 1 or 2 or the 924(c)'s, obviously.
7              You know, one training, Judge?  One training.
8    Okay.  "Do I need to buy more coffee cans?"
9              So what?  So what?
10             Where's the evidence that she agreed to use
11   those coffee cans to oppose the Government by force?  That's
12   the question.  And that's where the evidence is lacking.
13   Because there is none.  There is none.
14             These people were just like the show that is on
15   A&E right now or NatGeo.  Doomsday Preppers, that is all these
16   people are.  They are Doomsday Preppers.  They are waiting for
17   the end of time, when the antichrist comes down and the world
18   is in chaos.
19             And, as Mr. Shanker astutely pointed out --
20   unbelievably, we couldn't believe it, the Government was dumb
21   enough to put an exhibit there that says, "Code Black, use of
22   defensive force only."  Not offensive force.
23             Thank you, Your Honor.
24             THE COURT:  Thank you.
25             Mr. Light, I have a question for you with
```

1    respect to Tina Stone.

2              MR. LIGHT:  Okay.

3              THE COURT:  Assume that she did intend to buy

4    more coffee in metal cans that could be used to make IEDs, but

5    that her understanding was that these IEDs were going to be

6    used when the Apocalypse begins.

7              Is she in this conspiracy?

8              MR. LIGHT:  It depends upon who they were going

9    to be used against and how that fits in with some idea of the

10   Apocalypse.

11             I didn't hear Tina Stone talking about the

12   Apocalypse in any of the recordings, but --

13             THE COURT:  No.  But Mr. Rataj points out the

14   context of the conversation in January of 2010 and the

15   response that Mr. Stone gave to the question, when is the war

16   going to start, and he talked -- and he said -- I didn't look

17   it up, but I remember, I think, he did say if and when things

18   line up.

19             What if that was her understanding of how these

20   IEDs were going to be used?

21             MR. LIGHT:  Well, if it was also her

22   understanding that they were to be used against a convoy -- I

23   don't think that -- I don't think that the reference to the

24   Apocalypse as being a triggering event for the war excludes or

25   undermines the idea that the specific purpose of the EFPs and

```
 1    IEDs was to use them against a convoy.

 2                    THE COURT:  It may not be with respect to the

 3    specific intent of other people, but I'm talking about Tina

 4    Stone now.

 5                    And Mr. Rataj says that there isn't any evidence

 6    that she was present when any other discussions were being

 7    held about a convoy, about attacking the federal government;

 8    and that the most that can be said is that she was present in

 9    a discussion about IEDs where she may have been offering to

10    supply some material to make IEDs, but that she thought it

11    would be in the context of the Apocalypse.

12                    MR. LIGHT:  Well, that's the discussion

13    apparently specifically on January 14th, but there are other

14    discussions as well that she is party to, and it's not just

15    discussions about the Apocalypse.

16                    And if you'll give me a moment.

17                    (Brief pause.)

18                    MR. LIGHT:  I'm actually not finding any

19    discussion of the Apocalypse on the 14th, Your Honor.  Perhaps

20    Mr. Rataj could point me to that part of the discussion.

21                    MR. RATAJ:  It's amazing the Government doesn't

22    even know their own case, Your Honor.

23                    THE COURT:  Mr. Rataj, do you have it?  What

24    transcript is it?

25                    MR. RATAJ:  It would be Volume 28, page 83.
```

1              *(Brief pause.)*

2                   MR. LIGHT:  I point to a couple of things for

3       the Court's consideration.  First of all -- and this is from

4       the transcript on January 14th.  This is Government Exhibit 49

5       A at page five as they are inspecting the workroom at the

6       warehouse.  The agent says:  "I brought a few things out.  See

7       the cast boosters?  Basically it's like TNT.  It's very loud

8       and will do, do a lot of good work."

9                   David Stone says:  "Extremely nice."

10                  The agent says:  "I'm ditchin' dynamite.  I got,

11      uh, quite a bit of this.  Hang on."

12                  Tina Stone says:  "We've got to have Richie get

13      ahold of his buddy."

14                  And then David Stone talks about the need to

15      store this in cardboard to absorb some moisture.

16                  Later on the agent says:  "Little electric

17      blasting caps.  And, again, it's easier for us to get this

18      stuff a little at a time, 'cause for obvious reasons."

19                  Stone says:  "Most definitely."

20                  The agent says:  "We don't want to -- I got a

21      quite a bit more I've got to bring up, but I guess I gotta

22      bring a little at a time, because I don't want to, you know,

23      don't need to raise any eyebrows."

24                  And this is with Tina Stone participating in the

25      discussion.

1                    Later on in 49 G, the reference to Richie gets

2    clarified a little bit.

3                    THE COURT:  What page are you on?

4                    MR. LIGHT:  Page 72.

5                    THE COURT:  All right.

6                    MR. LIGHT:  The agent, talking about Jared,

7    says:  "He is -- that boy better put some rocks in his pocket.

8    If a strong wind, man, he'll blow away."

9                    David Stone says:  "He seemed to be a nice kid."

10                   The agent says:  "Yeah, he's quiet, but he don't

11   say nothin'."

12                   Going on, Tina Stone says:  "You got to get on

13   Richie about contacting that friend of his."

14                   The agent says:  "Who is that?"

15                   David Stone says:  "Oh."

16                   Tina:  "That's got the dad who does the

17   heavy --"

18                   David says:  "Construction."

19                   Tina says:  "Exactly.  He can get dynamite with

20   no problem."

21                   Now, if we go to the discussion on January 9th

22   in the trailer before the training starts, there is discussion

23   in which Tina Stone is involved, talking about what's going to

24   happen on February 6th.

25                   David Stone says:  "I'm taking a security team,

```
1    is what I'm taking.  I'm taking one secretarial person.  That
2    would be her."
3              Tina Stone says:  "That's me."
4              David Stone says:  "And for security, two is
5    going to sit in the vehicle.  Two will not leave the vehicle,
6    because that's where our rifles are going to be sitting.  They
7    wanted no guns in the open policy on this.  So, that means if
8    you have a handgun that goes and it stays tucked.  Okay?"
9              Joshua Clough says:  "How about duffle bags?
10   How about making an operational one?"
11             David Stone says:  "Because there ain't going to
12   be.  Kentucky is hopping with some fed. activity."
13             "So?"
14             And proceeding:  "This meeting is going to be
15   coming off.  Things are getting hot.  ATF is all over
16   Kentucky.  So, we are going to go in hot and heavy.  We're
17   taking rifles.  We're taking at least six mags. apiece.  We
18   are taking blow-out bags, and they are going to be tied to the
19   top of the van.  We're taking all of our military gear with
20   us.  And if we have to walk it home, we'll walk it home."
21             Tina says:  "Will you carry me, baby?"
22             Because at that point she was going to be part
23   of the trip down to Kentucky.  She didn't end up going.
24             THE COURT:  And so you're saying that being
25   present for that discussion on February 6th ties her into a
```

```
 1    war on the Government of the United States?
 2                  MR. LIGHT:  It could -- it ties her into
 3    knowledge and an understanding that part of the aim of the
 4    Hutaree was to oppose by force federal authorities.
 5                  THE COURT:  Knowledge and understanding that
 6    part of the aim was.
 7                  What gets her as part of the conspiracy?
 8                  MR. LIGHT:  Her participation as I've described
 9    earlier in the discussions about obtaining the explosives and
10    obtaining the components --
11                  THE COURT:  But that was January 14th?
12                  MR. LIGHT:  January 14th and a number of other
13    dates --
14                  THE COURT:  Well, that's what I've -- that's
15    what my question is designed to get to.
16                  Mr. Rataj said there were no other discussions
17    that she was a part of.
18                  MR. LIGHT:  Well . . .
19                  THE COURT:  And that maybe you can check those.
20                  MR. RATAJ:  May I respond quickly, Your Honor?
21                  THE COURT:  You may.
22                  MR. RATAJ:  First of all, if you will remember,
23    during my cross-examination of Special Agent Haug, I was able
24    to point out all of the things that he purposely left out of
25    his 302 which was relevant to this investigation.
```

1        And Mr. Light has still not, okay, responded to

2   your question as to how the conversation -- the conversation

3   regarding a coffee can, okay, where right after they start

4   talking about the end of times -- he just wants to ignore

5   that, just like Jersey Steve did up on the witness stand.

6        They don't want to put anything -- Stone was

7   asked when was the war going to start.  Oh, it could start

8   next week.  It could start in one of seven states.  I mean,

9   the answers changed all the time.

10        And I asked Haug, okay, where is that in your

11   302?  I didn't put it in there.  Was it relevant to the

12   investigation?  Yes.

13        And you're getting the same thing right here.

14        THE COURT:  All right.  So, Mr. Light, as I look

15   at this transcript, there were a number of questions that

16   Mr. Rataj asked Agent Haug about what happened at the

17   warehouse.  And this is where he said -- one of the questions

18   was from Mr. Rataj, and he said that:  "Whenever you're

19   talking about the feds., you are not even talking about our

20   federal government.  You're talking about the global

21   government?"  And he said:  "Do you see that?"

22        "Yes, sir."

23        And then there was earlier than that Mr. Haug's

24   agreement that there had been this discussion about the war

25   coming when the antichrist makes war with the saints.

1          So, there was at that time a disclaimer, if you

2     will, from David Stone, Sr., that he wasn't talking about the

3     federal government, and certainly in front of Tina Stone he

4     talks about this war with the antichrist.

5          And I guess all of this gets back to the danger

6     in saying that people adopt whatever it is that they're

7     hearing around them.

8          Let's say, for example, that the only discussion

9     that Tina Stone was ever part of was one discussing a war with

10    the antichrist.  And if I agree with the Government's

11    position, that should let Tina Stone out, right?  Because

12    she's around the discussion and the discussion is about the

13    war with the antichrist.

14               MR. LIGHT:  Well --

15               THE COURT:  And then she may have been around

16    another discussion where there is talk about a war with

17    someone else.

18          Where do we draw the line between what someone

19    is just listening to and not necessarily buying into and what

20    they are buying into such that they should be responsible for

21    the commission of a crime?

22               MR. LIGHT:  We draw the line where they either

23    agree expressly to do something or to join in a plan or

24    conspiracy or when they take actions that reflect their

25    agreement to join in the conspiracy.

1          THE COURT:  What about Mr. Stone saying as late

2     as February 6th I'm not talking about the federal government;

3     I'm talking about the global government?

4          MR. LIGHT:  Well, I think that's a

5     mischaracterization of what he said on February 6th, and it

6     reflects a misunderstanding of the relationship between the

7     various elements of government that Mr. Stone had and that he

8     shared with the other members, which is, you know -- again,

9     referring back to that segment that I read from to the Court

10    and to other similar discussions, "they're all inextricably

11    intertwined."

12          And, you know, it's not him saying it's not the

13    federal government; it's something over and above the federal

14    government.  It's him saying it's the New World Order or the

15    United Nations or some organization over the federal

16    government, using the federal government as a tool.

17          I think that's an accurate interpretation of

18    what he means there if taken in the context of other

19    statements.  He puts them all together.

20          And the federal government is repeatedly an

21    element of the group that he opposes, an element of the enemy

22    that he identifies and the enemy that is going to be opposed

23    by force.  And sometimes it's specific to ATF.  Sometimes it's

24    specific to other federal government organizations.

25          More often it's the federal government as an

```
 1    aspect of law enforcement.  And there's no question that when

 2    he's talking about the, you know, 650,000 of law enforcement

 3    that he wants to chip away at in that conversation that I

 4    believe Mr. Thomas referred to, that includes local, state,

 5    and federal law enforcement.  It's not just local police

 6    officers.  It's the whole ball of wax that he aims at, and it

 7    includes -- and he knows it includes -- the federal the

 8    government.

 9                   It is not as though David Stone were saying, oh,

10    we oppose everybody but the federal government, that is in law

11    enforcement.

12                   I don't think that's a correct interpretation of

13    that passage that was quoted.

14                   THE COURT:  Okay.  Thank you.

15                   Counsel, we'll take a break?

16                   I'm sorry?

17                   MR. SCHARG:  Can we take a half hour break --

18                   THE COURT:  Yes.

19                   MR. RATAJ:  -- to eat lunch, Your Honor?

20                   THE COURT:  Yes.  We'll break until two.  Thank

21    you.

22                   (Recess held from 1:13 p.m. until 2:02 p.m.)

23                   THE COURT:  Thank you.

24                   Is everyone back?

25                   Who is next?  Mr. Satawa?
```

1          Mr. Light, question.  Mr. Light, I was looking

2    back at the opening statement that Mr. Graveline gave, and I

3    know that it is not evidence, but he says on page 12 that:

4          "Any number of different incidents would have

5    led to the start of this war.  It could be a traffic stop.  It

6    could have been a search warrant.  It could have been an

7    action by another militia group.  However, the evidence is

8    going to show that in 2009 and 2010, and just as you heard in

9    that second clip from August 13, 2009, a plan started to

10   develop within the Hutaree, and that was to kill a member of

11   local law enforcement and then to attack that officer's

12   funeral procession because that's where a large number of law

13   enforcement would be."

14          So, my question is in your argument today you're

15   trying to tell me that it wasn't just that scenario that could

16   unfold, but that it was other scenarios also that you have

17   presented proofs on and that evidence a broader -- a

18   conspiracy that was not just to bring in federal law

19   enforcement to a funeral procession, but to prompt them to

20   respond to any kind of attack as described in the indictment

21   on local law enforcement.

22          You -- "you" meaning the Government -- really

23   did narrow this issue in opening, did you not?

24          MR. LIGHT:  I don't think so, Your Honor,

25   because I don't think an opening statement limits the

1    Government to the facts or the parts of the case that are

2    referenced in an opening statement.

3               An opening statement isn't intended or required

4    to be a statement of every piece of evidence and every theory

5    on which the Government might be able to establish the

6    allegations of the indictment.

7               THE COURT:  I do understand that.  But this was

8    so specific and that it is in large part what we've been

9    talking about a good part of this morning, and that is exactly

10   what is the plan.  And the plan was to attack this funeral

11   procession as outlined in Mr. Graveline's opening statement.

12              I just want to know what your reaction was to

13   it, because he did -- he did narrow the issue for trial I

14   think.

15              MR. LIGHT:  Well, I believe that he focused on

16   the same thing that the Court has focused on here today.  But

17   I don't think that that limits the Government to eliminate

18   other bases for liability that are alleged in the indictment.

19              The indictment, if anything, is what should be

20   looked to as to whether it limits the bases for liability

21   under the statute.

22              THE COURT:  Okay.  All right.

23              MR. LIGHT:  But I mean I know that the Court is

24   focused on that particular theory, and I have attempted to

25   also focus on the evidence as it relates to that particular

1   theory as well as the other theories.

2                  THE COURT:  But you said it is broader than the

3   funeral procession theory in that it included all of these

4   other potential ways of killing law enforcement.

5                  You have focused the Court on -- well, that's

6   not true, because you did say that the people that you -- that

7   as we went through the evidence beginning with August 13, '09,

8   that not all of those people were privy to a conversation

9   about a funeral procession, but that it didn't matter.

10                  All right.

11                  MR. LIGHT:  Thank you, Your Honor.

12                  THE COURT:  Mr. Satawa?

13                  MR. SATAWA:  May it please the Court, Your

14   Honor.  Good afternoon.

15                  THE COURT:  Good afternoon.

16                  MR. SATAWA:  Your Honor, I'd like to first start

17   by adopting the arguments made by co-counsel here today, as

18   well as those that will be made by counsel after me.

19                  I also want to echo both the spirit and the

20   sentiment of the argument made by Mr. Rataj, Judge.  It's

21   difficult, I think, when you're sitting here during this case,

22   to detach emotion and remain completely stoic in your reaction

23   to this case; a case that is without question on many levels,

24   at a minimum, extraordinarily troubling in its prosecution.

25                  Your Honor, as the Court I think has done an

1     excellent job so far today of pointing out, we know it takes

2     more than mere presence at the meetings or while things are

3     being said, to constitute guilt or participating in the two

4     alleged conspiracies.

5                      We have the mere presence instruction that this

6     Court is going to give to the jury.

7                      We also know how many people were present at

8     various meetings or trainings that aren't sitting here today;

9     people like Shannon Witt who, when asked who will pull the

10    trigger, was the first to say I will, who was at the

11    warehouse, who was at the bomb demonstrations performed by

12    Agent Haug.  Eric Jackson, the Lineweavers, Pete Palmer, Dan

13    Kelly who lived at the Tomer Road address for long periods of

14    time.  And, Your Honor, if mere presence was enough, I'm quite

15    certain that any number of those folks, if not others, would

16    have been charged.

17                      Your Honor, as I've listened to the Government

18    here today and I listened to the argument about Count 1, it

19    seems to me that, as I've heard the Government, and in their

20    written responsive pleading, Your Honor, that they want to

21    have their cake and eat it too.  They charge a conspiracy --

22    as Your Honor points out, not only do they charge that

23    conspiracy in the indictment, but in opening statement to the

24    jury, tell the Court, as well as the jury, that that

25    conspiracy has a specific plan and a specific target; and,

1          that is, killing a police officer and ambushing the funeral.

2                    Then when the Defense focuses on that plan and

3          attacks it, they complain.  They distance themselves from it.

4                    Your Honor, it's very difficult for me to follow

5          what the Government is really arguing at this point in

6          response to the various Rule 29s that have been made.  But one

7          thing strikes me as clear, and that is they continue to use

8          the word "Hutaree" as a substitute for the individual

9          Defendants.

10                    I submit to you, Your Honor, that that is no

11         accident; that they are doing that on purpose.  They are doing

12         that on purpose because they cannot prove anything against any

13         of the individual Defendants in this case except -- well, they

14         cannot argue -- they cannot prove anything against any

15         specific individual Defendant in this case, Your Honor.  And

16         they certainly cannot do that against Mr. Meeks.

17                    It is only by combining what each and every one

18         of these individuals said over the course of an 18-month

19         period, many of which conversations that only some of them

20         were present for.  And by that, of course, I mean my client

21         Mr. Meeks was not present, as I pointed out -- at least I

22         tried to follow the Court's instruction in my pleading on

23         Friday and discuss some of the many 801(d)(3) -- (d) --

24         801(d) --

25                    THE COURT:  (E).

1          MR. SATAWA:  You know what I mean, Judge.

2          -- statements that the Court asked us to note

3  and list for Your Honor.  It was stunning to me how often my

4  client wasn't even there.

5          As an example, Your Honor -- and I was going to

6  come back to that later.  But he was never at the warehouse.

7  He was late to the August 13th training where explosive

8  devices were used, that the Government continues to try to

9  refer to as IEDs.

10         Your Honor, I suppose a bottle rocket -- and if

11 the Government is taping this, I suppose this is an admission.

12 That at Lake St. Helen last summer on the 4th of July I

13 possessed and used IEDs, because I, Your Honor, shot off

14 mortars.  I, Your Honor, shot off bottle rockets.  I, Your

15 Honor, exploded devices that, to quote the individuals on

16 those tapes, including Daniel Murray, were slightly bigger

17 than an M-80 or similar to a cherry bomb.

18         THE COURT:  Mr. Rataj, do you want to stop your

19 client from incriminating himself?

20         MR. SCHARG:  No, we'll stay quiet.

21         MR. SATAWA:  I think she wants you to represent

22 me now, Mike.

23         Your Honor, the question we should ask the

24 Government is what is essential in the indictment and proofs,

25 because all they keep doing is repeating the language of the

1    statutes involved and somehow relating that to the indictment.

2              But what they don't do is ask the critical

3    question that we all ask, including Your Honor; and, that is,

4    how does the mere presence at these meetings or trainings, how

5    does the language used by the Defendants, how does the

6    combination of even that by my client with others equate to

7    guilt of Counts 1 and 2.

8              And, Your Honor, what strikes me, as I was in

9    the middle of saying, was not only was my client late to the

10   June 13th demonstration or training, excuse me, he was not

11   present for either of the August meetings where Agent Haug,

12   the only person in this case who had not only the ability and

13   resources to build a true EFP, but also built, brought,

14   introduced and demonstrated an explosive device -- my client

15   wasn't at either one.

16             When this Court asked the Government this

17   morning, Mr. Light, in response to my objection, can you be

18   more specific to individual Defendants, I think it's telling

19   that the Government couldn't do it.  The reason they couldn't

20   do it is because they can't do it.  And the reason they can't

21   do it, Your Honor, is because Mr. Meeks, along with others,

22   can't be individualized in this case with guilt.  They can be

23   individualized by association, but they can't be

24   individualized with guilt.

25             My client, Mr. Meeks, cannot be.  And like

1    Mr. Thomas, I want to apologize.  My comments are not meant to

2    be stepping on the toes of any other Defendant or Defense

3    counsel.  I'm speaking only of course as to Mr. Meeks.

4              Your Honor, I read the Government's -- I read

5    the Government's response as an example.  And I see on pages

6    33 and 34 the statement:

7              "While he was not part of the group that

8              observed the detonation of an EFP on August

9              27, 2009, he was invited."

10             How that is relevant is beyond me.

11             "And he showed up later that day.  When

12             he saw the results of the demonstration, he

13             immediately recognized what the UCE had

14             brought to the group and joined in discussing

15             it further."

16             The Government's responsive pleading goes on to

17   say:

18             "Mr. Meeks was tasked with locating and

19             obtaining a van for use in the op. and was

20             involved in getting the street signs the

21             group wanted to steal for use in the EFPs."

22             Your Honor, that is a combination of hyperbole,

23   exaggeration, and outright lying and distorting what appears

24   on this record before Your Honor.

25             How dare, as Mr. Rataj said, the Government,

US v Stone, et al. #10-CR-20123

1    representing the -- the lawyers representing the Government in

2    this case, who are charged with doing justice, file a pleading

3    that says that about Mr. Meeks?

4                There is no proof -- because they don't say that

5    he was asked to look for street signs.  They say he was

6    involved.

7                Judge, there is not a shred of evidence on this

8    record before Your Honor that my client took a single step

9    towards acquiring a street sign or actually attempted to or

10   did acquire a single street sign.

11               He was involved in one conversation that I

12   identified in my brief about street signs where his response

13   was, so, you need the big signs or you're talking about the

14   big signs.

15               Your Honor, Mr. Meeks did not join in discussing

16   the August 27th, 2009 EFP later, as suggested by the

17   Government.  Mr. Meeks talked about his own training and

18   experience as a United States Marine at United States Marine

19   Base Camp Pendleton at demolition school when he honorably

20   served this country as a United States Marine.

21               The suggestion that him speaking of his own

22   apparently aced final exam at bomb demolition school, because

23   he blew up some device that he made that got props from a

24   sergeant at demolition school, and trying to tell the Court --

25   or suggest to this Court that somehow -- that somehow means he

1     joined the discussion, is troubling to say the least.

2               Again, Your Honor, he was late to the June 13th

3     training.  He was absent from the August 13th training and

4     absent from the August 27th training -- demonstration.

5               The Government went on to talk this morning and

6     in its responsive pleading about the Kentucky trip.  Before

7     they left, Mr. Light said this morning, there was

8     conversations in the trailer about IEDs and EFPs.  And

9     Mr. Light pointed to that as possible further evidence of my

10    client's and other Defendants' participation in this plan or a

11    conspiracy.

12              Your Honor, there's no evidence that my client

13    participated in those conversations in the trailer.  Agent

14    Haug was very clear that my client arrived late and did not

15    remember at what point he got there.  And there's certainly no

16    evidence on this record that my client was part of any

17    conversation that occurred in that trailer before they left in

18    the van for Kentucky.

19              I will point to what I wrote in my Rule 29

20    motion on Friday.  Michael Meeks is not heard on Government

21    Exhibit 54-A or B, the part at the beginning of the -- at the

22    beginning of the trip before they left in the van, and does

23    not participate -- is not heard participating in the

24    conversation at that point.

25              In fact, if Your Honor remembers the video seen

1    in 54-F, Mr. Meeks is seen sitting in the back row staring out

2    the window, looking around, and not participating in any way

3    in the conversation.

4              Later, when someone needs to get Mr. Meeks'

5    attention, they have to -- later when Mr. Meeks is being

6    solicited to participate in the conversation, someone has to

7    get his attention.

8              Your Honor, the person doing most of the talking

9    is Agent Haug.

10              Your Honor, I tried to quote from the record

11   exactly in my Rule 29 on Friday.  I listed the comments that

12   my client did make both on February 20th, 2010 as well as

13   earlier statements.

14              Your Honor, some of the things that my client

15   said are admittedly offensive, and that can't be denied.  But,

16   Your Honor, as other counsel have done a much better job than

17   I of explaining to this Court, what they are not is illegal.

18              Even my client's participation in the February

19   20th, 2010 conversation about copicide began with my client

20   stating, as I said in my motion, words to the effect of "That

21   guy just made my Top 10 List."  Judge, "copicide" is a term

22   that my client was clearly using to mean if you're going to

23   go, you might as well have to cops kill you, apparently to be

24   a martyr.

25              I don't know, Your Honor.  I guess what I meant

1    to say is apparently the Government is suggesting that that's

2    what the purpose would be, is to be a martyr.

3              But in no way does the term "copicide" mean

4    shooting another cop.  It means the cop shooting you.

5              And, Your Honor, what's more, and critically

6    important, is other than exercising his own First Amendment

7    right to say things, and things that are quite candidly, Your

8    Honor, like I said, not all that smart -- in fact, Your Honor,

9    I will be very candid.  On the four or five comments I

10   actually put in my brief, because I wanted my brief to be a

11   fair statement on what my client actually did say on some of

12   these statements that are alleged either to be statements in

13   furtherance of the conspiracy or used to prove the conspiracy

14   or verbal acts, Your Honor, some of the things my client says,

15   they range pretty high on the dumbness and stupidity meter.  I

16   mean, they do.  But what they are not is illegal.  And what

17   they're not is ever evidence that my client joined this

18   conspiracy or ever had knowledge of a conspiracy, its intent

19   or its objective.

20             And, Your Honor, in that February 20, 2010

21   copicide conversation where my client does say things like I'm

22   looking at enough people here to do something, you just have

23   to be motivated to do it, there is no evidence that my client

24   intended that statement to be taken seriously.  There is no

25   evidence that my client stated -- made that statement as part

```
1    of a conspiracy to oppose by force the lawful authority of the

2    United States Government.   There is no suggestion that my

3    client was stating that as a suggestion or an agreement on any

4    kind of plan, because, Your Honor, there's no evidence

5    admitted even by the Government at that February 20th, 2010

6    conversation that there ever was an agreement, that there ever

7    was a plan or that there ever was a target.

8                    And, Your Honor, what strikes me as troubling is

9    that when you look at the exhibits that I pointed out to Your

10   Honor in my written pleading, that my client -- I suppose

11   there's three different ones, Your Honor -- or four.  The one

12   end is the overwhelming number of exhibits, telephone calls

13   and live body recordings that were made where my client wasn't

14   even present.

15                    THE COURT:  Mr. Satawa, all of the Defendants

16   have made much of Agent Haug's testimony that by February 20th

17   there was no plan, no date, no time, no target.  And the

18   Government's position is that that really is of no moment

19   because it is an agreement and there doesn't have to be --

20   even if it's a year or two years off, if there was an

21   agreement, if there was a discussion to kill police officers

22   and then certain steps taken to accomplish that, even if it

23   wasn't going to be accomplished for another year or two years

24   or no definite date, that that's sufficient.

25                    MR. SATAWA:  Or five years.
```

1              THE COURT:  Or five years.

2              MR. SATAWA:  According to Mr. Stone at one point

3      I believe.

4              THE COURT:  Whatever.

5              MR. SATAWA:  Yeah.  Your Honor, I would answer

6      that question by saying this -- and I think Leslie Larsen

7      herself when asked on cross-examination acknowledged this as

8      well.

9              And that is, Judge, the agreement -- we are not

10     looking just for an agreement.  We are not looking for a

11     consensus that my client joined.  We are not looking for an

12     agreement that my client joined.

13             THE COURT:  Well, he would have had to have

14     joined somebody.

15             MR. SATAWA:  I understand, Your Honor.

16             But even if the Court feels that the Government

17     has proven that my client did agree to kill a local law

18     enforcement officer -- Judge, I submit that there's no proof

19     of that, but if the Court's question assumes that, Agent

20     Larsen acknowledged that none of these Defendants, including

21     my client, are charged with conspiracy to commit murder on a

22     police officer.  My client is charged with opposing by force

23     the lawful authority of the United States.

24             And, Judge, to say that my client saying things

25     like copicide or that guy made my Top 10 List or I'm looking

US v Stone, et al. #10-CR-20123

1    at enough people to do whatever means that he knowingly joined

2    a conspiracy to oppose by force the lawful authority of the

3    United States, Your Honor, isn't just an inference that the

4    Government argued to in their presentation to the Court this

5    morning, stating that we are entitled not just to evidence in

6    the light most favorable to the Government, but reasonable

7    inferences, Judge, that's not an inference.  That is an

8    inference on an assumption, on a presumption, on a speculative

9    guess.

10                   Judge, I mean, the fact that that conversation

11   occurred, by itself, means or proves that whatever this Court,

12   for purposes of this Rule 29, I suppose, determines that it

13   proves.

14                   But what I would submit to Your Honor is that it

15   is a huge step to go from, I would submit, joking around and

16   puffery and hyperbole and to use the words that other counsel

17   have used.

18                   But even if the Court says, okay, I'm going to

19   eliminate that because I'm supposed to look at the evidence in

20   a light most favorable to the Government, so I'm going to take

21   them at their word.  I'm going to take the leap of faith that

22   the Government asked me to make and assume that this

23   conversation are people talking seriously.  By itself, Judge,

24   it doesn't establish a conspiracy to resist by force the

25   lawful authority of the United States, even if it proves a

1    conspiracy to commit murder on local law enforcement.

2              Judge, there's -- I think Mr. Helfrick's

3    cross-examination as to Mr. Murray and I think Agent Haug, as

4    well, was extraordinarily telling when he said, by the way,

5    how many funerals do you see driving through the woods?  All

6    your training was in the woods.  Did you ever train to ambush

7    a police officer's funeral procession?

8              The comments that are attributed to other

9    Defendants in this case about, well, that could take out a

10   whole convoy -- Your Honor, a convoy is a military term of art

11   that suggests a foreign Army.  It suggests the United Nations.

12   It suggests the Chinese or the Germans or whoever it is, and I

13   suppose if we believe the "Red Dawn" movie, maybe the Cubans

14   in conjunction with the Soviet Union that doesn't exist

15   anymore.  So, the Russians I guess.

16             Judge, what is law enforcement?  Law enforcement

17   don't drive around in military convoys?  Armies do.

18             What the Government has done here -- and I echo

19   Mr. Rataj's statements on this subject, Your Honor, because

20   what they've done is ingenious but I also suggest insidious.

21   Because what they've done is they've taken -- and, again, they

22   are in control of the indictment.  They are in control of what

23   was charged here.  But they've taken Count 1, the seditious

24   conspiracy, and they've said Mr. Meeks has committed a

25   conspiracy to oppose by force the lawful authority of the

1    United States.  And they've taken this grab bag and mishmash

2    of actions and statements, and they've put it all together,

3    and they've stirred it up in a pot, and they want this Court

4    to take a sip with a spoon and not say it's foul.

5              But, Judge, we have to really look at what's

6    inside that brew to answer Your Honor's question.  Because,

7    because the fact that people had guns -- individually all of

8    these things that Mr. Meeks was alleged to have done as an

9    overt act is legal.  Again, my client had no illegal weapons.

10   My client didn't have an automatic weapon.  My client didn't

11   have a short-barreled rifle.

12             Saying stupid things, thank God for my children,

13   is not illegal.  Running around in the woods in tiger fatigues

14   is not illegal.  Carrying a rifle while you are running around

15   in the woods in tiger fatigues is not illegal.  Talking about

16   dumb things while doing that is not illegal.

17             But what the Government tries to do is, well,

18   look, we, as Your Honor has properly pointed out, we have

19   charged Mr. Meeks and others with opposing by force the lawful

20   authority of the United States.  They've trained in the woods.

21   So they -- but what they haven't done is support their own

22   specific plan, conspiracy, target and agreement.

23             They haven't shown that they ever -- they ever

24   did road training.  They never did, you know, we're going to

25   ambush this road.  They never trained in a cemetery.  They

1    never trained on a road.  They never trained as to, you know,

2    what we would do if a funeral was driving by with X amount of

3    police cars.

4                    As Mr. Helfrick's cross -- it was a brilliant

5    line of questioning, Judge.  The fact that they want these

6    pieces that don't fit together, they want Your Honor to make

7    them fit together because they don't.  Because the training

8    that they've conducted, that my client participated in,

9    doesn't fit their own plan that they have presented to Your

10   Honor as the basis of the charges.  The two things don't fit

11   together.

12                   There is no evidence that the training that my

13   client participated in would in any way advance a plan to kill

14   a police officer and ambush his funeral.  None.  Even if he

15   was doing something illegal, like the Government tries to

16   suggest, what he wasn't was practicing to do that.  Because

17   there's no evidence of it.

18                   These two things don't fit together, Your Honor.

19   They don't fit together unless they get past Your Honor and

20   then hope that a jury is just impressed or scared or

21   intimidated or frightened into putting them together for them.

22                   Because when Your Honor asks those tough

23   questions, the Government fumbles.  They can't answer them.

24   They can't answer them, Your Honor, because it isn't there.

25   There is no answer.

1        That's how I am going to answer the Court's

2   question.  And there's lawyers here that are both more

3   experienced and smarter than I am, so maybe they will add

4   something to my answer.  But that's how I would answer it,

5   Your Honor.

6        Just because my client did any number of the

7   things he's charged with doing in the indictment as an overt

8   act doesn't mean he was practicing or ever trained to kill a

9   police officer, ambush his funeral, and thereby oppose by

10  force the lawful authority of the United States.  Even saying

11  the things he said on February 20th doesn't make it so.

12       Your Honor, again, to finish very, very

13  briefly -- and I appreciate the Court's question, because I

14  think the Court asks a very good question, and I would -- and

15  I appreciate the opportunity to address that issue because I

16  think it's important.

17       Your Honor, I would simply say this.  I was

18  impressed after reviewing the transcripts, the trial

19  transcripts in this case, the number of exhibits where my

20  client, A, wasn't even present for, all of the trips to the

21  warehouse, the two bomb demonstrations that were demonstrated

22  by Agent Haug, et cetera.  And then there's the conversations

23  where my client was allegedly there, but never participated.

24  Never participated, thereby, as Your Honor has asked, showing

25  any acknowledgment of what was being said, agreement with what

```
 1    was being said, adoption of what was being said in any way.

 2                  And then there are the conversations that my

 3    client did participate in, saying things like I love that

 4    smell or talking about his training as a United States Marine.

 5    That, I would submit, are in no way evidence of anything,

 6    certainly not evidence of his participation in or adoption of

 7    any alleged conspiracy in this case.

 8                  And then the fourth category, Your Honor -- a

 9    category that's infinitesimally small -- and I believe I came

10    up with far less than 10 examples of it -- was where my client

11    said anything at all that could be considered either, A, a

12    verbal act or, B, admissible under 801(d)(2)(E).

13                  It's just not there against Mr. Meeks, Your

14    Honor.  And I would join all the other counsel in asking the

15    Court, on behalf of Mr. Meeks, to dismiss this case.

16                  Judge, he has been sitting in jail two years

17    now.  I think that he has more than paid the price for the

18    investigation and the case that this Court -- that the

19    Government has brought in to this Honorable Court and has

20    presented not only to this Honorable Court, but to the

21    citizens sitting in this jury.

22                  Thank you.

23                  THE COURT:  Thank you.

24                  Whoever is next?

25                  MR. SCHARG:  Thank you, Judge.
```

1          I kind of feel a little awkward being at the

2    podium in this case because I haven't been at the podium.

3          And there's two things that I'd like to say,

4    first of all, that I am going to try not to do, that are

5    unique in this case.  I'm going to try not to mention other

6    Defendants in this case and I'm going to try not to repeat

7    myself.

8          Saying that, what I did today was look at the

9    trial transcripts and the opening statements and looked to see

10   what Mr. Graveline said about my client in his opening.

11         There were four things.  And we are getting

12   close to the Jewish holiday and Passover and asks four

13   questions.  And, interesting, there are four questions in his

14   opening statement.

15         First of all, the name of Kristopher Sickles,

16   the first time his name was mentioned on page 11 of the

17   2/13/12 transcript where Mr. Graveline says Khris Sickles was

18   a member of team Teok.

19         What significance does that mean?  He was

20   participating in training at the Hutaree training session and

21   he was designated on one of the teams.

22         The second question comes from later on in that

23   transcript where it says that Khris Sickles possessed a weapon

24   during the training, which he did, along with everyone else.

25   There is no evidence that it was an illegal weapon.  It was an

1    AR15, with no other significance.

2              The third time Mr. Sickles' name comes up in the

3    opening was that he was wearing a Ghillie suit, a Ghillie suit

4    that's purchased at any sporting goods store, that sells

5    hunting equipment.  It's used for deer hunting.

6              The way that came up in the trial was during one

7    of the training sessions, during a break, Mr. Sickles put on

8    the Ghillie suit for like a photo op.  There's no indication

9    that he wore it at any other time or for any other purpose

10   than to demonstrate that he had a Ghillie suit.  It was not

11   used in any training.  He never said he was going to use it

12   for any reason whatsoever.  But the Government felt compelled

13   to mention it in their opening and to produce it as an exhibit

14   in this case.

15             The fourth time Mr. Sickles' name is mentioned,

16   the fourth and last time in the opening, was that the

17   Government went out of their way to talk about this night

18   training and that Mr. Sickles had night vision goggles.

19             During the trial there was no evidence that

20   Mr. Sickles participated in any night training.  The testimony

21   was that he did not participate in the night training.  And,

22   in fact, the night vision goggles were from a video game.  And

23   although the Government would not admit it -- the Government

24   witness would not admit that it was a video game, the

25   Government knows it is.  They know that it was from a video

1    game.  And if you looked at it, that's what it was.

2                 Now, in terms of the Government's response to

3    the motion for directed verdict, as was today where

4    Mr. Sickles's name comes up at the end of the Government's

5    argument and the Government is conceding that if Mr. Sickles

6    joined an alleged conspiracy and allegedly did some acts in

7    furtherance of the conspiracy, it would have been on August

8    22nd of -- excuse me -- it would have been on February 20th of

9    2010.

10                In the Government's response, the argument

11   regarding Mr. Sickles is found at pages 33 and 34.

12                And I should also say that when we talk about

13   hyperbole, the Government can also be accused of using the

14   same, because in the paragraph where the Government makes its

15   argument, its strong argument regarding Mr. Sickles'

16   involvement as a co-conspirator it starts out "Mr. Sickles

17   also came to numerous Hutaree training sessions."

18                We know, through the testimony of Agent Larsen,

19   that during the course of the Government's investigation

20   Mr. Sickles attended five trainings.  His first training was

21   in September of 2008.  He was not at another training for

22   almost a year.  The next training was in August of 2009.

23                Mr. Sickles did not participate in any night

24   training.  He did not participate in any meetings, any

25   weddings, any barmitzvahs, any type of ceremonies, any type of

1    telephone conversations, any type of body counts during that

2    period of time, was not involved in any demonstrations

3    regarding explosives, did not discuss any type of explosives.

4            There's not one shred of evidence to support

5    that in fact he was -- had any involvement at all in the

6    discussion, use, demonstration or possession of any type of

7    explosive devices.

8            The prosecution then goes on and says in the

9    next line "and also came a considerable distance from

10   Sandusky, Ohio."

11           He traveled an hour and a half to two hours five

12   times during 20 months to attend a daily -- a day of training

13   with the Hutaree Group.  He was part of the Ohio Militia.  And

14   during the course of the trial there kept on being reference

15   to the fact -- identifying Mr. Sickles and Mr. Ward not as

16   Hutaree, but saying the guys from Ohio, the Ohio Militia.

17           And the Ohio Militia consisted of two people:

18   Khris Sickles and Jacob Ward.  Jacob Ward who has been

19   referenced to in the testimony as someone who was delusional,

20   more delusional than other people in this case, but he was

21   delusional.

22           The Government then goes on and says, well,

23   Mr. Sickles was involved in the training on January 9th, 2010.

24           So, Mr. Sickles was at a training session in

25   September of 2007.  The next training session was in August of

1    2009, and then there was a training session in November of

2    2009, and then the next -- the fourth training session during

3    this 20-month period that Mr. Sickles attended was January

4    9th, 2010.

5              And from the testimony of Agent Haug, there were

6    a number of discussions, a number of discussions regarding the

7    Kentucky trip and other discussions before Mr. Sickles even

8    got there.

9              Mr. Sickles arrived from his journey across the

10   midwest, as the Government says, in time to participate in the

11   training exercises of January 9th.

12             The Government concludes this overwhelming case

13   and argument against Mr. Sickles by saying that February

14   20th -- that Sickles returned to Tomer Road the fifth time,

15   the fifth and final time "February 20th for training and was

16   an active participant later that day in the discussion of

17   killing cops, including killing a single cop and then

18   attacking the funeral with IEDs and EFPs."

19             I commented and I directed the Court in my

20   joinder and pleadings that that's just out-and-out false and

21   taken totally out of context.  Because although the

22   conversation and disjointed conversation that day on February

23   20th started out with language about a plane going into a

24   building, about copicide, there was -- there was talk by I

25   think Mr. Clough about the fact that there had been a funeral

```
 1    in Monroe and that there was some type of procession.  And
 2    Mr. Clough said we should throw some nails on the ground, and
 3    then there was -- someone made a statement about IEDs.  It's
 4    the first time.  And Mr. Sickles' response to that was, "But
 5    that's not fair."
 6                   "But that's not fair."  That's what he said.
 7                   And I echo his comments now.  But that's not
 8    fair that this case continues against Kristopher Sickles,
 9    because the Government has not met its burden.
10                   There's a couple quick things I want to say
11    before I sit down.
12                   It's tough being a lawyer in a trial like this
13    and keeping quiet, which I pretty much did.  But I did the job
14    that I thought I should do, and sometimes advocacy is silent.
15                   There's three things I'd like to say to the
16    Court.
17                   One is Mr. Rataj is very passionate.  He's an
18    ex-Marine and he fought for his country.  He loves his
19    country.  And he has very strong feelings about First
20    Amendment rights.
21                   I, on the other hand, was a protester against an
22    unfair war back in the sixties.  And people that I went to
23    school with -- well, went to school during the same time, in
24    Ohio, got gunned down because of freedom of speech, because
25    they voiced their opposition to the government, to an unfair
```

US v Stone, et al. #10-CR-20123

1    war.  They opposed what the government was doing, and they

2    lost their lives.

3              And I feel very strongly also and as passionate

4    as Mr. Rataj does about freedom of speech, because it's

5    different things to different people.

6              The second thing I'd like to say is that this

7    group of lawyers, that I respect and adore, have been meeting

8    in the side room for the last seven weeks, and an individual

9    that will not be -- that I will not mention at this time to

10   protect the guilty and the innocent, said a lot of things, a

11   lot of ranting and antigovernment things in closed doors.  And

12   I, along with others, didn't agree with him, but didn't object

13   to what he was saying.

14             And by the mere fact of staying in that room

15   with that person, the Government can make the same argument as

16   what my client did at certain times when other people were

17   ranting.  We let them rant.  We let them espouse

18   antigovernment sentiments.  And the fact that we stay there,

19   remain in the room, that we don't criticize or question what

20   that person is saying, that's because he has a right to say

21   what he wants to say, as we all do.

22             And, finally, something that was very disturbing

23   to a number of us is when we got together one afternoon at Jim

24   Thomas's office, we were looking on the board and looking at

25   some old news media stuff, and we came across a statement in

some type of paper, whereas in late 2010, early 2011, Sarah

Palin, the ex-Governor of Alaska, had put out a hit list for

Congressmen and women who she wanted to unseat in the 2012

election.  The pictures of those Congressmen and women were

posted.  There were bull's-eyes on their faces.  One of those

people targeted was a freshman Congress woman from Arizona.

Gabriel Gifford.  It was her face that was on that hit list

with a bull's-eye on her face.  Less than a month later, she

was gunned down at a shopping mall in her district.

              And I assume before that happened, that when

Sarah Palin put out this hit list, I'm sure that a lot of

people e-mailed her and made statements and left messages

supporting what she was doing.

              I guess the Government could say that Senator

Palin or Governor Palin and all those people who supported her

in terms of e-mailing her and encouraging her, that they all

should have been -- they could have been indicted and charged

with opposing by force the Government and targeting Congress

people.

              I don't think they did.

              As much as I despise and dislike and disrespect

the ex-Governor, I think that she had a right to freedom of

speech, because that's what it was.  That's all it was.

              In this case, there's a lot of people, including

my client, who is a strong advocate of First Amendment rights,

1   of Second Amendment rights, of the right to form a militia, to

2   protect his family, which came out all the times during this,

3   during this trial.

4              Was his words beyond mainstream?  Yes.  Was it

5   excessive?  Yes.  Was it vulgar?  Yes.  But it was protected

6   speech, protected activities.  And there is no indication and

7   no evidence that he conspired to overthrow the Government or

8   that he conspired to build a weapon of mass destruction,

9   because on that count there is no evidence whatsoever.

10             Thank you.

11             THE COURT:  Thank you.

12             MR. WEISS:  Good afternoon, Your Honor.  As I

13   did in writing, I'm going to respectfully join orally in the

14   remarks by co-counsel.

15             Your Honor, I know there has been a lot of

16   discussion where the First Amendment ends and criminality

17   begins.

18             And as this case has unfolded, you know, I can't

19   help by thinking that a lot of times you hear about situations

20   in the media where the FBI has arrested someone who is on

21   their way with an inert explosive device, that has been given

22   to them by the government, to a particular building or what

23   have you, and the government has supplied that device.

24   There's a specific plan.  There's a specific target.  There's

25   a specific location.  Admittedly, the explosives are

nonexistent because the Government has given it to them.  But there is something concrete there.

Here, with all due respect -- and I believe because Dan Murray was unraveling, we will never know.  But what we do know is on the basis of this record, there is no target, there is no date, there is no specificity at all except for occasionally some people mouthing off.

And I think that the remarks of I believe it was Mr. Murray, but it could have been Agent Haug, there is a training one night and they are starting to come to the woods, and someone asks, well, if we run into somebody, what should we do.  And the remark is made, well, we'll kill 'em.

And everybody knew that that was simply a hyperbolic statement not to be taken seriously.  And they took five.  They took a deep breath and they walked around the woods.  In other words, they knew that at times statements were going to be made among themselves that were not to be taken as true.  They were simply expressions, they were statements and, I respectfully submit, they were protected by the First Amendment.

The Government takes the position that any time there is a reference to killing a law enforcement officer, even if a federal law enforcement officer may be in the -- I forget what the word was called -- in a procession, that that somehow is sedition.

1          Well, if you look at 2384, it really doesn't say

2     that.  And if you look at Title 18 Section 111, which

3     prescribes assaulting or even killing a federal agent, if the

4     Government's theory was accurate, there would be no necessity

5     for that statute.  It would be superfluous.

6          I believe it was Ralph Waldo Emerson that said

7     "Consistency is the hobgoblin of little minds."  If that is

8     true, then the next of my remarks are going to demonstrate

9     that I have a rather little mind.

10          But what troubles me is that on this record Dan

11     Murray and, to an extent, Agent Larsen testified a great deal

12     about what transpired with the Southern Michigan Volunteer

13     Militia.  And with what transpired there, to someone like

14     Mr. Piatek, who would drive up from Indiana, there appeared to

15     be no demonstrable difference.  The clothing, fatigues,

16     camouflage, the boonie hats, the helmets, the type of

17     equipment, whether they were ammunition vests, web bags,

18     battle fatigues, backpacks, equipment vests, even the SMVM

19     used the balcommas (phonetic) -- I think I'm probably

20     butchering that.  All I'm saying is the SMVM was allowed to

21     wear that type of military-related gear.  And both Agent

22     Larsen and Dan Murray indicated numerous times in front of the

23     jury that that was okay.  It was neither suspicious.  It was

24     not criminal.

25          But yet when I listen to Mr. Light, the fact

1    that Mr. Piatek associates with people dressed like that is

2    somehow criminal.  And there's where I'm troubled by the

3    consistency or the inconsistency.

4              I'm troubled by the fact that they could engage

5    in military-style training, small groups going into woods,

6    using stealth tactics, silent moving, ambushing, search and

7    destroy, even trip wires, even having simulated grenades and

8    grenade launchers, having weapons on tripods, all that is okay

9    for the SMVM, but somehow when Mr. Piatek comes to Michigan,

10   it's criminal.  I have a problem with that.

11             They can talk about the SMVM, about having to

12   harden themselves, that they have to either learn to shoot to

13   kill or get out; that the frontline of the war is coming; that

14   our targets are the Blue Helmets, that the FBI is fine,

15   spying, that they have hidden microphones and cameras, that we

16   hate the FBI, we hate the government, they are killers and

17   bastards, they are fucking murderers, that we don't support

18   the government.  That's okay for the SMVM.  But yet you come

19   to Michigan and it's criminal.

20             THE COURT:  Well, Mr. Weiss, the Court hears

21   you, understands your argument.  But in the end, what does

22   that matter for the decision that this Court needs to make

23   since the jury is going to be told they are not to consider

24   whether someone else should be charged or convicted or

25   anything like that you are saying?

1          MR. WEISS:  Because I heard Mr. Light today

2    advocating for a denial of our Rule 29 motions.  That given

3    the dress, the language, the training, the indicia of criminal

4    activity, when on the surface of it, I don't see a difference.

5          And if the Court is going to review all of the

6    evidence that has been presented, even if it's in the light

7    most favorable to the Government, it's all of the evidence.

8          And all I'm saying is when you have somebody

9    come up from Indiana or somewhere else and the training

10   appears to be the same as in other militias, that the

11   inference that they would like the Court to draw simply is

12   inappropriate.

13          Now, Mr. Light indicates that the subject of

14   this seditious activity had its genesis on October 13th --

15   excuse me -- August 13th, 2009 at a meeting.

16          Mr. Piatek is not present.

17          It was developed further, August 27th, 2009.

18   Mr. Piatek is not present.

19          There's more discussion on January 14th, 2010.

20   Mr. Piatek is not present.

21          And then there's further discussion on February

22   20th, 2010.  Mr. Piatek is not present.

23          With all due respect, you can't be convicted --

24   you can't -- the Government has not sustained a demonstration

25   of a criminal conspiracy conduct against Mr. Piatek when he's

1    not aware of it.

2              Now, the Government says -- and the first time

3    they mention Mr. Piatek is on February 6, 2010, on the trip to

4    Kentucky.

5              We don't know what Mr. Piatek was told.  We

6    know, from what the agent tells us, that he was a substitute

7    because other individuals could not go.

8              And Mr. Light spends a considerable amount of

9    time advocating to the Court, well, there was no objection to

10   what Mr. Stone was saying.

11             Well, first of all, we are not dealing here with

12   an involuntary manslaughter case where a mother or a doctor or

13   someone that owes a duty didn't act.  We're dealing here with

14   a federal criminal conspiracy.

15             And I would respectfully cite to the Court the

16   Sixth Circuit Patterned Jury Instruction 3.03, Paragraph 3.

17                  "But proof that a Defendant simply knew

18                  about a conspiracy or was present at times or

19                  associated with members of the group is not

20                  enough even if he approved of what was

21                  happening or did not object to it."

22             So, the Sixth Circuit has determined that

23   Mr. Light's argument is without merit in this matter.

24             Mr. Light then talks about, well, if you look at

25   the video when Mr. Stone is giving his speech, and that speaks

1    volumes as to the culpability of Mr. Piatek.

2            I too invite the Court to take a look at that

3    video.  And I come at it from a hundred eighty degrees

4    different.  Because what it shows is Mr. Piatek is sleeping in

5    the back seat.  He's not dressed in full military regalia.  He

6    doesn't have a flat vest.  He doesn't have bullets.  He

7    doesn't have all of that.  He's got blue jeans on, a black

8    t-shirt and a camouflage sort of light-weight jacket.

9            Towards the end of the speech he gets up.  He's

10   half asleep.  He doesn't know what's going on.

11           I don't see how the Court -- excuse me -- how

12   the Government with a straight face can argue culpability on

13   someone who is half asleep.

14           And when Haug is bemoaning the fact that Stone

15   had this speech, Piatek doesn't say, hey, right on, yeah,

16   yeah.  What does he say?  Reschedule.  Do it in the spring.

17           He thinks he's going to Knob Creek and that is

18   when the gun shoot is, in the spring, in April.

19           In terms of the officer, later in the

20   conversation, much later, Stone says I ought to pop him or I

21   will pop him, or whatever the words are, it's not certain, or

22   I should pop him.  Again, Piatek doesn't jump up and say yes,

23   right on.

24           He talks about experiences with law enforcement

25   officers and chastises Stone, tells him he -- and I reference

1    it in my brief -- that he's not right.

2              And he talks about, yeah, officers are like

3    other people.  Some of them are good; some of them are bad.

4              So, how does that equate to joining yourself

5    with a conspiracy for sedition against the United States?

6              You have to infer that he believed that Stone

7    was sincere.  He had to infer from that that this Hudson

8    officer was going to have a funeral where federal law

9    enforcement officers were coming.  Have to infer from that

10   that there was going to be a -- some type of action at the

11   funeral procession, and infer from that that, from that, it

12   was going to somehow oppose by force the authority of the

13   United States.

14             But the United States Supreme Court in the

15   Ingram and Direct Sales case advise us that you're not

16   supposed to pile inference upon inference upon inference.

17             And we have to remember, Piatek is never present

18   for any of the earlier discussions.  Haug admitted that he was

19   never present for any of the April op. discussions.

20             Again, how can he be held culpable for something

21   that he doesn't know anything about?

22             Then in questioning from the Court, Mr. Light

23   went back to -- excuse me -- the training on June 13th where

24   some devices were set off, and the Government took the

25   position that what was set off was somehow a destructive

1    device.

2            And I will join in the arguments previously

3    given.  And I'm going to beg the Court's indulgence, because

4    some of this may be duplicative, but just so the record is

5    clear.

6            2332(c)(2) defines weapons of mass destruction.

7    And paragraph capital (A) says:

8                    "Any destructive device as defined in

9                    Section 921 of this title."

10           So, if we look at 18 USC 921(a)(4), the term

11   destructive device means -- and then it goes on, and then it

12   states later in the paragraph:

13                   "The term destructive device shall not

14                   include any device which is neither designed

15                   nor redesigned for use as a weapon."

16           My recollection of the testimony on June 13th

17   was, is that attached to a trip wire, or what have you, there

18   was some powder in a cardboard tube that was set off to show

19   what could happen if you set off a trip wire.

20           And this was not cited in my brief, and I thank

21   Mr. Thomas for giving the case, United States v. Hammond, 371

22   F.3d 776, an Eleventh Circuit, 2004 case.

23           Now, admittedly, that case dealt with some Title

24   26 offenses, but what was at issue is the definition of the

25   same phrase "destructive device" and used some of the same

language from 921 about having to be designed as a weapon.

And on page -- it's pages 780 and 781, it talks about a cardboard tube, that it's got some powder in it, and affirms the district court's granting of a Rule 29 motion because there was no demonstration that either the powder or the tube was designed to be a weapon and therefore not a destructive device.

So, again, we have nothing on June 13th, 2009 which would demonstrate that Mr. Piatek was associating himself with either a seditious conspiracy or a conspiracy to use weapons of mass destruction.

I think what is most telling is when a pipe is brought out and it's talked about -- first of all, I respectfully submit it's no different than the simulated grenades that were used at the SMVM.  But most importantly, in front of all of these people that are there -- and there's probably 20 of them.  They are not all charged.  What does Mr. Piatek say?  "I never" -- and he repeats, "I never, I never fuck with shit like that."

Now, if that is not a disavowal of anything having to do with explosives, then I don't know what is.

And even though the Sixth Circuit in 303 Paragraph 3 doesn't require that, there is an overt clear-cut, no doubt about it statement, "I don't fuck with shift like that."  He is not involving himself with anything like that.

1           And there may be some questions about what you

2    do with them, but he is not going to involve himself with

3    that.  He is not going to join if there is.  If there is

4    something down the road, he is not going to be involved in it.

5           Mr. Light talks about, well, that he continued

6    to come up after February 6th, 2010.

7           He is unheard of after February 6, 2010.

8    There's no e-mails.  There are no telephone conversations.

9    There are no meetings.  There are no trainings.  There is

10   nothing between Mr. Piatek and the rest of the Hutaree after

11   that date.

12          In fact, on the November 7th training, when

13   Stone tells him to get his head out of his rear, he doesn't

14   even come to anymore training sessions.  He's not there for

15   the weddings.  He's simply not there.

16          So, according to Mr. Light, he's gone, he's

17   left, and there is nothing there for him to be involved in.

18          I recognize that the Court can -- that the Court

19   is supposed to look at the evidence in the light most

20   favorable to the Government and make reasonable inferences,

21   but they are not supposed to be specious inferences.

22          He wasn't aware of the conspiracies.  They

23   weren't discussed around him, and there is not even a

24   scintilla, but there's definitely not more than a scintilla of

25   evidence of his participation in either one of the charged

```
 1    conspiracies.

 2                   And since the two 924(c) counts of August 22nd,

 3    2009 are predicated upon his committing crimes of violence in

 4    Counts 1 and 2, that those counts would go as well.

 5                   THE COURT:  Counsel, I need to take a break

 6    until about 3:30, if you would.

 7                   MR. THOMAS:  How many minutes, Judge?

 8                   THE COURT:  3:30.

 9                   (Recess held from 3:19 p.m. until 3:31 p.m.)

10                   THE COURT:  What pages is it?

11                   MR. THOMAS:  It is ID36 and it was Exhibit 24.

12                   MR. SWOR:  It's Exhibit 24.

13                   MR. THOMAS:  And we have that here.

14                   THE COURT:  What pages of that exhibit?

15                   MR. THOMAS:  Right here, Judge, in the exhibit

16    book.

17                   THE COURT:  Okay.

18                   MR. LIGHT:  It is 24A-N.

19                   THE COURT:  A-N, you said?

20                   MR. LIGHT:  N as in Nancy.

21                   THE COURT:  N as in Nancy.

22                   MR. THOMAS:  Judge, I was looking at pages 100,

23    101, in that area.

24                   THE COURT:  Is that it, Mr. Light?

25                   MR. LIGHT:  Yes, it is.
```

```
 1                    THE COURT:  100 to 101?

 2                    MR. LIGHT:  100 through . . .

 3                    MR. THOMAS:  I got 103, as far as that in

 4   my . . .

 5                    MR. LIGHT:  Well, I think to take it in context,

 6   it really is necessary to go through the rest of the exhibit,

 7   106.

 8                    THE COURT:  Okay.  Pages 100 through 106.

 9                    MR. THOMAS:  All of which we're admitting and I

10   have no objection.

11                    THE COURT:  Are you going to talk about that?

12                    MR. SWOR:  I'm going to talk about Exhibit 24,

13   yes.

14                    THE COURT:  Those pages specifically?

15                    MR. SWOR:  I don't know.  I don't think so.

16                    THE COURT:  Well, those are the pages that

17   supposedly this whole thing got started, right?

18                    MR. SWOR:  Not those -- well . . . okay, yeah.

19                    THE COURT:  That's what Mr. Light said.

20                    MR. SWOR:  Yeah.

21                    THE COURT:  And I want to make sure I'm focused

22   on the right conversation.

23                    Do you agree, Mr. Thomas?  Since it involves

24   your client also.

25                    MR. THOMAS:  I thought it was so important, I
```

```
 1    discussed it when I talked to you about my Rule 29.
 2                    THE COURT:  Okay.  100 to 106.  Okay.
 3                    MR. SWOR:  I am going to be a little herky jerky
 4    because I'm going to try to jump over things that other people
 5    have said and I am trying not to repeat anything they have
 6    said.
 7                    But first and foremost -- and this will come to
 8    no surprise to you -- this will come as no surprise to you --
 9    I believe that there is no conspiracy here.
10                    There is no agreement to do any act, general or
11    specific, other than talk, other than train, other than to
12    associate with people.
13                    And talking and training and associating with
14    people implicates the First Amendment and the freedom of
15    speech.  And speech cannot be taken in bits and pieces.  It
16    must be taken as a whole.
17                    The Court is not bound by the Government's
18    representation of what the evidence is.  Just because
19    something says something on its face does not mean the
20    Government's interpretation is correct.
21                    This is all speech.  It is all conditional
22    speech.  And it is all in the context of Mr. Stone's religious
23    tenets.  And that tenet was that at some time, indefinite in
24    time, that the antichrist would come and that David Stone
25    would be called upon to defend his family, and that he was
```

1    teaching and helping other people of a similar view train to

2    protect their families.  At an indefinite time, in an

3    indefinite place and in an indefinite manner.

4              You heard already one reference to biblically,

5    but during my examination of Mr. Murray, Mr. Murray conceded

6    that in February of 2009, all of Mr. Stone's speech was in the

7    context of his religious beliefs.

8              In June of 2009 it was always in the context of

9    his religious beliefs.

10             In August of 2009, yea verily, even August 13th,

11   2009, you will see -- and I would ask the Court -- and I know

12   it's a burden -- but to listen to the entire tape, not just

13   the snippets and cutouts that the Government drew the Court's

14   attention to, but pull the whole transcript from page one on

15   to the end past -- I think it's page 126.  And you will see --

16   and I'll loop back to it in a second, Judge.  But that whole

17   conversation is surrounded by, wrapped in, encompassed by and

18   permeated by Mr. Stone's belief and his plan for the battle at

19   the end of time.

20             In December at his own wedding he talks about --

21   his wedding or Josh's wedding.  But in any event -- since I --

22             Let me go to the next point, which is January of

23   2010 when Steve asks him -- well, actually he doesn't even

24   wait for Steve to ask him.  If you will recall, Your Honor --

25   and we played it.  But they are in the workshop area for two

1    minutes.  Okay, while Steve shows David Stone and Tina Stone

2    his workshop area -- because I'm lefthanded, I do things

3    backwards because it's over there -- David looks at something

4    he has in the closet.

5            They leave that closet and they go into the next

6    room where they sit on the floor.  And, sitting on the floor,

7    Mr. Stone never mentions that workshop again.  In fact, what

8    he talks about, he immediately goes to the biblical time, the

9    end of time, the Hutaree Bicycle Squad.

10           The plan was always Jesus versus Satan.  His

11   speech at Josh's wedding, when he describes the Hutaree

12   uniform, he talks about we wear these stripes because, by His

13   stripes, we are saved.

14           We talked about that.  I asked Agent Haug about

15   that, and he agreed with me that when David Stone was talking,

16   he was talking about the battle at the end of time.

17           The plan was always Jesus.

18           Mr. Light -- I'm sorry.  The Government says

19   that this was a general plan to do a violent act to draw the

20   attention of law enforcement.  Okay.

21           What do we know for sure?

22           We know for sure that on February 6, 2010 in the

23   car, Mr. Stone says we will not fire the first shot.

24           On February 6th, when Agent Haug tries to

25   provoke Mr. Stone and say why don't we hit them first and hit

1    them hard, Mr. Stone says no.

2              How would it start?  It never starts with David

3    Stone.

4              The conversations -- you know, we heard this

5    morning from the Government about repeated discussions,

6    quote-unquote, about the need to oppose the Government.

7    Repeated discussions about the need to oppose the government

8    are constitutionally protected speech.  There is nothing

9    illegal about talking about opposing the government.

10              If you'll recall, on February 20th, 2010,

11   Mr. Stone says there are a hundred and one scenarios that

12   could start this thing.

13              If you'll recall, we've heard taking away our

14   weapons, taking away our religion, forcing vaccination,

15   forcing vaccination with computer chip.  It always starts with

16   some other thing.  There is never a time when David Stone

17   says, you know what -- when David Stone says the ATF is

18   looking into our business.  Okay?  And if they push, we'll be

19   ready.  He does not say we will attack them.

20              We will answer the call.

21              He never threatens with force or violence to

22   attack the Government.

23              The reason the Government suggests, I believe --

24   the Government today says that this was intended to draw the

25   Government into challenging them is because Magistrate Komives

```
1    said that the plan to do a violent act to draw the attention
2    of federal law enforcement, dot, dot, dot, dot, if the
3    evidence -- not the Government's argument, but if the evidence
4    does not establish the second goal of the conspiracy, Baldwin
5    requires Defendants be acquitted.
6              That's Docket Entry 269, page nine.
7              And it has to be designed to provoke a
8    confrontation with local, state, and federal law enforcement
9    for the purpose of engaging them in an armed conflict.
10             The fact that twice in a period of 20 months or
11   18 months there was passing conversation, with no antecedent
12   and no activity afterwards, does not excise those two pieces
13   of conversation from the greater context and does not make
14   them, in and of themselves, a conspiracy.
15             There is no continuing plan.
16             On August 13th, if you go through the entire
17   transcript, you will see that the conversation the Government
18   played starting at page seven -- okay?  But if you go back to
19   the very first page -- and there's a lot of unintelligible in
20   the transcript, but you will see that the conversation is
21   initiated by Stephen Haug, and it's initiated to talk about
22   the foreign troops occupying U.S. bases.  You will see that
23   Mr. Stone says, well, we've got Selfridge for now.  Selfridge
24   is safe for now.  Okay?
25             And then rather than let it go, Agent Haug ramps
```

```
 1    it up and says, well, you now, we've got this air base in New

 2    Jersey and it's a very big air base and we're worried about

 3    the Germans taking over.  There are foreign troops taking over

 4    that.

 5                  And that leads into where the Government began

 6    to play Exhibit 24.

 7                  So, they put it -- you know, they talk today

 8    about it being in context, but they start that conversation

 9    out of context.  And they --

10                  Remember, that is not a training session.  Agent

11    Haug drops in.  Okay?

12                  Now, they never record or play for the Court

13    what Agent Haug said to Mr. Stone when he told him he was

14    coming over.  So, we don't know.

15                  We do know that in his redirect-examination

16    Mr. Haug tried to make it look more suspicious by saying I

17    told him I had some stuff that my buddies in New Jersey want

18    me to detonate for him.  That was his words on redirect.  That

19    was on April 15th.

20                  In fact, if you look at the transcript, it says

21    no such thing.  Okay?

22                  In fact, if you listen to the recording and you

23    watch the transcript and review the transcript, David Stone is

24    giggling when the explosion takes place.

25                  Okay.  Agent Haug is the one who suggests
```

putting that explosive material in something. Not David Stone. David Stone does not ask, to that point -- okay. Remember, Haug has been there now six months. He has known them six months. During that six months, David Stone does not ask Haug to do anything about explosives. Okay.

Haug decides, the Government decides, Leslie Larsen decides, whoever decides, that they're going to introduce larger explosives in here. And they commence the activity.

Okay. The Government conceded, at least initially the Government conceded that Count 2 is inextricably intertwined with Count 1; that is, obtaining the weapons of mass destruction for the purpose of Count 1. Okay.

THE COURT: You said the Government conceded that --

MR. SWOR: The Government said this morning --

THE COURT: -- inextricably?

MR. SWOR: The Government said this morning that the possession of the WMD information was obtained for the purpose of Count 1. I can't cite the transcript.

THE COURT: No, I understand that.

MR. SWOR: Okay?

And then, as if they were playing David Stone, they tried to change the line.

Okay. The line is moved. And one of the

1    problems with the Government's case is the line has always

2    been moving.

3              Back in April of 2010 -- Leslie Larsen sat on

4    that stand.  Mr. Waterstreet was here.  And they swore to the

5    Court that there was an imminent op. coming on in the second

6    week of April at which citizens who were not involved in this

7    were at risk of being injured.  And that was the reason that

8    the Hutaree, David Stone, everybody else, were arrested.  That

9    was the reason it was needed.  That there was imminent danger.

10             And, yet, less than two weeks ago -- that was

11   the line.  That was the line they drew.

12             Less than two weeks ago, okay -- well, actually

13   going all the way to the beginning of the trial.  But less

14   than two weeks ago, Agent Haug told us that he knew in

15   January, on January 14th when David Stone is telling him for

16   the first time about the Knob Creek shoot, okay, but certainly

17   by February 20th, which is a month and a half before the

18   take-down, that there was going to be no training op. on the

19   second week of April; that this was a tuck-and-hide training

20   session and that it was a recon training session and that the

21   purpose of it was to be invisible.  Those are all things we

22   heard during this trial which contradict the Government's

23   drawing of the line.

24             Let me get back to Exhibit 24.  And I'll come

25   back to this.  August 13th, when the Government says . . .

1                David Stone, according to the Government, says

2     he wants shaped charges to take out convoys.

3                Now, that's at the very end of the conversation.

4                And during my examination -- and, by the way, if

5     you are looking at the transcript, it would be pages 119,

6     roughly, to 123.  Okay.

7                Agent Haug admits that that conversation is

8     about the battle at the end of time.  When I cross-examined

9     him on March 16th, he conceded that fact.  In fact, he

10    conceded that fact again on January 14th.

11               The Government says that this was an

12    evolutionary plan, that it evolved to the point that on

13    February 20th, blah-blah-blah-blah-blah-blah-blah.

14               Well, the fact is you can cut and paste the

15    conversations of August 13th, that short couple of pages, with

16    all of the nonsense on February 20th.  And there's no

17    evolution.  Except for the addition of strippers, there's no

18    evolution.  There is nothing in between April 13th and

19    February 20th that shows any kind of action.

20               Remember, in Exhibit 1016A -- I'm sorry -- the

21    Government's 707.  Okay.  That focused on action.  Okay.

22               There was no action.  As 1016 -- the profilers

23    got it right, okay, when they said holding pattern.  There was

24    no evidence -- and you've got the exhibit.  So . . .

25               The Government says that -- today the Government

1    says that convoys can include funeral processions.  Okay.

2                Okay.  Well, on August 13th, pages 119 to 123,

3    David Stone is talking about shape charges, convoys and

4    Bradley and Abrams tanks.  "I can't remember the last time I

5    saw a Bradley or Abrams tank in a funeral procession."

6                The Government's argument is wrong.  There is

7    nothing in any of these transcripts to suggest that a convoy

8    includes a funeral procession.

9                The Government says that on January 14th

10   Mr. Stone is at the warehouse and he says "We ain't that far

11   off."

12                What he's talking about is being prepared for

13   the final battle.  It's the same thing he said during the

14   entire 20 months.

15                On the transcript of March 15, 2012 at pages 50

16   and 51, Agent Haug admitted that Mr. Stone was talking about

17   the battle at the end of time.  Okay.

18                49 K, the discussion about killing officers and

19   then going and killing their families, that's in the context

20   of the battle at the end of time.  Okay.

21                The Government said this morning that there were

22   additional signs.  Now, I'm not talking about signs from on

23   high, but they are talking about street signs.

24                The Government says they were obviously brought

25   for Steve.

1           If you will listen to the recording on March 27,

2   2010 -- I do not have with me -- Steve asks Dave Stone do you

3   have anymore signs?  And David says no.

4           So, clearly, those signs were not for Mr. Haug.

5           The Government says there were other ways of

6   provoking a response.

7           Nowhere does the Hutaree or Mr. Stone or anyone

8   else here advocate provoking a response from the Government.

9           March 1st, 2012, pages 33 and 34 of Dan Murray's

10  testimony, he testified, he admitted this was always in the

11  context of Mr. Stone's religious beliefs.

12          And, yes, one of my brother counsel said,

13  February 12th, 2010, Leslie Larsen says in an e-mail we're not

14  going to put all this time and effort to come away with three

15  gun charges.

16          Okay.  March 18th, 2010, Exhibit 65 -- it's

17  either E or F -- when Stephen Haug is trying to provoke Dave

18  Stone.  And if it's not Exhibit 65, it's Exhibit 63 -- when

19  Haug is trying to provoke David Stone, remember he says when

20  do you want these shape charges.  And David says "When you get

21  to it."  Okay.

22          The Government tried -- he tried to change it

23  and say "As soon as you can get to it," but it doesn't say

24  that.  It says "When you get to it."  Okay.

25          When do you want the first one?  "When you get

```
 1    to it."

 2                When do you want the rest of them?  Okay.  Four

 3    or five, six months.  We've got that much time.

 4                So, now we are to the end of 2010.

 5                And David Stone says -- and if you'll look at

 6    that series of questions where he says, well, do you have a

 7    priority?  No.  Do you have a target?  No.  Do you have first

 8    preference?  No.  At the very beginning of that David says,

 9    "Yeah, when you get 'em, I'll put 'em in storage so we'll be

10    prepared."  Okay.

11                The crux of the WMD count is they have to be

12    intended to be used.  And The American Book Sellers

13    Association v Hudnut, 771 F.2d 323, which is a case I should

14    have remembered, but I didn't until over the weekend, at page

15    329, "Seditious libel is protected unless the danger is not

16    only grave, but also imminent," citing New York Times v

17    Sullivan, Brandenburg v Ohio.

18                There was never any imminence.  And later on in

19    the same opinion, the Court says "Cases such as Brandenburg v

20    Ohio and NAACP v Claiborne Hardware hold that a state may not

21    penalize speech that does not cause immediate injury.

22                Okay.  So, there has to be an immediacy here.

23    There's clearly no immediacy.  There's no intention.

24                And the Government can say, you know, well, they

25    intended to, but sometime in the indefinite future.
```

1                   That's wishful thinking, you know.  That's like,

2       oh, when Mr. Stone says if I come into a lot of money, we

3       won't have to do any training.  Okay.  If, if, if.  This is

4       all conditional.  There is never anything fixed in this.  It

5       is all talk.

6                   We can tell about the immediacy thing, okay,

7       because on January 14th Mr. Stone is saying to Agent Haug --

8       you know -- well, they are sitting on the floor there.  You

9       know, I'm not in a hurry for this.  I'm not in a hurry for

10      this.  The battle at the end of times.  I'm not in a hurry for

11      this.  Because I like to throw the log on the wood burner and

12      take a nap.  And when this comes, we're not going to take any

13      naps.  All right.

14                  Exhibit 34 -- and I apologize, but I told you

15      this was going to be kind of herky jerky.  Exhibit 34,

16      September 13, 2009, pages 48 and 51, Mr. Stone describes this

17      battle as the battle between Jesus and Satan.

18                  Exhibit 7, February 1st, 2009, page 48, the goal

19      is this is a battle between Jesus and Satan.

20                  January 14th when Agent Haug gets the

21      conversation going again about dynamite --

22                  THE COURT:  About what?

23                  MR. SWOR:  Dynamite.  Okay?  David Stone talks

24      about how a farmer he knows used dynamite to dig a pond, to

25      blow up a hole to dig a pond.  Okay?

1          January 14th, 2010, when David Stone is talking

2     about the feds. being active, when he's talking about the

3     February 6th trip to Kentucky, he's talking about the fed.

4     activities.  Okay.  He says we got to take our blowout bags.

5     We got to be ready -- and, by the way, this will tie into that

6     e-mail that followed it.  But we got to take our blowout bags.

7          He doesn't say so we can attack anybody.  He

8     says if anything goes wrong, we're going to have to disappear.

9     Okay.  We're going to have to disappear and survive.

10          He doesn't say we're going to attack the

11    Government.  He can be as paranoid about the government as he

12    wants to be.  He doesn't say we're going to attack the

13    government.  In fact, he doesn't even say that if something

14    goes wrong, it will be because of the government.

15          Okay.  The Government was trying to tell the

16    Court its version of what David Stone thinks.  Okay.

17          Now, it's the evidence, not what the Government

18    argues.  So, even if the evidence is taken in a light most

19    favorable to the Government, that doesn't say that the

20    Government's argument prevails.

21          It is looking at the evidence.  And the evidence

22    is there was no specific to any government; the Blue Helmets,

23    the local sheriff or whoever that was, the ATF -- wait a

24    minute.  Wait a minute.

25          On June something 2009, Mr. Stone says -- June

1    13, 2009, page 14 of the transcript.  "Europe will be the Army

2    we are going to fight."

3                    You hear the Blue Helmets.  We've heard the Blue

4    Helmets.

5                    In the video that Leslie Larsen said that she --

6    that concerned her so much, that she started this

7    investigation, we saw a blue helmeted soldier.  Okay.  The

8    Michigan Militia, the SMVM all talk about the Blue Helmets.

9                    They are not local law enforcement.  They are

10   not the federal government.  Okay.

11                   June 13th.  On his redirect of Agent Haug,

12   Mr. Graveline talked about June 13th.  And Haug referred to

13   what was exploded as a training device; not a destructive

14   device, not a weapon of mass destruction.

15                   By the way, page 51, I believe, on February 6th

16   is the discussion of why don't you hit them first.  And as

17   Mr. Thomas pointed out, he was talking about Interpole --

18   Mr. Stone said, no, we don't go after the state police.  State

19   police are interpole.  Okay?

20                   So . . .

21                   Mr. Stone talked about he was angry, he was

22   frustrated.  He never threatened the U.S. Government.

23                   One of the speeches that's in evidence -- and

24   forgive me.  I can't point it out to you.  But he talks

25   about -- the one where they're talking about how bad the

1   economy is, he's talking about if people don't take care, they

2   won't be able to pay their income taxes.

3              Okay.  For somebody who is antigovernment,

4   worrying about not being able to pay their income taxes is a

5   little congruous.

6              He talks about not being able to pay your

7   property taxes.  He doesn't say we won't have to.  He says you

8   won't be able to.

9              He recognizes the government.  He does not

10  oppose it.

11             I would also ask the Court to remember that on

12  June 26, 2009, Agent Haug and that recording that we put in on

13  cross-examination, said that David Stone was afraid of big

14  explosives.  That's Exhibit 20, pages I think it was 115 to

15  117.

16             Page 43, shortly after -- you know, that's when

17  Agent Haug -- August 13th, 2009.  Okay.  Agent Haug explodes

18  the mixture, and then Agent Haug suggests putting the

19  explosive in something.  And right after David Stone says

20  "cylinder," he goes back to talking about making smoke bombs

21  and using rocket launchers.

22             He only discussed signs, Your Honor, street

23  signs as blast shields.

24             David Stone does not talk about using those as

25  shrapnel.  He talks about blast shields.

1            The agent is the one that says shape charges.

2            Pages 114 of August -- through 123 of August

3     13th, David Stone is talking about the battle at the end of

4     times, need for biodiesel, using divining rods to find water,

5     starting society all over again, abandoning in Michigan.

6            David Stone talks about the Hutaree having

7     helicopters.  Okay.  He talks about Bradley and Abrams tanks.

8     David says he's got guys who can fly F-15s and Apaches.  Yes.

9     And then he says at page 122, 123, the shape charges were to

10    stop those convoy lines.  Okay.

11           MR. THOMAS:  Your Honor, may I have one moment,

12    please?

13                *(Off the record.)*

14           MR. SWOR:  By this point, in the battle at the

15    end of times, the Bradley and Abrams tanks are on the side of

16    the Hutaree, and the convoy lines that are being interrupted

17    are the supply convoy lines.  They are opposing them.

18           This is not the United States Government.  This

19    is Satan's Army.

20           Page 121, Your Honor.  It's very specific.

21           THE COURT:  Page 120 what?

22           MR. SWOR:  Page 121.

23           That by this time -- and tanks are mentioned I

24    think a couple of times during this.  But by this time in the

25    battle at the end of time -- you know, the F-15s are on the

side of the Hutaree.  The helicopter is on the side of the
Hutaree.  The Bradley and Abrams tanks are on the side of
Hutaree.  This is clearly the battle of the end of times.  And
that theme repeats itself through every conversation.

The fact that there are these two isolated
conversations which include the discussion of shooting a
police officer and attacking a funeral does not make it a
conspiracy.

There -- you know, one of the things that we've
learned about Mr. Stone during this case is that he's a very
good parrot.  Okay.  During the February 20 -- no.  During one
of the conversations when -- maybe it is February 20th.
Maybe -- no.  No.  You know what?  It's the March 18th
conversation where Steve says to him, how hard can it be to
get signs?  Just back up a -- you know, put a chain on the
sign and pull it out with your truck.

And David Stone says, oh, no, don't do that,
because they fly out of the ground and break the back window
of your vehicle.

Now, that was not a new idea to David Stone.  As
a matter of fact, on February 20th someone else had that idea.
Okay.  Someone else made that statement.  And David just
parroted.

So, the fact that David Stone says something in
February that somebody else said in August doesn't mean that

1     it's a conspiracy.

2                    There is no agreement.   There is no strategy.

3     There is simply these two isolated conversations.   They are

4     not a conspiracy.   They are not, as the Government described

5     in its opening statement, a plan.

6                    Taking the evidence -- not the Government's

7     argument -- taking the evidence even in a light most favorable

8     to the Government, what went on here was speech.   What went on

9     here was association.   What went on here was constitutionally

10    protected activity.

11                   There was no conspiracy.   There was no plan to

12    do anything.

13                   You know, God rest his soul, my uncle was very

14    upset when John Kennedy was elected President.   And my uncle

15    lived in the flight path of the -- the landing path of what we

16    call today Air Force One.   And my uncle used to say, one of

17    these days when that plane flies over, I'm going to get my gun

18    and I'm going to shoot it.

19                   I never saw a gun.   My uncle would never have

20    shot the plane.   But he said it.

21                   Does that mean that he intended to do it?   Does

22    that mean that my aunt, who heard him say it numerous times

23    and didn't move out of the house, conspired with him?

24                   Of course not.

25                   Does that mean that my father, who heard him say

1   it and brought his family over to visit multiple times after

2   that statement or while he made it again, were conspirators to

3   assassinate the President?

4                    Of course not.

5                    There's nothing here but talk.  Counts 1, 2, 3

6   and the 924(c) charges should all be dismissed.

7                    THE COURT:  Thank you.

8                    Do you have a response, Mr. Light?

9                    MR. LIGHT:  Yes, Your Honor.  Give me a minute

10  to bring a few things.

11                   THE COURT:  I'm sorry?

12                   MR. LIGHT:  Could I have a minute to bring a few

13  things forward?

14                   THE COURT:  Okay.

15                   *(Brief pause.)*

16                   MR. LIGHT:  What we've heard from Mr. Swor and a

17  large part of what we've heard from others is what I believe

18  is an argument about the interpretation of the evidence, an

19  argument about Mr. Swor's interpretation, his understanding of

20  what the evidence means as opposed to what the Government

21  argues that the evidence means.  And he has pointed to very

22  specific things of the evidence and given his interpretation

23  of what it might mean in conjunction with the charges in this

24  case.

25                   And I submit to the Court that that doesn't

1    address the question of the sufficiency of the evidence to

2    support the charges when viewed in the light most favorable to

3    the Government so that they could be submitted to the jury.

4              For example, just a specific example.  In my

5    argument, I pointed to the fact that when Mr. Stone drove to

6    the warehouse in Ann Arbor on March 27th, he had signs, five

7    street signs in the back of his car.

8              And Mr. Swor says, oh, those couldn't have been

9    for the person who had the warehouse that Mr. Stone was

10   driving to because a day or a few days earlier he had said he

11   hadn't gotten any signs.

12             Well, that's his interpretation and he's

13   entitled to it.  But I think the Government is entitled to

14   argue and the evidence would support the proposition that

15   those street signs being brought to that warehouse were for

16   that very purpose of continuing to support the building of

17   EFPs.

18             Similarly, he talks about the April op., the

19   Real World op. that was planned for April and holds up four

20   fingers one at a time and says, well, it was a tuck and hide,

21   be invisible.  And I forget the rest of his fingers.

22             But if you listen to the statements made by

23   David Stone, Sr. and by Joshua Stone on January 9th, in

24   separate addresses to their fire teams and other people who

25   were there at the time they gave those addresses, they speak

1    very graphically and very specifically about the fact that

2    these Real World Ops. could involve conflict with anyone who

3    would come tripping along.

4                    Language like "welcome to the world of killing

5    people."  Language --

6                    THE COURT:  But they didn't talk about killing

7    federal officials.

8                    MR. LIGHT:  But I'm addressing the broader

9    question of interpretation of the evidence.  And Mr. Swor

10   wants to take one view, and we want to take another view.

11                   And our view would be that this -- even though

12   it wasn't specifically about killing officers -- was an aspect

13   of the conspiracy in terms of the training for the conflict

14   that would follow the killing of an officer and the bringing

15   in of federal authority that would then be opposed.

16                   So, it is an aspect of the training of the

17   conspiracy.  And I'm simply addressing the question that Mr.

18   Swor has one interpretation and the Government has another.

19   And just because his interpretation differs, doesn't mean the

20   Court must disregard our interpretation.

21                   They talked about the need to wipe down every

22   shell that would be brought along on the April op. so as not

23   to be discovered if anything happened.

24                   So, it's a matter of interpretation and

25   argument.

1          And that's quintessentially what means the case

2    needs to be submitted to the jury if there is sufficient

3    evidence.

4          THE COURT:  Mr. Light, talk a bit about the

5    inferences upon inferences, that so many of the lawyers have

6    mentioned today and also in their briefs.

7          MR. LIGHT:  Well --

8          THE COURT:  And just use the example that you've

9    just pointed out; that they talked about wiping down shells or

10   bullets, whatever, so that there would not be any evidence.

11         What if they did do that?  What if they did talk

12   about not leaving evidence of a crime that doesn't involve an

13   attack on federal officials?

14         MR. LIGHT:  That specific act, that specific

15   aspect of the training did not involve an attack on federal

16   officials, but it was part of the conspiracy.

17         As I think the Court has pointed out before, not

18   every overt act -- not every act in furtherance of the

19   conspiracy need be illegal, nor need it be specifically with

20   regard to the object of the conspiracy in terms of opposition

21   to federal -- to the authority of the United States

22   Government.

23         Count 1 lists a variety of things that were

24   being done or that were part of the activities of the Hutaree

25   to prepare for the consequences of taking the action that they

```
 1   intended to take to bring about the confrontation with the

 2   authority of the United States.

 3                 THE COURT:  But there is no -- in the end,

 4   Mr. Light, there isn't any direct evidence of this conflict

 5   that they intended to trigger with federal officials.

 6                 MR. LIGHT:  There is evidence --

 7                 THE COURT:  It's all circumstantial.

 8                 MR. LIGHT:  Well, no.

 9                 It's evidence in the words of the Defendants,

10   the words and conversations of the Defendants about what they

11   intended to do.  And it's those conversations, combined with

12   actions, combined with the actions of obtaining weapons,

13   combined with the actions of obtaining ammunition, combined

14   with the actions of seeking to obtain explosive devices that

15   could be used in attacking a convoy.

16                 It's the words, the conversations, the

17   agreement, combined with the actions, that constitute the

18   conspiracy.

19                 Words have consequences.

20                 THE COURT:  I understand that.  But it is also

21   the words.

22                 You talked about the number of times that

23   members -- that some of these Defendants talked about their

24   opposition to the Government.  And they did -- to the federal

25   government.  They did do that.
```

1          They are entitled to oppose the Government with

2     their words.  And they did do that.

3          It's still unclear to me, after hearing all of

4     these arguments for this entire day, how that speech -- how

5     that speech crossed the line into becoming illegal and how I

6     get there without building all of these inferences on

7     inferences.

8          How do I get to where you want this Court to be

9     and not dismiss these conspiracy charges?

10          MR. LIGHT:  You get there most specifically by

11     looking at the conversations on August 13th of 2009 and

12     February 20th of 2010.

13          And I'd like to go a little bit further into

14     those conversations, because they have been perhaps taken

15     somewhat out of context.

16          *(Brief pause.)*

17          THE COURT:  While you are trying to answer that

18     question, Mr. Light, the other thing that I have a big

19     question about is the point that you made earlier that it

20     wasn't necessary for everyone to have been drawn into a

21     discussion to kill a local law enforcement officer.  Only

22     that -- I think these were your words -- only that a number of

23     discussions ensued to oppose the Government by force, and that

24     there would be -- somehow, something was going to happen --

25     I'm not sure what that something was -- that other people

```
 1    talked about that was going to trigger this response.
 2                    MR. LIGHT:  I'm not clear exactly on the Court's
 3    question.
 4                    THE COURT:  Well, Mr. Graveline pointed out in
 5    his opening argument, opening statement, that it was the
 6    killing of the police officer and the funeral procession.
 7                    It sounds to me like you're saying that's not
 8    all.  That we have presented evidence of other things, not
 9    just attacking a funeral procession, and that those other
10    things don't necessarily involve the killing of a police
11    officer, but there were other things, and that there didn't
12    have to be a discussion that the Defendants participated in
13    that involved the killing of a police officer.
14                    Didn't you say that?
15                    MR. LIGHT:  (No response.)
16                    THE COURT:  And that there were just more
17    general discussions about opposing the Federal Government by
18    force?
19                    MR. LIGHT:  Well, if I said that, it was not in
20    the -- I didn't mean to say that simply stating an opposition
21    to the Federal Government would amount to opposing the Federal
22    Government by force.  And if that's the way it came out,
23    that's not what I intended to say.
24                    THE COURT:  Well, that's how I heard it.  And I
25    thought you said also that these other things were going to --
```

US v Stone, et al. #10-CR-20123

1    whatever they are, are going to trigger a response so that

2    they could then oppose the Government by force.  And it's not

3    the funeral procession.

4                    MR. LIGHT:  Well, I think the other things were

5    the other kinds of things listed in Paragraph 3 of Count 1,

6    which were other ways of killing a police officer.

7                    There's a list of various ways in which they

8    might provoke that response without killing a police officer

9    and then attacking the funeral.  That was the last clause in

10   Paragraph 3 of Count 1.  But earlier in Paragraph 3 of Count 1

11   there are listed a variety of other ways of attacking or

12   killing a police officer that I would submit could provoke a

13   response that would result in federal authorities being

14   involved and the Hutaree opposing that authority by force.

15                   THE COURT:  I know what's in the indictment.  I

16   know what's in the indictment.

17                   And you are about to direct me now to

18   conversations that still involved the discussion of the

19   funeral procession.

20                   MR. LIGHT:  That's what I am --

21                   THE COURT:  So, is that what I'm to be focusing

22   on?  Are you telling me that there are other things that these

23   Defendants agreed to do to trigger this response?

24                   MR. LIGHT:  I'm going to focus on the funeral

25   procession, Your Honor.

1              Looking at Government Exhibit 24 N, and starting

2     on page 100, David Stone says:  "But the Brotherhood is our

3     problem.  Once we take those guys down, the rest of it will

4     come."

5              The agent says:  "That's a big Army across the

6     country though."

7              Stone says:  "650,000."

8              Josh Stone says something unintelligible, and

9     someone else says something unintelligible.

10             David Stone:  "That's what they say their

11    numbers are."

12             The agent:  "Yes."

13             David Stone:  "650,000 strong in the

14    Brotherhood.  650,000.  And when everyone starts shooting,

15    your numbers are going to fall real fast to 150,000."

16             The agent:  "Probably."

17             Stone:  "Because half a million of them going to

18    say, hmm, die for a paycheck or protect my family.  Because,

19    oh, that's right I've been tasering these guys and beating the

20    crap out of these guys and they know where my family lives."

21             The agent:  "Yeah."

22             Stone.  "Bye-bye, I'm going home."

23             The agent.  "Mm-hmm."

24             An unidentified male:  "Yeah."

25             Stone:  "Which is great.  Oh, you are going to

1        hide in your house?"

2                    Josh Stone makes a bomb noise.

3                    David Stone:  "Just throw some" -- saying

4        something unintelligible.

5                    Josh Stone:  "Bye-bye."

6                    David Stone:  "Take that torch.  Throw that

7        torch on there and your house is on fire.  You going to come

8        out or you going to die inside?  Remember Waco?  You guys beat

9        your chest and thought Waco was so great."

10                   Josh Stone.  "Yeah."

11                   David Stone.  "Now you get to see what the

12       Davidians see."

13                   And it goes on.  And I won't read 102, except

14       for the bottom.

15                   David Stone says:  "Got away with anything and

16       everything, and bragging because my dad's a cop.  I can do

17       anything I want.  My dad is a cop.  So that means you know

18       what your daddy does.  So, you are no better than your daddy.

19       And his wife, you think she sits up all night and she worries?

20       You know, honey, you shouldn't be doing what you are doing.

21       Heck no.  She goes to sleep right next to him.  Has peace and

22       comfort knowing it's not me that's going to get beat

23       tomorrow."

24                   Agent:  "Mm-hmm."

25                   Stone:  "She is as guilty as he is.  That is a

1    terrible way to look at it, but they lump patriot families all

2    together.

3                  Agent:  "Yeah, they do."

4                  Stone:  "The wife and the kids are just as

5    guilty as their father and her -- you know, her the husband."

6                  The agent:  "Sure."

7                  Stone:  "Are they any different?  And they are a

8    gang called the Brotherhood.  You kill one, they come

9    together.  Yeah, that's our bait.  That's like, you know, you

10   say, ah, you know, yeah, you know, whenever you are going to

11   decide to go.  We only got to kill one, and then we just

12   withdraw and wait three days."

13                 Josh Stone:  "I know where to go."

14                 David Stone:  "Because on the third day you know

15   where they're all going to be.  You will have a thousand or

16   better."

17                 The agent:  "Mm-hmm."

18                 Stone:  "For one funeral.  And they're all going

19   to be flocked together, and they are going to be boohooing and

20   crying, and they will be from all over the nation.  That's

21   when we need our mortars.  And then just, uh ..."

22                 And Josh Stone:  "How about pipe bombs with, ah,

23   ball bearings?"

24                 David Stone:  "And they just raining on top of

25   them."

```
 1                  Then Josh Stone makes noises.
 2                  And David Stone says:  "All of a sudden, how
 3      many you just kill?  You think you're going to pack in for
 4      another funeral?  Now they won't support each other even at
 5      funerals.  Demoralize them.  Attack them whenever they're down
 6      and kick them in the teeth."
 7                  PP says:  "Yeah."
 8                  David Stone:  "Because they'll no longer" --
 9                  And then he goes into a discussion about a cop
10      that died in Mississippi.
11                  Later on there's more reference to the Davidians
12      and what David Stone would have done if he had been in the
13      situation of the Davidians.  And that's a link to federal
14      authority right now, because they know that Waco and the
15      Davidians was all about a federal attack -- or a federal
16      conflict with that compound in Waco, Texas.
17                  One moment, Your Honor.
18                  (Brief pause.)
19                  MR. SATAWA:  Your Honor, while he's looking, the
20      lot across the street closes at five o'clock.  They have my
21      keys.
22                  Could I have somebody run across, from my
23      client's family, to grab my keys?
24                  (Off the record.)
25                  MR. SATAWA:  Thank you, Judge.
```

1          MR. WEISS:  Thank you, Your Honor.

2          MR. LIGHT:  Shall I proceed?

3          THE COURT:  Yes, sir.

4          MR. LIGHT:  Sorry for the hoarseness.  Let me

5     get a glass of water.

6               *(Off the record.)*

7          MR. LIGHT:  The February 20th conversation is in

8     Government Exhibit 59A-H, where 59H is the recording.  And

9     using the transcript, starting on 217, there's a reference

10    to -- by David Stone to "Suicide by cop, man."

11         Michael Meeks says:  "No.  Copicide."

12         Joshua Stone chuckles and says:  "Copicide."

13         David Stone says:  "But if you are going to do

14    that, do it the smart way and start shooting them at a

15    distance."

16         Josh Stone says:  "Get used to all of us."

17         David Stone says:  "Increase the number that's

18    coming in after so you can increase how many you're killing

19    because you don't care any way."

20              And a few pages later on 222, this evolves into

21    this discussion that's about the funeral procession.

22         David Stone:  "Or better yet, we shoot one from

23    a distance.  High power rifle, you sit back, you take 'em out,

24    you go pop.  You just shot one and you just kind of sit back.

25    They will pack out hunting for you, trying to find out who you

1    are.  But they have this thing that everybody has, and it's

2    called a funeral.  Now, for that funeral you have cops from

3    every state of the country come where?  To his funeral.  Now

4    they always go through a cemetery.  Am I correct?

5                    Meeks:  "Yeah.  Oh, yeah."

6                    Stone:  "They are right there.  Right not just

7    take --"

8                    Khris Sickles:  "And they're focused."

9                    Stone:  "-- care of the situation.  Kaboom,

10   kaboom."

11                   Josh Clough:  "When they had that funeral for

12   that one cop in Monroe and they're like they are going to have

13   to close down M-50 for the funeral procession and I'm thinking

14   wow."

15                   Dave Stone:  "IEDs."

16                   Then he goes on:  "I'm thinking IEDs.  You just

17   blow the whole convoy up, kaboom."

18                   Khris Sickles:  "But that's not fair."

19                   Josh Clough.  "I was thinking more like

20   harassing as opposed to starting up -- I mean I don't want --

21   I wouldn't care which way."

22                   But the discussion continues.

23                   Dave Stone:  "Start -- we can just -- we just

24   start killing 'em."

25                   Josh Stone:  "Yeah."

```
 1              David Stone:  "Every way we can, we just blow
 2   them up."
 3              Khris Sickles:  "Sneak in their house, poison
 4   their milk."
 5              David Stone:  "No, no."
 6              Josh Stone.  "We'll leave -- we will leave it to
 7   Az.  He wanted to play around with them."
 8              David Stone:  "You set the house on fire and
 9   have another team sitting back and watching the local fire
10   department trying to come down the road, and there's a pop,
11   pop, pop, and then the truck goes kaboom, kaboom."
12              Khris Sickles:  "So, they come running out."
13              David Stone:  "Whenever he comes through the
14   front door, tries to open the front door to come out, pop,
15   pop, pop.  You ain't leaving."
16              Josh Stone:  "Welcome to Waco, buddy."
17              Khris Sickles:  "Welcome to Waco."
18              MR. RATAJ:  Well, Your Honor, he should read the
19   next two lines, because that is what we argue today.  He's not
20   reading the next two lines.
21              THE COURT:  What are the next two lines?
22              MR. LIGHT:  The next two lines are:
23              "I mean there's a hundred and one scenarios you
24   can use."
25              An unidentified male says:  "Welcome to Waco."
```

1          David Stone says:  "Because they are their first

2    line of defense.  I -- if we take that down -- I mean if

3    everybody was to join the band wagon and started shooting

4    cops, then what's left?  Who went to Waco and burnt Waco down?

5    Oh, federal agents.  Let's see, Kansas City SWAT.  How many

6    other SWAT teams did we use?  So, if we're taking out the

7    cops" --

8          The implication being that would bring in the

9    federal authorities.  And that is exactly what he just said.

10          "Oh, federal agents.  Let's see, Kansas City

11   SWAT.  How many other SWAT teams ..."

12          I want to address a couple of other things as

13   well.

14          In Mr. Swor's argument, he pointed the Court to

15   portions of the recordings that have not been played or

16   admitted into evidence here.

17          And I have no objection to the Court looking at

18   whatever he can point to if he can specify it and provide it

19   to the Court.

20          But I would submit that that material is

21   available to the Defense to use in its defense.  It has been

22   provided and it has been available.

23          And this is not a burden-shifting argument.

24   This is a matter of saying that for purposes of arguing and

25   submitting the case to a jury, we haven't tried to hide the

ball.  What we've tried to do is to identify what we believe are the relevant, material portions of the recordings without playing more hours of recordings than we already have for the jury.

That doesn't preclude the Defense from using the same materials to support their arguments, but I would submit that they can be supported before the jury as well.

Mr. Weiss -- and I just want to point to a couple of more specific items that have been covered in the arguments that I've heard.

Mr. Weiss pointed to a portion of a recording where his client, Mr. Piatek, after being told about the process for screwing the top onto a pipe bomb and how to avoid setting it off in your hands, how you have to lubricate it.

And if you'll recall, when the expert testified about how they went about it, even the experts said they reach around a tree to do that so as to minimize the risk of harm to themselves.

And I would submit that that's what Mr. Piatek was talking about when he said I never F with that.  What he wouldn't F with is actually screwing a pipe bomb together.

And I would submit that's a fair wise thing. But that doesn't mean he wouldn't F with using it or being part of having somebody else put one together for use in connection with activities that he's involved in.

1          And, in fact, the next three or four pages after

2  the one line that Mr. Weiss likes to quote, consists of a

3  detailed discussion between Mr. Piatek and Mr. Stone about

4  what goes into a pipe bomb, about fusing a pipe bomb, about

5  the shrapnel aspects of a pipe bomb.

6          So, it wasn't him disclaiming or distancing

7  himself from the concept of pipe bombs.  At most, it was him

8  saying I'm not going to be the guy who screws it together.

9          MR. WEISS:  But, Your Honor --

10          THE COURT:  Was there any discussion at that

11  point about what the agent testified to as being his preferred

12  method, to hug a tree when doing something like this?

13          MR. LIGHT:  You mean during the conversation --

14          THE COURT:  Yes.

15          MR. LIGHT:  -- on the tape?

16          THE COURT:  Yes.

17          MR. LIGHT:  No.  No, there wasn't.

18          I was just using that as an example of why it's

19  a dangerous thing to do, based upon the expert testimony in

20  this case, and Mr. Piatek understood that it was a dangerous

21  thing to do.

22          THE COURT:  Mm-hmm.

23          MR. WEISS:  Your Honor, while Mr. Light is

24  looking for his next remark, I would invite the Court to look

25  at the transcript.  Because it's not just that.  He says, "I

```
 1      don't fuck with shit like that," meaning the entire concept.

 2                    THE COURT:  I'm convinced Mr. Weiss loves to say

 3      that.

 4                    MR. WEISS:  How often do you get to use a

 5      four-letter word in a courthouse, Your Honor, without being

 6      held in contempt, hopefully?

 7                    (Brief pause.)

 8                    MR. LIGHT:  Well, Mr. Satawa talked about the

 9      training and the cross-examination regarding whether or not

10      any of the training was specific to attacking or ambushing a

11      convoy or a funeral procession.

12                    I would submit there are a couple of things that

13      are relevant to that.

14                    One is that the conspiracy that's charged

15      involves a plan to oppose by force the United States

16      Government after the provocation that would be caused by

17      killing a cop and attacking the cop's funeral.  And the

18      training that was done was towards the resistance to that

19      authority once that had been accomplished.

20                    And I would also submit that some of the

21      training was directed at least initially towards learning how

22      to detonate explosives in such a way as to accomplish an

23      attack on a convoy or a funeral.  It wasn't specific to roads,

24      but it was specific to how to wire and fuse and detonate

25      through command detonation of explosives.  That was the
```

```
 1    training or part of the training that happened on June 13th.
 2                    And I would suggest to the Court that some of
 3    the argument that you've heard here today muddles together
 4    different aspects of the training that took place on June
 5    13th.  One aspect of it was trip wire detection.  And they had
 6    trip wires attached to triggers in an exercise to see if they
 7    could detect trip wires.
 8                    But that was separate and apart from the command
 9    detonation of six IEDs that were set out in the woods and were
10    wired to be detonated using electrical battery.  That was
11    separate from the trip wire.
12                    A third part of it was the Bouncing Betty that
13    there was testimony about.  And that was separate from the
14    command detonation of explosives.
15                    THE COURT:  And that was all on June 13th?
16                    MR. LIGHT:  That was all on June 13th.  But they
17    were three separate aspects.
18                    Indeed, the first aspect was training in ambush
19    and how to detect an ambush.  And if the Court listens to the
20    recordings of that, those will be apparent.
21                    THE COURT:  And what are you saying in Count 3,
22    which part of this are you --
23                    MR. LIGHT:  It's the command detonation of the
24    IEDs that is the specific matter that's the subject of Count
25    3.
```

 1                    Now, there is also a discussion in Mr. --

 2                    THE COURT:  Mr. Light, before you leave that, do

 3       you have an exhibit reference on that?

 4                    MR. LIGHT:  I'll --

 5                    Can you dig for it?

 6                    *(Off the record.)*

 7                    MR. LIGHT:  Well, the recordings relating to

 8       June 13th are in Government Exhibit 17.  And I think the

 9       specific ones referencing what I just discussed are 17 E and

10       F.

11                    THE COURT:  That would cover the command

12       detonation?

13                    MR. LIGHT:  I believe so.  We'll check that

14       further and confirm that for the Court.

15                    Another point with regard to Mr. Satawa is he

16       talked about how Mr. Meeks was not present for the detonation

17       of the first shaped charge.  That was on August 13th, I

18       believe it was -- no.  Later in August.

19                    And looking at Government Exhibit 27 P, I'd like

20       to elaborate on what happened when Mr. Meeks joined the group

21       after that shaped charge had been detonated and they discussed

22       what had taken place, and he -- he provided some discussion

23       and commentary about it.  Because I think it amounts to more

24       than Mr. Satawa would have it.

25                    Starting on page 235, Joshua Stone says:  "Holy

```
 1    cow.  That would really have done some damage to the road."

 2              David Stone says:  "I mean, it dug a hole,

 3    Mikey, into the ground about that deep, just after it went

 4    through a steel plate.  A massive hole.  It moved it.  You

 5    could feel it shake the whole ground inside the truck."

 6              Joshua Stone:  "Yeah.  It was sweet."

 7              David Stone:  "It was sweet."

 8              The agent:  "It was all right."

 9              Stone:  "It was all right."

10              Mike Meeks:  (Laughing.)

11              Stone:  "It wasn't very big."

12              The agent:  "No."

13              Stone:  "It was only about that big a round."

14              Agent:  "Yeah, not big at all."

15              Stone:  "Not very big."

16              Josh Stone:  "No.  That was so good, you could

17    have stuck -- actually stuck it in the ground itself."

18              And they go on about the size of it.

19              And going on, moving on to 237:

20              David Stone says:  "Now, if I could just get

21    cotton-picking Jeff with those mortars, man."

22              The agent:  "He's that guy you were talking

23    about last time?"

24              Stone:  "God, yeah."

25              The agent:  "He just doesn't want to play?"
```

US v Stone, et al. #10-CR-20123

```
 1              Stone:  "This guy could build mortars, Mikey.
 2   And if you gave him a power pole at 350, 400 yards, dude, I
 3   could hit that, kapew."
 4              Josh Stone:  "You look all pissed."
 5              David Stone:  "It's like --"
 6              Shannon Stone:  "It's --" (unintelligible).
 7              David Stone.  "He can't shoot a rifle to save
 8   his life."
 9              Shannon Stone laughs.
10              Mike Meeks says:  "Hey, everybody's got their
11   talent, man."
12              The Agent:  "Exactly."
13              Meeks laughing.
14              The agent:  "That's why it's a team, right?"
15              Meeks.  "You know that's right."
16              Josh:  "Leave 'em alone.  Leave 'em alone."
17              Dave Stone:  "But it's like, dude, if you could
18   do that.  We don't need these things as much.  Bunk, bunk,
19   bunk."
20              Shannon Stone:  "Yeah."
21              David Stone:  "Oh, look, they're all dead."
22              Michael Meeks:  "I'll tell you what, that
23   indirect line of fire, man, that's helpful."
24              David Stone:  "Heck, yeah."
25              Josh Stone.  "I" -- and unintelligible.  "Same
```

```
1    thing down there for you."

2               David Stone:  "We could stop them in their

3    tracks going down the road and then . . ."

4               Joshua Stone:  "Or should I?"

5               David Stone:  "Drop things in on top of their

6    heads."

7               Josh Stone:  "I ain't doing," unintelligible.

8               David Stone:  "That eliminates their positions

9    to be able to hide."

10              Shannon Stone:  (Laughing.) "You're welcome."

11              David Stone.  "Take them out of them armored

12   plates and out from behind buildings.  Puts us on equal terms.

13   Then all we got to do is take them out of the sky and build

14   them out of mortars.  We'll tear helicopters up with them.

15   The only way to come after you, you know, is with jets."

16              Mike Meeks:  "Well, hey, you know."

17              David Stone:  "They are expensive."

18              Mike Meeks:  "They have to be easy because they

19   were making them proximity fuses back in the forties, man.  If

20   they can have that crap back then, you know you can buy that

21   crap now.  You have to be able to."

22              Again, this was a piece of the plan to attack a

23   convoy, the plan to drop things on their heads; that is, to

24   attack the convoy with explosives and mortars.

25              There was some discussion by Mr. Thomas and
```

1    Mr. Shanker about the explosive devices that are the subject

2    of Count 3 and whether or not they were really either weapons

3    of mass destruction, destructive devices, or explosives, as

4    defined in the statutes.  And Mr. Shanker pointed to part of

5    the statute regarding destructive devices, suggesting that if

6    they are not intended as weapons, then they're not destructive

7    devices.

8              And I would submit that on this record, the IEDs

9    that were used were in fact intended as weapons and were

10   destructive devices.  But even if they weren't, they are also

11   charged as explosives.  And under the definition of an

12   explosive in 18 United States Code Section 844(j), they still

13   qualify as devices whose training is forbidden by the statute

14   that Count 3 charges.

15             But I would also point to Government Exhibit 17

16   E, also from the June 13th training, as it relates to the

17   actual devices that were involved here.

18             David Stone says:  "IED time."

19             Josh Clough:  "I know to do that."

20             Shannon Stone:  "I don't."

21             David Stone:  "All right.  This is how you take

22   out a trail.  Go."

23             Then one of the devices is exploded using the

24   command detonation procedure that you see in the recording.

25             David Stone:  "That's more than one on a line.

 1          That's --"

 2                    Junior says:  "That's two of them."

 3                    David Stone:  "That's two.  That's an entire

 4      team.  We set up in multiple teams.  Detonate this one and we

 5      want the last one too."

 6                    Josh Clough:  "As you see the cap."

 7                    It goes on later on the page 76:

 8                    "We set up for three teams to detonate.  So, if

 9      Kovar would have went nose and in on a line, that they should

10      have went and looked at it.  So went off.

11                    And Junior says:  "Yeah.  I was almost going to

12      signal him to -- signal Dan to set it off.  Then I see Az

13      walking right towards it."

14                    David Stone:  "We would, but here's the

15      problem."

16                    Junior:  "I could have killed you."

17                    That's him stating that.

18                    David Stone says:  "And it's real difficult

19      whenever you are out here and you're going --"

20                    The source says:  "Everything is just chance,

21      isn't it?"

22                    David Stone:  "Did all the bombs go off?"

23                    David Stone:  "I don't know."

24                    Senior Stone:  "It's really not worth it."

25                    David Stone:  "Nothing's more scarier than

1    setting off a line and going back and looking and the bomb

2    didn't go off because it was black powder.  Black powder."

3              Clough:  "I know what that's like."

4              Stone:  "Doesn't always detonate right away."

5              And this, combined with other statements such as

6    Stone's statement to Dan Murray the week before when he showed

7    him the devices that he was building, that "Holy crap, do

8    these things go off," all taken together, I think support the

9    conclusion that they were -- they were destructive devices or

10   at least explosives as defined in the statutes, in the

11   relevant statutes.

12             There's talk about cherry bombs and M-80s.  And

13   I think there's a general -- there may be a general perception

14   that a cherry bomb or an M-80 is just a firecracker.

15             There isn't a record in this case as to what

16   those devices really are, but if one does some elemental

17   research, one finds that they're much more than firecrackers.

18             But there's not a record in this case before

19   this jury as to what a cherry bomb is or an M-80 is.  And so I

20   would submit that there's no basis on saying, that because

21   there was a comparison to an M-80, then anything here was just

22   a firecracker.  That's speculation and, I would submit,

23   uninformed speculation from someone who doesn't understand the

24   history of M-80s as they were used by the military or cherry

25   bombs as they were used by the military.  True cherry bombs.

1           And, in fact, some of the evidence in this case

2   is manuals regarding how to build cherry bombs.  Not

3   amusement-type cherry bombs.  The real thing.

4           A couple of things to conclude with, Your Honor.

5   It has been a long day.  I'll wrap it up.

6           Like Mr. Scharg and, I think, like Mr. Rataj, I

7   too believe in the First Amendment.  I didn't serve my country

8   the way Mr. Rataj has.  And, in fact --

9           MR. SATAWA:  And Mr. Meeks.

10          MR. LIGHT:  I, like Mr. Scharg, protested what I

11  thought was an unjust war in the late sixties and early

12  seventies.  And I was in college at the time of the shootings

13  at Penn State as well.

14          MR. SCHARG:  You made us co-conspirators.

15          MR. LIGHT:  We'll talk later.

16          MR. THOMAS:  Statutes run.

17          MR. LIGHT:  I haven't served in the military

18  like Mr. Graveline either.  But I'm sure he, like me, respects

19  and is grateful for the protections of the First Amendment.

20          But I submit to this Court that even with the

21  protections of the First Amendment, words have consequences,

22  and words can constitute part of and the basis for an

23  agreement to conduct criminal activities.  And, in fact, a

24  conspiracy can be based on words alone if those words are

25  sufficient to show that agreement.

1        But if those words are then combined with

2   actions, it takes it further.  And if words, combined with

3   actions, show directly through the words and/or

4   circumstantially through those actions and, further,

5   circumstantially through other statements that reflect a

6   criminal intent, then words can provide part of the basis for

7   a charge of conspiracy.

8        This case, in large part, is based on words, but

9   it's the words of these Defendants as recorded in the evidence

10   that has been admitted in this court.

11        And I submit to you that those words are

12   sufficient to submit this case to the jury on each of the

13   Defendants as to conspiracy to oppose by force the authority

14   of the United States, as well as a conspiracy to use

15   explosives or destructive devices or weapons of mass

16   destruction against persons or property against the United

17   States, as charged in Counts 1 and 2.

18        Finally, I started my career as an appellate

19   lawyer, and this argument has seemed to me like, in a way, the

20   appellate argument from hell insofar as it's an attempt to

21   argue the sufficiency of the evidence based upon a lengthy

22   record, a seven-week record, with multiple recordings, and an

23   attempt to respond to the Court's questions to pin down

24   specific statements, specific evidence, specific recordings to

25   support things that I believe are supported by the evidence.

1           Why it's from hell?  Because normally in an

2   appellate argument you have time to sit down and examine the

3   record carefully and identify those things in response to a

4   brief that's been filed.  And, in this case, we've essentially

5   tried to do this over a weekend.

6           And so if there are specific areas on which

7   we've failed to specify, we would seek the opportunity to

8   specify more directly the answers to some of the Court's

9   questions, especially the questions to me earlier today.

10           And I don't know if that could be done either in

11   something that would be filed later on this week or if the

12   Court could reserve ruling on this motion until after the case

13   is submitted to the jury and then take it up as a post-verdict

14   motion for judgment of acquittal.

15           Thank you.

16           THE COURT:  Thank you.

17           Does any Defense counsel have a brief response?

18           MR. RATAJ:  I just got one comment to that last

19   statement, Your Honor.

20           They've had four years to put this together.

21   Four years.  Okay?  And they're going to come in here on

22   today, when we're arguing Rule 29 motions, and say, well,

23   geez, we haven't had enough time to put in all of the

24   evidence, to outline for you all of the evidence that supports

25   guilt?  That's an unbelievable admission.

1          THE COURT:  Mr. Swor, did you have something?

2          MR. SWOR:  Just very, really very briefly.

3          One, Mr. Light suggested that he has no

4     objection to us putting the recordings in as part of our case.

5          Your Honor, the exhibits are already in.  When

6     the Government moved the admission of the recordings, they

7     moved the admission of the entire recording.  And everything

8     we've referred to was part of the entire recording.

9     Therefore, it's already in evidence and the Court can consider

10    it as part of the proofs of this case.

11         THE COURT:  Is that true, Mr. Light?

12         MR. LIGHT:  Your Honor, I think technically they

13    have been moved into evidence.

14         I don't think the Court has the entire

15    transcripts.  I think all the Court has now are transcripts of

16    the specific portions that were played either by the

17    Government or maybe some of the specific portions that the

18    Defense played.

19         I don't know if the Defense produced those

20    transcripts to the Court.  But I don't think the Court has the

21    entire transcript in the form in which Mr. Swor is referring

22    to.

23         THE COURT:  All right.

24         MR. LIGHT:  I may be incorrect about that.

25         THE COURT:  No, I don't think we have that.  But

```
 1    all right.

 2                MR. SWOR:  Secondly, sort of what Mr. Rataj

 3    said.  The Court told the Government three weeks ago, maybe

 4    four weeks ago, to start preparing the specifications upon

 5    which they sought to prevail.

 6                Let me see.  Mr. Light said that there was not

 7    only talk, but there was action; that they obtained weapons,

 8    ammunition, and sought to obtain -- I believe he said sought

 9    to obtain explosive devices.

10                Mr. Stone bought one gun since August 16, 2008.

11    He bought no ammunition, and he did not seek any explosive

12    devices.

13                The Government raised the subject and the

14    Government is the one that proposed the larger explosives.

15    And we have that all the way from December 2008.

16                Secondly, saying that we took the conversations

17    out of context is absolutely not true.

18                You know, Exhibit 24 N, which they claim is the

19    evidence of the intention to kill cops, there are -- in

20    Exhibit 24 there are at least nine different conversations.

21    Certainly -- and the thing is that that one talks about using

22    a mortar.

23                There was no mortar.  There was no movement to

24    obtain a mortar.

25                Exhibit 59 H that the Government referred to.
```

1    Mr. Stone said "if," as a condition to every activity there,

2    at least four times.  Every activity was preceded by "if."

3              Kansas City SWAT is a local police unit; not a

4    federal police unit.

5              17 E and F.  On the one conversation only, which

6    is F, Mr. Stone made every action, if we could, if we could,

7    if we did, if we did.  It's all conditional.  There's no

8    agreement to do anything.

9              And I am going to stop before I start getting

10   wound up further.  But, Your Honor, we are not asking the

11   Court to take our view of the evidence.  We're saying that

12   there is no evidence.  There is no evidence of a conspiracy

13   even taken in the light most favorable to the Government.

14              Thank you.

15              THE COURT:  Thank you.

16              Any other Defense counsel?

17              All right.  Thank you, counsel.

18              I have instructed my staff to tell the jury not

19   to come in tomorrow.  The Court just needs to consider these

20   motions and their outcome.  And so you will hear from us

21   tomorrow.  But the jury won't be here until Thursday.

22              MR. HELFRICK:  What are we supposed to do?

23   Where do we go?

24              THE COURT:  You can come here and be in that

25   little room if you'd like.

```
 1                    MR. HELFRICK:  The clubhouse.  That's the
 2    clubhouse.
 3                    MR. WEISS:  Should we assume that you don't want
 4    us here until Thursday either?
 5                    THE COURT:  No.  No.
 6                    MR. WEISS:  When would you like us?
 7                    THE COURT:  But I don't know, counsel.  I really
 8    don't know.
 9                    MR. WEISS:  All right.
10                    MR. HELFRICK:  Are you saying we may get called
11    over here tomorrow?
12                    THE COURT:  You might.  I just don't know.
13                    You were planning on being here anywhere.  Just
14    work in your offices tomorrow and dress up.
15                    MR. HELFRICK:  We have to wear a suit?
16                    MR. WEISS:  Judge, will the Defendants be called
17    over?
18                    MR. HELFRICK:  What about the Defendants, you
19    know, that are not in custody?
20                    THE COURT:  Oh, that's true.
21                    All right.  Well, let me say no.
22                    MR. HELFRICK:  Thank you.
23                    (Off the record.)
24                    THE COURT:  Court is back in session on
25    Wednesday.
```

US v Stone, et al. #10-CR-20123

1                    Did I say Thursday?  I didn't mean to say that.

2                    MR. SWOR:  We'll wait until Thursday.

3                    THE COURT:  No.  I meant to say -- I'm a day

4    ahead.

5                    Wednesday.  Not tomorrow.  Wednesday.

6                    Wednesday at 8:30 for any issues that we may

7    have.  At nine o'clock the jury is scheduled to be here.

8    Wednesday.  All right?

9                    Thank you.

10                   *(Off the record.)*

11                   MR. SCHARG:  Are we supposed to have witnesses

12   here on Wednesday morning?

13                   THE COURT:  You should prepare for that, yes.

14   But I'm going to let you know tomorrow as early as I can about

15   the outcome of these motions.

16                   MR. SCHARG:  Okay.

17                   *(Proceedings were adjourned at 5:20 p.m.)*

18                           —    —    —

19

20

21

22

23

24

25

STATE OF MICHIGAN )
                  ) ss.
COUNTY OF WAYNE   )


I, Denise A. Mosby, Federal Official Court Reporter, do
certify that the foregoing is a correct transcript from the
record of proceedings in the above matter.


                              s/ Denise A. Mosby
                              _____
                              DENISE A. MOSBY, CSR, RMR, CRR
                              United States Court Reporter
                              124 Theodore Levin U.S. Courthouse
                              231 W. Lafayette Boulevard
                              Detroit, MI 48226
                              313.961.6230
                              Denise_Mosby@mied.uscourts.gov


Dated:   June 13, 2012